ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
    – and –
DARREN J. ROBBINS (168593)
DAVID C. WALTON (167268)
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
davew@rgrdlaw.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VISWANATH V. SHANKAR, Individually and on Behalf of All Others Similarly Situated, ) ) ) Plaintiff, ) ) vs. ) ) IMPERVA, INC., SHLOMO KRAMER and TERRENCE J. SCHMID, ) ) ) Defendants. ) ) | Case No. <br><br> CLASS ACTION <br><br> COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS <br><br><br> DEMAND FOR JURY TRIAL |

Plaintiff, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Imperva, Inc. ("Imperva" or the "Company"), as well as media reports about the Company and conference call transcripts. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION AND OVERVIEW

1. This is a securities class action on behalf of all persons who purchased or otherwise acquired the publicly traded securities of Imperva between May 2, 2013 and April 9, 2014, inclusive (the "Class Period"), against Imperva and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 (the "1934 Act"). These claims are asserted against Imperva and certain of its officers and/or directors who made materially false and misleading statements during the Class Period in press releases, analyst conference calls, and filings with the SEC.

2. Imperva provides data security solutions focused on providing visibility and control over business data across systems within the data center.

3. During the Class Period, defendants issued materially false and misleading statements regarding the Company's operations and business and its financial results. As a result of defendants' false statements, Imperva securities traded at artificially inflated prices during the Class Period, with its stock price reaching a high of $65.53 per share on March 6, 2014.

4. On April 9, 2014, the Company issued a press release announcing its preliminary first quarter 2014 financial results. The Company reported preliminary total revenue in the range of $31.0 to $31.5 million, which was below the Company's prior guidance of total revenue in the range of $36.0 to $37.0 million for the first quarter of 2014. Additionally the Company reported an expected net loss per share in the range of $(0.40) to $(0.44), below prior guidance of $(0.33) to $(0.37) and a $(0.35) consensus estimate. The Company blamed "'extended sales cycles on deals

over $100,000,'" especially in the U.S., and stated that "'intensifi[ed] competition for large orders'" and sales execution issues contributed to the lengthy sales cycles.

5. As a result of this news, Imperva's stock plummeted $21.73 per share to close at $28 per share on April 10, 2014, a one-day decline of nearly 44% on volume of 10.9 million shares.

6. As a result of defendants' false statements, Imperva securities traded at artificially inflated prices during the Class Period. While Imperva's stock price was artificially inflated, the Company's top officers and directors were able to sell $25.9 million worth of their Imperva stock, including $11.8 million worth of stock sold by the Chief Executive Officer ("CEO") and the Chief Financial Officer ("CFO"). However, after the above revelations seeped into the market, the Company's securities were hammered by massive sales, sending the Company's stock price down 57% from its Class Period high.

**JURISDICTION AND VENUE**

1. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

2. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

3. Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

4. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE"), the world's largest stock exchange by market capitalization.

**PARTIES**

5. Plaintiff Viswanath V. Shankar, acquired Imperva securities as set forth in the attached certification and has been damaged thereby.

6.      Defendant Imperva provides data security solutions focused on providing visibility and control over business data across systems within the data center. Defendant Imperva is a Delaware corporation that maintains its headquarters at 3400 Bridge Parkway, Suite 200, Redwood Shores, California 94065.

7.      Defendant Shlomo Kramer ("Kramer") is, and at all relevant times was, Imperva's Chairman of the Board, President and CEO. During the Class Period, defendant Kramer sold 200,000 shares of his Imperva stock for proceeds of nearly $10.2 million.

8.      Defendant Terrence J. Schmid ("Schmid") is, and at all relevant times was, the Company's CFO. During the Class Period, defendant Schmid sold 39,000 shares of his Imperva stock for proceeds of $1.6 million.

9.      The defendants referenced above in ¶¶7-8 are referred to herein as the "Individual Defendants." The Individual Defendants made, or caused to be made, false statements which caused the prices of Imperva's securities to be artificially inflated during the Class Period.

