ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
        – and –
DOUGLAS R. BRITTON (188769)
CODY R. LeJEUNE (249242)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
dougb@rgrdlaw.com
clejeune@rgrdlaw.com

Lead Counsel for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VISWANATH V. SHANKAR, Individually and on Behalf of All Others Similarly Situated, ) )  )  )  )  )  )  )  )  )  )  )  )  )  ) | Case No. 3:14-cv-01680-PJH |
| Plaintiff, | CLASS ACTION |
| vs. | AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| IMPERVA, INC., et al., | |
| Defendants. | DEMAND FOR JURY TRIAL |

975162_1

1

## TABLE OF CONTENTS

2

**Page**

3 INTRODUCTION ................................................................................................1

4 PARTIES ............................................................................................................5

5 RELEVANT NON-PARTIES ............................................................................6

6 STATEMENT OF THE CASE............................................................................8

7      Background ................................................................................................8

8      Imperva and Its Founder Shlomo Kramer's Connection to the Cyber-Security
9      Industry in Israel ....................................................................................10

     Imperva Goes Public and Publicly Promotes Its Superior Technology............................11
10

11      The Class Period Begins – Defendants Continue to Emphasize the Strength of
     Imperva's Technology, Claiming Strong Wins Against Competitor IBM ......................12

12      Knowing that Imperva Was Struggling to Compete in Large Deals, Kramer
     Pockets $240 Million by Selling IBM an Instrumental Piece of IBM's
13      Comprehensive Threat Protection Solution, Further Strengthening Imperva's
     Chief Competitor .....................................................................................16
14

15      Defendants Continue to Emphasize Imperva's Technological Superiority and
     Dismiss Imperva's Competition, Claiming IBM's "Political Connections" Were
16      the Only Way It Could Win a Deal Against Imperva .........................................19

17      Defendants Continue to Boast About Imperva's Competitive Success and
     Superior Technology While Executing Their Shift to the Cloud; Kramer Begins to
18      Use Imperva as His Personal Bank to Cash out on His Imperva Investment – and
     in on His Other Investments .....................................................................22

19      Defendants Disclose the Truth – Sales of SecureSphere Collapse Because of
     Extended Sales Cycles on Big Deals and Purported "Sales Execution Issues"................26
20

21      The Aftermath ........................................................................................27

22 JURISDICTION AND VENUE .......................................................................30

23 DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ....................30

24 DEFENDANTS DISCLOSE THE TRUTH .....................................................40

25 FRAUDULENT SCHEME AND COURSE OF BUSINESS ...........................41

26 SCIENTER ALLEGATIONS ..........................................................................42

27 LOSS CAUSATION/ECONOMIC LOSS .......................................................47

NO SAFE HARBOR .........................................................................................48
28

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
3:14-cv-01680-PJH                                              - i

1

2                                                                                    **Page**

3
APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET ..........48

4

CLASS ACTION ALLEGATIONS ......................................................................................49

5

COUNT I ...............................................................................................................................50

6

    For Violation of §10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder

7        Against All Defendants........................................................................................................50

8    COUNT II .............................................................................................................................52

9        For Violation of §20(a) of the 1934 Act and Rule 10b-5 Against All Defendants............52

10   PRAYER FOR RELIEF ........................................................................................................53

11   JURY DEMAND ...................................................................................................................53

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Court-appointed Lead Plaintiff Delaware County Employees Retirement System ("plaintiff"),

2   individually and on behalf of all others similarly situated, by its undersigned attorneys, allege the

3   following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon

4   information and belief as to all other matters based on the investigation conducted by and under the

5   supervision of plaintiff's counsel, which included, among other things: (1) review of press releases,

6   news articles, conference call transcripts, and other public statements issued by or concerning

7   Imperva, Inc. ("Imperva" or the "Company" ); (2) review of research reports issued by financial

8   analysts concerning Imperva's business; (3) review of Imperva's United States Securities and

9   Exchange Commission ("SEC") filings; (4) interviews with witnesses knowledgeable of relevant

10  information, including former employees of the Company; and (5) review of other publicly available

11  information and data concerning Imperva, its securities, and the markets therefor.  Plaintiff believes

12  that substantial additional evidentiary support will exist for the allegations set forth herein after a

13  reasonable opportunity for discovery.

14  **INTRODUCTION**

15      1.      This is a securities class action on behalf of all persons who purchased or otherwise

16  acquired the publicly traded securities of Imperva between May 2, 2013 and April 9, 2014, inclusive

17  (the "Class Period"), against defendants Imperva, Shlomo Kramer ("Kramer") (Imperva's President

18  and Chief Executive Officer ("CEO")), and Terrence J. Schmid ("Schmid") (Imperva's Chief

19  Financial Officer ("CFO")) (collectively, the "defendants") for violations of the Securities Exchange

20  Act of 1934 (the "1934 Act").  These claims are asserted against defendants, who made materially

21  false and misleading statements during the Class Period in press releases, analyst conference calls,

22  roadshow conferences, and filings with the SEC.

23      2.      This is a case of securities fraud in which defendants deceptively hyped throughout

24  the Class Period Imperva's purported technologically superior products and its supposed "very

25  strong" win-loss ratios against large competitors such as International Business Machines

26  Corporation ("IBM").  Defendants then used Imperva's resulting artificially inflated stock price to

27  acquire two companies, Skyfence and the remaining shares of Imperva's Incapsula subsidiary (both

28  co-founded by defendant Kramer).  Defendant Kramer cashed in on the Skyfence acquisition, in

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
3:14-cv-01680-PJH                                                                                          - 1 -

1   particular, securing $13.3 million in cash and roughly $12.1 million in stock and did so at the same

2   time that he was in the process of unloading another $10 million worth of his Imperva holdings,

3   when Imperva's stock was trading at its then near-record trading highs.  Suspiciously, it was the first

4   time Kramer had ever sold a single share of Imperva stock.  Then, just ***two days*** after Kramer

5   stopped selling, defendants disclosed the truth – Imperva suffered a significant guidance miss for

6   1Q2014[1] because IBM was squeezing Imperva's opportunities for its flagship product.  Imperva's

7   stock collapsed 44% in a single day as class members' investments were wiped out.

8          3.      Investors in Imperva stock got caught up in Kramer's scheme to enrich himself with

9   his strategy of creating and selling cyber-security companies.  Imperva was one of many companies

10  that Kramer had started in a never-ending cycle of creating companies and selling them at a profit

11  without regard for their long-term sustainability.  At its core, Imperva is comprised of two products

12  that block hackers from destroying an organization's website or from stealing its valuable data.  The

13  first was SecureSphere, Imperva's flagship product dedicated to protecting large enterprises with so-

14  called on-premise security; SecureSphere represented 63% of the Company's net revenues when

15  Imperva went public in November 2011 but would fall to 38% by the end of the Class Period.  The

16  second was Incapsula, Imperva's majority owned subsidiary dedicated to protecting small to

17  medium-sized organizations that stored their data remotely in the "cloud."  Undisclosed to investors,

18  Imperva was losing large deals for its SecureSphere product during the Class Period as its Incapsula

19  sales grew in importance, increasing from just 2.3% of Imperva's net revenues when Imperva began

20  trading publicly in November 2011 to over 14% at the end of the Class Period.

21         4.      Defendants took Imperva public with the apparent goal of inflating its stock price.

22  Defendants issued press releases, conference calls, and traveled on many roadshows to promote

23  Imperva and its products.  Defendants' message was uniform and relentlessly positive – Imperva's

24  superior technology drove its strong financial results and enabled it to beat its larger competitors, in

25  particular IBM, in head-to-head competition for customers.  Defendants claimed that Imperva's

---

26  [1]   For the purposes of brevity and convenience, fiscal quarters are referred to by their number and

27  year.  Thus, the first fiscal quarter of 2014 is abbreviated "1Q2014."  Fiscal years are abbreviated by
    FY and year.  FY2014, for example, represents fiscal year 2014.  Imperva's fiscal year is

28  contemporaneous with the calendar year.

1  strong financial results "highlight[ed] the underlying strength of [Imperva's] technology, our

2  comprehensive, fully-integrated solution," they emphasized "strong demand" for that solution with

3  strong growth in large deals over $100,000, and they repeated that Imperva enjoyed "very strong"

4  win-loss ratios against its larger competitors where they "continu[ed] to displace [Imperva's]

5  competitors in the market quite successfully." In fact, defendants claimed that Imperva's success

6  against its larger competitors, where Imperva supposedly "beat IBM 4 out of 5 times," "highlight[ed]

7  the value of [Imperva's] integrated solution."

8       5. But what defendants failed to tell investors was that Imperva was unable to compete

9  against IBM with its SecureSphere product because IBM was offering its products at low cost and in

10  a way that permitted customers to defer costs for IBM solutions until the renewal of their enterprise

11  vendor agreements. At the same time that defendants were proclaiming the "strength of [Imperva's]

12  technology" and "very strong" win-loss ratios against Imperva's largest competitors, they knew that

13  Imperva was losing large on-premise deals to IBM because it was offering essentially free product in

14  the near term, causing the senior executives of the prospective customers to select IBM because of

15  the perception of saving money. In fact, an analyst confirmed at the end of the Class Period that

16  Imperva's 1Q2014 miss "we think [was] driven by more aggressive discounting/bundling practices

17  by IBM" and that "the IBM Guardium product is attractively priced." Defendants knew, through

18  their direct involvement in the sales process, that most of Imperva's regional sales managers and

19  Strategic Account Directors were consistently missing their quotas throughout the Class Period. But

20  this was just the start. Indeed, by defendants' own admission just weeks before the end of the Class

21  Period, Imperva lacked a meaningful or reliable mainframe product to even compete in the largest

22  on-premise deals because Imperva faced a "***perceived risk*** of losing access to [a] mainframe

23  technology agent" because it was relying on an OEM relationship to compete for large mainframe

24  opportunities. These competitive dynamics put Imperva at a severe disadvantage when competing

25  for the most coveted large on-premise opportunities.

26       6. At the same time that Imperva was struggling in head-to-head competition with IBM

27  for these large deals, defendant Kramer's create-and-sell strategy actually helped IBM strengthen its

28  already formidable competitive advantage. During the middle of the Class Period, defendant Kramer

1    sold IBM a crucial component of IBM's comprehensive security offering, a company that he co-

2    founded named Trusteer, for close to a reported $1 billion, ***pocketing $240 million for himself***.  And

3    in connection with that sale, Kramer had the opportunity to "get[] to know the products and the

4    abilities on each side, and saw there was a connection and a joint vision" between IBM and Trusteer.

5    Defendants, in general, and Kramer, in particular, thus knew that Imperva's chief competitor was

6    now even stronger, compliments of Kramer himself.  And it was a strengthened IBM that would

7    contribute to Imperva's downfall at the end of the Class Period.

8          7.    Defendants, remarkably, increased the intensity of their statements after Kramer's

9    sale of Trusteer to IBM.  Not only did they repeat their technical superiority mantra, reasserting that

10   Imperva "beat IBM four out of five times" because "we have superior technology to IBM, no

11   question," and "[t]echnically, we are better" but they went so far as to claim that IBM could only

12   compete with Imperva by using its "political connections" or by "taking the CEO to Augusta

13   National to play a round of golf."  These false statements drove Imperva's stock price to record

14   highs.  And in a suspicious coincidence, it was at this time that defendants announced that they

15   would pay for Imperva's acquisitions using Imperva's stock, and when defendant Kramer was in the

16   middle of his $10 million selling spree.

17         8.    On April 9, 2014, ***just two days after Kramer's last stock sale***, defendants shocked

18   the market with preliminary first quarter 2014 financial results that missed the Company's revenue

19   guidance by nearly $6 million – ***an almost 20% miss***.  Defendants disclosed that Imperva's first

20   quarter results were "primarily impacted by extended sales cycles on deals over $100,000" resulting

21   from "a combination of intensifying competition for large orders, which resulted in additional review

22   and approval cycles, as well as sales execution challenges in the U.S."  And by praising "strong

23   performance . . . in sales of subscription products during the first quarter," defendants informed

24   investors that Imperva's SecureSphere product was the problem.  Imperva's stock collapsed in

25   response, falling an extraordinary 44% in a single day of trading as analysts directly attributed the

26   drop to the statements alleged herein to be misleading:

27         "IBM Squeezing Israel Cyber Guru as $584 Million Wiped Out . . . ."

28

975162_1
AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
3:14-cv-01680-PJH                                                                    - 4 -

"They had a significant miss," Jonathan Ho, a Chicago-based analyst at William Blair & Co., said in an April 10 telephone interview.  Investors were surprised as '*the company would always downplay their competitors and always viewed themselves as having a strong competitive position*.'"

9.     In the end, news reports claimed that "Imperva replace[d] founder Shlomo Kramer as CEO with Anthony Bettencourt, who has led his last two companies through acquisitions."  Kramer was either stepping down despite Imperva being in the "early innings of the game" or the Board of Directors demoted him even though, as defendants claimed, Kramer was "an enormous asset to [Imperva]."  Either way, Kramer positioned himself to realize a fortune when and if Imperva is sold.  And he has already moved on to his next investment – with some familiar faces from Imperva.

## PARTIES

10.     Plaintiff Delaware County Employees Retirement System, acquired Imperva securities as set forth in the certification attached as Exhibit A to the Declaration of Tricia L. McCormick in Support of the Pennsylvania Retirement Fund Group's Motion for Appointment as Lead Plaintiff and Approval of Lead Plaintiff's Selection of Counsel (Dkt. No. 19-1) and has been damaged thereby.

11.     Defendant Imperva provides data security solutions focused on providing visibility and control over business data across systems within the data center.  Defendant Imperva is a Delaware corporation that maintains its headquarters at 3400 Bridge Parkway, Suite 200, Redwood Shores, California 94065.

12.     Defendant Kramer was at relevant times, Imperva's Chairman of the Board of Directors, President and CEO.

13.     Defendant Schmid is, and at all relevant times was, the Company's CFO.

14.     The defendants referenced above in ¶¶12-13 are referred to herein as the "Individual Defendants."  The Individual Defendants made, or caused to be made, false statements that caused the prices of Imperva's common stock to be artificially inflated during the Class Period.

15.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Imperva's quarterly reports, shareholder letters, press releases and presentations to securities analysts, money and portfolio managers and

1 institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports

2 and press releases alleged herein to be misleading prior to or shortly after their issuance and had the

3 ability and opportunity to prevent their issuance or cause them to be corrected. Because of their

4 positions with the Company, and their access to material non-public information available to them

5 but not to the public, the Individual Defendants knew that the adverse facts specified herein had not

6 been disclosed to and were being concealed from the public, and that the positive representations

7 being made were then materially false and misleading. The Individual Defendants are liable for the

8 false and misleading statements pleaded herein.

