1  SUSAN S. MUCK (CSB NO. 126930)
   smuck@fenwick.com
2  JENNIFER BRETAN (CSB NO. 233475)
   jbretan@fenwick.com
3  MATTHEW MEYERHOFER (CSB NO. 268559)
   mmeyerhofer@fenwick.com
4  FENWICK & WEST LLP
   555 California Street, 12th Floor
5  San Francisco, California 94104
   Telephone:    (415) 875-2300
6  Facsimile:    (415) 281-1350

7  DEBORAH KANG (CSB NO. 288143)
   dkang@fenwick.com
8  Silicon Valley Center, 801 California Street
   Mountain View, California 94041
9  Phone:    (650) 988-8500
   Fax:      (650) 938-5200
10

11 Attorneys for Defendants Imperva, Inc.,
   Shlomo Kramer and Terrence J. Schmid

12

13                     UNITED STATES DISTRICT COURT

14                  NORTHERN DISTRICT OF CALIFORNIA

15                          OAKLAND DIVISION

16  VISWANATH V. SHANKAR, Individually         Case No. CV 14-01680 PJH
    and on Behalf of All Others Similarly Situated,
17                                              **DEFENDANTS' NOTICE OF
                                                MOTION AND MOTION TO DISMISS
18                Plaintiff,                    AMENDED COMPLAINT AND
                                                MEMORANDUM OF POINTS AND
19          vs.                                 AUTHORITIES IN SUPPORT
                                                THEREOF**
20  IMPERVA, INC., SHLOMO KRAMER and
    TERRENCE J. SCHMID,                         Date:   May 13, 2015
21                                              Time:   9:00 a.m.
                  Defendants.                   Judge:  Hon. Phyllis J. Hamilton
22                                              Date Action Filed:  April 11, 2014

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION TO DISMISS ............................................................. 1

ISSUES TO BE DECIDED ............................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES .......................................................... 1

I.     PRELIMINARY STATEMENT .......................................................................... 1

II.    STATEMENT OF FACTS ................................................................................. 4

       A.    The Defendants ................................................................................... 4

       B.    The Company's Growth Throughout 2013 ............................................. 4

       C.    The Company Misses Its Guidance In The First Quarter Of 2014, But Quickly
             Rebounds ............................................................................................ 5

       D.    Plaintiff's Claims ................................................................................. 6

III.   PLAINTIFF HAS FAILED TO STATE A CLAIM UNDER SECTION 10(b) ................. 7

       A.    Plaintiff's Allegations Concerning Imperva's Forward-Looking Guidance For
             The First Quarter Of 2014 Fail To State A Claim .................................. 8

       B.    Plaintiff's Allegations Concerning Competition With IBM Or Others  Fail To
             State A Claim ..................................................................................... 11

       C.    Plaintiff's Allegations Concerning Imperva's Technological Capabilities Fail
             To State A Claim ................................................................................ 13

       D.    Plaintiff Does Not Allege Facts Supporting A Strong Inference Of Scienter ....... 15

             1.    Plaintiff Fails To Allege Facts Demonstrating That Guidance For The
                   First Quarter Of 2014 Was Knowingly False ........................................ 17

             2.    Defendants' Stockholdings And Trading Negate An Inference Of
                   Scienter ........................................................................................ 18

             3.    Allegations That Mr. Kramer Had  Supposed "Insight" Into IBM's
                   Business Does Not Support A Strong Inference Of Scienter ................... 19

             4.    Plaintiff's "Core Operations" Theory Does Not Support A Strong
                   Inference Of Scienter ..................................................................... 21

             5.    A Holistic Analysis Of Plaintiff's Allegations Does Not Support A
                   Strong Inference Of Scienter ............................................................ 22

       E.    Plaintiff Cannot Establish Loss Causation ........................................... 23

IV.    CONCLUSION ............................................................................................. 25

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Applestein v. Medivation, Inc.,*
861 F. Supp. 2d 1030 (N.D. Cal. Mar. 22, 2012), *aff'd*, 561 F. App'x 598 (9th
Cir. 2014) ...................................................................................................................19

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) .....................................................................................................7

*Benson v. Applied Signal Tech., Inc.*
527 F.3d 982 (9th Cir. 2008)......................................................................................21

*Cement Masons & Plasterers Joint Pension Trust v. Equinix, Inc.,*
2012 WL 685344 (N.D. Cal. Mar. 2, 2012)................................................................17

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.,*
2014 WL 4180845 (N.D. Cal. Aug. 22, 2014)............................................................21

*City of Roseville Emp. Ret. Sys. v. Sterling Fin. Corp.,*
963 F. Supp. 2d 1092 (E.D. Wash 2013) ...................................................................23

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.,*
880 F. Supp. 2d 1045 (N.D. Cal. 2012) ..............................................................18, 19

*DSAM Global Value Fund v. Altris Software, Inc.,*
288 F.3d 385 (9th Cir. 2002).......................................................................................7

*Dura Pharms., Inc. v. Broudo,*
544 U.S. 336 (2005)...............................................................................................23, 24

*Glazer Capital Mgmt., LP v. Magistri,*
549 F.3d 736 (9th Cir. 2008)..................................................................................7, 22

*Gompper v. VISX, Inc.,*
298 F.3d 893 (9th Cir. 2002)......................................................................................16

*In re Bare Escentuals Sec. Litig.,*
745 F. Supp. 2d 1052 (N.D. Cal. 2010) ............................................................. *passim*

*In re Century Aluminum Co. Sec. Litig.,*
729 F.3d 1104 (9th Cir. 2013).....................................................................................25

*In re ChinaCast Educ. Corp. Sec. Litig.,*
2012 WL 6136746 (C.D. Cal. Dec. 7, 2012) .............................................................23

*In re Cisco Sys. Inc. Sec. Litig.,*
2013 WL 1402788 (N.D. Cal. Mar. 29, 2013).......................................................12, 14

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*In re Copper Mountain Sec. Litig.*,
    311 F. Supp. 2d 857 (N.D. Cal. 2004) ........................................................................14

*In re Cornerstone Propane Partners, L.P. Sec. Litig.*,
    355 F. Supp. 2d 1069 (N.D. Cal. 2005) ....................................................................14

*In re Cutera Sec. Litig.*,
    610 F.3d 1103 (9th Cir. 2010).................................................................8, 10, 14, 17

*In re Daou Sys., Inc.*,
    411 F.3d 1006 (9th Cir. 2005).............................................................................10, 22

*In re Downey Sec. Litig.*,
    2009 WL 2767670 (C.D. Cal. Aug. 21, 2009)..........................................................18

*In re FoxHollow Techs. Inc. Sec. Litig.*,
    2008 WL 2220600 (N.D. Cal. May 27, 2008), *aff'd*, 359 F. App'x 802 (9th Cir.
    2009) ..........................................................................................................................11

*In re LeapFrog Enters., Inc. Sec. Litig.*,
    527 F. Supp. 2d 1033 (N.D. Cal. 2007) ....................................................................11

*In re Metricom Sec. Litig.*,
    2004 WL 966291 (N.D. Cal. Apr. 29, 2004), *aff'd sub nom.*, 182 F. App'x 714
    (9th Cir. 2006)...........................................................................................................13

*In re Oracle Corp. Sec. Litig.*,
    627 F.3d 376 (9th Cir. 2010).....................................................................................24

*In re Rackable Sys., Inc. Sec. Litig.*,
    2010 WL 3447857 (N.D. Cal. Aug. 27, 2010)..........................................................24

*In re Rigel Pharms. Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012)......................................................................................7

*In re Silicon Graphics, Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999)................................................................................7, 18

*In re Silicon Storage Tech. Inc. Sec. Litig.*,
    2007 WL 760535 (N.D. Cal. Mar. 9, 2007).................................................10, 12, 14

*In re Skechers U.S.A., Sec. Litig.*,
    273 F. App'x 626 (9th Cir. 2008) ..............................................................................18

*In re Stac Elec. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996)......................................................................................21

*Janus Capital Group v. First Deriv. Traders*,
    131 S. Ct. 2296 (2011) .............................................................................2, 9, 16, 17

*Kovtun v. VIVUS, Inc.*,
    2012 WL 4477647 (N.D. Cal. Sept. 27, 2012) ..................................................19

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002)............................................................................20

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014)........................................................................23, 24

*Mallen v. Alphatec Holdings, Inc.*,
    861 F. Supp. 2d 1111 (S.D. Cal. 2012) ...............................................................21

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008)........................................................7, 22, 23, 24

*Navarro v. Block*,
    250 F.3d 729 (9th Cir. 2001)..................................................................................7

