1   ROBBINS GELLER RUDMAN
       & DOWD LLP
2   SHAWN A. WILLIAMS (213113)
    One Montgomery Street, Suite 1800
3   San Francisco, CA 94104
    Telephone: 415/288-4545
4   415/288-4534 (fax)
    shawnw@rgrdlaw.com
5          – and –
    DOUGLAS R. BRITTON (188769)
6   CODY R. LeJEUNE (249242)
    ASHLEY M. PRICE (281797)
7   655 West Broadway, Suite 1900
    San Diego, CA 92101-8498
8   Telephone: 619/231-1058
    619/231-7423 (fax)
9   dougb@rgrdlaw.com
    clejeune@rgrdlaw.com
10  aprice@rgrdlaw.com

11  Lead Counsel for Plaintiff

12                  UNITED STATES DISTRICT COURT

13                NORTHERN DISTRICT OF CALIFORNIA

14  VISWANATH V. SHANKAR, Individually    )  Case No. 3:14-cv-01680-PJH
    and on Behalf of All Others Similarly Situated, )
15                                        )  CLASS ACTION
                            Plaintiff,    )
16                                        )  PLAINTIFF'S OPPOSITION TO
            vs.                           )  DEFENDANTS' MOTION TO DISMISS
17                                        )  AMENDED COMPLAINT
    IMPERVA, INC., et al.,                )
18                                        )  DATE:    May 13, 2015
                            Defendants.   )  TIME:    9:00 a.m.
19  _____  )  CTRM:    3, Hon. Phyllis J. Hamilton

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ...........................................................................1

II.     SUMMARY OF THE CASE.........................................................2

    A.   Background – Imperva and Its Market .....................................2

    B.   Imperva Required a Rising Stock Price ....................................3

    C.   Imperva Purportedly Turns the Corner After a Tumultuous 2012 While Dominating Its Largest Competitor IBM...........................3

    D.   As Imperva Struggles to Compete with IBM, Kramer Sells IBM an Instrumental Upgrade to Its Cyber- Security Offering ...........5

    E.   Imperva Purportedly Remains Dominant as It Shifts to the Cloud, Creating a Windfall for Kramer ............................................5

    F.   Defendants Disclose the Truth – SecureSphere Sales Collapse Because of "Intensifying Competition" from IBM .....................7

III.    ARGUMENT ................................................................................8

    A.   Standards Governing a Motion to Dismiss Under Rule 12(b)(6) .........8

    B.   Defendants' Statements Were False and Misleading..................8

        1.   Defendants' Statements About Imperva's Competitive Success Were False and Misleading...................................8

        2.   Defendants' Statements About Imperva's Superior Technology Were False and Misleading...............................11

        3.   Defendants Had No Basis for Imperva's 1Q14 Guidance ........13

    C.   The Complaint Adequately Alleges Defendants' Scienter .................16

        1.   Defendants Knew that Their Statements Were False ................16

        2.   Defendants' Unique Access to IBM's Development Plans Raises a Strong Inference of Scienter ....................................18

        3.   Kramer's Self-Dealing Raises a Strong Inference of Scienter..................20

        4.   Imperva's Acquisitions Raise a Strong Inference of Scienter .................20

        5.   Kramer's Stock Sales Support a Strong Inference of Scienter .................21

        6.   The Inference of Scienter Is Compelling; Defendants Do Not Offer Any Non-Culpable Inferences ................................23

    D.   Plaintiff Has Adequately Alleged Loss Causation................................24

**Page**

IV.     CONCLUSION..................................................................................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
572 F.3d 221 (5th Cir. 2009) .................................................................................25

*Applestein v. Medivation, Inc.*,
No. C-10-0998 EMC, 2011 U.S. Dist. LEXIS 92230
(N.D. Cal. Aug. 18, 2011).....................................................................................22

*Backe v. Novatel Wireless, Inc.*,
607 F. Supp. 2d 1145 (S.D. Cal. 2009)................................................................23

*Backe v. Novatel Wireless, Inc.*,
642 F. Supp. 2d 1169 (S.D. Cal. 2009)................................................................12

*Barrie v. Intervoice-Brite, Inc.*,
409 F.3d 653 (5th Cir. 2005) ...............................................................................13

*Batwin v. Occam Networks, Inc.*,
No. CV 07-2750 CAS, 2008 U.S. Dist. LEXIS 52365
(C.D. Cal. July 1, 2008).......................................................................................21

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ...................................................................... *passim*

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
No. 12-cv-06039-BLF, 2014 U.S. LEXIS 118438
(N.D. Cal. Aug. 22, 2014).....................................................................................19

*City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012)...................................................................15

*City of Roseville Emps. Ret. Sys. v. Sterling Fin. Corp.*,
963 F. Supp. 2d 1092 (E.D. Wash. 2013).............................................................23

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
880 F. Supp. 2d 1045 (N.D. Cal. 2012) ...............................................................23

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)..............................................................................................24

*Eminence Capital, LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) .............................................................................25

*Emp'r Teamsters Local. Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*,
353 F.3d 1125 (9th Cir. 2004) .............................................................................15

| | Page |
|---|---|

*Genesee Cnty. Emps. Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3,*
    825 F. Supp. 2d 1082 (D.N.M. 2011) ...................................................................9

*Howard v. Everex Sys.,*
    228 F.3d 1057 (9th Cir. 2000) .......................................................................20

*In re Bare Escentuals, Inc. Sec. Litig.,*
    745 F. Supp. 2d 1052 (N.D. Cal. 2010) .....................................................10, 15

*In re Cabletron Sys.,*
    311 F.3d 11 (1st Cir. 2002) ...........................................................................24

*In re Century Aluminum Co. Secs. Litig.,*
    729 F.3d 1104 (9th Cir. 2013) .......................................................................25

*In re Chinacast Educ. Corp. Sec. Litig.,*
    No. CV 12-4621-JFW, 2012 U.S. Dist. LEXIS 175436
    (C.D. Cal. Dec. 7, 2012) ...............................................................................23

*In re Cisco Sys. Sec. Litig.,*
    No. C 11-1568 SBA, 2013 U.S. Dist. LEXIS 53137
    (N.D. Cal. Mar. 29, 2013) .............................................................................10

*In re Complete Mgmt. Sec. Litig.,*
    153 F. Supp. 2d 314 (S.D.N.Y. 2001) ...........................................................20

*In re Computer Assocs. Class Action Sec. Litig.,*
    75 F. Supp. 2d 68 (E.D.N.Y. 1999) .................................................................9

*In re Cooper Sec. Litig.,*
    691 F. Supp. 2d 1105 (C.D. Cal. 2010) .........................................................12

*In re Cutera Sec. Litig.,*
    610 F.3d 1103 (9th Cir. 2010) ...................................................................13, 15

*In re Daou Sys.,*
    411 F.3d 1006 (9th Cir. 2005) ...............................................................17, 20, 21

*In re Downey Sec. Litig.,*
    2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ...............................................22

*In re FoxHollow Techs., Inc.,*
    No. C 06-4595 PJH, 2008 U.S. Dist. LEXIS 52363
    (N.D. Cal. May 27, 2008), *aff'd, In re FoxHollow Techs., Inc. Sec. Litig.,*
    359 F. App'x 802 (9th Cir. 2009) ..................................................................10

*In re Global Crossing, Ltd. Sec. Litig.*,
   322 F. Supp. 2d 319 (S.D.N.Y. 2004)....................................................................19

*In re HP Sec. Litig.*,
   No. C 12-05980 CRB, 2013 U.S. Dist. LEXIS 168292
   (N.D. Cal. Nov. 26, 2013).................................................................................9

*In re Immune Response Sec. Litig.*,
   375 F. Supp. 2d 983 (S.D. Cal. 2005)........................................................8, 11, 15

*In re Lattice Semiconductor Corp. Sec. Litig.*,
   No. CV04-1255-AA, 2006 U.S. Dist. LEXIS 262
   (D. Or. Jan. 3, 2006).......................................................................................18

*In re LeapFrog Enters., Inc. Sec. Litig.*,
   527 F. Supp. 2d 1033 (N.D. Cal. 2007)............................................................14

*In re Metricom Sec. Litig.*,
   No. C 01-4085 PJH, 2004 U.S. Dist. LEXIS 7834
   (N.D. Cal. May 4, 2004), *aff'd, Young v. Dreisbach*,
   182 F. App'x 714 (9th Cir. 2006).....................................................................11

*In re MGM Mirage Sec. Litig.*,
   No. 2:09-cv-01558-GMN-VCF, 2013 U.S. Dist. LEXIS 139356
   (D. Nev. Sept. 26, 2013)..................................................................................12

*In re Oracle Corp. Sec. Litig.*,
   627 F.3d 376 (9th Cir. 2010)............................................................................25

*In re Oxford Health Plans, Inc. Sec. Litig.*,
   187 F.R.D. 133 (S.D.N.Y. 1999)......................................................................21

*In re Questcor Sec. Litig.*,
   No. SA CV 12-01623 DMG, 2013 U.S. Dist. LEXIS 142865
   (C.D. Cal. Oct. 1, 2013)..................................................................................21

*In re Rackable Sys.*,
   No. C 09-0222 CW, 2010 U.S. Dist. LEXIS 88927
   (N.D. Cal. Aug. 27, 2010)................................................................................25

*In re Silicon Graphics Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999)............................................................................22

| | Page |
|---|---|

*In re Silicon Storage Tech., Inc., Sec. Litig.*,
No. C-05-0295 PJH, 2007 WL 760535
(N.D. Cal. Mar. 9, 2007) .................................................................10, 15

*In re Stac Elec. Sec. Litig.*,
89 F.3d 1399 (9th Cir. 1996), *cert. denied*,
*Anderson v. Clow*, 520 U.S. 1103 (1997) ...............................................19