10.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Imperva's quarterly reports, shareholder letters, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

**FRAUDULENT SCHEME AND COURSE OF BUSINESS**

11.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Imperva. Defendants' fraudulent scheme and course of business

that operated as a fraud or deceit on purchasers of Imperva securities was a success, as it: (i) deceived the investing public regarding Imperva's prospects and business; (ii) artificially inflated the prices of Imperva securities; (iii) caused plaintiff and other members of the Class to purchase Imperva securities at inflated prices; and (iv) permitted the Company's top officers and directors to sell nearly 2.4 million shares of their Imperva stock at artificially inflated prices for proceeds of over $25.9 million.

## BACKGROUND

12. Imperva provides data security solutions focused on providing visibility and control over business data across systems within the data center. The Company's SecureSphere data security suite is a solution designed to prioritize and mitigate risks to high-value business data, protect against hackers and malicious insiders and address and streamline regulatory compliance. SecureSphere is an integrated, modular suite that provides database, file and Web application security and secures all business data across a range of systems in data centers. The Company has two segments: Imperva, which is comprised of its financial position and results of operations and those of the Company's wholly owned subsidiaries; and Incapsula, which is comprised of the financial position and results of operations of the Company's majority owned subsidiary.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

13. On May 2, 2013, Imperva issued a press release announcing it first quarter 2013 financial results. The Company reported revenue of $28.6 million and $(0.25) diluted earnings per share ("EPS") for the first quarter of 2013. Additionally, the Company provided its outlook for the second quarter of 2013, with expected revenue in the range of $31.0 to $31.5 million and diluted EPS of $(0.03) to $(0.05). Furthermore, the Company provided its full year expectations, with total revenue expected to be in the range of $133.0 to $137.0 million and diluted EPS of $0.02 to $0.09 for the year ending December 31, 2013. The release stated in part:

> "The investments being made to our global sales and support infrastructure are beginning to pay off, evidenced by the 66% year-over-year increase in new customers during the first quarter," stated Shlomo Kramer, President and Chief Executive Officer of Imperva. "Our results highlight the underlying strength of our technology, our comprehensive, fully-integrated solution, and our global footprint as we accelerated our investments in the business to take advantage of the demand we

are seeing worldwide. Looking forward, we see numerous growth opportunities to expand our geographic reach and introduce additional products to enhance our offering and extend our leadership position."

14. After releasing its first quarter 2013 financial results on May 2, 2013, Imperva hosted a conference call for analysts, media representatives and investors during which defendant Kramer represented the following:

> We currently believe that our existing customer base is less than 10% penetrated and represents a significant long-term growth opportunity for the Company.
>
> Finally, we are well positioned to maintain momentum as we have a great start to the year and continue to see our pipeline grow at a rate above both our revenue and our bookings growth.
>
> From a geographical perspective, customer demand remains solid across all regions. Specifically in the Americas region, revenue increased 45% year-over-year during the first quarter. We continue to benefit from the strong execution of our China partner and the investment made in our sales and marketing infrastructure.

15. On August 7, 2013, Imperva issued a press release announcing its second quarter 2013 financial results. The Company reported total revenue of $31.3 million and $(0.24) diluted EPS for the second quarter of 2013. Additionally, the Company provided its outlook for the third quarter of 2013, with total revenue expected to be in the range of $34.0 to $35.0 million and $(0.04) to $(0.06) diluted EPS for the quarter ended September 30, 2013. Furthermore, the Company reported 76 deals valued at over $100,000 for the second quarter of 2013. The release stated in part:

> "The second quarter was highlighted by the 46% year-over-year growth in new customers and 36% increase in deals valued over $100,000," stated Shlomo Kramer, President and Chief Executive Officer of Imperva. "While we continued to see strong demand for our fully integrated solution, performance in Europe and South America was impacted by sales execution challenges in these regions. Looking forward, we have already taken steps to reaccelerate growth and remain confident in our ability to grow global market share due to the continued strong pipeline of opportunities worldwide."