9 **RELEVANT NON-PARTIES**

10 16. Mickey Boodaei ("Boodaei") has a long history with defendant Kramer. He co-

11 founded Imperva and Trusteer with Kramer, still serving as Trusteer's CEO, and, with Kramer,

12 serves as a director on Trusteer's Board of Directors. Boodaei was also an investor in Skyfence with

13 Kramer and serves on the Board of Directors of Lacoon Security Ltd. ("Lacoon Security") with

14 Kramer, Amichai Shulman ("Shulman"), and Ralph Pisani ("Pisani"), among others.

15 17. Exabeam was founded in 2013 and is headquartered in San Mateo, California.

16 Exabeam is a "big data security analytics company," which has technology and products that appear

17 to surpass Imperva's in that they "change the way cyberattacks are detected" and eliminate the need

18 to "hire teams of data scientists" as Imperva had done with its products and technology. Exabeam

19 shares many links with Imperva, most notably, personnel. Specifically, Nir Polak ("Polak") and

20 Sylvain Gil ("Gil") co-founders of Exabeam, were both previously at Imperva. Then, in July 2014,

21 Exabeam hired former Imperva Senior Vice President ("SVP") of Worldwide Sales Pisani as its

22 Executive Vice President of Field Operations. In June 2014, Exabeam raised $10 million from three

23 investors, one of which was Kramer. Currently, Polak, Gil, and Kramer serve together on the

24 Exabeam Board of Directors.

25 18. F5 Networks, Inc. ("F5 Networks") is based in Seattle, Washington and "develops,

26 markets, and sells application delivery networking products that optimize the security, performance,

27 and availability of network applications, servers, and storage systems." F5 Networks is Imperva's

28

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
3:14-cv-01680-PJH                                                                    - 6 -

1    main competitor in the web application firewall ("WAF") market against Imperva's SecureSphere

2    WAF product.

3           19.    Sylvain Gil is the former Senior Director of Product Management at Imperva.  Gil

4    currently serves as Vice President of Products at Exabeam, and, along with Polak and Kramer,

5    serves on the Board of Directors of Exabeam.

6           20.    IBM, based in Armonk, New York, is Imperva's main competitor against its

7    SecureSphere product in the database security arena.  IBM is a leading vendor in this field with

8    products such as Guardium and its Comprehensive Threat Protection System, which features

9    Trusteer technology, which Kramer sold to IBM in August 2013 for reportedly close to $1 billion.

10   Kramer pocketed an estimated $240 million from that deal.  Kramer also sold Worklight Ltd.

11   ("Worklight") to IBM for a reported $50-$60 million in January 2012.

12          21.    Incapsula is a subsidiary of Imperva and is Imperva's primary cloud-based product.

13   Incapsula was founded by Kramer, along with Gur Shatz ("Shatz") and Marc Gaffan, in 2009.  Shatz

14   is a former employee of Imperva, serving previously as Imperva's product development director.  In

15   February 2014, Imperva purchased the remaining shares of Incapsula that it did not own for $5.8

16   million in Imperva stock.

17          22.    Ralph Pisani was the former SVP Worldwide Sales at Imperva until June 30, 2014.

18   On July 8, 2014, Exabeam announced that Pisani joined the Company as its Executive VP of Field

19   Operations, a position Pisani currently holds.  Pisani also sits on the Board of Directors of Lacoon

20   Security with Kramer, Boodaei, and Shulman, among others.

21          23.    Nir Polak, along with Gil, co-founded Exabeam and currently serves as its CEO.

22   Polak is the former VP of Corporate Strategy at Imperva.  Polak, along with Kramer and Gil, among

23   others, serve together on Exabeam's Board of Directors.

24          24.    Amichai Shulman is a co-founder and CTO of Imperva and a co-founder of, and

25   major investor in, Skyfence.  Shulman also sits on the Board of Directors of Lacoon Security with

26   Kramer, Boodaei, and Pisani.

27

28

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
3:14-cv-01680-PJH                                                                                    - 7 -

25.     Skyfence is a cloud-based security company that was purchased by Imperva in February 2014 for $70 million.  Kramer profited more than $13 million in cash and 1% in Imperva stock.  Skyfence's major investors are Kramer, Boodaei and Shulman.

26.     Tomium was purchased by Imperva on January 30, 2014 for $8.3 million, $3.4 million of which was Imperva stock.  Tomium served strictly to enhance Imperva's SecureSphere product so that it could compete better in the more competitive large mainframe database deals against the likes of IBM and McAfee.

27.     Trusteer is an Israeli based, cyber-security company that was co-founded by Kramer and Boodaei.  Kramer, a current Board of Directors member, is known as the entrepreneur behind Trusteer, and Boodaei, who also serves on the Trusteer Board of Directors, is Trusteer's CEO.  In August, 2013, IBM acquired Trusteer for nearly $1 billion, wherein Kramer profited approximately $240 million.

## STATEMENT OF THE CASE

**Background**

28.     Imperva is an enterprise data security company that offers products designed to enable enterprises to comply with regulatory requirements while preventing cyber-attacks in databases that store valuable information, such as credit card numbers, social security numbers, and the like.  Founded in 2002, Imperva claims to pioneer "the third pillar of enterprise security," which is data center security.  Imperva's products are "designed to provide the visibility and control needed to neutralize attacks, theft and fraud from inside and outside the organization, mitigate risk, and streamline compliance."  As defendants described it in more plain terms at the beginning of the Class Period, Imperva's products seek to prevent attackers from both inside and outside of an organization from damaging the organization's website or stealing its valuable information:

> [O]ur entire focus is on protecting the data and the applications that you would have in a data center environment.  And why is this important?  Because if you look at the fastest-growing type of attack that companies are facing right now, all of those attacks are focused on your data center . . . .  Some designed to bring your website down, some designed to get through your website and into the data behind it to steal information.

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 3:14-cv-01680-PJH                                                                                    - 8 -

29. Imperva's technology is based, in part, on the efforts of many security engineers located in Tel Aviv, Israel. Through its dedicated security research team, which before the Class Period included 183 employees dedicated to research and development, Imperva "performs security analysis, tracks hackers and trends in the hacker community and undertakes vulnerability discovery, in addition to providing [Imperva] with regulatory compliance expertise." Based on these scientific efforts, Imperva offers two primary products – SecureSphere and Incapsula.[2] SecureSphere is Imperva's flagship product that provides database, file and web application security across various physical and virtual systems in data centers (*i.e.*, on-premise data center security). Incapsula is Imperva's primary cloud-based product, which is designed to protect against threats created as enterprises shift to deploying their applications and storing their data in the cloud (*i.e.*, remote data center security). While SecureSphere originally represented more than half of Imperva's revenues, Incapsula was an increasing component of Imperva's results leading up to the Class Period, increasing from 2.3% of net revenue when the Company went public to 7% of net revenue in 1Q2013 – by the end of the Class Period it would reach as high as 14.5%. Besides being subscription-based with revenue that can only be recognized ratably, the average size of an Incapsula transaction is significantly smaller than a SecureSphere transaction.

30. The market in which Imperva competes is highly competitive and, importantly, fragmented – it is common for enterprises to utilize the product and services of multiple vendors to piece together a security solution. In fact, one report noted that a government organization had 85 different security products across its environment. Along these lines, defendants described the data security market in terms of "pillar[s] of enterprise security." The first and second pillars are the traditional pillars – endpoint (*i.e.*, antivirus) and perimeter (*i.e.*, first generation firewalls). "[D]ata center security is the third pillar of enterprise security because it fills the gaps" between these traditional pillars. And it is the nature of these pillars and the evolving nature of cyber-security that creates a fragmented market – different vendors focus on different pillars. For its part, Imperva competes in the third pillar – with its on-premise SecureSphere product against large infrastructure

---

[2] While Imperva currently offers a cloud-based product called Skyfence, that product was in its infancy and acquired by Imperva during the Class Period.

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 3:14-cv-01680-PJH
- 9 -

1  database vendors, such as IBM and McAfee, with SecureSphere WAF competing primarily with

2  security vendor F5 Networks.  Imperva's cloud-based Incapsula product primarily competes against

3  security vendors, Akamai and CloudFlare.

4  **Imperva and Its Founder Shlomo Kramer's Connection to the Cyber-Security Industry in Israel**

5

6  31.     Imperva was co-founded by defendant Kramer, who is considered to be a cyber-

7  security "guru."  As a *Globes* article described him in August 2013, Kramer was "consolidating his

8  status as a data security guru who ha[d] learned how to produce companies one after another and

9  pretty quickly generate substantial value for anyone who believe[d] in his vision."[3]  Public estimates

10  in 2013 put Kramer's net worth, which he amassed using a create-and-sell strategy, in the $1 billion

11  area.  Ironically, one of Kramer's primary benefactors and a source of this significant wealth is IBM

12  – which also happens to be one of Imperva's main competitors.  In fact, Kramer sold one of his first

13  startups, a company called Worklight, to IBM for $50-$60 million.  And as will be described herein,

14  Kramer continued selling key security components to IBM during the Class Period, notwithstanding

15  the detrimental impact this would have for Imperva and its shareholders.

16  32.     Kramer is also an icon in the Israeli cyber-security industry – he found his start in

17  Israel's elite military-intelligence department and has been instrumental in Israel's effort to dominate

18  the cyber-security industry.  A *Bloomberg* article even noted that "Israel's campaign to become a

19  cybersecurity powerhouse, an effort trumpeted by Prime Minister Benjamin Netanyahu, owes a debt

20  to entrepreneur and investor Shlomo Kramer."  The nature of that Israeli cyber-security industry,

21  according to a February 10, 2014 *TechWorld* article, is "incestuous" because "people know one

22  another, invest in each other's enterprises and eventually buy each other out."

23  33.     The cyber-security industry in the U.S. has strong ties to Israel.  Imperva's chief

24  competitor IBM, in fact, has a rich history in that country.  It opened its first Scientific Center in

25  ───────────────

26  [3]     The list of companies Kramer founded, co-founded, and/or was an early investor in, and that he subsequently cashed out of for millions of dollars include: Check Point Software Technologies, Trusteer, Incapsula, Skyfence, and Worklight.  Indeed, Kramer has proven to have a wandering eye when it comes to cyber-security companies.  As he explained it himself in a September 12, 2013 forbes.com article, "'I like to invest at the intersection of the most cutting edge trends – changes in the IT infrastructure such as the growing popularity of mobile devices[.]'"

27

28

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 3:14-cv-01680-PJH                                                                          - 10 -

1   1972 on the University of Haifa campus and has grown from just three researchers to over 500

2   employees, including regular staff members and many students.  In 1992, IBM changed the name of

3   the Scientific Center to change the focus of the Center's work to benefit IBM Israel by finding

4   solutions for its customers.  Consistent with this change, IBM acquired ten Israeli companies or

5   companies with Israeli operations by January 2012, which became an integral part of IBM's

6   development operations.  And, not surprisingly, Kramer was front and center on several of these

7   acquisitions.

8   **Imperva Goes Public and Publicly Promotes Its Superior Technology**

9        34.     Imperva went public in November 2011, selling 5.5 million shares at $18.00 per share

10  for proceeds of approximately $90 million.  Imperva's offering was met with much fanfare.

11  Analysts were excited about Imperva's opportunity in a growing market, describing Imperva as a

12  leader in data center security that would take advantage of the opportunity to bridge a disconnect

13  between where enterprises spend their security dollars and where the attacks occur.  As an analyst

14  from J.P. Morgan described it in March 2012 after meeting with management, "[w]e . . . came away

15  feeling more positive about Imperva's competitive position, the opportunity ahead of them, and

16  actions they are taking on their path to profitability."   As would be expected from this type of

17  enthusiasm, Imperva's stock price jumped nearly ***120%*** in response, closing at a high of $39.55 per

18  share on March 23, 2012 – just four months after Imperva's IPO.

19       35.     Imperva disappointed, however, with its 1Q2012 results, reported in May 2012.

20  While defendants boasted about Imperva's "strong competitive position," its product and license

21  revenue (*i.e.*, SecureSphere sales) had decelerated and were below analyst expectations.  Its stock

22  price again reacted in response, this time collapsing by more than 35% with the same vigor that it

23  had jumped just weeks earlier.

24       36.     Defendants were determined to reignite Imperva's stock price.  They reported strong

25  performance, record pipelines, and an improving "win/loss ratio" throughout 2012.  And they caused

26  Imperva to report "strong growth," while emphasizing that Imperva was "going to win every time"

27  against its competitors because of its superior technology.  Defendants issued press releases,

28  participated in conference calls, and went on multiple roadshows all for the purpose of promoting

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
3:14-cv-01680-PJH                                                                                            - 11 -

1   Imperva and its purportedly dominant position in the market.  With this drumbeat of positive claims,

2   Imperva's stock price was not far off of its post-IPO high by the end of the year, trading in the low

3   $30 per share range throughout December 2012.

4   **The Class Period Begins – Defendants Continue to Emphasize the Strength of Imperva's Technology, Claiming Strong Wins Against Competitor IBM**

5

6          37.    On May 2, 2013, Imperva reported strong financial results for the first quarter of 2013

7   and emphasized that those results "highlight[ed] the underlying strength of [Imperva's] technology,

8   our comprehensive, fully-integrated solution."  Importantly, defendants told investors that Imperva

9   had turned the corner, claiming that "[t]he investments being made to our global sales and support

10  infrastructure *are beginning to pay off*."  Defendants added on the conference call the same day that

11  Imperva experienced a "very strong" win-loss ratio against its largest competitors, stating that

12  Imperva's "win-loss ratio in head-to-head comparative deals remains at a very strong ratio" and that

13  "[s]imilar to recent quarters, we had a number of deals in which we won against larger comparators

14  [that] highlight[ed] the value of [Imperva's] integrated solution":

15         [Press Release:]  "The investments being made to our global sales and support infrastructure *are beginning to pay off*, evidenced by the 66% year-over-year increase in new customers during the first quarter," stated Shlomo Kramer, President and Chief Executive Officer of Imperva.  "*Our results highlight the underlying strength of [Imperva's] technology, our comprehensive, fully-integrated solution*, and our global footprint as we accelerated our investments in the business to take advantage of the demand we are seeing worldwide.  Looking forward, we see numerous growth opportunities to expand our geographic reach and introduce additional products to enhance our offering and extend our leadership position."

19                           *       *       *

20         [Conference Call:]  As I mentioned earlier, we believe that our existing customer base is less than 10% penetrated and represents a significant long-term growth opportunity for the Company.  *From a comparative perspective, our win-loss ratio in head-to-head comparative deals remains at a very strong ratio.  Similar to recent quarters, we had a number of deals in which we won against larger comparators, highlighting the value of our integrated solution and the superior level of support we provide on a global scale*.