*Oregon Pub. Emps. Ret. Fund v. Apollo Group, Inc.*,
    --- F.3d ----, 2014 WL 7139634 (9th Cir. Dec. 16, 2014)............................ *passim*

*Paracor Fin. Inc. v. General Elec. Capital Corp.*,
    96 F.3d 1151 (9th Cir. 1996)................................................................................25

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001).......................................................7, 8, 10, 17

*South Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008)................................................................................21

*Stickrath v. Globalstar, Inc.*,
    527 F. Supp. 2d 992 (N.D. Cal. 2007) .................................................................14

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008) ................................................................................................7

*Teamsters Local. Nos. 175 & 505 Pension Fund v. The Clorox Co.*,
    353 F.3d 1125 (9th Cir. 2004)..............................................................................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)....................................................................8, 15, 16, 22

*Tripp v. Indymac Fin. Inc.*,
    2007 WL 4591930 (C.D. Cal. Nov. 29, 2007)......................................................19

*Verona Partners, LLC v. Tenet Capital Partners Convertible Opportunities Fund
    LP*, 2006 WL 2669035 (N.D. Cal. Sept. 18, 2006).................................................17

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Westley v. Oclaro, Inc.*,
   897 F. Supp. 2d 902 (N.D. Cal. 2012), *modified in part on reconsideration*
   (Jan. 10, 2013) .................................................................................................21

*Wietschner v. Monterey Pasta Co.*,
   294 F. Supp. 2d 1102 (N.D. Cal. 2003) ........................................................19

*Wozniak v. Align Tech., Inc.*,
   850 F. Supp. 2d 1029 (N.D. Cal. 2012) ........................................................25

*Yanek v. Staar Surgical Co.*,
   388 F. Supp. 2d 1110 (C.D. Cal. 2005) ........................................................11

*Zack v. Allied Waste Indus., Inc.*,
   2005 WL 3501414 (D. Ariz. Dec. 15, 2005), *aff'd*, 275 F. App'x 722 (9th Cir.
   2008) .................................................................................................................18

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009)...................................................................7, 21

**STATUTES & RULES**

15 U.S.C. § 78u-4(b)(1)(B) ..................................................................................7

15 U.S.C. § 78u-4(b)(2)(A).............................................................................7, 15

15 U.S.C. § 78u-5(c)(1) .......................................................................................17

15 U.S.C. § 78u-5(c)(1)(A)(i)...............................................................................8

Private Securities Litigation Reform Act of 1995............................................ *passim*

Securities Exchange Act of 1934
   § 10(b) ................................................................................................... *passim*
   § 20(a) ................................................................................................... *passim*

Federal Rules of Civil Procedure
   Rule 9(b) ..............................................................................................1, 7
   Rule 12(b)(6)............................................................................................1

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

## NOTICE OF MOTION AND MOTION TO DISMISS

TO ALL PARTIES AND THEIR COUNSEL OF RECORD: PLEASE TAKE NOTICE that on

May 13, 2015, at 9:00 a.m., or as soon thereafter as counsel may be heard, in the courtroom of the

Honorable Phyllis J. Hamilton, U.S. District Court, Northern District of California, defendants

Imperva, Inc. ("Imperva" or the "Company"), Shlomo Kramer and Terrence J. Schmid will, and

hereby do, move to dismiss with prejudice all claims asserted against them in plaintiff's Amended

Complaint (the "AC"). Defendants move pursuant to Rules 12(b)(6) and 9(b) of the Federal

Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA") on

the grounds that Plaintiff fails to state a claim for violation of Sections 10(b) and 20(a) of the

Securities Exchange Act of 1934 ("1934 Act"). This motion is based upon this Notice of Motion

and Motion; the following Memorandum of Points and Authorities; Defendants' Request for

Judicial Notice ("RJN"); the Declaration of Susan S. Muck ("Muck Decl.") and exhibits thereto

("Ex.")[1]; the [Proposed] Order; the pleadings and records on file herein; the argument of counsel;

and such other matters as may be presented to the Court.

## ISSUES TO BE DECIDED

1.       Should plaintiff's Section 10(b) claim be dismissed where plaintiff does not allege

specific facts showing the existence of any actionable statements, raising a strong inference of

scienter, or demonstrating that the allegedly fraudulent conduct caused plaintiff's losses?

2.       Should plaintiff's Section 20(a) claim be dismissed where plaintiff fails to plead a

primary violation of Section 10(b)?

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.       PRELIMINARY STATEMENT

Plaintiff's securities fraud claim is not only devoid of the specifics required by the PSLRA

and well-established principles of law, but it is predicated on an irrational theory of fraud that no

court has accepted. This Court should not be the first.

As detailed below, Imperva achieved both sequential and year-over-year growth

throughout 2013. In the first quarter of 2014, however, the Company missed its forward-looking

---

[1] Unless otherwise noted, references to Exhibits ("Ex.") are to the Muck Declaration.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

guidance, reporting revenues of $31.5 million in comparison to its guidance of $36 million to $37 million. The Company announced preliminary results for that quarter on April 9, 2014, and explained that the lower than anticipated results were due to "extended sales cycles" on large deals (over $100,000), which caused delays in receiving expected orders from customers, as well as "sales execution challenges in the U.S." The Company quickly recovered from this one quarter setback (posting strong results in each period thereafter), and its stock price has since rebounded. Nevertheless, plaintiff works backwards from the miss, alleging that the guidance was "knowingly false" and that the Company's prior statements dating back almost one year to May 2, 2013 – whether about its products, technology or competition with International Business Machines ("IBM") or others – were knowingly or deliberately false.

Were this just another ordinary fraud by hindsight case, it would be subject to dismissal. There are, however, two aspects of plaintiff's claim that make it uniquely deficient.

*First*, in attempting to allege that the Company, its Chief Executive Officer (Shlomo Kramer) and Chief Financial Officer (Terrence J. Schmid) acted with scienter, plaintiff alleges that defendants "hyped" Imperva's products and win-loss ratio against IBM, and offered false guidance, in order to inflate its stock to acquire two companies, Skyfence Networks, Ltd. ("Skyfence") and the remaining shares of Incapsula, Inc. ("Incapsula") (which was already 80% owned by the Company), in February 2014 and March 2014, respectively. The problem with that theory is that Mr. Kramer was a significant stockholder of Skyfence, and received 252,669 shares of Imperva stock when the acquisition was consummated. In other words, according to plaintiff, Mr. Kramer was purposefully inflating the price of Imperva's stock only to acquire the allegedly inflated shares himself when Skyfence was sold, and then watched them decline in value. As detailed below, such an economically irrational theory of scienter has no support in the case law or in common sense.

Nor can plaintiff overcome the irrational nature of its theory by alleging that Mr. Kramer sold 100,000 shares of Imperva stock in early January, 2014, and another 100,000 shares in early April, 2014. As plaintiff is forced to acknowledge, these sales were made pursuant to a pre-established Rule 10b5-1 trading plan, and constituted just a tiny fraction of the more than 3.7

million shares of Imperva stock Mr. Kramer owned at the time. Indeed, Mr. Kramer was a *net purchaser* of Imperva stock during the class period, *acquiring 52,669 more shares than he sold*. And, rather than selling any significant portion of his holdings, Mr. Kramer saw the value of his interest in Imperva decline by $79.8 million following the April 9, 2014 announcement. Accordingly, for the Amended Complaint to survive, plaintiff would need to show that Mr. Kramer was effectively "defrauding" himself. As to Mr. Schmid, plaintiff makes no allegations at all about his trading, nor does it offer any other theory – much less pleaded facts – demonstrating why he would engage in securities fraud.

*Second*, despite ample time for investigation, plaintiff's Amended Complaint fails to identify a single witness, document, internal communication or data source that corroborates any aspect of its claim. Not one. Plaintiff has been unable to unearth anyone or anything that supports the notion that defendants engaged in misconduct. Instead, the Amended Complaint relies entirely on lawyer say-so and invective. It is therefore devoid of the factual details necessary to plead securities fraud, and its vaguely stated allegations are irreconcilable with the Company's actual results and forthright disclosures, as detailed below.

In an apparent effort to overcome these pleading shortcomings, plaintiff spills considerable ink casting aspersions on Mr. Kramer's success in the cyber-security industry and connections to the Israeli technology community. Stripped of pejorative characterizations, what these allegations actually show is that Mr. Kramer has been an enormously successful executive, the companies he has invested in or founded – like Imperva – have great products and have been quite successful, and that Mr. Kramer has accumulated considerable wealth as a result (which plaintiff estimates at $1 billion). Rather than creating an incentive to commit fraud, these allegations actually eviscerate the notion. Mr. Kramer had no reason (and certainly no financial one) to risk his stellar reputation as a technology "guru" by engaging in securities fraud, much less an irrational one in which he actually acquired more shares than he sold and saw the value of his holdings decline by $79.8 million. In any event, as shown below, plaintiff only attributes statements to Mr. Kramer on three dates (May 2, 2013, August 7, 2013 and November 15, 2013), none of which are actionable under well-established law.