*In re STEC Inc. Sec. Litig.*,
No. SACV 09-1304 JVS, 2011 U.S. Dist. LEXIS 75093
(C.D. Cal. June 17, 2011) ........................................................................10

*In re Tut Sys. Sec. Litig.*,
No. C 01-02659 CW, 2002 U.S. Dist. LEXIS 27092
(N.D. Cal. Aug. 15, 2002) ........................................................................21

*In re UTStarcom, Inc. Sec. Litig.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009) .....................................................13

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) ...................................................................16

*Janus Capital Grp., Inc. v. First Derivative Traders*,
131 S. Ct. 2296 (2011).............................................................................15

*Lipton v. PathoGenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002) .................................................................19

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) ...................................................................25

*Mallen v. Alphatec Holdings, Inc.*,
861 F. Supp. 2d 1111 (S.D. Cal. 2012)....................................................19

*Matrixx Initiatives, Inc. v. Siracusano*,
131 S. Ct. 1309 (2011)...............................................................................8

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) .................................................................25

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008) .....................................................................8

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*,
320 F.3d 920 (9th Cir. 2003), *cert. denied*, 540 U.S. 966 (2003)...........21

| | | |
|---|---|---|
| | | **Page** |
| *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, | | |
| 774 F.3d 598 (9th Cir. 2014) | ...................................... | 11, 24, 25 |
| *Patel v. Axesstel, Inc.*, | | |
| No. 3:14-CV-1037-CAB-BGS, 2015 U.S. Dist. LEXIS 18385 | | |
| (S.D. Cal. Feb. 13, 2015) | .................................................. | 17 |
| *Plumbers Union Local No. 12 Pension Fund v. Ambassador's Grp.*, | | |
| 717 F. Supp. 2d 1170 (E.D. Wash. 2010) | ......................... | 17 |
| *Police Ret. Sys. v. Intuitive Surgical, Inc.*, | | |
| 759 F.3d 1051 (9th Cir. 2014) | ......................................... | 16 |
| *Provenz v. Miller*, | | |
| 102 F.3d 1478 (9th Cir. 1996), *cert. denied*, | | |
| *Miller v. Provenz*, 522 U.S. 808 (1997) | ....................... | 10, 13, 15 |
| *Reese v. Malone*, | | |
| 747 F.3d 557 (9th Cir. 2014) | ......................................... | *passim* |
| *Ronconi v. Larkin*, | | |
| 253 F.3d 423 (9th Cir. 2001) | ......................................... | 14 |
| *Scritchfield v. Paolo*, | | |
| 274 F. Supp. 2d 163 (D.R.I. 2003) | ................................. | 10 |
| *Skechers U.S.A. Sec. Litig. v. Skechers U.S.A., Inc.*, | | |
| 273 F. App'x 626 (9th Cir. 2008) | ................................... | 22 |
| *South Ferry LP #2 v. Killinger*, | | |
| 687 F. Supp. 2d 1248,1257-62 (W.D. Wash. 2009) | .......... | 16 |
| *South Ferry LP v. Killinger*, | | |
| 542 F.3d 776 (9th Cir. 2008) | ......................................... | 16, 17 |
| *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, | | |
| 551 U.S. 308 (2007) | ....................................................... | 16 |
| *Tripp v. IndyMac Bancorp., Inc.*, | | |
| No. CV 07-1635, 2007 U.S. Dist. LEXIS 95445 | | |
| (C.D. Cal. Nov. 29, 2007) | .............................................. | 22 |
| *United States SEC v. E-Smart Techs.*, | | |
| No. 11-895 (JEB), 2014 U.S. Dist. LEXIS 31629 | | |
| (D.D.C. Mar. 12, 2014) | .................................................. | 17 |

<table>
<tr><td></td><td align="right">Page</td></tr>
</table>

*Verona Partners, LLC v. Tenet Capital Partners Convertible Opportunities Fund LP*,
    2006 WL 2669035 (N.D. Cal. Sept. 18, 2006) ........................................14

*Westley v. Oclaro, Inc.*,
    897 F. Supp. 2d 902 (N.D. Cal. 2012) ................................................19

*Wozniak v. Align Tech.*,
    850 F. Supp. 2d 1029 (N.D. Cal. 2012) ..............................................25

*Yanek v. Staar Surgical Co.*,
    388 F. Supp. 2d 1110 (C.D. Cal. 2005) ..............................................14

*Zack v. Allied Waste Indus.*,
    No. CIV-04-1640-PHX-MHM, 2005 U.S. Dist. LEXIS 35323
    (D. Ariz. Dec. 15, 2005), *aff'd*, 275 F. App'x 722 (9th Cir. 2008).................22

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) .......................................................8, 9, 24


**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78j(b)..........................................................................1, 13, 25
    §78t(a)............................................................................1, 25
    §78u-4(b)..............................................................................8

Federal Rules of Civil Procedure
    Rule 9(b)..............................................................................24
    Rule 12(b)(6)...........................................................................8
    Rule 15(a).............................................................................25

17 C.F.R.
    §240.10b5-1...........................................................................23
    §240.10b5-1(c)........................................................................23

# I.     INTRODUCTION

The issues to be decided on defendants' motion are whether plaintiff has adequately alleged violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934, including falsity, scienter, and loss causation.

Plaintiff's Amended Complaint (the "Complaint") alleges an egregious case of fraud. During the Class Period, defendants boasted aggressively about Imperva's superior technology and its competitive dominance, in particular against IBM, and drove Imperva's stock to near record highs. But at the same time, they had actual knowledge that Imperva's flagship SecureSphere product was at a competitive disadvantage against IBM (Imperva's key SecureSphere adversary) and could not sustain the growth rates that Imperva was reporting. What defendants knew, and investors did not, was that IBM was offering its security solution essentially free, using enterprise agreements to "discount/bundle" its offering. And IBM eclipsed Imperva in the largest deals because it offered a mainframe solution that Imperva did not. Then, in the span of just several months, Imperva CEO and founder, Shlomo Kramer ("Kramer"), used his inside knowledge to cash in on his investments. He sold another of his start-up enterprises, Trusteer, to IBM in August 2013 – a sale that rapidly upgraded IBM's security offering – and enriched himself to the tune of $240 million. He then sold $10 million of his Imperva stock in January and April 2014 – the first time he had ever sold Imperva stock and, by no mere coincidence, when it was trading at near-record highs. And he pulled in another $13.3 million in cash (over $25 million in total) by selling to Imperva his Skyfence start-up and his remaining interest in Incapsula, another start-up. These deals supported Imperva's cloud-based business, now necessary to sustain Imperva after Kramer upgraded IBM with the Trusteer sale. After disclosing that Imperva had succumbed to competition from IBM, causing Imperva's stock to collapse 44% in response, Kramer stepped down as Imperva's CEO and moved on to his next investment, Exabeam, and used "the [same] team behind the security company Imperva" to engineer technology that would compete against Imperva. None of these events happened by coincidence. Defendants had inside knowledge and used that knowledge to their benefit.

Defendants' motion is an essay in misdirection. Defendants attack the Complaint primarily on the basis that it does not plead sufficient particulars. But in doing so, they simply overlook most

of the allegations providing those particulars. In fact, defendants ignore entirely the independent research and evaluations done by analysts investigating what happened at Imperva to cause such a surprising earnings miss at the end of the Class Period. Those findings revealed that defendants' statements about Imperva's dominant competitive position and superior technology were not true. For example, defendants say nothing about analyst Wedbush's discovery that Imperva was suffering from "more aggressive discounting/bundling practices by IBM" and a "lack of mainframe coverage." And defendants ignore entirely Terrence J. Schmid's ("Schmid") own confirmation that Imperva was at a competitive disadvantage because of this lack of coverage. They say nothing about the "surprise" expressed by analysts specifically because "'the company would always downplay their competitors and always viewed themselves as having a strong competitive position'" – the same statements at issue in this case. And, notably, they do not say a word about Kramer's act of stepping down at Imperva and moving on to his next investment, even though such an act is entirely *inconsistent* with the belief that Imperva had "superior technology" and was dominating its competitors. Defendants' motion has failed to address plaintiff's allegations. Their protests about a lack of particulars should be disregarded when they have not addressed the particulars alleged.

## II. SUMMARY OF THE CASE

### A. Background – Imperva and Its Market

Imperva is a small technology company that makes products designed to protect against cyber-attacks in an enterprise's database. ¶28. Imperva's sales depend upon two products – SecureSphere and Incapsula. ¶29. SecureSphere, Imperva's largest and most profitable product, provides database protection to enterprises storing information in on-premise datacenters. Incapsula, by contrast, is Imperva's smallest and least profitable product and provides database protection to enterprises storing information in remote datacenters (*i.e.*, the "cloud"). *Id.* SecureSphere was Imperva's flagship product, representing nearly two-thirds of Imperva's revenues when Imperva went public in November 2011 and a large majority until the very end of the Class Period. ¶¶3, 29.

Imperva's toughest competitor is IBM, which through its Guardium product competes fiercely with Imperva's SecureSphere product. ¶47. Both Imperva and IBM are considered leaders in on-premise data security. ¶48. Forrester, a technology analyst, noted in May 2011 that both

companies offered "features and functionality to meet *any* enterprise auditing requirement." *Id.* But IBM scored higher in the strength of its Guardium offering, its strategy and its market presence. *Id.* Gartner concluded in October 2013 that IBM's Guardium product "include[d] *all nine* critical [Database and Audit Protection] capabilities that Gartner recommends." *Id.*

### B. Imperva Required a Rising Stock Price

The cyber-security market with its large competitors required Imperva to raise large amounts of capital to enhance its product offerings – through innovation or acquisition – to remain competitive. ¶¶2, 30, 52. As defendants knew, IBM alone spent billions of dollars acquiring companies to enhance its own security solution. ¶¶33, 46, 48, 49. Defendants thus raised $90 million in needed capital through an initial public offering ("IPO") in November 2011. ¶34.