16. After releasing its second quarter 2013 financial results on August 7, 2013, Imperva hosted a conference call for analysts, media representatives and investors during which defendants represented the following:

> [KRAMER:] Terry will provide some additional color later, but our confidence is driven by the continued strong pipeline of opportunities worldwide. In addition, Imperva remains in position to benefit from the increasing number and frequency of attacks targeting high-value business data and applications, as organizations of all sizes continue to lose the battle to protect their assets against hacking data breaches, internal abuse, and fraud.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 5 -

As a reminder, we are the only provider to offer such a comprehensive integrated data center security solution, which we view [as] a significant competitive advantage. Since enterprises seek to minimize security overhead, while optimizing the protection of their applications and data.[sic] Imperva's integrated SecureSphere suite secures data usage and business transactions across various systems by providing database file and WAF application security in the data center, including traditional on-premise data centers, as well as private and hybrid Cloud computing environments.

\* \* \*

[SCHMID:] As we look to the remainder of this year, we continue to see strong demand for our solutions, and believe that Imperva remains in position to grow market share and extend our leadership position. As Shlomo mentioned earlier, we plan to continue to invest in the business due to the strength of our pipeline worldwide, with a particular emphasis on the European and South American territories.

\* \* \*

In summary, we believe Imperva remains in position to grow above our Q2 performance in the second half of the year and beyond, due to the strength of our pipeline and our restructure efforts in Europe and South America, and continued demand worldwide for our comprehensive integrated security solution.

17. On November 5, 2013, Imperva issued a press release announcing its third quarter 2013 financial results. The Company reported total revenue of $35.1 million and $(0.15) diluted EPS for the third quarter of 2013. Additionally, the Company projected total revenue to be in the range of $41.0 to $42.0 million for the fourth quarter of 2013. The release stated in part:

"We are very pleased with our strong execution during the third quarter, especially our ability to achieve solid growth across all geographies," stated Shlomo Kramer, President and Chief Executive Officer of Imperva. "During the quarter, demand for our integrated solution remained robust, evidenced by the 39% increase in the number of deals over $100,000 booked and 33% growth in combined product and subscription revenue compared to last year. Given the strong pipeline of opportunities worldwide, we remain committed to investing in our global sales and research and development infrastructure to further extend our leadership position and gain market share."

18. On November 20, 2013, Imperva hosted a conference call at the UBS Global Technology Conference for analysts, media representatives and investors during which defendant Schmid represented the following:

So I think that from the competitive perspective on the technology side, IBM is the most competitive technically. I would say the pace of innovation since they bought the company, Guardium, three years ago has certainly slowed relative to when we competed against Guardium as a standalone business. They were more innovative and more formidable from a technology perspective there.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 6 -

> That's not to disparage IBM, but it's more difficult to innovate and hold the team together that created those innovations when you're part of a larger organization. One of the mainstays of the security business is standalone security companies. They are the ones who innovate and come out with the newest products.
>
> You really don't see innovative security products coming out of networking vendors. I can't think of any, to be honest with you. So, it's very, very difficult to be innovative in that case.
>
> If I look at the rest of the competition, the McAfees and the Oracles of the world, you know, both of them both companies and they're not particularly relevant from a technical perspective at all. And I don't know how much innovation has come out of those two.
>
> So it's IBM that we see the most. We do see McAfee every now and then. I think Oracle relies on their native audit capabilities more than anything else, which is a fundamental limitation in a security policy anyway because your database administrator is now not protected. That guy can do anything he wants, he or she.
>
> And I think competitively on the web application firewall side, F5 is clearly the most competitive product against us there. And they lack a lot of the security functionality and the scalability that we have. But they are probably the ones putting the most resources into it, although they give off conflicting messages these days about what their security position is going to be. . . .
>
> So, you know, technically I think that it is – the companies that we compete against I think rely a little bit more on their political connections and a little less on their innovations to compete against us.

19. On December 10, 2013, Imperva hosted a conference call at the Raymond James Systems, Semiconductors, Software & Supply Chain Conference for analysts, media representatives and investors during which defendant Schmid represented the following:

> So on the database side, the biggest competitor for us is IBM. About three years ago, they bought a company called Guardi[um], and that's still the name of the product that they sell. We see IBM and competitor situations far more than we see anybody else by far.
>
> It's just not even – in terms of market share, IBM and Imperva are number one and two and three is really far behind in terms of specific products. Actually, the number one market share goes to people. People pouring over audit logs and doing code reviews and things like that. That's the number one competitor in the space, which is why it is a greenfield opportunity.
>
> So, we beat IBM four out of five times. We have a very, very good win rate against them. But they are – how do they win the other 20% of the time?