24         38.    The market was beginning to respond to defendants' message.  While Imperva's stock

25  price had not returned to its post-IPO high, it had increased appreciably since the beginning of the

26  year.  Indeed, Imperva's stock closed above $39 per share on the date of Imperva's announcement.

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 3:14-cv-01680-PJH                                                                    - 12 -

39.     Defendants' statements about the "strength of [Imperva's] technology" and their claims that its "very strong" win-loss ratio, especially against larger competitors "highlighted the value of [Imperva's] integrated solution" were false and misleading.  While Imperva may have been winning some larger deals, Imperva was also losing deals to IBM and the reason reflected a fundamental and intractable challenge to Imperva's business.  In fact, what defendants failed to tell investors was that Imperva was losing deals for its largest and most profitable SecureSphere product to IBM because IBM was offering its security solution (which a Gartner report in October 2013 confirmed "includes all nine critical DAP capabilities" that Gartner recommends) at low cost, and in a way that permitted customers to defer costs for IBM solutions until the renewal of their enterprise agreement with IBM.  Indeed, on a regular basis, senior-level managers at potential customers decided to use IBM, instead of Imperva, because of the existing enterprise-level agreements and the perception of saving money, while still receiving robust cyber-security protection.  Thus, at the same time that defendants were proclaiming success and telling investors that their investments were "beginning to pay off," they were regularly unable to advance their sales cycle for these SecureSphere deals beyond the request for information stage because of these established agreements.  All of these factors contributed to Imperva's regional sales managers and Strategic Account Directors struggling to meet and missing sales quotas, even as defendants were claiming that they had resolved sales execution challenges in North America while continuing to proclaim the inherent superiority and advantages that Imperva supposedly enjoyed in the cyber-security industry. With Imperva's SecureSphere sales goals not being achieved, Imperva's business was shifting to its Incapsula products, which were smaller and less profitable than their SecureSphere counterparts. Indeed, the average size of a SecureSphere transaction was around $70,000, whereas the average size of an Incapsula transaction was considerably less.  And in addition to these competitive challenges in 2013, Kramer was also in the process of enabling IBM to increase its already strong security offering and capture even more of the cyber-security market.

40.     On August 7, 2013, knowing that Imperva's business was becoming increasingly dependent on its smaller and less profitable Incapsula products as it struggled in on-premise deals with SecureSphere, defendants were still able to report strong, albeit unsustainable, results across

Imperva's business.  That day, Imperva announced its financial results for the second quarter of 2013.  Defendants reported $31.3 million in total revenue, up 28% year-over-year, and diluted EPS of $(0.24), claimed that they were seeing "strong demand for [Imperva's] fully integrated solution," and emphasized that "[t]he second quarter was highlighted by the 46% year-over-year growth in new customers and 36% increase in deals valued over $100,000."  Defendants did not disclose that in this same period, many sales representatives in North America were struggling and unable to achieve their sales goals due to the reasons cited.

41.     Defendants also reported that Imperva's South American and European businesses had reported a slow-down in product revenue growth, not because of competitive issues with its products or prices but instead because of "sales execution challenges."  Imperva had used and would use this ambiguous catchall phrase to explain away past and future sales shortfalls without owning up to the actual competitive challenges facing the Company.  Defendants used those "sales execution challenges," however, as an opportunity to highlight the significant investments that they had made to address *and correct* a similar problem in North America.  Defendants told investors that they "brought in new sales leadership in North America last year, and restructured the sales organization" and that "[t]hose investment[s] have paid off."  Imperva, according to defendants, saw "increased growth in North America, [as] evidenced by the 38% year over year growth in revenue."  Defendants directly attributed North America's success to their sales organization changes and emphasized that similar changes, already instituted, would correct Imperva's sales execution challenges in South America and Europe:

> ***The changes that we made in [North America] have paid off***.
>
> During the second quarter, we began instituting similar changes in Europe and South America.  We have brought new sales leadership on board in both territories, and we believe this transition is one of the factors that led to the under-performance, as the new leadership began the process of evaluating and upgrading their organizations.  Going forward, we will continue to invest in the sales infrastructure to support accelerating growth in these regions, ***just as we did in North America. . . . [W]e are confident that we can successfully address the sales execution issues, as we did in North America***.

42.     Despite Imperva's "sales execution challenges" during the quarter, defendants offered a "reminder" that Imperva is "the only provider to offer such a comprehensive integrated data center

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 3:14-cv-01680-PJH                                                                                          - 14 -

1    security solution, which we view [as] a significant competitive advantage." And they even claimed

2    that Imperva "continu[ed] to displace [its] competitors in the market quite successfully, and we

3    continued to do that in last – in Q2, as well," adding that "we continue to be . . . in a very good

4    competitive position, and our win-loss ratio continues to be very strong." Defendants' message was

5    clear – Imperva's technology remained dominant in an industry that was enjoying strong worldwide

6    demand.

7         43.    Only a few weeks after reporting these disappointing results for 2Q2013, defendant

8    Schmid took to the road, boasting at technology conferences about Imperva's success and its

9    superior technology. He claimed at an August 14, 2013 Oppenheimer conference that "the

10   underlying technical advantages that we have in these products is really what drives their sales" and

11   that "we have the best technology available" for database and Web application security. In fact, he

12   was specific that Imperva "compete[d] very well against" IBM and emphasized that when competing

13   against IBM, Imperva has "a bigger lead on them on the technical side." Defendant Schmid even

14   told investors that he expected Imperva's "average deal sizes to continue to trend upward," in part,

15   because "customers are more comfortable with Imperva." Defendants' statements had their intended

16   effect – Imperva's stock price had not only returned to its post-IPO high level, it raced past it to trade

17   higher than $45 per share in July and August 2013.

18        44.    But defendants' statements about "strong demand for [Imperva's] fully integrated

19   solution" with a "36% increase in deals valued over $100,000" in 2Q2013 that Imperva achieved

20   because of the "significant competitive advantage" from being "the only provider to offer such a

21   comprehensive integrated data center security solution" and from "continu[ing] to displace [its]

22   competitors in the market quite successfully" were false and misleading. In fact, these statements,

23   along with defendants' continued assertion of being "in a very good competitive position and our

24   win-loss ratio continues to be very strong" because Imperva has "the best technology available" and

25   "competed very well against" IBM where Imperva has "a bigger lead on them on the technical side,"

26   omitted a material adverse fact – Imperva was losing out on the largest deals to enterprise vendors,

27   such as IBM, because those vendors were offering their security solutions, which provided

28

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
3:14-cv-01680-PJH                                                                    - 15 -

1  equivalent protection, at low cost, and in a way that permitted customers to defer costs for IBM

2  solutions until the renewal of their enterprise agreement they had with IBM.

3      45.     At the same time, Imperva's technology, which defendants claimed was "the best []

4  available" and was enabling Imperva to "compete[] very well against" IBM, actually limited

5  Imperva's ability to compete for the largest enterprise deals in the market.  What defendants omitted

6  from their upbeat version of events is that Imperva was missing very large on-premise enterprise

7  deals because Imperva did not have meaningful mainframe coverage, or at least reliable coverage

8  (which IBM had with its Guardium database product), and was relying on an Original Equipment

9  Manufacturer ("OEM") arrangement that restricted its ability to offer a competitive solution.

10  Defendants would admit when announcing Imperva's 4Q2013 results that Imperva faced a

11  "perceived risk of losing access to the mainframe technology agent" and purchased the assets of its

12  OEM provider Tomium to "improve our competitive position in the market against IBM and

13  McAfee."  This competitive chasm, along with IBM's offering, which it offered to customers with

14  aggressive discounts and deferred payment, put Imperva at a steep disadvantage and caused it to lose

15  the largest on-premise deals in competition with IBM.

16  **Knowing that Imperva Was Struggling to Compete in Large Deals, Kramer Pockets $240**
**Million by Selling IBM an Instrumental Piece of IBM's Comprehensive Threat Protection**
17  **Solution, Further Strengthening Imperva's Chief Competitor**

18      46.     In August 2013, during the middle of the Class Period and when Imperva was

19  struggling to compete with IBM for large on-premise opportunities, defendant Kramer sold to IBM

20  an Israeli based cyber-security specialist, Trusteer, that would become an important component in

21  IBM's security solution.  Kramer, who was reportedly "the entrepreneur behind Trusteer" and served

22  as a director on Trusteer's Board of Directors, sold Trusteer to IBM for close to a reported $1 billion,

23  personally pocketing $240 million from the sale.  While the timing of the sale suited Kramer, it was

24  not so convenient for Imperva, as Trusteer was an important piece of IBM's security strategy and

25  gave it a full set of online defense technologies.  IBM explained when it announced the acquisition

26  publicly that Trusteer would "complement IBM's advanced portfolio of counter-fraud software and

27  services."  And analysts recognized the transaction's importance to IBM's strategy, viewing it as a

28  sign of "IBM's ambition to make [cyber-security] a bigger part of its own business" and an

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
3:14-cv-01680-PJH                                                                              - 16 -

1    "indication of how moving into more, next generation services like cybersecurity is part of IBM's

2    bigger strategy to evolve."  Incredibly, Kramer *still* sits on Trusteer's Board of Directors.

3        47.    Without question, the Trusteer acquisition made IBM (compliments of Kramer) an

4    even stronger competitor to Imperva.  As Kramer knew, IBM was already Imperva's largest and

5    fiercest competitor in the database security market.  IBM took its first step in database security when

6    it purchased Guardium in 2009 for a reported $225 million.  Guardium provided (and continues to

7    provide) "real-time monitoring of database activity" and was Imperva's direct competitor for its

8    SecureSphere opportunities.  And according to an article written when IBM announced the deal,

9    "Guardium [was] one of the only firms still standing with a mainframe monitoring solution, which

10   [was] a major prerequisite for much of IBM's customer base" since mainframe opportunities are

11   amongst the largest opportunities in the database security market.  They were also the opportunities

12   where Imperva was facing a "perceived risk of losing access to the mainframe technology agent."

13       48.    Although defendants would claim repeatedly throughout the Class Period that

14   Imperva's technology was superior to IBM's Guardium product and claimed to have gained an

15   advantage because "it's hard to hold onto those people when a big company buys a small one" and

16   "they've started to lack some innovation," they knew that IBM was a serious technological

17   competitor, even before Kramer sold Trusteer to IBM.  In fact, IBM's Guardium product fared well

18   in head-to-head comparisons with Imperva.  For example, a Forrester report noted in May 2011

19   (almost two years after IBM acquired Guardium) that IBM and Imperva were both market leaders

20   and that they both offered "features and functionality to meet *any* enterprise auditing requirement."

21   But it gave IBM higher scores in terms of the strength of IBM's Guardium offering, its strategy, and

22   its market presence.  According to Forrester, "IBM's acquisition of Guardium in 2009 changed

23   everything, making IBM one of the leading players in this [Database Auditing and Real-Time

24   Protection] market."  That view did not change at any point before the Class Period and continued

25   into the Class Period as noted in an October 11, 2013 Gartner report, which recognized that IBM's

26   "InfoSphere Guardium product line includes all nine critical DAP [("Database and Audit

27   Protection")] capabilities that Gartner recommends."

28

49.     But, as defendants knew, IBM was not content with just competing with Imperva for database monitoring projects.  It was focused on offering a much larger and comprehensive solution to its customers (or, in layman terms, one-stop shopping) to avoid "security sprawl," the phrase used to describe the practice of deploying separate new tools to address each new risk.  And defendants knew this.  Indeed, IBM announced four separate acquisitions of security companies since 2007 and each were integral to IBM's larger security strategy.   Defendant Schmid **himself** publicly acknowledged that he was paying attention to IBM's security strategy – during a roadshow conference in August 2013, he acknowledged that at least one IBM acquisition, that of Q1 Labs in October 2011, advanced IBM's security strategy:

> On the database side, really not much competitive landscape change in all, other then I will tell you that I think that IBM has got – they bought Q1 Labs, which I think was a great acquisition for them.  It makes very good sense strategically.  I think they got some good talent with that, some good leadership, and *I think their security strategy is coming together a little bit more*.

> We have had the same success rate we've always had with them.  But, it will be interesting to see how IBM plays out here. . . .  *[I]t will be interesting to see if they can start to pull together a security strategy overall that makes more sense than it has in the past*.

50.     The Trusteer acquisition gave defendant Kramer deep insight into IBM's strategy and the new-found strength of its security strategy.  In fact, Trusteer CEO Boodaei, who was Kramer's fellow Imperva founder, explained publicly that by approximately February 2012, Trusteer and IBM "started getting to know the products and the abilities on each side, and *[they] saw there was a connection and a joint vision*."  And to add to Kramer's opportunities for insight into IBM's strategy, IBM also agreed to "form[] a cybersecurity software lab in Israel that [would] bring together more than 200 Trusteer and IBM researchers and developers."  IBM's Trusteer acquisition was viewed for IBM as being a "deeper move into Israel," where the cyber-security industry is viewed as "incestuous" because "people know one another, invest in each other's enterprises, and eventually buy each other out."

51.     Kramer had actual knowledge through his direct dealing with IBM, where as a Trusteer Board of Directors member, at a minimum, he would have seen "a connection and a joint vision" with IBM, and through his involvement in the Israeli cyber-security industry, that the IBM

1   acquisition strengthened an already formidable competitor for Imperva in the on-premise deals on

2   which defendants were claiming such a high win-loss ratio.

3   **Defendants Continue to Emphasize Imperva's Technological Superiority and Dismiss
    Imperva's Competition, Claiming IBM's "Political Connections" Were the Only Way It
4   Could Win a Deal Against Imperva**

5        52.    Armed with the knowledge that, through the Trusteer sale, Kramer had significantly

6   enhanced IBM's already strong competitive position against Imperva and that IBM was already

7   beating Imperva in large on-premise opportunities with its enterprise vendor discounts that offered

8   its security solution at low cost, and in a way that permitted customers to defer costs for IBM

9   solutions until the renewal of their enterprise agreement with IBM, defendants knew that Imperva

10  would need to adjust its own product offerings to remain viable.  Thus, defendants had to shift

11  Imperva's business to the cloud.  To minimize the cost of doing so, defendants increased the

12  intensity of their statements to further inflate Imperva's stock price, which had lost its momentum

13  and had fallen back below its post-IPO highs.  The higher they were able to drive the price, the

14  cheaper targeted acquisitions would be using Imperva's common stock as currency.  Defendants thus

15  proceeded to flood the market with positive claims about Imperva's strong financial performance

16  and superior technology.

17       53.    Accordingly, on November 5, 2013, Imperva reported impressive financial results for

18  the third quarter of 2013 and emphasized "robust" demand for the Company's "integrated solution."