1    Because the Amended Complaint is devoid of specifics and offers an unsupported and

2    irrational theory of fraud, it should be dismissed without further leave to amend.

3    **II.    STATEMENT OF FACTS**

4        **A.    The Defendants**

5        Imperva is a publicly traded Delaware corporation headquartered in Redwood Shores,

6    California.  AC ¶ 11.  It offers security products and services designed to enable companies to

7    protect against cyber-attacks in databases that store valuable information and applications.  AC ¶

8    29.  Among its product offerings are SecureSphere, Incapsula and Skyfence.  AC ¶¶ 29, 64.

9    SecureSphere provides database, file, and web application security across systems with on-

10   premise and virtual data centers.  AC ¶ 29.  Incapsula is a cloud-based product that is designed to

11   block attacks against web applications to help ensure website safety and availability.  *Id.*

12   Skyfence helps ensure security and compliance of cloud applications and data, allowing greater

13   visibility and control over corporate use of Software-as-a-Service applications. Ex. G (Ex. 99.1).

14       Defendant Shlomo Kramer co-founded Imperva in 2002.  AC ¶¶ 16, 28.  He has served as

15   the Company's Chief Executive Officer and Chairman of the Board of Directors.  While retaining

16   the position as Chairman, he has recently transitioned into the role as the Company's Chief

17   Strategy Officer, upon the hiring of a new CEO in August, 2014.  *See* AC ¶¶ 12, 76.  Defendant

18   Terrence J. Schmid is the Company's Chief Financial Officer.  AC ¶ 13.

19       **B.    The Company's Growth Throughout 2013**

20       The class period begins on May 2, 2013, when the Company announced its results for the

21   first quarter of 2013 ending on March 31, 2013 (for convenience, quarters will be referenced in

22   the form Q1 2013 hereafter).  For that period, the Company reported net revenues of $28.6

23   million, a substantial increase over the same period the prior year, when net revenues totaled

24   $21.5 million.  These results also included a 66% year over year increase in new customers

25   utilizing Imperva's products and services.  *See* AC ¶ 37; Ex. A (Ex. 99.01); Ex. B at 3.

26       The next quarter was an equal success.  In Q2 2013, the Company reported net revenues

27   of $31.3 million, an increase of 28% over the same period the prior year, a 46% increase in new

28   customers, and a 36% increase in deals valued over $100,000.  *See* AC ¶ 40; Ex. C (Ex. 99.01);

Ex. D at 3.

The Company's growth continued in Q3 2013, both sequentially and year-over-year. Net revenues were $31.5 million, a 24% increase over the comparable period the prior year, with deals over $100,000 also up over 39% compared to the same period. *See* AC ¶ 53; Ex. E (Ex. 99.01); Ex. F at 3.

Imperva's results for the fourth quarter and year-end were equally impressive. Net revenues for the quarter were $42.7 million, and for the full year totaled $137.8 million. This represented substantial (greater than 30%) growth over the prior year, where fourth quarter net revenues were $31.8 million, and year-end revenues were $104.2 million. *See* AC ¶ 95; Ex. G (Ex. 99.2); Ex. H at 39, 54. The Company reported "solid growth across all geographic regions" for the year. AC ¶ 62. The Company's stock price reacted accordingly, increasing from $32.54 per share at the beginning of the year to $48.13 at year end. Ex. I.[2]

## C.    The Company Misses Its Guidance In The First Quarter Of 2014, But Quickly Rebounds

The Company therefore entered 2014 with momentum from the growth in its business the prior year. On February 6, 2014, during the Company's earnings conference call with the investor community following the release of 2013 results, Mr. Schmid provided forward-looking guidance for the first quarter of 2014. Among other things, he stated that "we expect total revenue to be in the range of $36 million to $37 million." AC ¶ 98.

When the Company experienced unanticipated difficulties in the first quarter, it announced preliminary results on April 9, 2014 (the end of the class period), stating that it expected revenue of $31 million to $31.5 million (the revenue number it would ultimately report).

---

[2] Imperva's forward-looking guidance was remarkably accurate in predicting the Company's performance throughout 2013. For Q1 2013, the Company predicted revenues of $27 million to $27.5 million, and reported revenues above that estimate at $28.6 million. Ex. A (Ex. 99.01); Ex. J (Ex. 99.01); AC ¶¶ 37, 81. For Q2 2013, the Company provided guidance estimated at $31 million to $31.5 million in revenues, and reported within that range at $31.3 million. Ex. A (Ex. 99.01); Ex. C (Ex. 99.01); AC ¶¶ 40, 84. For Q3 2013, the Company reported $35.1 million in revenues, which slightly exceeded its forward-looking guidance of $34 million to $35 million. Ex. C (Ex. 99.01); Ex. E (Ex. 99.01); AC ¶¶ 53, 88. For Q4 2013, the Company again exceeded its guidance, reporting revenues of $42.7 million, slightly above its forward-looking range of $41 to $42 million. Ex. E (Ex. 99.01); Ex. G (Ex. 99.2); AC ¶¶ 62, 63, 95.

Fenwick & West LLP
Attorneys At Law
San Francisco

AC ¶ 100.  While this was significantly above the comparable period in 2013 ($28.6 million), it was below the Company's guidance.  In the Company's April 9 press release, Mr. Kramer explained that the lower than anticipated results were principally due to "extended sales cycles on deals over $100,000, which led to delays in receiving anticipated orders from customers," caused by "a combination of intensifying competition for large orders" as well as "sales execution challenges in the U.S."  Ex. K (Ex. 99.1); AC ¶ 100.

These problems proved to be short-lived.  By Q2 2014 – the very next quarter – the Company reported revenues of $38.4 million (compared to $31.3 million the prior year).  Ex. L (Ex. 99.01).  Likewise, in Q3 2014, Company revenues were $42.7 million, well above the comparable period the prior year (of $35.1 million).  Ex. M (Ex. 99.01).  The Company's stock price has reacted accordingly, closing as high as $52.19 on December 26, 2014 (above the $49.73 per share price immediately before the April 9, 2014 announcement).  Ex. I.

**D.  Plaintiff's Claims**

This action was commenced on April 11, 2014, just two days after the Company's April 9 announcement.  Following appointment of a lead plaintiff and counsel, plaintiff Delaware County Employees Retirement System ("plaintiff") filed its Amended Complaint on October 10, 2014.

Plaintiff generally alleges that the Company made material misrepresentations during a class period running from May 2, 2013 through April 9, 2014.  These statements were made in press releases announcing earnings issued on May 2, August 7 and November 5, 2013, and on February 6, 2014, and in analyst conference calls on those days.  AC ¶¶ 81, 84, 88, 95.  The Amended Complaint also references two technology conferences at which Mr. Schmid spoke on November 20 and December 10, 2013.  AC ¶¶ 91-92.  The misstatements allegedly concern:  (1) the Company's Q1 2014 guidance provided by Mr. Schmid, which plaintiff contends was knowingly false when given; (2) Company statements regarding competition with IBM and others, which it alleges were false and misleading throughout the class period, even while the Company was reporting increasing revenues; and (3) Company statements regarding its technological capabilities.  For the reasons detailed below, plaintiff's allegations are deficient as a matter of law.

# III. PLAINTIFF HAS FAILED TO STATE A CLAIM UNDER SECTION 10(b)

A motion to dismiss "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). The Court examines the well-pleaded factual allegations, and any materials referenced in the pleading or subject to judicial notice, and "determine[s] whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

In asserting claims for securities fraud under Section 10(b), a plaintiff "must meet the higher, exacting pleading standards" of Rule 9(b) and the PSLRA. *Oregon Pub. Emps. Ret. Fund v. Apollo Group, Inc.*, --- F.3d ----, 2014 WL 7139634, at *2 (9th Cir. Dec. 16, 2014); *see Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).[3] The PSLRA imposes stringent pleading requirements that are designed to "filter out the unfounded [suits] early enough to avoid huge litigation expenses." *Ronconi v. Larkin*, 253 F.3d 423, 428 (9th Cir. 2001).