Defendants' actions after the IPO reveal their intent to inflate Imperva's stock price to use as currency. Almost immediately, they flooded the market through press releases, conference calls, and technology conferences with positive claims about Imperva's technology and its competitive position. ¶¶34-36. As defendants knew, an inflated stock price would facilitate acquisitions to enhance Imperva's competitive position while enabling stock sales at inflated prices. ¶52.

### C. Imperva Purportedly Turns the Corner After a Tumultuous 2012 While Dominating Its Largest Competitor IBM

At the start of the Class Period (May 2, 2013), and after a tumultuous 2012, defendants continued their quest to inflate Imperva's stock price. ¶¶34-36. Their statements were relentlessly positive. Indeed, defendants supplemented each of Imperva's earnings announcements in 1Q13 and 2Q13 with statements about the "strength" of Imperva's "comprehensive, fully-integrated solution," its "strong competitive position," and its "significant competitive advantage." ¶¶35, 37, 44. Kramer emphasized during Imperva's 2Q13 conference call that Imperva "continu[ed] to displace [its] competitors in the market quite successfully, and we continued to do that in last – in Q2, as well," and "we continue to be . . . in a very good competitive position, and our win-loss ratio continues to be very strong." ¶42. And Schmid, just a week later, was specific that "we have the best technology available," that Imperva has "a bigger lead on [IBM] on the technical side," and that Imperva "compete[d] very well against" IBM. ¶43.

These statements were false and misleading.  As independent analysts discovered while investigating Imperva's end-of-Class Period disclosures, Imperva was actually succumbing to "intensifying competition" ***from IBM***.  ¶69.  In fact, a Wedbush analyst attributed Imperva's poor results to "more aggressive ***discounting/bundling practices by IBM***" – a practice that plaintiff's investigation discovered was plaguing Imperva throughout the Class Period.  ¶70.  Contrary to defendants' boastful claims of dominance, defendants knew that Imperva was losing deals to IBM because of this "discounting/bundling" practice that IBM implemented through enterprise agreements.  These agreements, in fact, presented a fundamental and intractable challenge to Imperva's SecureSphere business since Imperva could not compete with (and continue to report strong SecureSphere growth in the face of) IBM's strategy of offering an equivalent product ***essentially free*** in the near term, deferring costs until IBM renewed the enterprise agreement with the customer, at times years later.  ¶¶39, 44.  Thus, when defendants were making claims of "very strong" win-loss ratios, "displac[ing] competitors," and "competing very well against [IBM]," they failed to disclose that competition from IBM and its enterprise agreements caused most of Imperva's sales representatives to miss sales quotas, often being rejected at the request for information ("RFI") stage, and that senior-level managers for prospective customers were choosing IBM over Imperva because of the perception of saving money.  ¶39.

Imperva's struggles with IBM were not limited to IBM's "discounting/bundling" practices and its enterprise agreements.  In fact, Wedbush's analysis, and Schmid himself, confirmed that Imperva's "lack of mainframe coverage" limited its ability to compete with IBM for the largest on-premise opportunities.  By contrast, Wedbush explained that "[o]ur industry contacts tell us that the IBM Guardium product . . . can cover a variety of use cases, including both relational and mainframe databases," which was reported earlier to be "a major prerequisite for much of IBM's customer base."  ¶¶47, 70.  Schmid confirmed in February 2014 that this put Imperva at a significant competitive disadvantage, as Imperva was facing a "perceived risk of losing access to [a] mainframe technology agent," making necessary Imperva's purchase of its OEM operator Tomium to "improve [Imperva's] competitive position in the market against IBM and McAfee."  ¶¶5, 45, 87.  Thus, when defendants were emphasizing the "strength of [Imperva's] technology," its "very strong" win-loss

ratios, and its "technical advantages," especially over IBM, they omitted the very material fact that Imperva's technology actually limited its ability to compete in the largest enterprise deals. ¶¶5, 43.

### D.   As Imperva Struggles to Compete with IBM, Kramer Sells IBM an Instrumental Upgrade to Its Cyber- Security Offering

In August 2013 – at the same time that Imperva was struggling to compete against IBM – IBM announced that it acquired Trusteer, a cyber-security platform that gave IBM a full set of online defense technologies. ¶46. It was ***Kramer that sold Trusteer to IBM*** for close to a reported $1 billion and, as "the entrepreneur behind Trusteer," personally pocketed $240 million from the sale. *Id.* Kramer was and continues to be a director on Trusteer's Board of Directors. *Id.*

Kramer's sale strengthened IBM. ¶47. Analysts viewed the acquisition as "part of IBM's bigger strategy to evolve" into "next generation services like cybersecurity." ¶46. And defendants were, in fact, aware of IBM's strategy. Mickey Boodaei, Trusteer's CEO and Kramer's partner in a long list of start-ups, including Trusteer, Lacoon Security, Skyfence, and Imperva, confirmed publicly that as early as February 2012, Trusteer and IBM "***started getting to know the products and the abilities on each side***" and saw that "***there was a connection and joint vision***." ¶50. Kramer, as a director and co-founder of Trusteer, ***at a minimum***, was privy to this information. Schmid also acknowledged IBM's developing security strategy, stating earlier "I think [IBM's] security strategy is coming together a little bit more." ¶49.

Defendants knew that Imperva's competitive position in SecureSphere deals had been dealt a blow. ¶46. IBM, already a dominant competitor, would now offer its prospective customers (the same ones Imperva targeted) its already robust Guardium offering and Trusteer's full set of online defense technologies. *Id.* Not long after, defendants shifted their focus to the cloud.

### E.   Imperva Purportedly Remains Dominant as It Shifts to the Cloud, Creating a Windfall for Kramer

Despite the Trusteer sale, defendants continued to boast of Imperva's competitive success. Defendants, again, supplemented each of Imperva's 3Q13 and 4Q13 earnings announcements with claims of "very strong" win-loss ratios and wins against "***large competitors*** highlight[ing] the value of [Imperva's] integrated solution." ¶¶53-57. Defendants forecasted strong annual revenue growth for 1Q14 of "$36 million to $37 million, or growth of approximately 28% at the midpoint"

1  emphasizing that "Imperva remain[ed] well positioned to maintain its momentum due to the ongoing

2  demand for our integrated solutions."  ¶96.  Schmid also professed dominance over IBM at

3  technology conferences in November and December 2013, stating that Imperva had "superior

4  technology to IBM, no question," that "we're better, or we wouldn't" "beat IBM four out of five

5  times," and that IBM could only compete with Imperva with its "political connections" or by

6  inviting prospective customer's CEO to a round of golf at Augusta National.  ¶¶55, 57.

7        These increasingly aggressive claims were false and misleading.  By this time, Imperva

8  continued to struggle against IBM's "discounting/bundling" practices, still lacked "mainframe

9  coverage," and now was struggling to compete against F5 Networks, as analysts reported: "***[W]e***

10  ***believe F5 is at least extending sales cycles for Imperva, if not taking share***."  ¶¶39, 44, 58, 59.  F5

11  Network's "enhanced WAF solution" further reduced the incentive for prospective customers to

12  select and pay for SecureSphere as F5 Networks had partnered with IBM to offer a combined

13  solution to customers.  ¶59.  These facts, undisclosed to investors, directly undermined defendants'

14  claims of "very strong" win-loss ratios, wins against "large competitors," and Imperva's 1Q14

15  revenue guidance, which required, at a minimum, SecureSphere growth of 26% - nine percentage

16  points above SecureSphere sales in 1Q13.

17        The market responded to defendants' message, as Imperva's stock jumped ***over 60%*** in just

18  three months.  ¶¶54, 90, 97.  Defendants then struck, with Kramer unloading $10 million of his

19  Imperva stock in January and April 2014 – ***his first Imperva sales ever*** – as defendants announced

20  that Imperva would acquire the remaining shares of its cloud-based Incapsula subsidiary and a newly

21  formed cloud-based start-up named Skyfence using over $60 million in Imperva stock.  ¶¶61, 64, 68.

22  Both companies were co-founded by Kramer, who received a windfall of over $25 million from

23  those transactions, including an additional 1% ownership of Imperva and $13.3 million in cash.  ¶64.

24  When asked, Schmid denied that Imperva was shifting to the cloud, stating expressly that "we're not

25  experiencing . . . a move from perpetual license [*i.e.*, SecureSphere sales] to subscription [*i.e.*,

26  Incapsula sales]," claiming that "[w]e're seeing growth in both."  ¶99.  Yet analysts later discovered

27  the precise opposite – Incapsula was, in fact, cannibalizing SecureSphere opportunities.  An analyst

28  even confirmed that "a few partners did mention they had deals for the on-premise WAF [in 1Q14]

which ended up turning into cloud-based WAF deals." ¶65. Another analyst explained that "demand momentum for the Database firewall [*i.e.*, SecureSphere] lags that of Web Application Firewall [*i.e.*, Incapsula]" with "customer awareness [being] low, and customer perception of the vulnerability of their database servers appears to be lower than that of their Application Servers." *Id*. These facts directly undermined defendants' positive claims about Imperva's competitive position, Imperva's 1Q14 guidance, and Schmid's denial that Imperva was shifting from its on-premise license products to cloud-based subscription products.