20. On February 6, 2014, Imperva issued a press release announcing its fourth quarter and full year 2013 financial results. The Company reported total revenue of $42.7 million and $(0.38) diluted EPS for the fourth quarter of 2013. The Company further reported total revenue of $137.8

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 7 -

million and $(1.04) diluted EPS for the year ended December 31, 2013. Additionally, the Company provided its business outlook for the first quarter of 2014, with total revenue expected to be in the range of $36.0 to $37.0 million and $(0.33) to $(0.37) diluted EPS for the first quarter ended March 31, 2014. Furthermore, the Company reported the number of deals booked valued at over $100,000 had increased 43%. The release stated in part:

> "Our fourth quarter marked a strong finish to the year, highlighted by revenue growth that was above our guidance," stated Shlomo Kramer, President and Chief Executive Officer of Imperva. "Our performance was driven by the combination of continued demand for our integrated solution and strong growth of combined product and subscription revenues. We also had solid growth across all geographic regions and continued to make progress on leveraging the investments made in our global sales and research and development infrastructure. Looking forward, we remain in position to extend our leadership position and gain share as we execute our comprehensive plan for addressing the security challenges for the cloud."

21. After releasing its fourth quarter and full year 2013 financial results on February 6, 2014, Imperva hosted a conference call for analysts, media representatives and investors during which defendant Kramer represented the following:

> During the past five years, we have proven that our market focus and strategy were correct as we have achieved greater than 30% compounded annual growth for our revenues and a growing list of blue chip customers. We currently believe that we are at the very early stages of a large and fast growing market of protecting business critical application and data in the cloud, and that our comprehensive strategy here significantly enhances our effort to be a leader in this market and further positions Imperva for long-term growth.
>
> Now, turning to a deal highlight in Q4, we continued to see traction with some of our largest existing accounts, as well as strong head-to-head win ratio in competitive deals. Some highlights include a Fortune 250 energy company that selected Imperva to replace and consolidate their existing Lumigent BeyondTrust and IBM Guardi[um] deployments. The primary use case is privileged user monitoring for regulatory compliance. The key selection driver was ease of use and ability to successfully roll out at the scale needed for the deployment.

22. In fact, defendants knew but deliberately disregarded that Imperva was being adversely affected by competitive products, particularly with respect to larger deals, to a much greater extent than suggested by the defendants' statements, and that its future financial results would be materially worse than the estimates then being promulgated for the Company.

23. On March 6, 2014, Imperva's stock reached it Class Period high of $65.53 per share.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 8 -

24. After the end of the quarter, between April 1, 2014 and April 7, 2014, defendant Kramer sold 100,000 shares of his Imperva stock for proceeds of $5.26 million at prices as high as $56.99 per share.

25. Then, on April 9, 2014, the Company issued a press release announcing its preliminary first quarter 2014 financial results. The Company reported preliminary total revenue in the range of $31.0 to $31.5 million, below the Company's prior guidance of total revenue in the range of $36.0 to $37.0 million for the first quarter of 2014. Additionally, the Company expected EPS in the range of $(0.40) to $(0.44), below prior guidance of $(0.33) to $(0.37) and a $(0.35) consensus estimate. The release stated in part:

> "Based on our preliminary analysis, our first quarter results were primarily impacted by extended sales cycles on deals over $100,000, which led to delays in receiving anticipated orders from customers, particularly in the U.S., which resulted in lower than expected revenue for products," said Imperva President and CEO, Shlomo Kramer. "While our overall win rates remained consistent during the quarter, the extended sales cycles resulted from a combination of intensifying competition for large orders, which resulted in additional review and approval cycles, as well as sales execution challenges in the U.S. We are taking steps to address these issues. We are also continuing to analyze the factors that impacted our first quarter results, and consider[ing] additional steps we may take to address them and how they may impact our outlook for the full year. We expect to provide updated guidance during our regular earnings call."
>
> Kramer added, "While we are disappointed with the overall results, we were pleased with the strong performance in EMEA as well as in sales of subscription products during the first quarter. We remain confident in the longer term due to ongoing growth in global demand for data center security solutions and our growing global pipeline of opportunities, as well as our commitment to innovation and ability to execute our comprehensive plan for addressing the security challenges for the cloud."