19  Despite suffering from "execution challenges" just a quarter earlier, defendants highlighted "strong

20  execution" this quarter and "solid growth across all geographies."  Defendants again emphasized the

21  number of deals that Imperva had closed over $100,000, emphasizing a 39% year over year increase

22  as evidence that Imperva's solutions remained dominant.  Defendants added that its product revenue

23  reportedly grew 24% year-over-year with its "win-loss ratio in head-to-head competitive deals"

24  again being "very strong," with wins against large competitors "highlighting the value of

25  [Imperva's] integrated solution."

26       54.    Defendants' statements had their intended effect.  Imperva's stock price jumped 20%

27  in response in a single day of trading, increasing $8.01 per share from a close of $36.65 on

28  November 5, 2013 to $44.66 the next day on volume of 2.8 million shares.

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
3:14-cv-01680-PJH                                                          - 19 -

55.    Two weeks later, defendants were back on the road promoting Imperva and its products.    Knowing that IBM's strategy, in fact, was advancing rapidly, Schmid specifically addressed Imperva's competitive position at a November 20, 2013 UBS Technology Conference. During that conference, Schmid told investors that Imperva's products were so technologically superior to IBM that it had to rely on its political connections to compete and to maintain the notion that somehow only smaller, independent companies like Imperva had a monopoly on innovation:

> So I think that from the competitive perspective on the technology side, IBM is the most competitive technically.  I would say the pace of innovation since they bought the company, Guardium, three years ago has certainly slowed relative to when we competed against Guardium as a standalone business.  They were more innovative and more formidable from a technology perspective there.

> That's not to disparage IBM, but it's more difficult to innovate and hold the team together that created those innovations when you're part of a larger organization.  One of the mainstays of the security business is standalone security companies.  They are the ones who innovate and come out with the newest products.

> You really don't see innovative security products coming out of networking vendors.  I can't think of any, to be honest with you.  So, it's very, very difficult to be innovative in that case.

*        *        *

> ***So, you know, technically I think that is – the companies that we compete against I think rely a little bit more on their political connections and a little less on their innovations to compete against us***.

56.    Schmid also dispelled the idea that Imperva was competing on price.  Sure, price was an issue for very large deals.  But Schmid clarified that "it's really not a price game" and "it is not a race to the bottom."  As he explained it, "It is generally not the approach that any of us take" because "[w]e are not a commoditized business right now."

57.    Schmid went a step further on December 10, 2013, at a Raymond James Conference. That day, Schmid repeated defendants' technological superiority mantra, stating that Imperva purportedly "beat IBM four out of five times."  But this time, he claimed that Imperva lost deals to IBM not because of the quality of IBM's products or "political connections" but instead because IBM could take potential customers to "Augusta National to play a round of golf":

> [Q.:]  They [IBM] wouldn't be bundling services or anything like that?

*        *        *

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 3:14-cv-01680-PJH                                                                                          - 20 -

[Schmid:] They may be doing that, a*nd they may be taking the CEO to Augusta National to play a round of golf*. There are things that – I can't get them there. I can take them to my local muni.

So they have a lot of tentacles into organizations that give them a lot of political power, and a lot of account control. And it's very, very difficult for a Company of our size to overcome. ***Technically, we're better or we wouldn't win four out of five times***.

They don't scale the way we do. They don't have the same level of functionality that we have. I don't think there's anything controversial about me saying ***we have superior technology to IBM, no question***.

58. Defendants' statements that Imperva was experiencing "robust" demand for its integrated solution with a "very strong" "win-loss ratio in head-to-head competitive deals," including "beat[ing] IBM four out of five times" because "we have superior technology to IBM, no question," and "[t]echnically, we're better" were false and misleading. In fact, defendants' claims that IBM could only compete with Imperva with its "political connections" or by taking customers to "Augusta National to play . . . golf" were a farce. While Imperva may have been winning some larger deals, Imperva was also losing deals to IBM and the reason reflected a fundamental and intractable challenge to Imperva's business. In fact, what defendants failed to mention was that IBM was offering its competitive security solution at low cost, and in a way that permitted customers to defer costs for IBM solutions until the renewal of their enterprise agreement they had with IBM. And at the same time that defendants were proclaiming such extraordinary success because "we have superior technology to IBM, no question," and "[t]echnically, we are better," they concealed that Imperva's lack of meaningful or reliable mainframe coverage, where Imperva was facing a "perceived risk of losing access to the mainframe technology agent," hindered Imperva's ability to compete for the largest on-premise mainframe opportunities.

59. Defendants' claims that "we have superior technology to IBM, no question," and that "[t]echnically, we're better or we wouldn't win four out of five times" were false and misleading for another reason – Imperva was facing intense competition in its flagship web application firewall from vendor F5 Networks, which had made considerable strides in feature parity with Imperva's on-premise web application firewall and, importantly, had partnered with IBM to offer an enhanced solution. As an analyst would explain after the Class Period, "[o]ur most recent channel checks

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 3:14-cv-01680-PJH

1  suggest F5 Networks . . . has significantly enhanced its WAF solution when compared to Imperva's

2  and *we believe F5 is at least extending sales cycles for Imperva, if not taking share*."  This

3  enhanced solution further reduced the incentive for potential enterprise customers to select and pay

4  for Imperva's SecureSphere product, especially considering that IBM's Guardium product already

5  competed head-to-head with Imperva even without an F5 Networks WAF enhancement.  With

6  Imperva's SecureSphere sales goals not being achieved, Imperva's business was shifting to its cloud-

7  based products.  By this time, Incapsula's cloud-based product had grown from 2.3% of Imperva's

8  revenue when it went public in 2011 to 8.7% of Imperva's net revenue in 3Q2013.

9        60.    Defendants did not disclose any of these material facts to investors when boasting

10  about Imperva's superior technology or competitive success.  Instead, Kramer would soon capitalize

11  on Imperva's shift to the cloud.

12  **Defendants Continue to Boast About Imperva's Competitive Success and Superior
    Technology While Executing Their Shift to the Cloud; Kramer Begins to Use Imperva as**

13  **His Personal Bank to Cash out on His Imperva Investment – and in on His Other
    Investments**

14

15        61.    Just three weeks after Schmid promoted Imperva and its products during the

16  December 2013 technology conferences, Kramer began to unload significant amounts of his Imperva

17  holdings – *the first time that he had ever done so during Imperva's time as a publicly traded*

18  *company* – and he did so when Imperva's stock was trading very near its then all-time trading high.

19  Between January 2, 2014 and January 8, 2014, Kramer sold 100,000 shares of Imperva stock for

20  proceeds of $4.9 million.  These sales were suspicious in timing and amount.  Not only was

21  Kramer's selling spree the first time Kramer had *ever* sold Imperva stock and at near then-record

22  highs, but it also came on the heels of Kramer's sale of Trusteer to IBM where he not only

23  strengthened Imperva's primary competitor but also reaped *$240 million* in the process.

24        62.    On February 6, 2014, shortly after Kramer finished selling his first block of sales,

25  defendants again increased the intensity of their statements.  That day, Imperva reported its fourth

26  quarter and fiscal year 2013 results, with a "strong finish" that was "highlighted by revenue growth

27  that was above [Imperva's] guidance."  Imperva's press release emphasized that Imperva's

28  performance was driven by "the combination of continued demand for our integrated solution and

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
3:14-cv-01680-PJH                                                                      - 22 -

1  strong growth of combined product and subscription revenues." The "sales execution challenges"

2  that plagued Imperva in 2Q2013 were also represented to be clearly behind defendants. Imperva

3  reportedly "had solid growth across all geographic regions and continued to make progress on

4  leveraging the investments made in our global sales and research and development infrastructure,"

5  while achieving an impressive 29% growth rate in product and license revenue (*i.e.*, SecureSphere

6  sales).

7          63.     Defendants also emphasized Imperva's strong win-ratios on the conference call the

8  same day, claiming that Imperva "continued to see traction with some of our largest existing

9  accounts, as well as strong head-to-head win ratio[s] in competitive deals," with "ongoing demand

10  for Imperva's integrated solution. They also attributed Imperva's "strong fourth quarter results" to

11  "continuing improved overall sales execution performance" and emphasized that a 40% growth rate

12  in North America was directly attributable to the sales organization changes that they had made a

13  year earlier:

14          From a macro perspective, customer demand remains solid across all
        geographies, and our overall bookings growth once again outpaced revenue growth

15          as our investment in sales and marketing infrastructure continues to pay off. In the
        ***Americas region, revenues increased 40% during the fourth quarter as we***

16          ***continue to benefit from the combination of strong execution from the channel***
        ***partner, new sales leadership and the structured sales organization in North***

17          ***America that we implemented last year***.

18          64.     The same day, and consistent with defendants' knowledge that Imperva's on-premise

19  solution was struggling in competition with IBM, defendants announced that Imperva was making

20  two cloud-based acquisitions – one of cloud-based startup Skyfence, and the remaining shares of

21  Imperva's cloud-based Incapsula subsidiary. Both acquisitions confirmed Imperva's focus away

22  from its large and most profitable on-premise SecureSphere solution to the much smaller and less

23  profitable solutions for the cloud. At defendants' direction, Imperva agreed to acquire cloud security

24  gateway startup Skyfence, ***co-founded by Kramer***, for $60 million and the remaining shares of its

25  cloud security Incapsula subsidiary, ***also co-founded by Kramer***, for $5.8 million. Taking advantage

26  of Imperva's inflated stock price, defendants originally agreed to acquire the companies almost

27  exclusively with Imperva stock as consideration – $57.2 million of the $60 million Skyfence

28  purchase and the entire Incapsula purchase would be paid for using Imperva stock. And while

1   defendant Schmid commented at the time that "***Shlomo . . . will be receiving only common stock as***

2   ***part of the transaction***," defendants would later restructure the deal to replace a portion of Kramer's

3   stock from the transaction with $13.3 million in cash to avoid a shareholder vote that would have

4   been required under New York Stock Exchange ("NYSE") rules dealing with related party

5   transactions.  In the end, Kramer personally received a total of $25.4 million in cash and stock from

6   the Skyfence transaction alone.

7         65.     While these acquisitions were clearly a shift in Imperva's strategy – away from large

8   deals involving on-premise solutions and large enterprises to smaller cloud-based solutions and

9   smaller enterprises – defendants expressly denied that they were borne out of necessity because of

10   troubles with SecureSphere sales.  In fact, Schmid specifically stated that "we're not experiencing . .

11   . a move from perpetual license to subscription," emphasizing that "[w]e're seeing growth in both."

12   But defendants' denials were false and/or misleading.  Imperva's customers were, in fact, electing its

13   cloud-based product over its on-premise SecureSphere product.  As an analyst from Stephens Inc.

14   confirmed just weeks later, "a few partners did mention they had deals for the on-premise WAF [in

15   1Q2014] which ended up turning into cloud-based WAF deals."  And the distinction was crucial for

16   Imperva to meet its quarterly guidance because "the on-premise version is a license sale whereas the

17   cloud-based version is a subscription, and this would have led to the deals being recognized as

18   deferred revenue on the balance sheet rather than immediate product revenue."  Another analyst, this

19   one from Deutsche Bank, even confirmed that demand for on-premise database firewalls was

20   lagging that of cloud-based application firewalls – "our checks have indicated that demand

21   momentum for the Database firewall lags that of Web Application Firewall, as customer awareness

22   is low, and customer perception of the vulnerability of their database servers appears to be lower

23   than that of their Application Servers."  Defendants' claims that "we're not experiencing . . . a move

24   from perpetual license to subscription" and "[w]e're seeing growth in both" were clearly untrue and

25   misleading.  In fact, defendants would later admit that while SecureSphere sales were falling,

26   Imperva saw "big uptick very nice growth" with regard to its cloud-based Incapsula products.

27         66.     Defendants' statements about the "continued demand for [Imperva's] integrated

28   solution" and "strong head-to-head win ratio in competitive deals" were also false.  Imperva

1  continued to lose large on-premise deals to IBM, which was offering its security solutions with

2  equivalent protection at low cost, and in a way that permitted customers to defer costs for IBM

3  solutions until the renewal of their enterprise agreement with IBM. Indeed, one analyst opined after

4  defendants disclosed the truth to the market on April 9, 2014 that Imperva was facing intensifying

5  competitive issues in its database security business that "we think is driven by more aggressive

6  discounting/bundling practices by IBM," with "the IBM Guardium product . . . attractively priced."

7  At the same time, defendants concealed that Imperva's lack of meaningful or reliable mainframe

8  coverage, where Imperva was facing a "perceived risk of losing access to the mainframe technology

9  agent," hindered Imperva's ability to compete for the largest on-premise mainframe opportunities.

10  Again, defendants did not disclose any of this material information to investors when boasting about

11  Imperva's purported superior products and continued competitive success.

12      67.     Defendants' claims about the "continued demand for [Imperva's] integrated solution"

13  and "strong head-to-head win ratio in competitive deals" were false and misleading for another

14  reason. Imperva continued to lose large on-premise deals because of intense competition in its

15  flagship web application firewall product from vendor F5 Networks, which had made considerable

16  strides in feature parity with Imperva's on-premise web application firewall and had partnered with

17  IBM to offer a combined solution. This combined solution further reduced the incentive for

18  potential enterprise customers to select and pay for Imperva's SecureSphere product, especially

19  considering that IBM's Guardium product already competed head-to-head with Imperva even

20  without an F5 Networks WAF enhancement. As a result, Imperva's business was shifting to cloud-

21  based products. By this time, Incapsula's cloud-based product had grown from 2.3% of Imperva's

22  revenue when it went public in 2011 to 8.8% of Imperva's net revenue in 4Q2013.

23      68.     Only a few weeks after announcing strong financial results and a dramatic turnaround

24  from the "sales execution challenges" that Imperva faced in the second quarter of 2013, defendant

25  Kramer unloaded more Imperva stock, again when Imperva stock was trading near then all-time

26  highs. Between April 1, 2014 and April 7, 2014, Kramer sold another 100,000 shares of his Imperva

27  stock for proceeds of $5.25 million. Like his January sales, these sales were also suspicious in

28  timing and amount. It was only the second time that Kramer had sold any of his Imperva stock, he

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
3:14-cv-01680-PJH                                                                    - 25 -

sold them at then near record highs, they came on the heels of his first sale, and they followed only months after Kramer secured $240 million from his sale of Trusteer to IBM and only days after Imperva's acquisitions of Incapsula and Skyfence, which brought Kramer another $13.3 million in cash and 252,669 shares of Imperva stock – or just under 1% of Imperva's total shares issued and outstanding – for a total of $25.4 million.  And to make Kramer's sales even more suspicious, Kramer stopped selling stock just *two days* before it plummeted upon the market learning of Imperva's huge first quarter 2014 earnings miss, which was attributed to sales of SecureSphere collapsing due to extended sales cycles on large deals and continued execution issues.