Among other things, the PSLRA requires plaintiffs to identify "each statement alleged to have been misleading, [and] the reason or reasons why [it] is misleading" (15 U.S.C. § 78u-4(b)(1)(B)), including specific contemporaneous facts showing that the challenged statements were false when made. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1071-72 (9th Cir. 2008). *See In re Rigel Pharms. Inc. Sec. Litig.*, 697 F.3d 869, 876-77 (9th Cir. 2012).

Plaintiffs must also establish a "strong inference" that each alleged misstatement was made with scienter (15 U.S.C. § 78u-4(b)(2)(A)), "the nefarious mental state necessary to constitute securities fraud." *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 391 (9th Cir. 2002); *see Rigel*, 697 F.3d at 877; *Oregon Pub.*, 2014 WL 7139634, at *3, 6. Plaintiff must plead facts showing that defendants intentionally made false statements or acted with deliberate recklessness tantamount to actual intent. *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 976-77 (9th Cir. 1999); *Oregon Pub.*, 2014 WL 7139634, at *6. Scienter must be established as to *each* defendant (*Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 743, 745 (9th Cir. 2008)) and the necessary strong inference "must be more than merely plausible or

---

[3] A Section 10(b) claim requires: (1) a material misrepresentation or omission; (2) scienter; (3) purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008); *Oregon Pub.*, 2014 WL 7139634, at* 2.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

The PSLRA also creates a two-pronged "safe harbor" protecting forward-looking statements. Such statements – such as earnings guidance – are not actionable if they are identified as forward-looking and "accompanied by meaningful cautionary" language. Even in the absence of such cautionary language, and to encourage companies to provide earnings guidance and other prospective information, the PSLRA requires plaintiffs to plead specific facts showing the speaker had *actual knowledge* that the forward-looking statement was false when made. *See* 15 U.S.C. § 78u-5(c)(1)(A)(i); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010).

The PSLRA thus changes the way in which pleadings are analyzed and represents a "deviation from the usually lenient requirements of federal rules pleading." *Ronconi*, 253 F.3d at 437. "In few other areas are motions to dismiss … so powerful." *Id.*

### A.    Plaintiff's Allegations Concerning Imperva's Forward-Looking Guidance For The First Quarter Of 2014 Fail To State A Claim

As set forth above, the Company achieved sequential and year-over-year revenue growth in all quarters of the class period in 2013, and such results met or exceeded the Company's guidance. Although plaintiff alleges that the Company was experiencing the same "competitive pressures" from IBM and others throughout each of these periods, and had the same supposed "technological issues" with its product offerings, plaintiff makes no effort to explain how these alleged problems were adversely impacting Imperva's business, which was not only doing well, but growing. Indeed, plaintiff is forced to concede that Imperva reported "strong" and "impressive" financial results in each quarter of 2013. AC ¶¶ 37, 40, 53, 62.

Instead, in predictable "fraud by hindsight" fashion, plaintiff alleges that the Company's guidance for Q1 2014, which was given orally by Mr. Schmid on the February 6, 2014 conference call with analysts, was "false or misleading or without a reasonable basis," on the strength of nothing more than the fact that the Company missed its estimate in that period. AC ¶¶ 96, 98. As the Company explained, the lower than forecasted results were primarily impacted by "extended

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

sales cycles on deals over $100,000, which led to delays in receiving anticipated orders from customers, particularly in the U.S., which resulted in lower than expected revenues for products." Ex. K (Ex. 99.1); AC ¶ 100. "While [the Company's] overall win rates remained consistent during the quarter, the extended sales cycle resulted from a combination of intensifying competition for large orders, which resulted in additional review and approval cycles, as well as sales execution challenges in the U.S." *Id.* Although these challenges arose *during the first quarter* (and were quickly overcome in subsequent periods), plaintiff alleges that the Company "knew it all along" and purposefully misstated its Q1 2014 guidance. There are at least three fundamental defects in that theory.

*First*, it is unsupported by specific, contemporaneous facts suggesting that Mr. Schmid's guidance was false when made. Plaintiff does not cite a single witness or internal Company document that suggests that Mr. Schmid or anyone else at the Company – which had historically provided accurate guidance – somehow "knew" that its guidance for Q1 2014 was unachievable or unreasonable. Instead, plaintiff relies on vaguely stated generalities that do not distinguish between this period and any other (when the Company faced the same alleged challenges yet met or exceeded guidance).

Thus, plaintiff alleges that the Company "was losing deals to IBM" because it was allegedly offering steep discounts, that Imperva's products "did not have meaningful or reliable mainframe coverage," and that by teaming with F5 Networks, IBM had become a more formidable competitor. AC ¶ 98. Plaintiff, however, provides no specifics to support these allegations: no customers are identified, no specifics about IBM pricing are detailed (what the prices were, when it allegedly started to discount, or to whom), no details are provided concerning IBM's "teaming" with F5 Networks or the impact it had on the market and when, and no information is provided as to how the Company would know of IBM's pricing or such supposed impact. These are not the allegations that show, as the PSLRA requires, the "reasons why" the Company's guidance was "false when made." *See In re Bare Escentuals Sec. Litig.*, 745 F. Supp. 2d 1052, 1076 (N.D. Cal. 2010) (dismissing claims where plaintiffs "completely fail to set forth any particularized allegations that would demonstrate 'how' or 'why' defendants'

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

alleged statements… were false when made"); *In re Silicon Storage Tech. Inc. Sec. Litig.*, 2007

WL 760535, at *8 (N.D. Cal. Mar. 9, 2007) (claim dismissed where "the allegations relating to

the reports and databases provide no specific, particularized information that contradicts

defendants' representations").[4]

  *Second*, the Company's guidance is protected by the PSLRA's safe harbor for forward-

looking statements.  At the outset of the February 6, 2014 earnings call, the Company expressly

indicated that it would be making "forward-looking statements regarding future events and future

financial performance of the Company," and that such statements were "subject to material risks

and uncertainties that could cause actual results to differ materially from those in the forward-

looking statements."  Ex. N at 2.  The Company also specifically directed stockholders to the

"risk factors" described in the Company's accompanying press release and its most recent Form

10Q filed with the SEC, which emphasized that the market for the Company's products "is

intensely competitive" by virtue of IBM and others and "we expect competition to intensify in the

future."  *Id.*; *see* Ex. G (Ex. 99.2); Ex. F at 35-52.  Such warnings bring the Company's guidance

well within the safety of the "first prong" of the PSLRA safe harbor.  *Cutera*, 610 F.3d at 1112-13

(holding that scienter need not be evaluated where forward-looking statement was accompanied

by meaningful cautionary language); *see Teamsters Local. Nos. 175 & 505 Pension Fund v. The

Clorox Co.*, 353 F.3d 1125, 1132-33 (9th Cir. 2004) (holding that such warning was sufficient to

invoke the safe harbor).

  *Third*, "even if unaccompanied by cautionary language, forward-looking statements

cannot support liability unless they are made with actual knowledge of their falsity."  *Bare*

---

[4] That plaintiff is relying entirely on impermissible fraud by hindsight is evident from its
allegations concerning the "U.S. sales execution challenges" the Company referenced in the April
9 press release.  Plaintiff pleads no facts demonstrating that the Company was experiencing such
challenges in earlier periods, and tellingly does not (and cannot) allege that U.S. sales had
declined in prior quarters.  To the contrary, the only references in the Amended Complaint to
"North American" sales in earlier periods shows significant growth, and contrasts how well North
America had performed in such periods in comparison to certain other regions.  *See* AC ¶¶ 41, 63.
The challenge in the U.S. in Q1 2014 was thus a new problem that the Company disclosed, and
hence cannot support a securities fraud claim.  *See Ronconi*, 253 F.3d at 434 (emphasizing
"substantial difficulties," or "difficult problems" does not mean that the Company will not "have
increasing revenues"); *In re Daou Sys., Inc.*, 411 F.3d 1006, 1021 (9th Cir. 2005) (fraud by
hindsight is prohibited).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1 *Escentuals*, 745 F. Supp. 2d at 1080 (dismissing claims where plaintiffs failed to plead with

2 particularity defendants' actual knowledge of falsity regarding future projections); *see In re*

3 *LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1047 (N.D. Cal. 2007) (plaintiffs failed

4 to plead facts showing that defendants knew "the purported competition or distribution problems

5 would render any of the specific predictive statements false when made").  Plaintiff, however,

6 alleges no concrete facts suggesting that Mr. Schmid actually knew the guidance for the first

7 quarter of 2014 was unreasonable at the time it was given.  Accordingly, even ignoring other

8 deficiencies, the claim predicated on guidance fails as a matter of law.  *See Yanek v. Staar*

9 *Surgical Co.*, 388 F. Supp. 2d 1110, 1126 (C.D. Cal. 2005) ("the "PSLRA requires a 'strong

10 inference' of *actual* knowledge, and not merely constructive knowledge, that a forward looking

11 statement was false").