**F.     Defendants Disclose the Truth – SecureSphere Sales Collapse Because of "Intensifying Competition" from IBM**

Then, on April 9, 2014, just ***two days*** after Kramer completed his last stock sale and ***less than a month*** before IBM officially announced its new "comprehensive" offering, defendants shocked the market with a ***20% revenue miss*** in 1Q14 caused by a "combination of intensifying competition for large orders, which resulted in additional review and approval cycles, as well as sales execution challenges in the U.S." ¶¶8, 69, 100. Defendants' disclosure also praised "strong performance . . . in sales of subscription products [*i.e.*, Incapsula]," placing the blame squarely on SecureSphere. *Id*. Imperva's stock collapsed 44% in response, as analysts reported that "***IBM [Was] Squeezing Israel Cyber Guru***" and that "[i]nvestors were surprised as 'the company would always downplay their competitors and always viewed themselves as having a strong competitive position.'" ¶¶8, 70, 102.

On May 5, 2014, IBM officially announced the release of its Comprehensive Threat Protection System, explaining that it represented "the acquisition of [six] companies," including Trusteer. ¶71. At the same time, Kramer had turned his attention to his next cybersecurity investment, Exabeam, which by June 10, 2014, had raised $10 million in funding from three investors, one of which was Kramer, who had cash on hand from his Imperva stock sales. Kramer appears to have mined Imperva's employees to get Exabeam off the ground, including the "engineer[ing] team behind the security company Imperva" and Imperva's Senior Vice President of Worldwide Sales Ralph Pisani, who publicly endorsed Exabeam's technology as what "the market has been waiting for" as it provides cybersecurity "without having to rebuild monitoring

1    infrastructure or hire teams of data scientists," unlike Imperva. ¶¶74, 75. In August 2013, Kramer

2    was replaced by a new CEO with a reputation for leading companies through acquisitions. ¶76.

3    **III.    ARGUMENT**

4        **A.    Standards Governing a Motion to Dismiss Under Rule 12(b)(6)**

5            In a securities fraud class action, courts must "[a]ssume[] the complaint's allegations to be

6    true" and construe them holistically in the light most favorable to plaintiff. *Matrixx Initiatives, Inc.*

7    *v. Siracusano*, 131 S. Ct. 1309, 1322 (2011). A complaint must state with particularity: (i) each

8    statement alleged to have been false or misleading and the reason or reasons why the statement was

9    false or misleading; and (ii) facts giving rise to a strong inference that the defendant acted with the

10   required state of mind. *Reese v. Malone*, 747 F.3d 557, 568 (9th Cir. 2014); *see also* 15 U.S.C.

11   §78u-4(b). In PSLRA cases, "'courts must be careful not to set hurdles so high that even meritorious

12   actions cannot survive a motion to dismiss.'"[1] *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d

13   983, 1018 (S.D. Cal. 2005). The PSLRA does "'not require a plaintiff to plead evidence.'" *Zucco*

14   *Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 997 n.4 (9th Cir. 2009).

15       **B.    Defendants' Statements Were False and Misleading**

16           A statement is actionable if it creates an "'impression of a state of affairs that differs in a

17   material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982,

18   985 (9th Cir. 2008). Even a literally accurate statement is actionable if it gives a false impression.

19   *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) ("'Some statements, although literally

20   accurate, can become, through their context and manner of presentation, devices which mislead

21   investors.'"). Defendants' focus on Imperva's purportedly "impressive" Class Period results

22   overlooks these fundamental principles. Defs.' Mem. at 1, 4-5, 8.

23           **1.    Defendants' Statements About Imperva's Competitive Success
                      Were False and Misleading**

24

25           Both Kramer and Schmid created an impression about Imperva's competitive success that

26   differed from the one that existed internally. At the same time they told investors that Imperva was

27   experiencing a "very strong" win-loss ratio against larger competitors (¶¶37, 42, 53, 63, 82, 85, 89,

28   [1]    Unless otherwise noted, internal citations are omitted.

96), that Imperva was dominating its primary competitor IBM and beating them in deals "four out of five times" (¶¶57, 92), and that Imperva was experiencing "strong demand" (¶¶40, 44, 84, 89, 91), they concealed material facts about Imperva's struggle to compete against IBM. As the PSLRA requires, the Complaint identifies the speaker, the date, quotes each statement at issue, and specifies precisely why those statements were false and/or misleading. *Reese*, 747 F.3d at 568.

The Complaint's allegations are particular. It contrasts defendants' statements about Imperva's competitive success with the truth that Imperva: (1) regularly lost out on SecureSphere deals to IBM, whose practice of "discounting/bundling" through its enterprise agreements made the product essentially free in the near term; and (2) lacked a mainframe offering to compete with IBM in the largest on-premise deals. ¶¶39, 44, 58, 66-67, 83. This latter omission was revealed by Schmid himself, who explained that Imperva relied on an OEM arrangement with Tomium to compete for mainframe deals. But as he disclosed, Imperva faced the "perceived risk of losing access to the mainframe technology agent." ¶¶45, 47, 87, 93, 98. Indeed, Imperva had to acquire the assets from Tomium to, as Schmid put it, "improve [Imperva's] competitive position against IBM and McAfee." Defendants' unqualified statements were thus false and misleading since they omitted the material fact that Imperva was being shut out of the largest opportunities in the database security market. *In re HP Sec. Litig.*, No. C 12-05980 CRB, 2013 U.S. Dist. LEXIS 168292, at *40 (N.D. Cal. Nov. 26, 2013) (assertions made "with certainty and without qualification" are misleading where a credible alternative explanation exists).[2]

Defendants also created an impression about Imperva's competitive success that differed from the one that existed internally by omitting any reference to the success IBM was having by

---

[2]    Defendants incorrectly argue that plaintiff is required to plead detail on a par with evidence obtained through discovery, such as "witnesses, documents, [or] data," the "customers involved" and "how and who at Imperva knew about IBM's pricing proposals to customers." Defendants' Motion to Dismiss Amended Complaint and Memorandum of Points and Authorities in Support Thereof (Dkt. No. 36) ("Defs.' Mem.") at 3, 11-12. But defendants overlook allegations establishing how Kramer and Schmid knew about IBM's pricing proposals. *See* §II.D. Defendants also disregard established case law holding that plaintiff is not required to plead this type of evidence at the pleadings stage. *Zucco*, 552 F.3d at 997 n.4; *In re Computer Assocs. Class Action Sec. Litig.*, 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999) ("[u]nknown specifics" not fatal to adequately pleading falsity where fraud widespread and the information was the type "peculiarly within the defendants' control"); *Genesee Cnty. Emps. Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3*, 825 F. Supp. 2d 1082, 1182 (D.N.M. 2011) ("mathematical certainty" unnecessary to plausibly plead falsity).

"discounting/bundling" though its enterprise agreements – a fact confirmed by an analyst at Wedbush Securities. *Berson*, 527 F.3d at 985. At the same time that defendants were boasting about Imperva's competitive success against IBM, most of Imperva's sales representatives were struggling to meet (or missing) their sales quotas and were often turned away at the RFI stage because of Imperva's inability to compete with an essentially free product. Not surprisingly, prospective customers' senior-level managers regularly selected IBM over Imperva because of the perception of saving money. ¶¶39, 44, 58, 83, 86, 93, 98. Investors were, in fact, misled. As a Deutsche Bank analyst confirmed, "[i]nvestors were surprised [by the disclosure] as 'the company would always downplay their competitors and always viewed themselves as having a strong competitive position.'" ¶¶8, 70, 102; *In re STEC Inc. Sec. Litig.*, No. SACV 09-1304 JVS, 2011 U.S. Dist. LEXIS 75093, at *24 (C.D. Cal. June 17, 2011) ("Particular statements made by analysts underscore the plausibility and reasonableness of the false impression . . . Defendants' statements conveyed.").[3]

Defendants argue that their statements were not misleading because they warned investors in SEC filings about intense competition and differing pricing and distribution models. Defs.' Mem. at 12-13. This argument fails on a number of levels. First, it entirely disregards defendants' representations about Imperva's dominance over its competitors and Schmid's claim that Imperva's competition was "really not a price game." ¶¶56, 99. Second, it ignores the "surprise" expressed by analysts ***specifically because*** of defendants' statements about its "strong competitive position." ¶¶8, 70. Third, it does not come close to meeting the standard for a truth-on-the-market defense – defendants' "'warnings'" did not "'effectively counterbalance any misleading impression created by insider's one-sided representations.'" *Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996),

---

[3] Defendants argue that plaintiff's allegations are too vague to make their statements actionable. Defs.' Mem. at 11-12. But when, like here, the prevailing condition is the exact opposite to the one represented, fraud is alleged. *Reese*, 747 F.3d at 570; *Berson*, 527 F.3d at 987; *see also Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 175-76 (D.R.I. 2003) (when not assessed in a vacuum, statements that company is "'premier,'" "'dominant,'" or "'leading'" are actionable). Defendants' authority is clearly inapposite. *See In re Cisco Sys. Sec. Litig.*, No. C 11-1568 SBA, 2013 U.S. Dist. LEXIS 53137, at *20 (N.D. Cal. Mar. 29, 2013) (no articulated reasons why statements were false); *In re Silicon Storage Tech., Inc., Sec. Litig.*, No. C-05-0295 PJH, 2007 WL 760535 at *24 (N.D. Cal. Mar. 9, 2007) (same); *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1076 (N.D. Cal. 2010) (non-actionable arguments unrebutted); *In re FoxHollow Techs., Inc.*, No. C 06-4595 PJH, 2008 U.S. Dist. LEXIS 52363, at *39, *47 (N.D. Cal. May 27, 2008), *aff'd, In re FoxHollow Techs., Inc. Sec. Litig.*, 359 F. App'x 802 (9th Cir. 2009) (false statements not specified).