26. As a result of this news, Imperva's stock price plummeted $21.73 per share to close at $28 per share on April 10, 2014, a one-day decline of nearly 44% on volume of 10.9 million shares.

27. Analysts noted this "[m]assive [g]uidance [r]eduction" and referred to "damaged management credibility."

28. As a result of defendants' false statements, Imperva securities traded at artificially inflated prices during the Class Period. While Imperva's stock price was artificially inflated, the Company's top officers and directors were able to sell $25.9 million worth of their Imperva stock, including $11.8 million worth of stock sold by the CEO and the CFO. However, after the above

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 9 -

revelations seeped into the market, the Company's stock was hammered by massive sales, sending the stock's price down 57% from its Class Period high.

**LOSS CAUSATION/ECONOMIC LOSS**

29. During the Class Period, as detailed herein, the Individual Defendants made false and misleading statements by misrepresenting the Company's business and prospects and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Imperva publicly traded securities and operated as a fraud or deceit on Class Period purchasers of Imperva publicly traded securities. Later, when the Individual Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the prices of Imperva publicly traded securities fell precipitously, as the prior artificial inflation came out of the prices over time. As a result of their purchases of Imperva publicly traded securities during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**APPLICABILITY OF THE PRESUMPTION OF RELIANCE  
AND FRAUD ON THE MARKET**

30. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) The Individual Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) The Company's stock traded in an efficient market;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e) Plaintiff and other members of the Class purchased Imperva securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

31. At all relevant times, the markets for Imperva securities were efficient for the following reasons, among others:

(a) As a regulated issuer, Imperva filed periodic public reports with the SEC; and

(b) Imperva regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## CLASS ACTION ALLEGATIONS

32. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Imperva publicly traded securities during the Class Period (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

33. The members of the Class are so numerous that joinder of all members is impracticable. The stock is actively traded on the NYSE and there are over 26 million shares of Imperva stock outstanding. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Imperva or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

34. Common questions of law and fact predominate and include: (i) whether defendants violated the 1934 Act; (ii) whether defendants omitted and/or misrepresented material facts; (iii) whether defendants knew or recklessly disregarded that their statements were false; and

(iv) whether defendants' statements and/or omissions artificially inflated the prices of Imperva securities and the extent and appropriate measure of damages.

35. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

36. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

37. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

38. Plaintiff incorporates all allegations in ¶¶1-37 above by reference.

39. During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

40. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) Employed devices, schemes, and artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Imperva common stock during the Class Period.

41. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Imperva publicly traded securities. Plaintiff and the Class would not have purchased Imperva publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Individual Defendants' misleading statements.

42. As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Imperva publicly traded securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

43. Plaintiff incorporates all allegations in ¶¶1-43 above by reference.

44. The Individual Defendants acted as controlling persons of Imperva within the meaning of §20(a) of the 1934 Act. By virtue of their positions with the Company, and ownership of Imperva stock, the Individual Defendants had the power and authority to cause Imperva to engage in the wrongful conduct complained of herein. Imperva controlled the Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B. Awarding damages and interest;

C. Awarding plaintiff's reasonable costs, including attorneys' fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: April 11, 2014

ROBBINS GELLER RUDMAN
 & DOWD LLP
SHAWN A. WILLIAMS

*s/ Shawn A. Williams*
SHAWN A. WILLIAMS

One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)

ROBBINS GELLER RUDMAN
 & DOWD LLP
DARREN J. ROBBINS
DAVID C. WALTON
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
110 West A Street, Suite 750
San Diego, CA 92101
Telephone: 619/230-0063
619/255-1856 (fax)

Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt Imperva.docx

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 14 -