**Defendants Disclose the Truth – Sales of SecureSphere Collapse Because of Extended Sales Cycles on Big Deals and Purported "Sales Execution Issues"**

69.    On April 9, 2014, defendants shocked the market with preliminary first quarter 2014 financial results that missed the Company's revenue guidance by nearly $6 million – *an almost 20% miss*.  Contrary to their repeated mantra that Imperva's products dominated the competition with Imperva beating IBM "4 out of 5 times," defendants disclosed that Imperva's first quarter results were "primarily impacted by extended sales cycles on deals over $100,000."   And despite defendants' repeated claims that their sales organization changes in North America had "paid off" and had been responsible for solid growth *the previous quarter*, and also a basis for Imperva's strong guidance going forward, defendants attributed the extended sales cycles to a "combination of intensifying competition for large orders, which resulted in additional review and approval cycles, *as well as sales execution challenges* in the U.S."  And by praising "strong performance . . . in sales of subscription products during the first quarter," defendants informed investors that Imperva's SecureSphere product was the problem.  The market clearly did not find defendants' excuse credible – it punished Imperva's stock in response by collapsing an extraordinary 44% in a single day of trading on volume of 11,359,700 shares.  Imperva's stock dropped $21.73 per share from a close of $49.73 on April 9, 2014 to just $28.00 the following day.

70.    This news obviously caught the market by surprise.  According to a *Bloomberg* article with the headline "IBM Squeezing Israel Cyber Guru as $584 Million Wiped Out," one analyst expressed surprise because of the very misrepresentations that are at issue in this case – "'[t]hey had

a significant miss,'" Jonathan Ho, a Chicago-based analyst at William Blair & Co., said in an April 10 telephone interview.  Investors were surprised as "'*the company would always downplay their competitors and always viewed themselves as having a strong competitive position*.'"  And this analyst was not alone in his assessment – analyst reports following defendants' disclosure expressed similar surprise and even questioned the Company's explanation:

- BMO Capital Markets – *The magnitude of the shortfall following a strong 4Q and upwardly revised F2014 targets is puzzling*. . . . [Company's] explanation is a little hard to square with comments noting unchanged win rates, but we don't have reason to believe as of yet that anything major has changed regarding the company's secular or competitive positioning.

- William Blair & Co. – *We were surprised by the magnitude of the miss* given the decision to increase investments and the solid pipeline of opportunities.  *Our discussions with private companies suggest a strong spending environment where deal cycles are shortening given heightened breach activity rather than one where spending is undergoing delays*.

- JMP Securities – *[W]e feel Imperva's preannouncement reflects competitive issues rather than a slow-down in the broader cyber-security market*.

- Wedbush – We believe intensifying competition is concentrated in Imperva's database security business (accounts for slightly less than 50% of overall sales), *which we think is driven by more aggressive discounting/bundling practices by IBM. Our industry contacts tell us that the IBM Guardium product is attractively priced and can cover a variety of use cases, including both relational and mainframe databases*.  We think lack of mainframe coverage forced Imperva to acquire Tomium in February of 2014, and we think the company is actively restructuring its sales force to more effectively compete with IBM. . . .

- RBC Capital Markets – *We find the news disappointing*, particularly following a strong Q4/13 that saw the Company go on the offensive by making several strategic acquisitions, release SecureSphere WAF for AWS, increase investments to expand product offerings and boost the SM infrastructure, and increase guidance for FY/14.

- sterne agee – *This preannouncement constitutes a significant miss of expectations*, as the midpoint of revenues of $31.25 million is 15% below our $37 million prior estimate and consensus of 36.7 million and the midpoint of the new EPS guidance drops to 37% below the ($0.32) prior consensus number. . . .  *We believe that investors, in [a downside] scenario, would apply a lower multiple to the equity, based on damaged management credibility* . . . .

**The Aftermath**

71.     The events transpiring after defendants stunned the market are revealing about the truth behind defendants' false and misleading claims about Imperva's technology and its purported competitive success.  Less than four weeks after Imperva's disclosure, IBM announced on May 5, 2014, what defendants – and specifically Kramer – knew was coming: the introduction of its new

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 3:14-cv-01680-PJH

"Comprehensive Threat Protection System and Critical Data Protection Program," which was a culmination of two years of intensive work by IBM to integrate its acquisitions, including Trusteer, the very company defendant Kramer co-founded and then sold to IBM during the Class Period. And, unlike Imperva, IBM reported that its security business had experienced its sixth consecutive quarter of double-digit growth, with IBM rising to become one of the largest players in enterprise security since it formed a dedicated cyber security business in late 2011:

> Today's introduction of the IBM Threat Protection System and Critical Data Protection Program represent two years of significant investment in organic development and the acquisition of companies, including Q1 Labs, **Trusteer**, Guardium, Ounce Labs, Watchfire and Fiberlink/MaaS360. Since forming a dedicated cyber security business in late 2011, **IBM has risen to become one of the largest players in enterprise security and has achieved six straight quarters of double-digit growth**. According to IDC's Software Tracker, IBM significantly outpaced the overall security software market, and has moved from the 4th largest security vendor to the 3rd for 2013.

72. The timing of this announcement cannot be mere coincidence. Companies routinely notify their customers when significant product enhancements are nearing introduction. In fact, IBM announced a partnership with AT&T on February 25, 2014 – contemporaneous with defendants' claims of Imperva's superiority – that offered similar features to the Comprehensive Threat Protection System and Critical Data Protection Program that was announced officially by IBM on May 5, 2014. Stated simply, defendants knew this was coming.

73. The fact that Imperva could not close large deals when IBM, its chief rival, was on the verge of offering such a comprehensive product that was designed to address the very "security sprawl" to which Imperva contributed is revealing. Indeed, it suggests that Imperva lost these large deals not because of IBM's political connections or ability to get CEOs to a round of golf at Augusta National as defendants led the market to believe, but because IBM had a more comprehensive solution to their already robust offering.

74. And the revealing news was not limited to IBM's new product. Indeed, shortly before IBM's disclosure, and contemporaneous with Imperva's announcement that it had significantly missed its guidance, Imperva announced that its SVP of Worldwide Sales, Ralph Pisani, resigned. While it was natural to believe that Pisani's resignation was related to Imperva's sales execution issues in North America, subsequent events reveal that was not the case.

1  Specifically, on July 8, 2014, a startup company called Exabeam, *in which defendant Kramer is a*

2  *co-founder and investor*, announced a "sales push with the hiring of former Imperva SVP of

3  Worldwide Sales Ralph Pisani" as its Executive Vice President of Field Operations. And Exabeam's

4  technology appears to surpass that of Imperva – it "uses machine-learning technologies . . . to

5  simplify security operations by focusing on attacker behavior rather than ever changing malware."

6  Kramer joined two funds in June 2014 in investing a combined $10 million – coincidentally the

7  same amount of Kramer's insider sales – in the new company.

8        75.    Exabeam's cutting edge software was "engineered by the [same] team behind the

9  security company Imperva."  Both Polak and Gil, co-founders of Exabeam, were previously at

10 Imperva, and Gil left Imperva in July 2013 to start Exabeam.  It thus appears that in addition to

11 cashing out on his Imperva holdings, and in on other investments – namely Incapsula and Skyfence –

12 at the expense of Imperva, defendant Kramer also strip-mined Imperva's top talents – Pisani, Polak,

13 and Gil – to bolster his new investment in Exabeam, once again to the detriment of Imperva.  And,

14 importantly, Exabeam's press release announcing the $10 million investment quoted Pisani as stating

15 that the market had been "waiting for a solution like Exabeam," which eliminated the need to hire

16 teams of data scientists – *the very approach Imperva's technology depended upon*:

17             "Having seen the challenges enterprises face in protecting against modern-
   day cyberattacks and harmful data breaches, *the market has been waiting for a*
18             *solution like Exabeam*," said Ralph Pisani, executive vice president of field
   operations at Exabeam.  "The company has an impressive founding team that's
19             applying big data security analytics to arm IT with the tools it needs, *without having*
   *to* rebuild monitoring infrastructure or *hire teams of data scientists*."
20

21       76.    On July 31, 2014, Imperva reported its 2Q2014 financial results, with subscription

22 revenue growing substantially more than product and license revenue (*i.e.*, SecureSphere sales).  One

23 week later, on August 18, 2014, the *San Jose Mercury News* announced breaking news that

24 "Imperva replaces founder Shlomo Kramer as CEO with Anthony Bettencourt, who has led his last

25 two companies through acquisitions."  Kramer was either stepping down, despite Imperva being in

26 the "early innings of the game" to pursue, in Kramer's words, more "cutting edge trends," or the

27 Board of Directors demoted him even though, as defendant Schmid told investors at the beginning of

28 the Class Period, Kramer was "an enormous asset to [Imperva]."

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
3:14-cv-01680-PJH                                                                     - 29 -

## JURISDICTION AND VENUE

77.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

78.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

79.     Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).   Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

80.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NYSE, the world's largest stock exchange by market capitalization.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

81.     On May 2, 2013, Imperva reported strong financial results for the first quarter of 2013 and emphasized that those results "'highlight[ed] the underlying strength of [Imperva's] technology, our comprehensive, fully-integrated solution.'"   Importantly, defendants told investors that Imperva had turned the corner, claiming that "'[t]he investments being made to our global sales and support infrastructure are beginning to pay off'":

> "The investments being made to our global sales and support infrastructure *are beginning to pay off*, evidenced by the 66% year-over-year increase in new customers during the first quarter," stated Shlomo Kramer, President and Chief Executive Officer of Imperva.   "***Our results highlight the underlying strength of [Imperva's] technology, our comprehensive, fully-integrated solution***, and our global footprint as we accelerated our investments in the business to take advantage of the demand we are seeing worldwide.   Looking forward, we see numerous growth opportunities to expand our geographic reach and introduce additional products to enhance our offering and extend our leadership position."

82.     On the conference call the same day, defendants reiterated Imperva's strong financial results, emphasized that "Imperva is the only provider to offer a comprehensive integrated data center security solution," and stated that its strong win ratio, especially against large competitors, "highlight[ed] the value of [Imperva's] integrated solution":

We are very pleased with the Company's continued strong execution during the first quarter, especially our ability to exceed the top end of our revenue guidance and to achieve 66% year-over-year increase in the number of new customers.

During the quarter we accelerated our investments in our sales and marketing support and product development infrastructure to take advantage of the demand we are seeing worldwide as attacks targeting high value business data and applications continue to increase in sophistication, scale and frequency.

\*     \*     \*

This data center security stack must be built specifically to protect high value business applications and data assets from theft, flood and attack from both outside and inside the organization. *Imperva is the only provider to offer a comprehensive integrated data center security solution, which we view as a comparative advantage since enterprise seeks to minimize security overhead while optimizing protection of their applications and data*.

\*     \*     \*

In regard to some of our summary level statistics, during the first quarter we added 148 new customers, representing growth of 66% compared to last year *and evidence that our investments are paying off*. We continue to see new customer growth be well balanced across all geographies and our average bill size continues to increase.

\*     \*     \*

As I mentioned earlier, we believe that our existing customer base is less than 10% penetrated and represents a significant long-term growth opportunity for the Company. *From a comparative perspective, our win-loss ratio in head-to-head comparative deals remains at a very strong ratio. Similar to recent quarters, we had a number of deals in which we won against larger comparators, highlighting the value of our integrated solution and the superior level of support we provide on a global scale*.

83.     Defendants' statements, as alleged in ¶¶81-82, that Imperva's "results highlight the underlying strength of [Imperva's] technology, our comprehensive, fully-integrated solution" and that Imperva's "win-loss ratio in head-to-head comparative deals remains at a very strong ratio" with wins "against larger comparators, highlighting the value of [Imperva's] integrated solution" were false and misleading. Contrary to their positive assertions, as alleged in detail in ¶39, Imperva was losing deals for its flagship SecureSphere product to IBM and the reasons for it reflected a fundamental and intractable challenge to Imperva's business. What defendants failed to tell investors is that Imperva was losing deals for its largest and most profitable SecureSphere product to IBM because IBM was offering its security solutions (which offered equivalent protection) at low cost, and in a way that permitted customers to defer costs for IBM solutions until the renewal of their

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 3:14-cv-01680-PJH                                                                                           - 31 -

1   enterprise agreement with IBM.  Indeed, on a regular basis, senior-level managers at potential

2   customers often decided to use existing IT providers, instead of Imperva, because of the existing

3   enterprise-level agreements and the perception of saving money.  Thus, at the same time that

4   defendants were proclaiming "very strong" win-loss ratios as "highlighting the value of [Imperva's]

5   integrated solution," they were regularly unable to advance their sales cycle beyond the request for

6   information stage for on-premise deals because of these established relationships.  All of these

7   factors contributed to Imperva's regional sales managers and Strategic Account Directors struggling

8   to meet and missing their SecureSphere quotas, even as defendants were claiming that they had

9   resolved sales execution challenges in North America while continuing to proclaim the inherent

10  superiority and advantages that Imperva supposedly enjoyed in the cyber-security industry.  With

11  SecureSphere sales goals not being achieved, Imperva's business was shifting to its Incapsula

12  products, which were far smaller and less profitable than their SecureSphere counterparts.

13          84.     On August 7, 2013, Imperva issued a press release announcing its second quarter

14  2013 financial results.  The Company reported total revenue of $31.3 million and $(0.24) diluted

15  EPS for the second quarter of 2013, while emphasizing that it "continued to see strong demand for

16  our fully integrated solution":

17          "***The second quarter was highlighted by the 46% year-over-year growth in new
             customers and 36% increase in deals valued over $100,000***," stated Shlomo
18           Kramer, President and Chief Executive Officer of Imperva.  "***While we continued to
             see strong demand for our fully integrated solution***, performance in Europe and
19           South America was impacted by sales execution challenges in these regions.
             Looking forward, we have already taken steps to reaccelerate growth and remain
20           confident in our ability to grow global market share due to the continued strong
             pipeline of opportunities worldwide."
21
            85.     During the conference call the same day for analysts, media representatives and
22
    investors, defendant Kramer offered a reminder that Imperva was "the only provider to offer such a
23
    comprehensive integrated data center security solution," and defendant Schmid emphasized "strong
24
    demand for [Imperva's] fully integrated solution":
25
            [KRAMER:]  Terry will provide some additional color later, but our confidence is
26           driven by the continued strong pipeline of opportunities worldwide.  In addition,
             Imperva remains in position to benefit from the increasing number and frequency of
27           attacks targeting high-value business data and applications, as organizations of all
             sizes continue to lose the battle to protect their assets against hacking data breaches,
28           internal abuse, and fraud.