## B. Plaintiff's Allegations Concerning Competition With IBM Or Others Fail To State A Claim

14     The bulk of plaintiff's remaining allegations concern putative misstatements about

15 Imperva's competition with IBM and others.  Plaintiff alleges that defendants had misrepresented

16 that it had a "very strong" win-loss ratio against IBM throughout the class period (AC ¶¶ 2, 4, 5,

17 37, 39, 42, 44, 53, 58, 82, 83, 85, 87, 89), including a December 2013 statement (by Mr. Schmid)

18 that the Company "beat IBM four out of five times" in head to head competition (AC ¶¶ 7, 57-59,

19 92-94).  While plaintiff alleges that these statements were "false," it provides no specific factual

20 allegations to support that assertion.  Indeed, plaintiff offers no facts, witnesses, documents, data

21 or any other information showing that the Company did not have a "very strong" win-loss ratio

22 against IBM.  *See Bare Escentuals*, 745 F. Supp. 2d at 1076 (claim dismissed where plaintiffs

23 failed to provide factual details establishing that statements were false when made); *In re*

24 *FoxHollow Techs. Inc. Sec. Litig.*, 2008 WL 2220600, at *14 (N.D. Cal. May 27, 2008) ("Vague

25 claims about what statements were false or misleading and how they were false are subject to

26 dismissal"), *aff'd*, 359 F. App'x 802 (9th Cir. 2009).

27     Likewise, to create the appearance of some specificity, plaintiff repeatedly incants the

28 allegation that IBM allegedly "offer[ed] its products at low cost and in a way that permitted

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

customers to defer costs," and faults defendants for not disclosing such "competitive pressure." AC ¶¶ 5, 39, 44, 52, 58, 66, 83, 86, 93, 98. But this allegation is again entirely vague and conclusory. No details whatsoever are offered about IBM's prices, the customers involved, which customers (if any) elected to use IBM instead of Imperva as a result, or how and who at Imperva knew about IBM's pricing proposals to customers. Nor is the allegation bolstered by the suggestion that unidentified "sales representatives" of Imperva were having "difficulty" making their "sales quotas" in unspecified ways at unspecified times. *See* AC ¶¶ 5, 39, 83, 86, 93. Indeed, throughout the bulk of the class period, the Company's business grew and sales were robust. In any event, these sorts of "vague allegations of deception" have been repeatedly rejected as insufficient to support a securities fraud claim. *See Bare Escentuals*, 745 F. Supp. 2d at 1076; *Silicon Storage*, 2007 WL 760535, at *8; *see also In re Cisco Sys. Inc. Sec. Litig.*, 2013 WL 1402788, at *13 (N.D. Cal. Mar. 29, 2013) (statements that company had "sizable lead over our competition," being "well positioned," possessing "strong foundation" and having "industry leading growth" were inactionable).

Moreover, the fact that the Company faced intense competition from IBM and others, including F5 Networks (*see* AC ¶¶ 59, 67, 94, 98), and that they may price their products more competitively or under a different model than Imperva, was publicly disclosed throughout the class period. For example, the Company's Form 10-Q for the first quarter of 2013, filed on May 9, 2013, disclosed that:

> [t]he market for business security products is *intensely competitive and we expect competition to intensify in the future.* Our competitors include companies such as Akami Technologies, Inc., Citrix Systems, Inc., F5 Networks, Inc., International Business Machines Corporation ("IBM"), McAfee, Inc. (a subsidiary of Intel Corporation), Oracle Corporation, Symantec Corporation and other point solution security vendors.

Ex. B at 34 (emphasis added). Imperva specifically warned that these companies might compete with Imperva by "pric[ing] their products more competitively than ours, or have an entirely different pricing or distribution model." *Id.* These disclosures were repeated in all of the Company's quarterly and annual reports filed with the SEC during the class period. *See* Ex. D at 38-39; Ex. F at 37-38; Ex. H at 13-14. In other words, in addition to being hopelessly vague,

plaintiff's allegations fail because the information was publicly disclosed. *See Oregon Pub.*, 2014 WL 7139634, at * 6 (no claim stated where information was publicly disclosed); *In re Metricom Sec. Litig.*, 2004 WL 966291, at *18 & n.18 (N.D. Cal. Apr. 29, 2004) (dismissing claims where omitted fact, concerning defendant's relationship with WorldCom, was disclosed in public filings), *aff'd sub nom.*, 182 F. App'x 714 (9th Cir. 2006).

Finally, plaintiff's assertion that Imperva's business was shifting from large, on-premise deals involving the Company's SecureSphere product to smaller, cloud-based solutions involving the Company's Incapsula product is a red herring. *See* AC ¶¶ 3, 29, 67, 83. Not only was the growth in the Company's cloud-based business a function of customer demand, as they have increasingly shifted to cloud-based storage (which is lower cost), but that information is likewise publicly disclosed. The Company disclosed, for example, that its cloud-based business (reported as part of its subscriptions business) had increased from 2.3% of net revenues in the fourth quarter of 2011 to 8.8% of net revenues by Q4 2013 and to 14.5% of net revenues for the first quarter of 2014. *See* Ex. O at 54; Ex. H at 54; AC ¶¶ 29, 67. The Company likewise regularly discloses the results of its product and licensing business (which includes SecureSphere) in its quarterly and annual SEC filings. *See*, *e.g.,* Ex. H at 54; AC ¶ 3. *Id.* While plaintiff appears to suggest that a relative percentage decline of SecureSphere's contribution to net revenues (from what plaintiff alleges was a 63% share at the time of the Company's IPO in November 2011) is somehow attributable to competition with IBM or others, that allegation has no factual basis identified in the Amended Complaint, and ignores that IBM and others also compete with the Company for cloud-based storage business. Accordingly, such allegations are a roadmap to nowhere.

### C. Plaintiff's Allegations Concerning Imperva's Technological Capabilities Fail To State A Claim

Plaintiff's allegations concerning the "technological capabilities" of the Company's products fare no better. In various ways, plaintiff assails defendants for stating that Imperva's products had "strength" or "value" (AC ¶¶ 4, 5, 37, 39, 53, 81, 82, 83, 89), offered the "best technology available" (AC ¶¶ 43, 44, 45), and were "superior" to IBM (AC ¶¶ 57, 58, 59, 92, 94). Plaintiff similarly alleges that defendants' statements that there was "strong" or "robust" demand

for Imperva's products were false and misleading.  AC ¶¶ 4, 40, 42, 44, 53, 58, 84, 85, 86, 89.

Plaintiff, however, fails to allege facts suggesting that these statements were inaccurate (much less believed by defendants to be inaccurate).  More fundamentally, such statements reflect corporate optimism or puffery that courts have repeatedly held are inactionable.  *See Oregon Pub.*, 2014 WL 7139634, at *4-5 (explaining that corporate puffery concerns expressions of opinion that are not subject to an objective standard, such as "good," "well-regarded," or similar statements); *In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005) (same).  Because investors are presumed to "know how to devalue the optimism of corporate executives" (*Cutera*, 610 F.3d at 1111), "courts have routinely held that vague or amorphous statements of optimism and 'puffing' about a company or a product are not actionable."  *Silicon Storage*, 2007 WL 760535, at *21; *see Oregon Pub.*, 2014 WL 7139634, at *4.

Accordingly, statements about the strength of the Company's technology and products, or strong or robust demand, are inactionable as a matter of law.  *See, e.g.*, *Cisco*, 2013 WL 1402788, at *13 (statements about having a "sizable lead over our competition," being "well positioned," possessing a "strong foundation," having "industry leading growth," "hitting on all cylinders" and "exceeding … expectations" all inactionable corporate optimism); *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 868 (N.D. Cal. 2004) (statements that company has a "strong product set" and "these products will continue to position [defendant's] solutions as best-of-breed" inactionable); *Stickrath v. Globalstar, Inc.*, 527 F. Supp. 2d 992, 998-99 (N.D. Cal. 2007) ("high quality [products]" and "high performance [products]" not actionable).

Given that the only three alleged misstatements attributed to Mr. Kramer fall plainly within such inactionable optimism, the claims against him fail, and should be dismissed, for this reason alone.  *See* AC ¶ 81 ("Our results highlight the underlying strength of Imperva's technology, our comprehensive, fully-integrated solution"); AC ¶ 84 ("[w]hile we continued to see strong demand for our fully integrated solution…"); AC ¶¶ 88-89 ("demand for our integrated solution remained robust" and "our win-loss ratio in head-to-head competitive deals remains very strong").