*cert. denied*, *Miller v. Provenz*, 522 U.S. 808 (1997).  The market's reaction, alone, demonstrates that defendants cannot carry their "'heavy burden of proof.'"  *Immune Response*, 375 F. Supp. 2d at 1036.  Fourth, defendants' warnings were inadequate.  Warnings about how competitors "may" or "could" compete by "pric[ing] their products more competitively" did not specifically warn that Imperva was *in fact* losing deals to IBM because of how it was "discounting/bundling" through its enterprise agreements.  *Berson*, 527 F.3d at 987.[4]

        Defendants argue that the Complaint's allegations regarding Imperva's shift to cloud-based solutions is a "red herring."  Defs.' Mem. at 13.  Not true.  The problems facing SecureSphere, which Kramer exacerbated by upgrading IBM's solution, drove Imperva to this smaller and less profitable business.  In fact, after Schmid *denied* that Imperva's business was shifting to the cloud, analysts commented that Imperva's 1Q14 results "reflect[ed] *competitive issues* rather than a slow-down in the broader cyber-security market."  ¶¶65, 70.  Imperva's disclosures of growing cloud-based revenue certainly did not reveal SecureSphere's competitive issues with IBM.  Defs.' Mem. at 13.

        **2.**      **Defendants' Statements About Imperva's Superior Technology Were False and Misleading**

        Defendants also created a misleading impression with their statements about Imperva's superior technology.  Defendants, in fact, repeatedly extolled that technology as the reason for Imperva's competitive success, claiming that "w[ins] against larger comparators, highlight[ed] the value of [Imperva's] integrated solution" (¶¶37, 82), that Imperva was "the only provider to offer such a comprehensive integrated data center security solution," "which we view [as] a significant competitive advantage" (¶¶42, 44, 82, 85), and that Imperva's competition relied on their "political connections" to compete (¶¶55, 57, 91).  They even stated with regard to IBM that "[t]echnically, we're better or we wouldn't win four out of five times," "we have superior technology to IBM, no question," and that IBM won in deals by "taking the CEO to Augusta National to play a round of

---

[4]   Defendants' reliance on *Apollo Group* and *Metricom* is misplaced.  Defs.' Mem. at 12-13.  In *Apollo Group,* the alleged deception was an intrinsic part of the Company's operations.  *See Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606-07 (9th Cir. 2014) (recruiting "flawed students" not undisclosed since that was the institution's business model).  And in *Metricom*, the public filings made "absolutely clear" the alleged deception.  *In re Metricom Sec. Litig.*, No. C 01-4085 PJH, 2004 U.S. Dist. LEXIS 7834, at *51 (N.D. Cal. May 4, 2004), *aff'd*, *Young v. Dreisbach*, 182 F. App'x 714 (9th Cir. 2006).  No comparable clarity is found here.

golf" (¶¶57, 92). Again, the Complaint identifies the speaker, alleges dates, quotes the particular statements, and specifies why the statements were false and misleading.

As the Complaint alleges, what made these statements false and misleading is the undisclosed truth that Imperva could not compete with IBM in the largest mainframe opportunities *because* of its technological dependency on an outside OEM provider. *See* §III.B.2., *supra*; ¶¶5, 26, 45, 58, 66, 70, 87, 93, 98. In fact, Wedbush's analysis, which defendants completely ignore, described a situation where "[w]e think [Imperva's] *lack of mainframe coverage* forced Imperva to acquire Tomium in February of 2014." ¶70. Thus, the undisclosed reality was that Imperva's so-called "superior" technology limited its ability to compete for the largest on-premise deals. These facts, combined with IBM's partnership with F5 Networks, which analysts noted had "significantly enhanced its WAF solution when compared to Imperva's and we believe F5 is at least extending sales cycles for Imperva, if not taking share," reveal that defendants created an impression of success that differed materially from the one that actually existed. ¶¶59, 94.

Defendants' argument that these statements qualify as "corporate optimism or puffery" simply ignores reality. *Compare* Defs.' Mem. at 14 *with In re Cooper Sec. Litig.*, 691 F. Supp. 2d 1105, 1118 (C.D. Cal. 2010) (product doing "very, very well" against competitor were materially false when product was in fact "doing very poorly"); *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1181 (S.D. Cal. 2009) (statements that demand was "'strong,'" "'increasing,'" and driven by "'innovative products'" were not too vague when the company failed to disclose that its largest customer discontinued its popular product). Imperva's technology was what defendants repeatedly told investors separated Imperva from the competition. Investors obviously considered it important. ¶70. *In re MGM Mirage Sec. Litig.*, No. 2:09-cv-01558-GMN-VCF, 2013 U.S. Dist. LEXIS 139356, at *18 (D. Nev. Sept. 26, 2013) (attempts to "improperly trivialize" statements as optimism rejected where statements reflected current financial status). Defendants' "puffery" authority is easily distinguishable. Defs.' Mem. at 14. Unlike the vague, "mildly optimistic" "feel good" monikers" deemed to be "puffing" in those cases, defendants' misstatements here were specific

about Imperva's past and current technological performance against IBM.[5] *See In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010).

Kramer's attempt to evade liability for Schmid's statements about IBM fails. Defs.' Mem. at 14. Kramer clearly knew what Schmid was saying. His remarks were disseminated in publicly available transcripts, and were posted on the Company's website. And those remarks were not fundamentally different than Kramer's own. ¶¶85, 89, 96. Defendants jointly disseminated a false message of confidence. *Barrie v. Intervoice-Brite, Inc.*, 409 F.3d 653, 656 (5th Cir. 2005) ("'a high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements'").

### 3.    Defendants Had No Basis for Imperva's 1Q14 Guidance

"A statement of belief is a '"factual" misstatement actionable under Section 10(b) if (1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy.'" *Reese*, 747 F.3d at 579; *Provenz*, 102 F.3d at 1487 ("no reasonable basis" for defendants' forecasts or projections because, at the time, defendants were aware of facts undermining the forecasts' accuracy); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 972-73 (N.D. Cal. 2009) (same).

Here, defendants had no basis for their revenue guidance of "$36 million to $37 million." ¶¶96, 98. Contrary to defendants' arguments that they did not actually know that guidance was unreasonable (Defs.' Mem. at 10-11, 17), the allegations demonstrate that defendants knew they had no chance of reaching even the lowest end of that guidance. Indeed, Imperva's guidance depended largely on SecureSphere sales because, unlike Incapsula sales, they were recognized immediately in the quarter in which the sale was made. And SecureSphere (*i.e.*, "Product and License revenue") represented ***more than 50%*** of Imperva's revenues in every quarter in 2013, with the exception of

---

[5] Defendants argue that Imperva's lack of mainframe coverage was immaterial and that allegations based on that fact amount to "pure fraud by hindsight." Defs.' Mem. at 15. Not so. Schmid's statements revealed conditions ***existing*** throughout the Class Period and that prohibited Imperva from competing with IBM in the largest deals. In fact, Wedbush's discussion about Imperva's "lack of mainframe coverage" in the description of IBM's "intensifying competition" undermines defendants' attempt to feign ignorance about "what these references are supposed to mean" and eliminates any suggestion that the information was immaterial. ¶70.

1 1Q13, when SecureSphere sales were 49.52% of total revenues. Defs.' Exs. B, D, F at 3; Ex. H at

2 54. SecureSphere sales thus had to reach between $17.8 million (25.9% year-over-year growth) and

3 $18.3 million (29.45% year-over-year growth) to meet guidance.[6]

4         Defendants knew that SecureSphere would not grow at a rate of nine to 12 percentage points

5 higher than what it reported a year earlier. SecureSphere, in fact, had not grown at the low end of

6 26% in any quarter over the previous year, except for the fourth quarter (Imperva's seasonably

7 strongest) when it grew at 29%. Defs.' Ex. H at 54. At the same time, IBM was not only winning

8 deals over Imperva using its enterprise agreements (*see* §III.B.1.), but Imperva was experiencing

9 "demand momentum for the Database [SecureSphere] firewall ***[that] lags*** that of Web Application

10 Firewall," as an analyst with Deutsche Bank confirmed. ¶¶65, 72. Any belief that SecureSphere

11 sales would grow at nearly the same rate as Imperva's seasonally strongest, in this environment, was

12 simply not reasonable. Indeed, with this environment and a greater dependency on Imperva's cloud

13 business, smaller deal sizes, and ratably reported revenue, defendants were clearly aware of facts that

14 undermined Imperva's guidance. ¶¶2, 29, 64.

15         Defendants complain about a lack of particulars and argue, improperly, that the "challenges"

16 seen in 1Q14 "were quickly overcome in subsequent periods." Defs.' Mem. at 2, 6, 8-9. Their

17 arguments fail. Defendants do not address the actual allegations (*see* §III.B.1.-2.), their assertion

18 about "overcoming" challenges is improper and untrue (*see* Response to Defendants' Request for

19 Judicial Notice ("Resp. to RJN"), filed concurrently herewith), and their argument defies common

20 sense. As they would have it, a sales force capable of strong growth in 2013 – a sales force

21 defendants boasted about strengthening and that was credited with "continuing improved overall

22

23 [6]    Plaintiff calculated the SecureSphere sales thresholds by using SecureSphere's lowest percentage contribution of any quarter in the previous year and multiplying that by the range of defendants' stated guidance (*i.e.*, $36 million x 49.52% = $17.8 million; $37 million x 49.52% = $18.3 million). Notably, the low end of $17.8 million, which gives defendants all the advantages in calculation, is only $6.3 million less than Imperva's 4Q13 sales, and the fourth quarter is seasonally Imperva's strongest quarter. This further demonstrates that defendants had no real basis for the outsized guidance they gave for 1Q14. Defendants' reliance on *In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1047 (N.D. Cal. 2007) and *Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1126 (C.D. Cal. 2005) (Defs.' Mem at 11), and *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001) and *Verona Partners, LLC v. Tenet Capital Partners Convertible Opportunities Fund LP*, 2006 WL 2669035, at *13 (N.D. Cal. Sept. 18, 2006) (Defs.' Mem. at 17), is to no avail since defendants' actual knowledge of Imperva's inability to reach 1Q14 guidance is amply alleged. *See* §III.C.