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
3:14-cv-01680-PJH                                                                        - 32

*As a reminder, we are the only provider to offer such a comprehensive integrated data center security solution, which we view [as] a significant competitive advantage*. Since enterprises seek to minimize security overhead, while optimizing the protection of their applications and data.[sic]  Imperva's integrated SecureSphere suite secures data usage and business transactions across various systems by providing database file and WAF application security in the data center, including traditional on-premise data centers, as well as private and hybrid Cloud computing environments.

\*      \*      \*

[SCHMID:]  *As we look to the remainder of this year, we continue to see strong demand for our solutions, and believe that Imperva remains in position to grow market share and extend our leadership position*.  As Shlomo mentioned earlier, we plan to continue to invest in the business due to the strength of our pipeline worldwide, with a particular emphasis on the European and South American territories.

\*      \*      \*

[KRAMER:]  Yes, so no, we continue to displace our competitors in the market quite successfully, and we continued to do that in last – in Q2, as well.  In general, we continue to be – as I said earlier – in a very good competitive position, and our win-loss ratio continues to be very strong.

86.     Defendants' statements, as alleged in ¶¶84-85, that they "continue[d] to see strong demand for [Imperva's] solutions" and had a "significant competitive advantage" because Imperva was "the only provider to offer such a comprehensive integrated data center security solution" were false and misleading.  Contrary to these positive assertions, as alleged in detail in ¶¶39, 44, 45, Imperva was losing deals for its flagship SecureSphere product because IBM was offering its competitive security solutions at low cost, and in a way that permitted customers to defer costs for IBM solutions until the renewal of their enterprise agreement with IBM.  Defendants knew that most of Imperva's regional sales managers and Strategic Account Directors were struggling to meet or even missing their SecureSphere quotas on a regular basis and that Imperva's business was becoming increasingly reliant on Imperva's Incapsula product, which were far smaller and less profitable than their SecureSphere counterparts.

87.     When boasting about Imperva's technology and its competitive success rate, including their statements as alleged in ¶85 that Imperva "continued to displace its competitors quite successfully" and that "we continue to be . . . in a very good competitive position, and our win-loss ratio continues to be very strong," defendants also omitted another material fact.  As alleged in ¶45,

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 3:14-cv-01680-PJH                                                                                        - 33 -

1   Imperva's technology actually limited its ability to compete for the largest enterprise deals in the

2   market, those involving mainframe databases.  What defendants failed to inform investors was that

3   Imperva was actually losing these very large deals because Imperva did not have meaningful

4   mainframe coverage, or at least reliable coverage (which IBM had with its Guardium database

5   technology), and was relying on an OEM arrangement that restricted its ability to offer a competitive

6   solution – it was, in fact, facing a "***perceived risk*** of losing access to the mainframe technology

7   agent."  This competitive chasm, along with IBM's own competitive offering that was receiving

8   strong reviews from independent IT analysts such as Gartner, which it offered to customers

9   essentially free in the near term, left Imperva at a steep competitive disadvantage and caused it to

10  lose out on the largest deals.  These were material facts that defendants were required to, but did not,

11  disclose to investors.

12          88.      Despite Imperva's struggles to close deals for its flagship SecureSphere product and

13  the shift in its business to much smaller and less profitable Incapsula sales, defendants continued to

14  promote Imperva as the dominant player in the industry.  Accordingly, on November 5, 2013,

15  Imperva issued a press release announcing its third quarter 2013 financial results.  The Company

16  reported total revenue of $35.1 million and $(0.15) diluted EPS for the third quarter of 2013.  The

17  press release boasted of "robust demand" and pointed to the number of large deals that Imperva

18  boasted as evidence of Imperva's strength:

19          "We are very pleased with our strong execution during the third quarter,
        especially our ability to achieve solid growth across all geographies," stated Shlomo
20      Kramer, President and Chief Executive Officer of Imperva.  "***During the quarter,
        demand for our integrated solution remained robust, evidenced by the 39%
21      increase in the number of deals over $100,000 booked and 33% growth in
        combined product and subscription revenue compared to last year***.  Given the
22      strong pipeline of opportunities worldwide, we remain committed to investing in our
        global sales and research and development infrastructure to further extend our
23      leadership position and gain market share."

24          89.      During the Company's earnings conference call the same day, defendant Kramer

25  emphasized Imperva's "very strong" win-loss ratio, especially against large competitors, to highlight

26  the "value of [Imperva's] integrated solutions":

27          ***From a competitive perspective our win-loss ratio in head-to-head
        competitive deals remains very strong, similar to past quarters we had a number of***

28

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
3:14-cv-01680-PJH                                                                    - 34 -

1   *deals that we won against large competitors, highlighting the value of our integrated solutions* . . . .

2   90.   The market responded to the news, increasing almost 22% in a single day of trading.

3   Imperva's stock jumped $8.01, from a close of $36.65 per share on November 5, 2013 to $44.66 per

4   share on November 6, 2013, on extremely heavy volume of more than 2.8 million shares.

5   91.   With the momentum from Imperva's 3Q2013 results, defendants went back out on the

6   road to reiterate their message that Imperva was the dominant player in the industry.   On

7   November 20, 2013, defendant Schmid addressed investors and analysts at the UBS Global

8   Technology Conference.   Defendant Schmid highlighted Imperva's purported technological

9   superiority by downplaying IBM, claiming that it could succeed against Imperva only by using its

10  political connections.   Schmid also emphasized that the number of deals over $100,000 was "[w]hat

11  we see is growing" and denied that Imperva was competing for these deals on price:

12

13  So I think that from the competitive perspective on the technology side, IBM is the most competitive technically.   I would say the pace of innovation since they bought the company, Guardium, three years ago has certainly slowed relative to when we competed against Guardium as a standalone business.   They were more innovative and more formidable from a technology perspective there.

14

15

16  That's not to disparage IBM, but it's more difficult to innovate and hold the team together that created those innovations when you're part of a larger organization.   One of the mainstays of the security business is standalone security companies.   They are the ones who innovate and come out with the newest products.

17

18  You really don't see innovative security products coming out of networking vendors.   I can't think of any, to be honest with you.   So, it's very, very difficult to be innovative in that case.

19

20  If I look at the rest of the competition, the McAfees and the Oracles of the world, you know, both of them both companies and they're not particularly relevant from a technical perspective at all.   And I don't know how much innovation has come out of those two.

21

22

23  So it's IBM that we see the most.   We do see McAfee every now and then. I think Oracle relies on their native audit capabilities more than anything else, which is a fundamental limitation in a security policy anyway because your database administrator is now not protected. That guy can do anything he wants, he or she.

24

25  And I think competitively on the web application firewall side, F5 is clearly the most competitive product against us there.   And they lack a lot of the security functionality and the scalability that we have.   But they are probably the ones putting the most resources into it, although they give off conflicting messages these days about what their security position is going to be. . . .

26

27

28

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS – 3:14-cv-01680-PJH                                                                                                    - 35 -

*So, you know, technically I think that it is – the companies that we compete against I think rely a little bit more on their political connections and a little less on their innovations to compete against us* . . . .

\*       \*       \*

Average deal sizes have] been trending upward a little bit over time. . . . **What we see is growing** is the number of deals that we are doing that are up over $100,000, for example; grew very nicely in Q3 and has continued to grow.

[Q.:]  Pricing out, this is an industry that is basically more technology-based than pricing based.  So the fact that you and up against the F5s . . . and the IBM's and the Oracles, that you can't come down to – I'll throw this in because it's not going to cut it.

[Schmid:]  It is generally not the approach that any of us take.  We are not a commoditized business right now, so it's really not a price game.  When we get engaged in very, very large deals, sure, pricing becomes a very significant factor when you're talking about that kind of money.  But we're not – it is not a race to the bottom.

92.    On December 20, 2013, Imperva hosted a conference call at the Raymond James Systems, Semiconductors, Software & Supply Chain Conference.  During the conference, defendant Schmid acknowledged that IBM was Imperva's "biggest competitor" but added that "we beat IBM four out of five times."  It was only because IBM "may be taking the [potential customers'] CEO to Augusta National to play a round of golf" that, according to Schmid, Imperva lost to IBM when competing for big deals:

[Q.] [Schmid]  So on the database side, the biggest competitor for us is IBM.  About three years ago, they bought a company called Guardi[um], and that's still the name of the product that they sell.  We see IBM and competitor situations far more than we see anybody else by far.

It's just not even – in terms of market share, IBM and Imperva are number one and two and three is really far behind in terms of specific products.  Actually, the number one market share goes to people.  People pouring over audit logs and doing code reviews and things like that.  That's the number one competitor in the space, which is why it is a green field opportunity.

*So, we beat IBM four out of five times.  We have a very, very good win rate against them.  But they are – how do they win the other 20% of the time?*

\*       \*       \*

*They may be doing that, and they may be taking the CEO to Augusta National to play a round of golf.*  There are things that – I can't get them there.  I can take them to my local muni.

So they have a lot of tentacles into organizations that give them a lot of political power, and a lot of account control.  And it's very, very difficult for a

Company of our size to overcome.  ***Technically, we're better or we wouldn't win four out of five times***.

They don't scale the way we do.  They don't have the same level of functionality that we have. . . . ***[W]e have superior technology to IBM, no question***.

93.     Defendants' statements, as alleged in ¶¶88-92, that "[w]hat we see is growing is the number of deals that we are doing that are up over $100,000" and that Imperva "beat IBM four out of five times" with a "very good win rate against them," including defendants' assertions that "the companies we compete against I think rely a little more on their political connections and a little less on their innovation to compete against us" with IBM needing to "tak[e] the CEO to Augusta National to play . . . golf" to win against Imperva were false and misleading.  Contrary to their claims, as alleged in ¶¶39, 44, 58, Imperva was losing deals to IBM because IBM offered its security solution at low cost and in a way that permitted customers to defer costs for IBM solutions until the renewal of their enterprise agreements with IBM.  In fact, defendants knew when promoting Imperva as the dominant player in the industry that most of its regional sales managers and its Strategic Account Directors were struggling to meet and were missing their quotas because of these types of established relationships and resulting discounts.  At the same time, Imperva's products still lacked meaningful or at least reliable mainframe coverage, which prevented Imperva from competing for the largest mainframe opportunities.  Indeed, as they would admit in February 2014, Imperva faced a "perceived risk of losing access to the mainframe technology agent" and sought to eliminate that risk by purchasing Tomium's assets.  But even that was too late.  Defendants still needed time to "expand the future set we include on the mainframe to include other parts of our data security suite."  Defendants' representation that Imperva lost deals to IBM only because of its "political connections" was thus a farce.

94.     Defendants' claims, as alleged in ¶92, that "[t]echnically, we're better or we wouldn't win four out of five times" and "we have superior technology to IBM, no question" were false and misleading for another reason.  As alleged in detail in ¶59, Imperva was facing intense competition in its flagship web application firewall from vendor F5 Networks, which was either extending sales cycles for Imperva or costing it market share.  As an analyst would explain after the Class Period, "[o]ur most recent channel checks suggest F5 Networks . . . has significantly enhanced its WAF

1    solution when compared to Imperva's and we believe F5 is at least extending sales cycles for

2    Imperva, if not taking share."  To make the competitive landscape worse for Imperva, IBM and F5

3    Networks had formed a partnership to offer a solution that strengthened their already formidable

4    offerings.

5            95.    On February 6, 2014, Imperva issued a press release announcing its fourth quarter and

6    full year 2013 financial results.  The Company reported total revenue of $42.7 million and $(0.38)

7    diluted EPS for the fourth quarter of 2013 and highlighted that "'[o]ur fourth quarter marked a strong

8    finish to the year, highlighted by revenue growth that was above our guidance[.]'"  The Company

9    reported the number of deals booked valued at over $100,000 had increased 43% and that the sales

10   execution issues that had plagued the company earlier in 2013 were past the Company, noting that

11   "[w]e also had solid growth across all geographic regions and continued to make progress on

12   leveraging the investments made in our global sales and research and development infrastructure."

13   Defendants also reported an impressive 29% growth rate in product and license revenue:

14         "***Our fourth quarter marked a strong finish to the year, highlighted by revenue
     growth that was above our guidance***," stated Shlomo Kramer, President and Chief

15         Executive Officer of Imperva.  "Our performance was driven by ***the combination of
     continued demand for our integrated solution and strong growth of combined***

16         ***product and subscription revenues***.  We also had solid growth across all geographic
     regions and continued to make progress on leveraging the investments made in our

17         global sales and research and development infrastructure.  Looking forward, we
     remain in position to extend our leadership position and gain share as we execute our

18         comprehensive plan for addressing the security challenges for the cloud."

19                              *     *     *

20         ***Within total revenue, product revenue was $24.2 million, an increase of 29%
     compared to the fourth quarter of 2012***.

21

22           96.    During the conference call the same day, defendant Kramer boasted of Imperva's

23   "strong head-to-head win ratio[s] in competitive deals" with Schmid emphasizing "ongoing demand

24   for [Imperva's] integrated solutions."  Defendants forecasted $36 million to $37 million in revenue

25   for 1Q2014 and growth of approximately 28% at the midpoint:

26           During the past five years, we have proven that our market focus and strategy
     were correct as we have achieved greater than 30% compounded annual growth for
     our revenues and a growing list of blue chip customers.  We currently believe that we

27           are at the very early stages of a large and fast growing market of protecting business
     critical application and data in the cloud, and that our comprehensive strategy here

28

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
3:14-cv-01680-PJH                                                                                     - 38

significantly enhances our effort to be a leader in this market and further positions Imperva for long-term growth.

Now, turning to a deal highlight in Q4, we continued to see traction with some of our largest existing accounts, ***as well as strong head-to-head win ratio in competitive deals***.  Some highlights include a Fortune 250 energy company that selected Imperva to replace and consolidate their existing Lumigent BeyondTrust and IBM Guardi[um] deployments.  The primary use case is privileged user monitoring for regulatory compliance.  The key selection driver was ease of use and ability to successfully roll out at the scale needed for the deployment.

\*       \*       \*

***Now, turning to our outlook for the first quarter of 2014.  We expect total revenue to be in the range of \$36 million to \$37 million, or growth of approximately 28% at the midpoint, compared to the same period in 2013*** . . . .

\*       \*       \*

Imperva remains well positioned to maintain its momentum due to the ***ongoing demand for our integrated solutions*** . . . .

97.     The market again reacted in response, jumping 6.8% in a single day of trading. Imperva's stock price increased \$3.78 per share, from a closing price of \$55.30 on February 6, 2014 to a closing price of \$59.08 on February 7, 2014.