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    Similarly, plaintiff's vaguely stated allegation that the Company failed to disclose that it

2  "lacked a meaningful" or "reliable" mainframe product (AC ¶¶ 5, 45, 58, 66), or that Imperva

3  faced a "perceived risk of losing access to the mainframe technology agent" (AC ¶¶ 5, 58, 66, 87,

4  98), fails to state a claim. Plaintiff never explains what these references are supposed to mean,

5  how they allegedly impacted the Company, when, and whether any such effect was material, or

6  how this supposed "omission" rendered anything the Company disclosed materially misleading.

7    In any event, plaintiff's only basis for this allegation appears to be the Company's

8  statements in the February 6, 2014 earnings call for the year-ended 2013 (portions of which

9  plaintiff otherwise quotes), in which the Company stated that:

> we also completed the small purchase of technology assets from a
> company called Tomium Software, which will help Imperva
> accelerate and expand our mainframe data security solutions. We
> had been OEM-ing the mainframe database auditing agent
> technology from Tomium, and ownership will allow us to expand
> the [feature] set we include on the mainframe to include other parts
> of our data security suite. In addition, we believe ownership will
> eliminate the perceived risk of losing access to the mainframe
> technology agent and improve our competitive position in the
> market against IBM and McAfee.

16  Ex. N at 6. In other words, although the Company had grown its business throughout 2013, it

17  made this acquisition to enhance its business going forward by securing access to certain

18  technology. The notion that the Company "failed" to disclose a "perceived risk" or should have

19  done so sooner, is unsupported by particularized facts and, viewed most charitably, is pure fraud

20  by hindsight. *See Bare Escentuals*, 745 F. Supp. 2d at 1074 (the PSLRA bars fraud by hindsight.)

21    **D.    Plaintiff Does Not Allege Facts Supporting A Strong Inference Of Scienter**

22    As the Ninth Circuit recently explained, the PSLRA requires that "the complaint shall,

23  with respect to each act or omission . . . , state with particularity facts giving rise to a strong

24  inference that the defendant acted with the required state of mind." *Oregon Pub.*, 2014 WL

25  7139634, at *3, quoting 15 U.S.C. 78u-4(b)(2)(A). Accordingly, plaintiff is required to plead

26  specific facts showing that each defendant made alleged misstatements "either intentionally or

27  with deliberate recklessness." *Oregon Pub.*, 2014 WL 7139634, at *6.

28    In *Tellabs,* the Supreme Court held that the "strong inference" standard requires careful

examination of all relevant facts – not just those alleged in the complaint, but also materials referenced in the pleading or subject to judicial notice – to determine whether they can rationally support a theory of fraud. The Court must undertake a "comparative analysis" and examine all relevant facts "holistically," consider all reasonable inferences including those unfavorable to plaintiff, and determine whether the inference of fraud is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs,* 551 U.S. at 314; *see Gompper v. VISX, Inc.,* 298 F.3d 893, 897 (9th Cir. 2002) ("the court must consider *all* reasonable inferences . . . , including inferences unfavorable to the plaintiffs").

Here, the predicate for plaintiff's theory of scienter is wholly undermined by these governing standards. According to the Amended Complaint, defendants supposedly "hyped" Imperva's products and win-loss ratio against IBM in order to inflate its stock value to acquire two companies, Skyfence and the remaining shares of Incapsula (which was already 80% owned by the Company). *See* Ex. P at 1; AC ¶ 2.[5] Any motive that plaintiff seeks to impute to Mr. Kramer from these acquisitions, however, is immaterial as a matter of law because Mr. Kramer is not alleged to have made any actionable misstatements. *See supra* at 14; *Janus Capital Group v. First Deriv. Traders*, 131 S. Ct. 2296, 2302 (2011). Moreover, as noted above, the acquisition of Skyfence actually resulted in Mr. Kramer *substantially increasing* his shares of Imperva stock. AC ¶¶ 21, 64. In fact, Mr. Kramer, who co-founded and was a significant stockholder of Skyfence, received 252,669 shares of Imperva stock (then worth about $12.1 million according to the Amended Complaint) when the acquisition was consummated in February, 2014. AC ¶ 2. In other words, according to plaintiff, Mr. Kramer was purposefully inflating the price of Imperva's stock only to *acquire* the allegedly inflated shares himself when Skyfence was sold. Such an irrational theory of scienter has no support in the case law.[6]

---

[5] According to plaintiff, "[i]n February 2014, Imperva purchased the remaining shares of Incapsula that it did not own for $5.8 million in Imperva stock." AC ¶ 21.

[6] The $58.2 million Skyfence acquisition, which was approved by the Company's acquisitions committee comprised of independent directors (as Mr. Kramer owned approximately 43% of Skyfence), was originally structured so that Mr. Kramer would have received only Imperva stock in the acquisition (532,263 shares, approximately $25.4 million, valued at $47.64 per share – the 60-day average trading price of Imperva for the 60 days prior to February 6, 2014). AC ¶ 64. Though the Company, in consultation with the NYSE, subsequently determined to amend this structure to limit the Imperva stock issued to Mr. Kramer to no more than 1% of the Company's

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**1. Plaintiff Fails To Allege Facts Demonstrating That Guidance For The First Quarter Of 2014 Was Knowingly False**

Guidance numbers or forecasts of revenue are by definition forward-looking statements. 15 U.S.C. § 78u-5(c)(1); *Cement Masons & Plasterers Joint Pension Trust v. Equinix, Inc.*, 2012 WL 685344, at *4 (N.D. Cal. Mar. 2, 2012). Because the Q1 2014 guidance provided by Mr. Schmid was forward-looking and accompanied by meaningful cautionary language, Ninth Circuit precedent holds that the state of mind of the speaker need not be considered as the statement is not actionable as a matter of law under the safe harbor. *Cutera*, 610 F.3d at 1112-13.

Even if there had been no such cautionary language, forward-looking statements cannot support liability unless they are made with actual knowledge of their falsity. *Bare Escentuals*, 745 F. Supp. 2d at 1080. For the reasons set forth above in Section III. A, *supra*, plaintiff has failed to allege facts giving rise to a strong inference that Mr. Schmid actually knew the guidance he provided on February 6, 2014 for Q1 2014 was unreasonable at the time (and, since Mr. Schmid is not alleged to have traded or profited in any way, plaintiff does not even offer a credible motive for acting with scienter). *See Ronconi*, 253 F.3d at 432; *Verona Partners, LLC v. Tenet Capital Partners Convertible Opportunities Fund LP*, 2006 WL 2669035, at *13 (N.D. Cal. Sept. 18, 2006) (plaintiff must show "that defendants had knowledge of…the falsity of public statements at the time they were made"). Plaintiff merely alleges that "true facts gave defendants actual knowledge that their guidance was made without a reasonable basis" (AC ¶ 99), but makes no effort to state what the true facts were that demonstrate Mr. Schmid's actual knowledge that his guidance was unreasonable at the time. As to Mr. Kramer, plaintiff makes no allegation that he made any forecast, much less that he did so with scienter. *See Janus*, 131 S. Ct. at 2302 (a defendant who does not "make" the challenged statement is not subject to § 10(b)). The "guidance" allegations therefore fail.

outstanding shares (consistent with NYSE listing requirements), the final deal as amended on February 19, 2014 was still structured so that Mr. Kramer would receive 252,669 shares of Imperva stock plus $13.3 million in cash (at the same $47.64 per share price) to substitute for Imperva stock surrendered so as to be in compliance with the NYSE requirement. *See* Ex. Q at 1-2; AC ¶¶ 2, 64. There is no allegation that the Skyfence acquisition (or Incapsula transaction) has been anything other than a tremendous success for the Company.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

### 2. Defendants' Stockholdings And Trading Negate An Inference Of Scienter

Plaintiff's effort to suggest that Mr. Kramer's stockholdings and trading in Imperva stock creates a strong inference of fraud backfires. Because Mr. Kramer actually *acquired more Company shares than he sold during the class period*, this poses a conundrum that neither the case law nor logic allows plaintiff to finesse. Such facts are inconsistent with a belief that Imperva's stock price was artificially inflated, and "instead gives rise to an inference of good faith." *Zack v. Allied Waste Indus., Inc.*, 2005 WL 3501414, at *14 (D. Ariz. Dec. 15, 2005), *aff'd*, 275 F. App'x 722 (9th Cir. 2008).