1  sales execution performance" in 4Q13 – was suddenly responsible for a colossal collapse in

2  Imperva's flagship product that defendants knew nothing about. ¶¶41, 63. Defendants' argument

3  requires leaps of logic too far to have any merit.[7]

4      Defendants also cannot hide behind the PSLRA's safe harbor (Defs.' Mem. at 10, 17), which

5  offers protection for forward-looking statements only when accompanied by "'meaningful

6  cautionary statements.'" *Immune Response*, 375 F. Supp. 2d at 1032-33. "'The cautionary

7  statements must be precise,'" "'directly address [the] future projections,'" and put "an investor

8  'sufficiently on notice of the danger of the investment to make an intelligent decision . . . according

9  to her own preferences for risk and reward.'" *Id.* at 133 (quoting *Provenz*, 102 F.3d at 1493).

10      Defendants' "warnings" about an "intensely competitive" market and that they "expect[ed]

11  competition to intensify" were certainly not meaningful. Defs.' Mem. at 10. They said nothing

12  about what was actually happening to Imperva – its lack of a mainframe solution prevented it from

13  competing in that market and it was, in fact, losing deals to IBM because of IBM's enterprise

14  agreements. *Cutera* and *Clorox* are not persuasive; those cases, unlike this one, involved contingent

15  and uncertain future events. *See Cutera*, 610 F.3d at 1112-13 (projections contingent on a newly

16  hired junior sales force); *Emp'r Teamsters Local. Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*,

17  353 F.3d 1125, 1132-33 (9th Cir. 2004) (timetable contingent on integration of acquisitions).[8]

18

19

---

20  [7]  Defendants, again, claim fraud-by-hindsight, arguing that "[p]laintiff pleads no facts
21  demonstrating that the Company was experiencing such challenges in earlier periods." Defs.' Mem.
   at 8-10. But, again, they ignore the allegations. *See* §III.B.1. And unlike the cases defendants cite,
22  defendants did not merely project future events inaccurately; they knew **when they gave the
   guidance** there was no reasonable basis for it. *Bare Escentuals*, 745 F. Supp. 2d at 1076; and *Silicon
23  Storage*, 2007 WL 760535, at *8, are therefore inapposite. Defs.' Mem. at 9-10. And defendants'
   arguments about growth in earlier quarters ignores the significant issues its sales force faced and the
24  extraordinary rate at which SecureSphere had to grow to reach guidance. Defs.' Mem. at 10 n.4;
   *Immune Response*, 375 F. Supp. 2d at 1020 ("'specific problems undermining a defendant's
25  optimistic claims suffice to explain how the claims are false'").

   [8]  *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011), does not support
26  Kramer's argument that he would only be liable for Imperva's guidance if he actually gave the
   guidance. Defs.' Mem. at 17. *Janus* "has no bearing on how corporate officers who work together
27  in the same entity can be held jointly responsible on a theory of primary liability." *City of Pontiac
   Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012). Kramer
28  was on the call when Schmid issued Imperva's guidance. He is liable for it.

## C. The Complaint Adequately Alleges Defendants' Scienter

To plead scienter, a plaintiff must allege false or misleading statements made intentionally or with deliberate recklessness. *Reese*, 747 F.3d at 569. "The relevant inquiry is 'whether **all** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Id.* (emphasis in original). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). It need only be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

### 1. Defendants Knew that Their Statements Were False

An executive's statements about a subject provides an inference that the executive was aware of, and had access to, facts about that subject. *Reese*, 747 F.3d at 576 ("'actual access' analysis also supports scienter, because Johnson's statements are specific and reflect her access to the disputed information"). And that inference is stronger where the subject of those statements is the Company's core operations. *South Ferry LP v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008) ("*South Ferry #1*"); *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012) (inference of scienter made more compelling by defendants' public statements about the issue); *South Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1257-62 (W.D. Wash. 2009) (core operations applies where defendants' statements indicated they had access to the information); *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061-62 (9th Cir. 2014) ("'corporate officers have knowledge of the critical core operation of their companies'").

Defendants' focus on Imperva's competitive position every time they spoke demonstrates that they were aware of how Imperva was competing against IBM. Kramer repeatedly referenced "wins against larger competitors," very strong win-loss ratios in "head-to-head comparative deals," and even stated that Imperva was "displac[ing] competitors in the market quite successfully." ¶¶42, 44, 53. Schmid referenced IBM often: "we have superior technology to IBM, no question," "we beat IBM four out of five times," and IBM won only by "taking the CEO to Augusta National." ¶¶57-59, 92. Schmid even noted the need to "improve [Imperva's] competitive position in the market against

IBM" and addressed how Imperva and IBM were competing, stating that it was "really not a price game." ¶¶45, 56, 91. Suggesting that defendants were not aware of how IBM was competing with Imperva is simply absurd. *South Ferry #1*, 542 F.3d at 784 (allegations should be "viewed with a practical and common-sense perspective").

Likewise, suggesting that defendants were not intently focused on SecureSphere is nonsensical. SecureSphere was Imperva's most important product. It represented the vast bulk of Imperva's revenues and, as Imperva's **only** product with sales recognizable entirely in the quarter it was sold, was outcome determinative for Imperva's quarterly guidance. It would be absurd to suggest that defendants did not know how IBM was winning deals against SecureSphere. *Berson*, 527 F.3d at 987-88 (hard to believe that defendants would not have known about stop-work orders costing the Company approximately $23 million and causing reassignments); *United States SEC v. E-Smart Techs.*, No. 11-895 (JEB), 2014 U.S. Dist. LEXIS 31629, at *22-*23 (D.D.C. Mar. 12, 2014) (defendants must have been aware of technological deficiencies when representing that product was functional and ready for deployment). "[S]ome events[,]" like the ones here, "are so integral to the operations of a company that knowledge thereof cannot be denied by senior executives." *Plumbers Union Local No. 12 Pension Fund v. Ambassador's Grp.*, 717 F. Supp. 2d 1170, 1178 (E.D. Wash. 2010); *see also Patel v. Axesstel, Inc.*, No. 3:14-CV-1037-CAB-BGS, 2015 U.S. Dist. LEXIS 18385, at *29 (S.D. Cal. Feb. 13, 2015) ("Axesstel is not to be confused with Apple. The individual defendants here are not officers in a large company who 'may be removed from the details of a specific business line or remote business activity.'").

Defendants' knowledge is also corroborated by Schmid's post-Class Period acknowledgment that Imperva utilized Salesforce.com **to track Imperva's sales opportunities**. *In re Daou Sys.*, 411 F.3d 1006, 1022 (9th Cir. 2005) (admissions of monitoring favor scienter). Kramer and Schmid used the application, inquired about deals on a regular basis through it, approved discounts using it, and had access to sales representatives who continuously updated deal closing estimates on it. ¶¶106-108. These facts establish that defendants had access to information about SecureSphere and IBM. *South Ferry #1*, 542 F.3d at 786 (allegations regarding management's role in the Company "suggest that defendants had actual access to the disputed information").

Defendants' arguments to overcome the "core operations" theory of scienter demonstrates the strength of plaintiff's allegations. Defs.' Mem. at 21-22. Defendants attempt to recast the case as one merely alleging that defendants "generally had knowledge of supposed misstatements due to their positions as '[h]igher-level executives.'" Defs.' Mem. at 21-22. But this overlooks *every* scienter allegation in the Complaint. Defendants also try to divert attention from plaintiff's core operations allegations to the Company's "one-quarter earning miss" and its purported post-Class Period success where "its stock price has since rebounded," and then conclude that "this is not a case where the 'core operations' theory applies." *Id.* at 22. This argument is improper on a motion to dismiss, an egregious mischaracterization of post-Class Period events (*see* Resp. to RJN), and is a non-sequitur. How Imperva and its stock has performed since defendants disclosed the truth has absolutely no bearing on what defendants knew during the Class Period.[9]

### 2. Defendants' Unique Access to IBM's Development Plans Raises a Strong Inference of Scienter

The allegations in this case are uniquely indicative of scienter. Kramer sold Trusteer to IBM and in the process gained access to IBM's development plans. Trusteer's CEO and Kramer's partner confirmed as much, stating publicly that in February 2012 Trusteer and IBM shared product information and a "joint vision." Kramer, as a Trusteer co-founder and director, undoubtedly had access to this vision. He also had access to it through IBM's "cybersecurity software lab in Israel" which combined "Trusteer and IBM researchers and developers." ¶¶50, 110. Kramer's ties to this industry – one where ""people know one another, invest in each other's enterprises, and eventually buy each other out" – gave him another source of access to IBM's strategy. ¶50. *In re Lattice Semiconductor Corp. Sec. Litig.*, No. CV04-1255-AA, 2006 U.S. Dist. LEXIS 262, at *41 (D. Or. Jan. 3, 2006) ("[A]ccess to information about the company's business success and to information about the company's financial data," adds to the inference of scienter.).