98.     Defendant's claims, as alleged in ¶¶88, 89, 91, 92, that Imperva's "performance [in 4Q2013] was driven by . . . continued demand for [Imperva's] integrated solution," that Imperva would "maintain its momentum due to the ongoing demand for our integrated solutions," with a "strong head-to-head win ratio in competitive deals," and that "we expect total revenue to be in the range of \$36 million to \$37 million" were false and misleading or made without a reasonable basis. As alleged in detail in ¶¶39, 44, 58, 65, 66, at the same time that defendants were boasting about Imperva's dominance in the industry, it faced a number of troubling facts that severely hindered Imperva's ability to sell its flagship SecureSphere products, including: (a) Imperva was losing deals to IBM because it was offering its security solutions (which offered equivalent protection) at low cost, and in a way that permitted customers to defer costs for IBM solutions until the renewal of their enterprise agreement with IBM; (b) Imperva was unable to compete for the largest enterprise deals because Imperva's products did not have meaningful or reliable mainframe coverage and faced the "***perceived risk*** of losing access to the mainframe technology agent" that they belatedly sought to redress with the Tomium asset acquisition; and (c) IBM had advanced its already competitive

1    offering by developing a comprehensive security solution and had partnered with F5 Networks,

2    which had significantly closed any feature advantage that Imperva had with its web application

3    firewall.  Combined with IBM's enterprise vendor discounts and deferred payments, there was

4    simply little reason for consumers to select Imperva's costly "integrated solution."

5        99.    With Imperva's SecureSphere goals not being met, Imperva was shifting to its smaller

6    and less profitable Incapsula product.  Indeed, by the end of the year, Incapsula sales had jumped

7    from just 2.3% of net revenue when Imperva went public to 8.8% of revenue at the end of 2013.

8    Yet, defendant Schmid denied expressly that "we're not experiencing . . . a move from perpetual

9    license [*i.e.*, SecureSphere sales] to subscription [*i.e.*, Incapsula sales]," claiming that "[w]e're

10   seeing growth in both."  These claims were not only untrue and misleading, the true facts gave

11   defendants actual knowledge that their 1Q2013 guidance was made without a reasonable basis.

12                        **DEFENDANTS DISCLOSE THE TRUTH**

13       100.    On April 9, 2014, the Company announced preliminary first quarter 2014 financial

14   results and disclosed the truth about its SecureSphere sales.  The Company reported preliminary total

15   revenue in the range of $31.0 million to $31.5 million ($5 million to $6 million below the

16   Company's prior guidance of total revenue in the range of $36.0 million to $37.0 million) and

17   expected EPS in the range of $(0.40) to $(0.44), (as much as $0.11 below prior guidance of $(0.33)

18   to $(0.37)).  The release directly attributed this significant miss to "intensifying competition for large

19   orders, which resulted in additional review and approval cycles, as well as sales execution challenges

20   in the U.S."  And by praising "strong performance . . . in sales of subscription products during the

21   first quarter," defendants informed investors that Imperva's SecureSphere product was the problem.:

22           "Based on our preliminary analysis, our first quarter results were primarily
             impacted by extended sales cycles on deals over $100,000, which led to delays in
23           receiving anticipated orders from customers, particularly in the U.S., which resulted
             in lower than expected revenue for products," said Imperva President and CEO,
24           Shlomo Kramer.  "While our overall win rates remained consistent during the
             quarter, the extended sales cycles resulted from a combination of intensifying
25           competition for large orders, which resulted in additional review and approval cycles,
             as well as sales execution challenges in the U.S.  We are taking steps to address these
26           issues.  We are also continuing to analyze the factors that impacted our first quarter
             results, and consider[ing] additional steps we may take to address them and how they
27           may impact our outlook for the full year.  We expect to provide updated guidance
             during our regular earnings call."

28

975162_1

Kramer added, "[w]hile we are disappointed with the overall results, we were pleased with the strong performance in EMEA as well as in sales of subscription products during the first quarter.  We remain confident in the longer term due to ongoing growth in global demand for data center security solutions and our growing global pipeline of opportunities, as well as our commitment to innovation and ability to execute our comprehensive plan for addressing the security challenges for the cloud."

101.    As a result of this news, Imperva's stock price plummeted $21.73 per share to close at $28 per share on April 10, 2014, a one-day decline of nearly 44% on volume of 11,359,700 shares. Analysts noted this "[m]assive [g]uidance [r]eduction" and referred to "damaged management credibility."

102.    Analysts directly attributed this news to increased competition from IBM for large on-premise deals.  According to a *Bloomberg* article with the headline "IBM Squeezing Israel Cyber Guru as $584 Million Wiped Out," one analyst expressed surprise because of the very misrepresentations that are at issue in this case – "'[t]hey had a significant miss,'" Jonathan Ho, a Chicago-based analyst at William Blair & Co., said in an April 10 telephone interview.  Investors were surprised as "'***the company would always downplay their competitors and always viewed themselves as having a strong competitive position***.'"  And as alleged at ¶70, this analyst was not alone in his assessment.

### FRAUDULENT SCHEME AND COURSE OF BUSINESS

103.    During the Class Period, defendants had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time.  In so doing, defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of Imperva securities during the Class Period.  The fraudulent scheme: (a) deceived the investing public regarding Imperva's financial outlook, technology of their products and the value of the Company's securities; (b) enabled defendant Kramer to sell $10.2 million worth of his Imperva stock at artificially inflated prices; (c) enabled Imperva to purchase Skyfence and the remaining shares in Incapsula using Imperva's inflated stock as currency; and (d) caused plaintiff and other Class members to purchase Imperva stock at artificially inflated prices, causing them damage.

**SCIENTER ALLEGATIONS**

104.     As alleged herein, defendants acted with scienter in that defendants either knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; that such statements or documents would be issued or disseminated to the investing public; and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Imperva, their control over, and/or receipt and/or modification of Imperva's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Imperva, participated in the fraudulent scheme alleged herein.

105.     Defendants had actual knowledge that Imperva was losing deals to enterprise vendor IBM for large on-premise opportunities for Imperva's flagship SecureSphere product.  As Imperva's most expensive and profitable product, defendants knew about and followed closely the circumstances surrounding its sales.  Importantly, SecureSphere sales were recognized immediately as license revenue upon sale (compared to ratably for Incapsula sales) and therefore had the ability to influence in the short term Imperva's success or failure each quarter.  As a result, defendants Kramer and Schmid were highly focused on the success and/or failure of the product to sell and the reasons therefore.  Thus, they knew that most of Imperva's regional sales representatives and Strategic Account Directors with responsibility for selling Imperva's SecureSphere product were struggling to meet and were missing their sales quotas and, in particular, because of the enterprise-level agreements and the deferred payments that IBM was offering using those agreements, potential customers were selecting IBM's security solutions, which were viewed as sufficiently protecting an enterprises security needs, and rejecting Imperva's solutions often at the request for information stage of the sales process.

106.     Defendants also had complete insight into the sales process for Imperva's SecureSphere product and therefore knew about the struggles that Imperva's sales representatives were facing in their attempts to sell Imperva's SecureSphere product.  As defendant Schmid would

1    admit after the Class Period, Imperva utilized a Salesforce.com Customer Relationship Management

2    ("CRM") application to track Imperva's sales opportunities.  In fact, Salesforce.com documented

3    every sales opportunity on which Imperva's sales representatives were working.  The sales

4    representatives were required to rate each prospective sales opportunity from 10% to 100%, which

5    represented the sales person's confidence in the opportunity becoming a sale by a certain point in

6    time.  At Imperva, there existed a common standard across all opportunities with regard to the

7    percentages assigned in salesforce.com, and each sales representative was expected to abide by that

8    methodology.

9        107.    Sales representatives were required to update the status of each sales opportunity

10   continuously, and every three months sales representatives presented sales forecasts utilizing the data

11   from salesforce.com to each sales representative's immediate supervisor.  The three-month forecast

12   had to be as accurate as possible detailing every sales opportunity and what part of the sales process

13   the customer had completed and needed to complete.

14       108.    Higher-level executives such as SVP of Sales Pisani, defendant Kramer and

15   defendant Schmid, had access to salesforce.com and used it throughout any given month to routinely

16   question the status of particular sales opportunities and to authorize discounts.  This access and

17   involvement gave defendants Kramer and Schmid actual knowledge that Imperva's SecureSphere

18   sales were suffering and were facing a competitive landscape that represented a fundamental and

19   intractable challenge to Imperva's business as IBM offered an equivalent security product at low

20   cost, and in a way that permitted customers to defer costs for IBM solutions until the renewal of their

21   enterprise agreement,.

22       109.    Defendant Kramer also had unusual insight into IBM's product offerings and thus

23   knew that it was developing a comprehensive solution that would increase IBM's already formidable

24   position in the market.  As an initial matter, defendant Kramer has significant influence in the Israeli

25   cyber-security industry where IBM does substantial business.  In fact, Kramer's influence is such

26   that he is credited for the strong position of the Israeli cybersecurity industry.  As a *Bloomberg*

27   article explained it, "Israel's campaign to become a cybersecurity powerhouse, an effort trumpeted

28   by Prime Minister Benjamin Netanyahu, owes a debt to entrepreneur and investor Shlomo Kramer."

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
3:14-cv-01680-PJH                                                                                      - 43

1    And as alleged, the nature of that Israeli cyber-security industry is "incestuous" because "people

2    know one another, invest in each other's enterprises and eventually buy each other out."  Kramer

3    was thus in a perfect position to know about IBM's intentions and the nature of its offerings.

4         110.    Beyond this influence, defendant Kramer also had direct insight into IBM's plans and

5    offerings because he sold IBM Trusteer, a specialist in cyber-security.  Kramer was credited as "the

6    entrepreneur behind" Trusteer and reaped $240 million of the nearly $1 billion purchase price for the

7    Company.  When IBM announced the transaction, Trusteer's CEO, Boodaei – who founded Imperva

8    with Kramer – stated publicly that both IBM and Trusteer "started getting to know the products and

9    the abilities on each side" beginning in February 2012 and "saw there was a connection and a joint

10   vision."  And to further connect IBM to Kramer, IBM announced with the Trusteer acquisition that it

11   was forming "a cybersecurity software lab in Israel," which brought together more than "200

12   Trusteer and IBM researchers and developers."  Defendant Kramer therefore had unique insight into

13   the developments of Imperva's primary competitor.  Indeed, Kramer still sits on the Trusteer Board

14   of Directors with Boodaei.

15        111.    The Trusteer deal, which Kramer knew would bolster IBM's competitive position

16   relative to Imperva on the Company's largest deals, exemplifies Kramer's motivation throughout the

17   Class Period – to cash out of his investments at the expense of and regardless of the fallout to,

18   Imperva and its shareholders.

19        112.    Defendants were motivated to inflate Imperva's stock price because they used

20   Imperva's stock to make two acquisitions during the Class Period.  As defendants knew, the higher

21   they were able to drive Imperva's stock price the cheaper those acquisitions would ultimately be for

22   Imperva.  On February 6, 2014, defendants announced that Imperva agreed to acquire Skyfence for

23   $60 million and the remaining shares of its Incapsula subsidiary for another $5.8 million using large

24   amounts of Imperva's stock – all $5.8 million of the Incapsula acquisition and $57.2 million of the

25   Skyfence acquisition would be paid for using Imperva common stock.

26        113.    Only days after announcing the Skyfence acquisition, defendants renegotiated it.

27   Defendants originally agreed to fund the transaction almost entirely with Imperva stock – 1.2 million

28   shares would fund $57.2 million of the $60 million purchase price.  An acquisition of a related party

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
3:14-cv-01680-PJH                                                        - 44 -

1  comprised of cash and greater than 1% stock, however, requires shareholder approval pursuant to

2  NYSE rules.  Knowing that shareholders would not approve Kramer reaping a 2.1% stake (nearly

3  $29 million) in Imperva, defendants instead re-structured the deal, paying Kramer $13.3 million in

4  cash (nearly 25% of Imperva's available cash) and $12.1 million in shares.  The amended Skyfence

5  acquisition served to insulate Kramer from the 44% drop in Imperva stock when defendants

6  disclosed the truth about Imperva's SecureSphere sales to the market.

7      114.    Defendant Kramer was also motivated to inflate Imperva's stock price to dispose of

8  significant amounts of his stock.  Indeed, Kramer took full advantage of Imperva's artificially

9  inflated stock price by selling 200,000 shares, for total proceeds of $10.192 million.  He sold his

10  Imperva shares in two blocks – 100,000 shares for $4.9 million in January 2014 and another 100,000

11  shares in April 2014 for $5.19 million as follows:

| Date | Shares | Price | Proceeds | Holdings End of CP | % Sold |
|------|--------|-------|----------|--------------------|--------|
| 01/02/14 | 20,000 | $47.39 | $947,800 | | |
| 01/03/14 | 20,000 | $49.23 | $984,600 | | |
| 01/06/14 | 10,081 | $49.09 | $494,876 | | |
| 01/06/14 | 9,919 | $49.62 | $492,181 | | |
| 01/07/14 | 9,508 | $50.90 | $483,957 | | |
| 01/07/14 | 10,492 | $50.38 | $528,587 | | |
| 01/08/14 | 20,000 | $50.10 | $1,002,000 | | |
| 04/01/14 | 9,190 | $56.99 | $523,738 | | |
| 04/01/14 | 10,810 | $56.35 | $609,144 | | |
| 04/02/14 | 9,343 | $53.95 | $504,055 | | |
| 04/02/14 | 1,100 | $56.52 | $62,172 | | |
| 04/02/14 | 7,886 | $55.11 | $434,597 | | |
| 04/02/14 | 1,671 | $55.66 | $93,008 | | |
| 04/03/14 | 12,056 | $51.95 | $626,309 | | |
| 04/03/14 | 7,944 | $52.40 | $416,266 | | |
| 04/04/14 | 4,384 | $49.99 | $219,156 | | |
| 04/04/14 | 3,783 | $51.46 | $194,673 | | |
| 04/04/14 | 3,003 | $51.85 | $155,706 | | |
| 04/04/14 | 8,830 | $49.18 | $434,259 | | |
| 04/07/14 | 9,293 | $48.83 | $453,777 | | |
| 04/07/14 | 6,127 | $49.39 | $302,613 | | |
| 04/07/14 | 4,580 | $50.06 | $229,275 | | |
| TOTAL | 200,000 | | $10,192,749 | 3,672,457 | 5.16% |

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
3:14-cv-01680-PJH                                                                                        - 45 -

115.     Kramer's sales were suspicious in timing and amount for the following reasons:

(a)     This was the first time that Kramer had sold as much as a single Imperva share in Imperva's history as a publicly traded company; (b) Kramer's sales occurred at or very near Imperva's then all-time trading highs; (c) Kramer's sales occurred just four months after Kramer reaped $240 million from his sale of Trusteer to IBM; and (d) Kramer's last trade occurred just ***two days*** before defendants disclosed the truth about Imperva's SecureSphere sales to market.  Kramer's trades are not insulated by his Rule 10b5-1 trading plan because he cannot establish that he was not aware of the facts herein before entering into any such plan or that the plan otherwise complies with Rule 10b5-1(c).