Even ignoring that devastating fact – as plaintiff does – the notion that Mr. Kramer had a financial motive to inflate the Company's stock by virtue of stock sales fails as a matter of law. Only "unusual" or "suspicious" insider trading can support an inference of scienter. *See Silicon Graphics*, 183 F.3d at 986 (trading is "suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information"); *see* also *In re Downey Sec. Litig.*, 2009 WL 2767670, at *13 (C.D. Cal. Aug. 21, 2009) ("a strong inference of scienter is negated when there is an absence of stock sales or where such sales are minimal"). In determining whether sales are suspicious, courts consider: (1) the amount and percentage of shares sold; (2) the timing of sales; and (3) consistency with prior trading history. *See City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1069 (N.D. Cal. 2012).

Here, Mr. Kramer held over 3.7 million Imperva shares as of March 31, 2014. Ex. R at 41. Plaintiff – who estimates Mr. Kramer's net worth at $1 billion (AC ¶ 31) – asserts that he sold a total of 200,000 shares during the class period for proceeds of about $10 million (half in early January, 2014 and half in early April, 2014), which amounts to just 5% of his overall Company holdings. Courts have repeatedly found that sales of much larger percentages and magnitude are not indicative of scienter. *See, e.g.*, *Silicon Graphics*, 183 F.3d at 987 (sales of 43.6% of defendant's shares not suspicious); *In re Skechers U.S.A., Sec. Litig.*, 273 F. App'x 626, 628 (9th Cir. 2008) (sales of 42% and 17% by respective defendants not supportive of scienter).

1    Put another way, Mr. Kramer retained 95% of his Imperva holdings (including the shares he

2    received by virtue of the Skyfence transaction), and saw them decline in value by $79.8 million.

3    Courts have repeatedly recognized that this too is inconsistent with scienter. *See, e.g., Applestein*

4    *v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1043 (N.D. Cal. Mar. 22, 2012) (sales of $22 million

5    not indicative of fraud where defendants retained the vast bulk of their holdings), *aff'd*, 561 F.

6    App'x 598 (9th Cir. 2014); *Tripp v. Indymac Fin. Inc.*, 2007 WL 4591930, at *4 (C.D. Cal. Nov.

7    29, 2007) (the "inference of scienter is functionally negated" by retention of a large percentage of

8    stock).

9           While plaintiff attempts to rely on the timing of Mr. Kramer's April, 2014 sales, which

10   preceded the April 9 press release by two to eight days, it is forced to concede that those sales

11   were made pursuant to Mr. Kramer's Rule 10b5-1 trading plan. *See* AC ¶ 115; Ex. S at 2 n.1;

12   Ex. T at 2 n.1.   Sales of stock made pursuant to such a plan are pre-determined and non-

13   discretionary – they are entered into in advance and sales are made automatically according to the

14   plan. *Kovtun v. VIVUS, Inc.*, 2012 WL 4477647, at *21 (N.D. Cal. Sept. 27, 2012).   Such pre-

15   determined stock sales negate scienter as they provide an "innocent, alternative explanation" for

16   the trades. *City of Royal Oak*, 880 F. Supp. 2d at 1069, citing *Metzler*, 540 F.3d at 1067 n.11; *see*

17   *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1117 (N.D. Cal. 2003).   Plaintiff's

18   throwaway allegation that Mr. Kramer's trading plan can be disregarded because "he cannot

19   establish that he was not aware of the facts [alleged] herein before entering into such plan" flips

20   the pleading burden on its head. *See* AC ¶ 115.   It is plaintiff that must establish that the trades

21   were suspicious under all the circumstances, and it simply has not and cannot do so.[7]

22                3.      **Allegations That Mr. Kramer Had  Supposed "Insight" Into IBM's
                         Business Does Not Support A Strong Inference Of Scienter**
23

24          Plaintiff also attempts to plead scienter by casting aspersions on Mr. Kramer's success in

25   the cyber-security industry and connections to the Israeli technology community. *See* AC ¶¶ 31-

26   32, 46-51, 109-111.   What these allegations actually show, however is that Mr. Kramer has been

27   _____

28   [7] Plaintiff makes no allegations about any trading by Mr. Schmid, and therefore concedes that
     scienter cannot be found as to him on this basis.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    an enormously successful executive, Imperva and the other companies he has founded or funded

2    have been quite successful, and that Mr. Kramer has accumulated considerable wealth as a result.

3    *See* AC ¶¶ 6, 20, 31.  Rather than creating an incentive to commit fraud, these allegations actually

4    eviscerate the notion:  Mr. Kramer had no reason, financial or otherwise, to risk his stellar

5    reputation as a technology "guru" (AC ¶ 31) by engaging in securities fraud, much less one in

6    which he actually *acquired* more shares than he sold and saw the value of his holdings decline by

7    $*79.8 million*.

8         In any event, plaintiff seeks to make much of the fact that in August 2013 IBM purchased

9    Trusteer, a company Mr. Kramer had invested in and served as a director.  *See* AC ¶¶ 6, 46-48,

10    50-51, 71, 110-111.  Plaintiff speculates that this transaction (which was publicly disclosed)

11    somehow gave Mr. Kramer "unique insight into the developments of Imperva's primary

12    competitor" and, from that unsupported premise, leaps to the equally untenable conclusion that

13    Mr. Kramer therefore "knew" that Company statements regarding Imperva's business or

14    competitive edge were false.  *See* AC ¶ 110.

15        Putting aside that IBM is not known to be in the business of "sharing insights" with Mr.

16    Kramer or any other competitor, plaintiff's theory is utterly devoid of specifics.  It never alleges

17    that Mr. Kramer was told by IBM how it intended to market its products after the Trusteer

18    acquisition, how it intended to price them, which customers it planned to target, or any other

19    significant information.  Plaintiff just ignores these necessary details, and makes no effort to

20    reconcile its theory with the fact that, both before and after IBM's purchase of Trusteer, the

21    Company continued to perform well against the competition.  Indeed, nothing in the April 9, 2014

22    announcement is alleged to have anything to do with IBM's earlier purchase of Trusteer or any

23    supposed "insights" Mr. Kramer derived therefrom.

24        Put simply, the theory is an essay in speculation, not a pleading of particularized facts.

25    *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) ("general assertion[s]

26    about what [plaintiffs] think the data shows" are not enough when "plaintiffs do not allege with

27    particularity any specific information showing that … data informed defendants" and do not

28    "plead, in any detail, the contents of any such report or the purported data" to which plaintiffs

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    claim defendants had access); *Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 923-25 (N.D. Cal.

2    2012), *modified in part on reconsideration* (Jan. 10, 2013) (mere access to data or information is

3    not enough to create a strong inference of scienter).

4        In any event, it is well-established that defendants were not obligated to predict what IBM

5    would or would not do, even assuming they had any "insights" into IBM's strategy.  *See In re*

6    *Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1406-07 (9th Cir. 1996) ("a company is not required to

7    forecast future events or to caution that future prospects [may not be] as bright as past

8    performance . . . . [A]nother company's plans cannot be known to a certainty"); *City of Dearborn*

9    *Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 2014 WL 4180845, at *13 (N.D. Cal.

10    Aug. 22, 2014) (knowledge of increasing competition in the market is not enough to support a

11    strong inference of scienter).  Indeed, the Company warned investors that "IBM is the most

12    competitive technically," the Company's "biggest competitor," and "publicly acknowledged" that

13    the Company was "paying attention to IBM's security strategy."  *See* AC ¶¶ 49, 55, 91, 92.  Such

14    disclosures are entirely inconsistent with plaintiff's theory.  *See, e.g., Mallen v. Alphatec*

15    *Holdings, Inc.*, 861 F. Supp. 2d 1111, 1136 (S.D. Cal. 2012) (matters that were publicly disclosed

16    in SEC filings failed to give rise to a strong inference of scienter).

17        **4.**    **Plaintiff's "Core Operations" Theory Does Not Support A Strong**
18                 **Inference Of Scienter**

19        Plaintiff asserts that Mr. Kramer and Mr. Schmid generally had knowledge of supposed

20    misstatements due to their position as "[h]igher-level executives."  AC ¶ 108.  This attempt to

21    invoke the "core operations" doctrine fails.  The doctrine applies only in "rare circumstances"

22    where a plaintiff pleads facts showing the existence of adverse information so "prominent … that

23    it would be 'absurd to suggest' that top management was unaware" that their statements were

24    false. *Zucco*, 552 F.3d at 1001 (citing *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989 (9th

25    Cir. 2008)).  By contrast, where (as here) the "complaint relies on allegations that management had

26    an important role in the company but does not contain additional detailed allegations about the

27    defendants' actual exposure to information, it will usually fall short of the PSLRA standard."