Defendants fail to address these allegations substantively. Defs.' Mem. at 19-21. Instead, they argue that the allegations show only that Kramer has accumulated considerable wealth and had

---

[9] *Glazer* and *Metzler*'s rejection of general allegations of hands-on management or general awareness of the day-to-day workings clearly do not apply here. Defs.' Mem. at 22. Plaintiff has pleaded specific facts that defendants knew about and, in fact, cannot deny.

no reason to "risk his stellar reputation." Defs.' Mem. at 3, 19-20. But in praising Kramer, defendants overlook the ***information and access*** that he accumulated in the process. Indeed, they ignore the allegation, sourced to *TechWorld*, describing the Israeli cyber-security industry as "incestuous." ¶32. Unfortunately for Imperva investors, Kramer did risk his reputation. *See, e.g.*, *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 345 (S.D.N.Y. 2004) (auditors' "'vested interest in the performance and profitability'" "'weaken[s] its ability to rely on its reputation in countering as "irrational" allegations that it participated in a client's fraud'").

Defendants argue that "plaintiff's theory is utterly devoid of specifics," listing facts that they claim plaintiff does not allege. Defs.' Mem. at 20-21. Defendants then state only that "IBM is not known to be in the business of 'sharing insights.'" *Id.* But again, they do not address the allegations, which reveal that IBM did, in fact, share a "joint vision." ¶¶50, 72. Defendants' characterization of the Complaint as "an essay in speculation," when they have chosen to ignore the factual foundation that they claim is missing, is baseless. Defs.' Mem. at 20. And *Lipton v. PathoGenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) and *Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 923-25 (N.D. Cal. 2012), are inapposite. Those cases discussed reliance on "'internal reports,'" details from which were necessary for the courts to "'ascertain whether there is any basis for the allegations.'" *PathoGenesis Corp.*, 284 F.3d at 1036. The same concern is not present here.

Defendants' remaining arguments are misguided. Defs.' Mem. at 20. They cite Imperva's performance before and after the Trusteer sale, and argue that their disclosure did not relate to IBM's earlier purchase of Trusteer. *Id.* But Imperva did ***not*** perform well against IBM, especially after the Trusteer sale, which defendants revealed less than a month before IBM's official announcement. ¶¶71, 73. Kramer's "insights" and his investment in Exabeam show he knew it was coming.[10]

---

[10]   Defendants' contention that "defendants were not obligated to predict what IBM would . . . do" misses the point. Defs.' Mem. at 21. They did not need to predict. Kramer had actual knowledge of IBM's "joint vision" and, as a director of Trusteer, was included in that vision. ¶51. Defendants' authority, which speaks of knowledge of "another company's plans" and of generally "increasing competition," are obviously different. *In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1406-07 (9th Cir. 1996), *cert. denied*, *Anderson v. Clow*, 520 U.S. 1103 (1997); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, No. 12-cv-06039-BLF, 2014 U.S. LEXIS 118438, at *46-*47 (N.D. Cal. Aug. 22, 2014). And, unlike *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1136 (S.D. Cal. 2012), defendants' "warn[ings]" about IBM being a competitor were meaningless, given their statements that Imperva was dominating IBM. *See* §III.B.1., *supra*.

### 3. Kramer's Self-Dealing Raises a Strong Inference of Scienter

Defendants' motion ignores Kramer's post-Class Period conduct, which is strongly indicative of scienter. Only four months after upgrading IBM's security offering ($240 million for himself), selling $10 million of his Imperva stock (at precisely the right time) while pulling another $13.3 million in cash ($25+ million total) out of Imperva with the Skyfence sale, and after flooding the market with claims about Imperva's dominance, Kramer stepped down and moved on to his next investment, Exabeam. Exabeam reportedly has technology that will compete against Imperva and Kramer appears to have mined Imperva's top talents, including the engineering "team behind the security company Imperva," to develop that technology. ¶75. It defies logic that Kramer would step down while investing in a competing enterprise if he truly believed that Imperva was strongly positioned in a nascent market. ¶¶9, 76.

### 4. Imperva's Acquisitions Raise a Strong Inference of Scienter

The motive to acquire another company using stock raises an inference of scienter. *Daou*, 411 F.3d at 1024; *Howard v. Everex Sys.*, 228 F.3d 1057, 1064 (9th Cir. 2000) ("potentially [having] a motive to inflate sales to raise financing" sufficient for a finding of scienter). Imperva's acquisitions of Tomium, Incapsula, and Skyfence therefore support an inference of scienter. At a time when Imperva's stock was trading at or near then-record highs, defendants structured the transactions to use Imperva's stock as currency – $3.4 million for the Tomium acquisition, $5.8 million for Incapsula, and $57.2 million for Skyfence. ¶¶21, 26, 64. The motive is strong, especially since the acquisitions were made in the context of SecureSphere's decline from increasing pressure from IBM. *In re Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001).

Defendants argue that the theory of scienter is "irrational" because Kramer would not have inflated Imperva's stock only to "acquire the allegedly inflated shares himself when Skyfence was sold." Defs.' Mem. at 2-3,16. While this argument has superficial appeal, it does not withstand scrutiny. What defendants overlook is that Skyfence was a "start-up," which by definition (and with a $60 million price tag) meant that Kramer had limited options for cashing in on his investment. At the same time, Imperva was not in a position to pay cash totaling $60 million – more than 75% of Imperva's available cash. *See, e.g.*, Defs.' Ex. F at 2. Defendants had to inflate Imperva's stock

price to put it into a position to acquire Skyfence, which directly rewarded Kramer in the form of an additional 1% ownership interest in Imperva (the maximum he could get without a shareholder vote) and $13.3 million in added cash. Given these circumstances, Kramer's actions were not so "irrational." He was able to cash in on a start-up, he preserved Imperva's cash position, and he benefitted all concerned by facilitating Imperva's shift to the cloud.

### 5. Kramer's Stock Sales Support a Strong Inference of Scienter

"'Unusual trading or trading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter.'" *Doau*, 411 F.3d at 1022-24. "'Among the relevant factors to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history.'" *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2003), *cert. denied*, 540 U.S. 966 (2003).

The timing of Kramer's trading could not have been more suspicious. It was the first time that he had sold Imperva stock, the sales occurred when Imperva was trading at, or near, record highs, and Kramer finished selling only ***two days*** before disclosing the truth. Such "[t]rades made a short time before a negative public announcement are suspiciously timed." *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999) (two months suspicious); *In re Tut Sys. Sec. Litig.*, No. C 01-02659 CW, 2002 U.S. Dist. LEXIS 27092, at *39 (N.D. Cal. Aug. 15, 2002) (sales "at all-time [trading] highs," raises "strong inference of scienter"). The amount is also suspicious. While only 5% of his holdings, Kramer's sales came shortly after he pulled $240 million out of the Trusteer sale and while pulling another $13.3 million in cash ($25+ million in total) out of the Skyfence sale. *In re Questcor Sec. Litig.*, No. SA CV 12-01623 DMG (FMOx), 2013 U.S. Dist. LEXIS 142865, at *45 n.11 (C.D. Cal. Oct. 1, 2013) (no bright-line rule for percentage necessary to be suspicious); *Batwin v. Occam Networks, Inc.*, No. CV 07-2750 CAS (SHx), 2008 U.S. Dist. LEXIS 52365, at *42-*45 (C.D. Cal. July 1, 2008) (sale of "small percentage" – 7% with vested

1   options – "suspect" where "sale occurred only a few months" before disclosure).  Kramer's sales

2   show that he knew what was coming.[11]

3            Defendants argue that Kramer's trades do not raise an inference of scienter because "Kramer

4   actually acquired more Company shares [through Skyfence] than he sold during the class period."

5   Defs.' Mem. at 3, 18.  But defendants' argument overlooks Kramer's practice of selling companies,

6   not shares.  Kramer has gained considerable wealth with this strategy, selling Workforce to IBM for

7   $50 to $60 million, Trusteer to IBM for $240 million, and Skyfence and Incapsula to Imperva for at

8   least another $25 million.  His lack of a single stock sale before the Class Period strongly supports

9   this conclusion.  And, consistent with this practice, Skyfence gave Kramer an additional 1% control

10  of Imperva.  Defendants' reliance on *Allied Waste* is therefore misplaced.  Defs.' Mem. at 18.

11  Unlike *Allied Waste*, Kramer did not make "significant investments during class period in the stock."

12  *Zack v. Allied Waste Indus.*, No. CIV-04-1640-PHX-MHM, 2005 U.S. Dist. LEXIS 35323, at *41-

13  *42 (D. Ariz. Dec. 15, 2005), *aff'd*, 275 F. App'x 722 (9th Cir. 2008).  He increased his control of

14  Imperva in a single transaction and pulled $13.3 million in cash out of the transaction in the process.

15           Defendants cite *Applestein* and *Tripp* to argue that Kramer's retention of 95% of his Imperva

16  holdings is inconsistent with scienter since those holdings declined in value by $79.8 million.  Defs.'

17  Mem. at 19.  But unlike there, Kramer has a history of holding shares regardless of trading prices

18  and a practice of selling companies, not shares.  The sales in *Applestein* and *Tripp* demonstrate that

19  those defendants, unlike Kramer, accumulated wealth by selling shares, making accumulation negate

20  an inference of scienter.  *Applestein v. Medivation, Inc.*, No. C-10-0998 EMC, 2011 U.S. Dist.

21  LEXIS 92230, at *7 (N.D. Cal. Aug. 18, 2011) (sales over three-year class period); *Tripp v. IndyMac*

22  *Bancorp., Inc.*, No. CV 07-1635, 2007 U.S. Dist. LEXIS 95445, at *12-*14 (C.D. Cal. Nov. 29,

23  2007) (more sales "in the preceding year").  The same is not true for Kramer.