116.     Kramer's self-dealing also demonstrates that he had the motive to artificially inflate Imperva's stock.  Beyond his $10 million in suspicious stock sales and the windfall that he received from selling Skyfence and the remaining interest in Incapsula to Imperva, Kramer appears to have moved on to his next venture – investing in Exabeam, a "big data security analytics company," which has technology and products that appear to surpass Imperva's in that they "change the way cyberattacks are detected" and eliminate the need to "hire teams of data scientists" as Imperva had done with its products and technology.  On June 10, 2014, shortly after Kramer finished selling his Imperva stock, Exabeam announced that it had raised $10 million from private investors, which included Kramer.  While the Exabeam announcement did not itemize how much of the $10 million came from Kramer, the total amount is suspiciously similar to the amount that Kramer received from his Imperva sales.  As if the timing of the investment was not suspicious enough, Exabeam's cutting edge software appears to surpass Imperva's – this fact should be unsurprising since it was "engineered by the [same] team behind the security company Imperva."  Indeed, both Polak and Gil, co-founders of Exabeam, were previously at Imperva.  Then, in June 2014, following his resignation, Pisani, a top Imperva salesman, surfaced at Exabeam as its Executive Vice President of Field Operations.  Thus, it would appear that Kramer mined Imperva's top talents – Pisani, Polak, and Gil – to use them to bolster his own investment in Exabeam, to the detriment of Imperva.  In August 2014, Imperva announced that Kramer was stepping down as CEO, being replaced with Anthony

1   Bettencourt, who has a "history of acquisitions."  Indeed, Kramer appears to be looking to cash out

2   again as he moves on to his next venture.

3                                   **LOSS CAUSATION/ECONOMIC LOSS**

4           117.    Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens v. United

5   *States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated

6   upon omissions of material fact which there was a duty to disclose.

7           118.    The markets for Imperva common stock were open, well-developed and efficient at

8   all relevant times.  During the Class Period, as detailed herein, defendants made false and misleading

9   statements regarding the Company's financial performance and demand for the Company's products,

10  and engaged in a scheme to deceive the market.  This artificially inflated Imperva's stock price and

11  operated as a fraud or deceit on the Class.  Later, when defendants' prior misrepresentations and

12  fraudulent conduct became apparent to the market, Imperva's stock price fell immediately and

13  significantly, as the prior artificial inflation came out of the stock price.  Plaintiff and other members

14  of the Class purchased or otherwise acquired Imperva's common stock relying upon the integrity of

15  the market price of Imperva's common stock and market information relating to Imperva.  As a

16  result of their purchases of Imperva securities during the Class Period, plaintiff and other members

17  of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws

18          119.    At all relevant times, the material misrepresentations and omissions particularized in

19  this Amended Complaint directly or proximately caused or were a substantial contributing cause of

20  the damages sustained by plaintiff and other members of the Class.  As described herein, during the

21  Class Period, defendants made or caused to be made a series of materially false or misleading

22  statements about Imperva's business, prospects and operations.  These material misstatements and

23  omissions had the cause and effect of creating in the market an unrealistically positive assessment of

24  Imperva and its business, prospects and operations, thus causing the Company's common stock to be

25  overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading

26  statements during the Class Period resulted in plaintiff and other members of the Class purchasing

27  the Company's common stock at artificially inflated prices, thus causing the damages complained of

28  herein, upon defendants' revelations of the truth and resulting collapse of Imperva's stock price.

120.   In sum, the significant decline in Imperva's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of Imperva's stock price decline negates any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff and other Class members was a direct result of defendants' fraudulent scheme to artificially inflate Imperva's stock price and the subsequent significant decline in the value of Imperva's stock when defendants' prior misrepresentations and other fraudulent conduct was revealed.

## NO SAFE HARBOR

121.   Imperva's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

122.   Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Imperva who knew that the FLS was false.  None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.  On the contrary, such statements concealed critical information about Imperva's financial performance.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

123.   Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
3:14-cv-01680-PJH                                                                                              - 48 -

1        (b)     The omissions and misrepresentations were material;

2        (c)     The Company's stock traded in an efficient market;

3        (d)     The misrepresentations alleged would tend to induce a reasonable investor to

4  misjudge the value of the Company's stock; and

5        (e)     Plaintiff and other members of the Class purchased Imperva stock between the

6  time defendants misrepresented or failed to disclose material facts and the time the true facts were

7  disclosed, without knowledge of the misrepresented or omitted facts.

8       124.    At all relevant times, the market for Imperva stock was efficient for the following

9  reasons, among others:

10       (a)     Since November 2011, Imperva's stock has been listed and actively traded on

11  the NYSE, a highly efficient and automated market;

12       (b)     As a regulated issuer, Imperva filed periodic public reports with the SEC; and

13       (c)     Imperva regularly communicated with public investors via established market

14  communication mechanisms, including through regular disseminations of press releases on the major

15  news wire services and through other wide-ranging public disclosures, such as communications with

16  the financial press, securities analysts and other similar reporting services.

17                 **CLASS ACTION ALLEGATIONS**

18       125.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

19  of Civil Procedure on behalf of all persons who purchased Imperva publicly traded securities during

20  the Class Period (the "Class").  Excluded from the Class are defendants, directors and officers of

21  Imperva and their families and affiliates.

22       126.    The members of the Class are so numerous that joinder of all members is

23  impracticable.  The disposition of their claims in a class action will provide substantial benefits to

24  the parties and the Court.  Imperva had more than 26 million shares of stock outstanding, owned by

25  thousands of persons.

26       127.    There is a well-defined community of interest in the questions of law and fact

27  involved in this case.  Questions of law and fact common to the members of the Class which

28  predominate over questions which may affect individual Class members include:

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
3:14-cv-01680-PJH                      - 49 -

1      (a)    Whether the 1934 Act was violated by defendants;

2      (b)    Whether defendants omitted and/or misrepresented material facts;

3      (c)    Whether defendants' statements omitted material facts necessary in order to

4  make the statements made, in light of the circumstances under which they were made, not

5  misleading;

6      (d)    Whether defendants knew or recklessly disregarded that their statements were

7  false and misleading;

8      (e)    Whether the price of Imperva stock was artificially inflated; and

9      (f)    The extent of damage sustained by Class members and the appropriate

10  measure of damages.

11      128.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class

12  sustained damages from defendants' wrongful conduct.

13      129.    Plaintiff will adequately protect the interests of the Class and has retained counsel

14  who are experienced in class action securities litigation.  Plaintiff has no interests which conflict

15  with those of the Class.

16      130.    A class action is superior to other available methods for the fair and efficient

17  adjudication of this controversy.

18  **COUNT I**

19  **For Violation of §10(b) of the 1934 Act and Rule 10b-5**
**Promulgated Thereunder**

20  **Against All Defendants**

21      131.    Plaintiff repeats and realleges each and every allegation set forth above in ¶¶1-130 as

22  if fully set forth herein.  This Count is asserted pursuant to §10(b) of the 1934 Act and Rule 10b-5

23  promulgated thereunder by the SEC against all defendants.

24      132.    As alleged herein, throughout the Class Period, defendants, individually and in

25  concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce,

26  the mails and/or the facilities of national securities exchanges, made untrue statements of material

27  fact and/or omitted to state material facts necessary to make their statements not misleading and

28  carried out a plan, scheme and course of conduct, in violation of §10(b) of the 1934 Act and Rule

1  10b-5 promulgated thereunder.  Defendants intended to and did, as alleged herein: (i) deceive the

2  investing public, including plaintiff and members of the Class; (ii) artificially inflate and maintain

3  the prices of Imperva common stock; and (iii) cause plaintiff and members of the Class to purchase

4  Imperva common stock at artificially inflated prices.

5       133.   The Individual Defendants were individually and collectively responsible for making

6  the false and misleading statements and omissions alleged herein and having engaged in a plan,

7  scheme and course of conduct designed to deceive plaintiff and members of the Class, by virtue of

8  having made public statements and prepared, approved, signed and/or disseminated documents that

9  contained untrue statements of material fact and/or omitted facts necessary to make the statements

10  therein not misleading.

11      134.   As set forth above, defendants made their false and misleading statements and

12  omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in

13  such a deliberately reckless manner as to constitute willful deceit and fraud upon plaintiff and the

14  other members of the Class who purchased Imperva common stock during the Class Period.

15      135.   In ignorance of the false and misleading nature of defendants' statements and

16  omissions, and relying directly or indirectly on those statements or upon the integrity of the market

17  price for Imperva common stock, plaintiff and other members of the Class purchased Imperva

18  common stock at artificially inflated prices during the Class Period.  But for the fraud, plaintiff and

19  members of the Class would not have purchased Imperva common stock at such artificially inflated

20  prices.  As set forth herein, when the true facts were subsequently disclosed, the price of Imperva

21  common stock declined precipitously and plaintiff and members of the Class were harmed and

22  damaged as a direct and proximate result of their purchases of Imperva common stock at artificially

23  inflated prices and the subsequent decline in the price of those securities when the truth was

24  disclosed.

25      136.   By virtue of the foregoing, defendants are liable to plaintiff and members of the Class

26  for violations of §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

27

28

**COUNT II**

**For Violation of §20(a) of the 1934 Act and Rule 10b-5**
**Against All Defendants**

137.    Plaintiff repeats and realleges each and every allegation set forth above in ¶¶1-136 as if fully set forth herein.  This Count is asserted pursuant to §20(a) of the 1934 Act against each of the Individual Defendants.

138.    As alleged above, Imperva violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase and sale of Imperva common stock and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period.  This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate and/or reckless disregard of the falsity of the Company's statements and the fraudulent nature of its scheme during the Class Period.

139.    As set forth above, the Individual Defendants were controlling persons of Imperva during the Class Period, due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations.  By virtue of the foregoing, the Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision making of Imperva, including the content of its public statements.

140.    Imperva had the power to control and influence the Individual Defendants and other Company executives through its Board of Directors and its power to hire, fire, supervise and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation and other employment considerations.  By virtue of the foregoing, Imperva had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Individual Defendants, including the content of their public statements.

141.    Defendants acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon plaintiff and the other members of the Class who purchased Imperva common stock during the Class Period.

1     142.    In ignorance of the false and misleading nature of the Company's statements and

2 omissions, and relying directly or indirectly on those statements or upon the integrity of the market

3 prices for Imperva common stock, plaintiff and other members of the Class purchased Imperva

4 securities at an artificially inflated price during the Class Period.  But for the fraud, plaintiff and

5 members of the Class would not have purchased Imperva common stock at artificially inflated

6 prices.  As set forth herein, when the true facts were subsequently disclosed, the price of Imperva

7 common stock declined precipitously and plaintiff and members of the Class were harmed and

8 damaged as a direct and proximate result of their purchases of Imperva common stock at artificially

9 inflated prices and the subsequent decline in the price of those securities when the truth began to be

10 disclosed.

11     143.    By reason of the foregoing, defendants are liable to plaintiff and the members of the

12 Class as controlling persons of Imperva in violation of §20(a) of the 1934 Act.

13 **PRAYER FOR RELIEF**

14     WHEREFORE, plaintiff prays for judgment as follows:

15     A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

16     B.    Awarding plaintiff and the members of the Class damages and interest;

17     C.    Awarding plaintiff's reasonable costs, including attorneys' fees; and

18     D.    Awarding such equitable/injunctive or other relief as the Court may deem just and

19 proper.

20 **JURY DEMAND**

21     Plaintiff demands a trial by jury.

22 DATED:  October 10, 2014        ROBBINS GELLER RUDMAN

23                                                      &amp; DOWD LLP

                                      DOUGLAS R. BRITTON

                                      CODY R. LeJEUNE

24

25

                                                    s/ DOUGLAS R. BRITTON

26                                        DOUGLAS R. BRITTON

27

28

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
3:14-cv-01680-PJH                                                               - 53

1

2          655 West Broadway, Suite 1900
           San Diego, CA  92101-8498
           Telephone:  619/231-1058
3          619/231-7423 (fax)

4          ROBBINS GELLER RUDMAN
             & DOWD LLP
5          SHAWN A. WILLIAMS
           One Montgomery Street, Suite 1800
6          San Francisco, CA  94104
           Telephone:  415/288-4545
7          415/288-4534 (fax)

8          Lead Counsel for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
3:14-cv-01680-PJH                                                        - 54 -

1

<u>CERTIFICATE OF SERVICE</u>

2
I hereby certify that on October 10, 2014, I authorized the electronic filing of the foregoing

3
with the Clerk of the Court using the CM/ECF system which will send notification of such filing to

4
the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I

5
caused to be mailed the foregoing document or paper via the United States Postal Service to the non-

6
CM/ECF participants indicated on the attached Manual Notice List.

7
I certify under penalty of perjury under the laws of the United States of America that the

8
foregoing is true and correct.  Executed on October 10, 2014.

9
  s/ DOUGLAS R. BRITTON
DOUGLAS R. BRITTON

10

11
ROBBINS GELLER RUDMAN
& DOWD LLP

12
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058

13
619/231-7423 (fax)

14
E-mail:  dougb@rgrdlaw.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS –
3:14-cv-01680-PJH

## Mailing Information for a Case 4:14-cv-01680-PJH Shankar v. Imperva, Inc. et al

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennifer Corinne Bretan**
  jbretan@fenwick.com,vsheehan@fenwick.com,mbafus@fenwick.com,kayoung@fenwick.com,pnichols@fenwick.com

- **Doug Britton**
  dougb@rgrdlaw.com,kathyj@rgrdlaw.com,e_file_sd@rgrdlaw.com,tjohnson@rgrdlaw.com,ldeem@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Michael M. Goldberg**
  mmgoldberg@glancylaw.com,csadler@glancylaw.com,info@glancylaw.com,rprongay@glancylaw.com

- **Frank James Johnson**
  frankj@johnsonandweaver.com,paralegal@johnsonandweaver.com,nathanh@johnsonandweaver.com,shawnf@johnsonandweaver.com,michaelf@johnsonandweaver.co

- **Deborah Kang**
  dkang@fenwick.com

- **Cody Ross LeJeune**
  clejeune@rgrdlaw.com

- **Tricia Lynn McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com,tjohnson@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Darren Jay Robbins**
  e_file_sd@rgrdlaw.com

- **David Conrad Walton**
  davew@rgrdlaw.com,ldeem@rgrdlaw.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)