28    *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    The gravamen of this case relates to a one-quarter earning miss attributed to extended

2    customer purchasing decisions and sales execution challenges in the U.S. incurred in that quarter.

3    *See* AC ¶¶ 69, 100.  The Company performed well both before and after that period, it suffered no

4    catastrophic setbacks, and its stock price has since rebounded. Accordingly, this is not a case

5    where the "core operations" theory applies, and thus is not a substitute for plaintiff's obligation to

6    plead specific facts giving rise to a strong inference of scienter.  *See Glazer*, 549 F.3d at 746

7    ("[g]eneral allegations of defendants' 'hands-on' management style … are insufficient to create

8    strong inference of scienter")(quoting *Daou*, 411 F.3d at 1022); *Metzler*, 540 F.3d at 1068

9    ("corporate management's general awareness of the day-to-day workings of the company's

10   business does not establish scienter – at least absent some additional allegation of specific

11   information conveyed to management and related to the fraud").[8]

**5.    A Holistic Analysis Of Plaintiff's Allegations Does Not Support A Strong Inference Of Scienter**

14   The PSLRA requires a "holistic" scrutiny of all facts, including nonculpable explanations,

15   to determine whether, viewed as a whole, they support a strong inference of fraud.  *Tellabs*, 551

16   U.S. at 314*; Oregon Pub.*, 2014 WL 7139634, at *6.  Such scrutiny completely disposes of

17   plaintiff's claim.

18   Reduced to its core, plaintiff's theory is that the Company intentionally lied about its

19   ability to compete with IBM and others throughout the class period, even though the Company

20   reported improving revenues each quarter throughout 2013.  Then, according to plaintiff, Mr.

21   Schmid provided "inflated" guidance for Q1 2014 so that the Company could acquire Skyfence

22   for stock (and cash), even though Mr. Kramer received 252,669 shares of Imperva stock in

23   exchange for his Skyfence holdings.  In other words, if plaintiff is to be believed, Mr. Kramer was

24   acquiring the very shares that were "artificially inflated."  He then watched as his retained

25   holdings in Imperva declined in value by $79.8 million.

26   Such an implausible premise for a fraud claim would need to be supported by concrete

27

28   _____

[8] Given that this is the only scienter theory directed at Mr. Schmid, the claims as to him should be dismissed for this reason alone.

facts showing that defendants knew (or were deliberately reckless) in making purported misstatements. But the Amended Complaint is devoid of such details. In fact, the entire pleading relies on mere lawyer say-so. There is not a single confidential witness who has come forward to corroborate a single allegation. Nor is there a single Company document, data source or other internal communication identified that supports such allegations. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 2012 WL 6136746, at *6 (C.D. Cal. Dec. 7, 2012) ("It is telling that Plaintiffs do not rely on confidential witnesses or specific internal reports to demonstrate what, if anything, the Individual Defendants knew or when they may have acquired that knowledge"); *City of Roseville Emp. Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1132 (E.D. Wash 2013) ("No confidential witness has come forward to say that Defendants were aware of secret, adverse financial information and failed to disclose it, much less that such adverse information contradicted Defendants' public representations. There are no documents or internal communication to show that Defendants were apprised of adverse financial information which they then failed to communicate to the public"). Therefore, whether viewed individually or holistically, the Amended Complaint fails as a matter of law.

### E.    Plaintiff Cannot Establish Loss Causation

In the Ninth Circuit, loss causation must be pleaded with specificity, just like all other elements of a Section 10(b) claim. *Oregon Pub.*, 2014 WL 7139634, at *3-4. Plaintiff's inability to plead loss causation – that a "revelation of fraudulent activity" proximately caused Imperva's stock price to decline – provides an independent basis for dismissal. *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014).

Stock price declines can be caused by myriad factors entirely unrelated to fraud. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005). That is why, to recover under Section 10(b), a plaintiff must plead facts demonstrating that there is a "causal connection between the material misrepresentation and the loss." *Id.* at 342. *See also Metzler*, 540 F.3d at 1062-63. Plaintiff must "allege specific statements made by the Defendants that were made untrue or called into question by subsequent public disclosures." *Oregon Pub.*, 2014 WL 7139634, at *7. Such allegations must show that "the market learned of and reacted to th[e] fraud, as opposed to merely reacting to

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   reports of the defendant's poor financial health generally." *Metzler*, 540 F.3d. at 1063. *See also*

2   *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010) ("Loss causation requires more

3   than an earnings miss"); *Loos*, 762 F.3d at 887-88 ("the market must have learned of and reacted

4   to the company's fraudulent *practices* as opposed to the financial impact of those practices").

5          Plaintiff's loss causation argument proceeds on the precise theory discredited by the

6   Supreme Court in *Dura* and echoed by the Ninth Circuit in *Oregon Pub.*, *Metzler, Oracle* and

7   *Loos*. Though plaintiff contends that the April 9 announcement revealed "fraudulent conduct" to

8   the market, that announcement – which merely noted that Imperva would miss its prior earnings

9   estimate because larger value deals in the first quarter of 2014 had been impacted by "extended

10  sales cycles," intensifying competition for larger orders and domestic "sales execution

11  challenges" – said ***nothing whatsoever*** to suggest ***improprieties*** in connection with that quarter's

12  results. *See* AC ¶¶ 118-120. Indeed, not one of the purportedly concealed or misrepresented facts

13  plaintiff broadly asserts as the basis for its claims was even addressed on April 9. *See* AC ¶ 100;

14  Ex. K (Ex. 99.1).

15         There is *no* mention of deals lost to IBM or F5 Networks, no mention of technological

16  issues or problems, or concerns raised about Imperva's mainframe product offerings. *Loos*, 762

17  F.3d at 887-88 (no loss causation based on theory that "disappointing financial results signaled

18  that the company lacked the 'growth drivers and profitability' that it had previously claimed"); *In*

19  *re Rackable Sys., Inc. Sec. Litig.*, 2010 WL 3447857, at *12 (N.D. Cal. Aug. 27, 2010) (news that

20  company would miss its earnings due to increased competition may show "a correlation between

21  a [company's] announcement of financial results and a decrease in stock price" but "do[es]  not

22  reveal the necessary causal link between the alleged fraud and the drop in . . . stock price" for

23  purposes of loss causation). Indeed, the *only* thing that is alleged is that the Company would miss

24  its Q1 2014 guidance provided by Mr. Schmid on February 6, 2014. Putting aside that this

25  "revelation" does not suggest fraud or misconduct, it could not possibly support a claim for loss

26  causation for any earlier alleged misstatements – such as the results throughout 2013 that plaintiff

27  acknowledges were "strong" and "impressive" (AC ¶¶ 37, 40, 53, 62) – which should be

28  dismissed for that reason alone.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    Similarly ineffective is plaintiff's attempt to transform recognition by Mr. Kramer of

2    "'strong performance . . . in sales of subscription products during the first quarter" into a dire

3    revelation with respect to Imperva's SecureSphere product. *See* AC ¶¶ 8, 69, 100. Indeed, the

4    fact that Imperva's subscription-based products gained traction in Q1 2014 – and thus grew as a

5    percentage of the Company's overall business – does not support an inference that other products

6    performed poorly during the same quarter. *See In re Century Aluminum Co. Sec. Litig.*, 729 F.3d

7    1104, 1108 (9th Cir. 2013) ("When faced with two possible explanations, only one of which can

8    be true and only one of which results in liability, plaintiffs cannot offer allegations that are

9    'merely consistent' with their favored explanation but are also consistent with the alternative

10   explanation.") Accordingly, plaintiff does not (and cannot) plead the necessary element of loss

11   causation. *See Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1046 (N.D. Cal. 2012)

12   (plaintiff does not plead loss causation where there is no allegation showing "the market became

13   aware of the alleged fraud" and where the "'far more plausible' reason for 'drop in [company's]

14   stock price [was that] company failed to hit prior earnings estimates").[9]

15   **IV.    CONCLUSION**

16       Plaintiff's Amended Complaint is devoid of specifics and offers an unsupported and

17   irrational theory of fraud. It should be dismissed without further leave to amend.

18   Dated: January 6, 2015              FENWICK & WEST LLP

19                                       By: /s/ *Susan S. Muck*

20                                          Susan S. Muck, Esq.

21                                       Attorneys for Defendants Imperva, Inc.,
                                         Shlomo Kramer and Terrence J. Schmid

22

23

24

25

26

27

28

_____

[9] Because plaintiff has failed to plead that any defendant violated Section 10(b), the control person claim under Section 20(a) also fails. *Paracor Fin. Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996).