24  _____

[11]  Defendants' authority is inapposite.  Defs.' Mem. at 18-19.  *Silicon Graphics* held that "a
25  relatively small portion of their total holdings" were not suspicious ***when combined with*** trading "in
    a manner consistent with prior practice."  *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 987 (9th
26  Cir. 1999).  *Skechers* held that stock sales were not suspicious because, unlike here, "[t]he
    defendants had sold large amounts of stock during the same two months of the previous year."
27  *Skechers U.S.A. Sec. Litig. v. Skechers U.S.A., Inc.*, 273 F. App'x 626, 628 (9th Cir. 2008).  And *In
    re Downey Sec. Litig.*, 2009 WL 2767670, at *13 (C.D. Cal. Aug. 21, 2009), held that "any inference
28  is negated . . . [by] the complete lack of stock sales . . . during the Class Period."

1   Kramer's 10b5-1 trading plan is no defense. Defs.' Mem. at 19. Kramer has not

2   demonstrated compliance with the rule, which he is required to do (17 C.F.R. §240.10b5-1(c)), and

3   the timing reveals that he adopted it while in possession of material nonpublic information.

4   Kramer's 10b5-1 plan, which triggered sales at $47.39 on January 2, 2014, did not trigger sales in

5   3Q13 or 4Q13 when Imperva's stock traded above that price. Defs.' Ex. I. The lack of any prior

6   trades establishes that Kramer adopted his plan shortly before his January 2014 trades. *Backe v.*

7   *Novatel Wireless, Inc.*, 607 F. Supp. 2d 1145, 1162 (S.D. Cal. 2009) (amendment to "10b5-1 plans to

8   allow more stock sales based on their inside information supports an inference of scienter").

9   Defendants' authority, where plans were adopted beforehand or where adoption was not discussed, is

10  inapposite. Defs.' Mem. at 19; *see, e.g.*, *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880

11  F. Supp. 2d 1045, 1069 (N.D. Cal. 2012) (Rule 10b5-1 plan was "created prior to the Class Period").

### 6. The Inference of Scienter Is Compelling; Defendants Do Not Offer Any Non-Culpable Inferences

12

13          Plaintiff's allegations clearly raise a strong inference of scienter. Defendants Kramer and

14  Schmid both promoted Imperva's competitive success and superior technology, in particular against

15  IBM, when they had actual knowledge that Imperva was losing SecureSphere sales because of

16  IBM's enterprise agreements and a mainframe solution that Imperva did not have. Both benefitted

17  tremendously from Imperva's inflated stock price; they were able to replace slowing SecureSphere

18  growth with cloud-based growth products by acquiring Skyfence and Incapsula. And Kramer was

19  able to cash in on his Skyfence startup while also selling $10 million worth of stock before stepping

20  down and moving on to his next investment. The inference of scienter in this case is compelling.

21          Defendants do not offer non-culpable explanations. Defs.' Mem. at 22-23. Instead, they

22  improperly invoke *post*-Class Period "success" (*see* Resp. to RJN) and cite *Chinacast* and *Sterling* to

23  suggest, incorrectly, that plaintiff must rely on confidential witnesses and internal documents.

24  Neither case supports defendants' argument. Unlike here, plaintiffs there relied solely on information

25  *publicly available during the Class Period*. *City of Roseville Emps. Ret. Sys. v. Sterling Fin. Corp.*,

26  963 F. Supp. 2d 1092, 1132 (E.D. Wash. 2013) ("'red flags' . . . contemporaneously reported"); *In re*

27  *Chinacast Educ. Corp. Sec. Litig.*, No. CV 12-4621-JFW (PLAx), 2012 U.S. Dist. LEXIS 175436, at

28

*17-*18 (C.D. Cal. Dec. 7, 2012) (no knowledge before "discovery and disclosure").  Moreover, the PSLRA requires plaintiff to plead facts, not evidence.  *In re Cabletron Sys.*, 311 F.3d 11, 33 (1st Cir. 2002) ("the rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence."  "Defendants' argument that even more detail be required . . . amounts to requiring plaintiffs to plead evidence.") (cited with approval in *Zucco*, 552 F.3d at 997 n.4).

### D.    Plaintiff Has Adequately Alleged Loss Causation

Loss causation requires plaintiff to "'demonstrate a causal connection between the deceptive acts . . . and the injury suffered.'"  *Apollo Grp.*, 774 F.3d at 608.  "Rule 9(b) applies to . . . loss causation."  *Id.* at 605.  But as the Supreme Court stated in *Dura*, "it should not prove burdensome for a plaintiff . . . to provide a defendant with some indication of the . . . causal connection that the plaintiff has in mind."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  A complaint must allege "particular facts indicating that 'but for the circumstances that the fraud concealed'. . . '[plaintiffs'] investment . . . would not have lost its value.'"  *Berson*, 527 F.3d at 989.

The Complaint easily meets this standard.  When defendants disclosed the truth about "intensifying competition for large orders, which resulted in additional review and approval cycles, as well as sales execution challenges in the U.S.," Imperva's stock dropped 44%.  ¶¶69, 100.  The disclosure revealed what plaintiff alleges defendants concealed – competitive problems between SecureSphere and IBM.  Indeed, the headline "IBM Squeezing Israel Cyber Guru" removes any doubt that defendants' disclosure revealed these competitive problems.  ¶8.  In fact, by praising "strong performance . . . in sales of subscription products," Kramer implicated problems with SecureSphere and thus IBM.  *Id.*  Analysts even expressed "surprise[] by the magnitude of the miss," suggested it "reflect[ed] competitive issues," and identified "Imperva's database security business" (*i.e.*, SecureSphere) as the source of the problem.  ¶70.  One analyst even questioned defendants' statements "downplaying their competitors."  *Id.*  But for these concealed facts, plaintiff's investment would not have lost its value.  *Berson*, 527 F.3d at 989 (Rule 9(b) met where disclosure was that "revenue had fallen 25% from the preceding quarter" and plaintiffs alleged that the

"reduced workload [from stop work orders] caused revenue to fall by 25%," which "caused the stock price to drop by 16%").[12]

Defendants argue that the disclosure did not "suggest improprieties." Defs.' Mem. at 24. But their own cases reject this timeworn argument. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008) ("admission or finding of fraud" not required); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010) (same). Indeed, "fact-for-fact disclosure[s]" are not required. *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009).[13]

## IV. CONCLUSION

Plaintiff has adequately alleged violations of §10(b) and thus §20(a). Defendants' motion should be denied. If the Court is inclined to grant the motion, plaintiff respectfully requests leave to amend, which should be freely given "when justice so requires." Fed. R. Civ. P. 15(a); *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1053 (9th Cir. 2003).

DATED: February 20, 2015        Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
DOUGLAS R. BRITTON
CODY R. LeJEUNE
ASHLEY M. PRICE


         s/ DOUGLAS R. BRITTON
         DOUGLAS R. BRITTON

---

[12] Defendants argue that subscription-based growth does not equate to poor SecureSphere performance. Defs.' Mem. at 25. They are wrong. Defendants entirely ignore analyst commentary implicating SecureSphere and overlook the fact that Imperva's revenues were driven primarily by two products. ¶29. If Imperva's subscription-based products posted strong growth, the poor results were caused by Imperva's other product, as analysts recognized. Defendants' reliance on *Wozniak* is misplaced – the plaintiff there alleged no facts connecting [the] drop in stock price to "ClinAdvisor" – the product at issue. The same is obviously not true here. *Wozniak v. Align Tech.*, 850 F. Supp. 2d 1029, 1046 (N.D. Cal. 2012). *In re Century Aluminum Co. Secs. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013), by contrast, does not even address loss causation.

[13] Defendants' authority is not remotely applicable. Defs.' Mem. at 24. Not one of them, like in this case, revealed the concealed facts in a single disclosure followed by a one-day collapse in the stock's value. *See In re Rackable Sys.*, No. C 09-0222 CW, 2010 U.S. Dist. LEXIS 88927, at *4, *33 (N.D. Cal. Aug. 27, 2010) (four disclosures in four months as stock price fell); *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014) (four quarters of disappointing results and share price declines "signaled" lack of profitability); *Apollo Grp.*, 744 F.3d at 608-09 (disclosures about industry as a whole did not implicate defendant).

655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiff

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2015, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 20, 2015.

s/ DOUGLAS R. BRITTON
DOUGLAS R. BRITTON

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: dougb@rgrdlaw.com

1006670_1

**Mailing Information for a Case 4:14-cv-01680-PJH Shankar v. Imperva, Inc. et al**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennifer Corinne Bretan**
  jbretan@fenwick.com,vsheehan@fenwick.com,mbafus@fenwick.com,kayoung@fenwick.com,pnichols@fenwick.com

- **Doug Britton**
  dougb@rgrdlaw.com,kathyj@rgrdlaw.com,e_file_sd@rgrdlaw.com,tjohnson@rgrdlaw.com,ldeem@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Michael M. Goldberg**
  mmgoldberg@glancylaw.com,csadler@glancylaw.com,info@glancylaw.com,rprongay@glancylaw.com

- **Frank James Johnson**
  frankj@johnsonandweaver.com,paralegal@johnsonandweaver.com,nathanh@johnsonandweaver.com,shawnf@johnsonandweaver.com,michaelf@johnsonandweaver.com

- **Deborah Kang**
  dkang@fenwick.com,tchow@fenwick.com

- **Cody Ross LeJeune**
  clejeune@rgrdlaw.com

- **Tricia Lynn McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com,tjohnson@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Susan Samuels Muck**
  smuck@fenwick.com,kayoung@fenwick.com,pnichols@fenwick.com,acaloza@fenwick.com

- **Ashley Price**
  aprice@rgrdlaw.com

- **Darren Jay Robbins**
  e_file_sd@rgrdlaw.com

- **David Conrad Walton**
  davew@rgrdlaw.com,ldeem@rgrdlaw.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)