SUSAN S. MUCK (CSB No. 126930)
smuck@fenwick.com
DEAN S. KRISTY (CSB No. 157646)
dkristy@fenwick.com
JENNIFER C. BRETAN (CSB No. 233475)
jbretan@fenwick.com
MATTHEW MEYERHOFER (CSB No. 268559)
mmeyerhofer@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: (415) 875.2300
Facsimile: (415) 281.1350

DEBORAH KANG (CSB No. 288143)
dkang@fenwick.com
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, CA 94041
Telephone: (650) 988.8500
Facsimile: (650) 938.5200

Attorneys for Defendants Imperva, Inc.,
Shlomo Kramer and Terrence J. Schmid

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| VISWANATH V. SHANKAR, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>IMPERVA, INC., SHLOMO KRAMER and TERRENCE J. SCHMID,<br><br>Defendants. | Case No.: CV 14-01680 PJH<br><br><u>CLASS ACTION</u><br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT**<br><br>Date: May 13, 2015<br>Time: 9:00 a.m.<br>Judge: Hon. Phyllis J. Hamilton<br>Action Filed: April 11, 2014 |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................... 1

II. THE OPPOSITION MAKES CLEAR THAT PLAINTIFF CANNOT STATE A CLAIM UNDER SECTION 10(b) ........................................................................ 2

    A. Plaintiff Fails To Show The Challenged Statements Were False And Misleading ........................................................................................................ 2

        1. Plaintiff's Assertions Concerning Imperva's Forward-Looking Guidance For The First Quarter of 2014 Fail To State A Claim ................ 2

        2. Plaintiff's Assertions Concerning Imperva's Competitive Success Against IBM Are Insufficient To State A Claim ........................... 5

        3. Plaintiff's Assertions Concerning Imperva's Technological Capabilities Are Insufficient To State A Claim ......................................... 8

    B. Plaintiff's Scienter Arguments Fail ................................................................ 9

        1. Plaintiff Fails To Allege Facts Demonstrating That Guidance For The First Quarter of 2014 Was Knowingly False ............................. 9

        2. Plaintiff's Stock Trading Argument Fails ................................................ 10

        3. Plaintiff's Assertions Regarding Mr. Kramer's Supposed "Insight" Into IBM Are Insufficient .............................................................. 11

        4. Plaintiff's Miscellaneous Remaining Arguments Do Not Give Rise To A Strong Inference of Scienter .................................................... 12

    C. Plaintiff's Opposition Confirms That Loss Causation Is Absent ........................... 14

III. CONCLUSION ............................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Applestein v. Medivation, Inc.*,
    861 F. Supp. 2d 1030 (N.D. Cal. 2012), *aff'd*, 561 F. App'x 598
    (9th Cir. 2014) .......................................................................................................................... 11

*Backe v. Novatel Wireless, Inc.*,
    642 F. Supp. 2d 1169 (S.D. Cal. 2009) .................................................................................... 9

*Barrie v. Intervoice-Brite, Inc.*,
    409 F.3d 653 (5th Cir. 2005) ................................................................................................... 9

*City of Roseville Emp. Ret. Sys. v. Sterling Fin. Corp.*,
    963 F. Supp. 2d 1092 (E.D. Wash. 2013) ................................................................................ 7

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
    880 F. Supp. 2d 1045 (N.D. Cal. 2012) ................................................................................. 11

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ............................................................................................................... 15

*Glazer Cap. Mgmt., L.P. v. Magistri*,
    549 F.3d 736 (9th Cir. 2008) ................................................................................................. 13

*In re Bare Escentuals, Inc. Sec. Litig.*,
    745 F. Supp. 2d 1052 (N.D. Cal. 2010) ................................................................................... 7

*In re ChinaCast Educ. Corp. Sec. Litig.*,
    2012 WL 6136746 (C.D. Cal. Dec. 7, 2012) ........................................................................... 7

*In re Cisco Sys. Inc. Sec. Litig.*,
    2013 WL 1402788 (N.D. Cal. Mar. 29, 2013) ......................................................................... 8

*In re Cooper Sec. Litig.*,
    691 F. Supp. 2d 1105 (C.D. Cal. 2010) ................................................................................... 9

*In re Copper Mountain Sec. Litig.*,
    311 F. Supp. 2d 857 (N.D. Cal. 2004) ..................................................................................... 8

*In re Cutera Sec. Litig.*,
    610 F.3d 1103 (9th Cir. 2010) ........................................................................................ 3, 4, 5

*In re FoxHollow Techs. Inc. Sec. Litig.*,
    2008 WL 2220600 (N.D. Cal. May 27, 2008), *aff'd*, 359 F. App'x 802
    (9th Cir. 2009) .......................................................................................................................... 7

*In re Global Crossing, Ltd. Sec. Litig.*,
    322 F. Supp. 2d 319 (S.D.N.Y. 2004) ................................................................................... 12

*In re Hansen Natural Corp. Sec. Litig.*,
    527 F. Supp. 2d 1142 (C.D. Cal. 2007) ................................................................................. 15

*In re Herbalife, Ltd. Sec. Litig.*,
   2015 WL 1245191 (C.D. Cal. Mar. 16, 2015) ...................................................................... 14

*In re HP Sec. Litig.*,
   2013 WL 6185529 (N.D. Cal. Nov. 26, 2013) ....................................................................... 7

*In re Lattice Semiconductor Corp. Sec. Litig.*,
   2006 WL 538756 (D. Or. Jan. 3, 2006) ............................................................................... 12

*In re NVIDIA Corp. Sec. Litig.*,
   2011 WL 4831192 (N.D. Cal. Oct. 12, 2011), *aff'd*, 768 F.3d 1046
   (9th Cir. 2014) ..................................................................................................................... 10

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ............................................................................................. 13

*In re Oracle Corp. Sec. Litig.*,
   627 F.3d 376 (9th Cir. 2010) ............................................................................................... 14

*In re Rigel Pharms. Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) ........................................................................................... 6, 13

*In re Silicon Graphics, Inc. Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999) ............................................................................................... 11

*Janus Capital Group v. First Deriv. Traders*,
   131 S. Ct. 2296 (2011) ........................................................................................................... 9

*Lipton v. Pathogenesis Corp.*,
   284 F.3d 1027 (9th Cir. 2002) ............................................................................................. 12

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014) ............................................................................................... 14

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) .................................................................................... 6, 11, 15

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,
   730 F.3d 1111 (9th Cir. 2013) ............................................................................................. 14

*Oklahoma Firefighters Pension & Ret. Sys. v. IXIA*,
   2014 WL 4978568 (C.D. Cal. Oct. 6, 2014) ....................................................................... 13

*Oregon Pub. Emps. Ret. Fund v. Apollo Group, Inc.*,
   774 F.3d 598 (9th Cir. 2014) ............................................................................................ 5, 8

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) ................................................................................................. 7

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ......................................................................................... 6, 9, 15

*Stickrath v. Globalstar, Inc.*,
   527 F. Supp. 2d 992 (N.D. Cal. 2007) .................................................................................. 8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007) .................................................................................................. 10, 13, 14

*Zack v. Allied Waste Indus., Inc.*,
 2005 WL 3501414 (D. Ariz. Dec. 15, 2005), *aff'd*, 275 F. App'x 722
 (9th Cir. 2008) ....................................................................................................................10

*Zucco Partners, LLC v. Digimarc Corp.*,
 552 F.3d 981 (9th Cir. 2009) ..............................................................................................13

**STATUTES**

15 U.S.C. 78u-4(b)(1)(B) ..............................................................................................................6

15 U.S.C. § 78u-5(c)(1)(A)(i) .......................................................................................................3

## I. INTRODUCTION

Plaintiff was challenged to support its irrational theory of fraud with case law and specific contemporaneous facts mandated by the PSLRA. Plaintiff has not risen to that challenge because it cannot.

The opposition does not and cannot offer a single contemporaneous fact supporting *why* any statement by any defendant was false when made or *what* defendants "knew" at the time. While plaintiff repeats the generalized allegations that Imperva had "regularly lost out" on deals to IBM because *that* company was allegedly "discounting/bundling" in a way that made its products "essentially free in the near term," and concludes that the Company ultimately "succumbed" to IBM as a result, there are no specifics that support these allegations, notwithstanding governing law mandating that plaintiff plead facts with particularity. Plaintiff's inability to do so comes as no surprise, however, given the absence of a single confidential witness, internal document, communication or data source that corroborates any aspect of its claim. Not one.

In this respect, plaintiff's opposition is most noteworthy for what it *fails* to say. Although claiming that Imperva's statements throughout the class period (May 2, 2013 to April 9, 2014) about competition with IBM or its technology were false, and that the Company faced a "fundamental and intractable challenge" from IBM, in reality Imperva's business *grew* in each and every quarter. As demonstrated below and in the moving papers, the Company's revenues grew by 32% in 2013 (rising to $137.8 million from $104.2 million), it added 718 new customers (up 30%), and the Company entered in to 373 deals over $100,000 (up 34%) – the "large" transactions associated with the SecureSphere solution as to which plaintiff claims the Company had supposedly suffered the most at the hands of IBM. Plaintiff has no way of reconciling its vague allegations of competitive collapse and inferior technology with these results (which are *not* challenged in the Amended Complaint), so the opposition just ignores them.

Indeed, even when Imperva announced preliminary results for the first quarter of 2014 on April 9, 2014, its business had grown (with revenues of $31.5 million, up from $28.6 million the prior year), albeit at a pace lower than the Company's guidance of $36-37 million. The Company

explained that these results were due to unanticipated delays in expected orders from customers in deals over $100,000 and domestic sales execution challenges. Imperva quickly recovered and its stock price has fully rebounded. The opposition fails to identify any contemporaneous facts showing that the Company's guidance was knowingly false when made, and instead, relies on impermissible fraud by hindsight associated with this one quarter setback.

Moreover, plaintiff fails to cite a single case in which any court has accepted the proposition that a defendant acted with scienter when he was a ***net purchaser*** of the company's stock during the class period. Here, Mr. Kramer (Imperva's CEO at the time) was a net purchaser, acquiring 52,669 additional shares during the class period (bringing his total holdings to over 3.7 million shares). The notion that he was engaged in a scheme to "artificially inflate" the Company's shares, only to acquire the supposedly inflated stock himself, is an economically irrational theory that has no support in the case law or in common sense, since Mr. Kramer would effectively be defrauding himself. Indeed, Mr. Kramer saw the value of his holdings decline by $78.9 million when the Company's share price declined after the April 9, 2014 announcement. Tellingly, although Mr. Kramer is alleged to have made challenged statements on only three days (May 2, 2013, August 7, 2013 and November 15, 2013), plaintiff does not identify a single contemporaneous fact showing that he did not believe those statements (which in any event constitute inactionable statements of corporate optimism). As to Mr. Schmid (the Company's CFO), the opposition all but ignores him. He is not alleged to have made any sales or profited in any manner, and the basis for accusing him of fraud remains a mystery.

## II. THE OPPOSITION MAKES CLEAR THAT PLAINTIFF CANNOT STATE A CLAIM UNDER SECTION 10(b)

### A. Plaintiff Fails To Show The Challenged Statements Were False And Misleading

#### 1. Plaintiff's Assertions Concerning Imperva's Forward-Looking Guidance For The First Quarter of 2014 Fail To State A Claim

To state a claim regarding the forward-looking revenue guidance Mr. Schmid provided on February 6, 2014 for the Company's first quarter, plaintiff must identify contemporaneous facts possessed by Mr. Schmid showing that he had actual knowledge of falsity and that the guidance

| DEFS.' REPLY ISO MOT. TO DISMISS AMENDED COMPLAINT | 2 | Case No.: CV 14-01680 PJH |

was not accompanied by meaningful cautionary language.  15 U.S.C. § 78u-5(c)(1)(A)(i); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010).  The opposition does neither.

Instead, plaintiff offers an unpleaded mathematical exercise, claiming that the Company's revenue guidance "must have" assumed that SecureSphere sales would grow by 25.9% during the first quarter and that such an assumption was unreasonable in light of the competitive threat posed by IBM.  Opp. at 13-14.  This speculative theory – which does not purport to be based on the actual information used by Mr. Schmid to provide guidance – fails for several fundamental reasons.

First, as with guidance given in prior periods – which even plaintiff does not dispute was accurate – Mr. Schmid's revenue guidance was Company-wide and did not purport to differentiate among one product line or another.  *See* Def. Mem. at 5.[1]  More fundamentally, however, plaintiff completely ignores that the revenue guidance was perfectly in line with the growth the Company experienced in 2013, including transactions in excess of $100,000 involving the Company's SecureSphere solution.

At the outset of the class period, Imperva announced revenues of $28.6 million for the first quarter of 2013 (up 33% from $21.5 million in the comparable period a year earlier), it added 148 new customers (up 66%), and it booked 64 deals over $100,000 (up from 57).  Ex. A.  In the second quarter, revenues increased to $31.3 million (up 28% from $24.6 million), it added 185 new customers (up 46%), and entered into 76 deals in excess of $100,000 (up 36%).  Ex. C.  In the third quarter, revenues increased to $35.1 million (up 33% from $26.3 million), it added 148 new customers (up from 138 the prior year), and entered into 97 deals over $100,000 (up 39%).  Ex. E. In the fourth quarter, revenues were $42.7 million (up 34%), the Company added 237 new customers (compared to 199), and booked 136 deals over $100,000 (up 43%).  Ex. G.  For the full year, revenues increased to $137.8 million (up 32% from $104.2 million), 718 new customers were added (up 30%), and the Company entered into 373 deals over $100,000 (up 34%).  *Id.*

---

[1] References to "Def. Mem." are to defendants' memorandum in support of their motion to dismiss filed on January 6, 2015.  References to "Ex. __", unless otherwise indicated, are to the exhibits annexed to the moving Declaration of Susan S. Muck, also filed on January 6, 2015.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Put simply – notwithstanding the "competitive threat" posed by IBM throughout the class period – the Company grew its revenues by 32% in 2013, and the number of large deals increased by 34%. Accordingly, plaintiff cannot plead that there was anything knowingly "unreasonable" about a forecast for the first quarter of 2014 that was consistent with such momentum, even assuming (as plaintiff speculates) that it was partially based on the assumption that SecureSphere sales would grow by 25.9% over the comparable period a year earlier.[2] Moreover, plaintiff fails to cite any contemporaneous internal document, data source or witness which suggests that Mr. Schmid did not believe the forecast he provided. Absent such particularized facts, plaintiff has not pleaded "actual knowledge" of falsity. *See Cutera*, 610 F.3d at 1108.

Even in the first quarter of 2014, the Company's business grew, albeit at a lower rate than it had anticipated. Revenues were $31.5 million (up from $28.6 million in the comparable period), the Company added 171 new customers (up from 148), and it booked 67 deals in excess of $100,000 (up from 64). *See* Ex. L. As the Company explained when announcing preliminary results on April 9, 2014, the lower than expected revenues were not due to "lost business" to IBM, but instead were primarily attributable to "extended sales cycles on deals over $100,000, which led to delays in receiving anticipated orders" and sales execution challenges in the U.S. Ex. K. In other words, the Company's growth slowed for one quarter, in which some large deals were delayed, and then resumed in subsequent periods. *See* Def. Mem. at 6.[3] Plaintiff fails to cite

---

[2] Plaintiff purports to arrive at its 25.9% growth rate by assuming that the Company's "products and license" revenues will always account for the same percentage of its business. Opp. at 14. The Amended Complaint, however, concedes that the Company's business was changing, not static. *See* AC ¶¶ 29, 52, 59, 65, 67, 76. Moreover, even disregarding those allegations, the opposition is forced to concede that "products and license" revenues grew over 29% in the fourth quarter of 2013 (*i.e.*, higher than 25.9%), the period that had just ended when Mr. Schmid's guidance was given. *See* Opp. at 14.

[3] Although plaintiff devotes an entire section of its Amended Complaint to events after the class period, which it entitles "The Aftermath" (AC ¶¶ 71-76), and purports to reference events preceding and following the alleged class period in its opposition (*see* Opp. at 2-3, 7-8, 18, 20), it completely ignores the Company's financial performance during such time. Def. Mem. at 6; Exs. L, M. Those results demonstrate that the Company experienced one quarter in which it missed its revenue guidance (the first quarter of 2014), quickly recovered, and has continued to thrive competitively against IBM and others. Indeed, the post-class period documents plaintiff has attached to the opposition declaration of its counsel actually underscore the point. They show that the Company had revenues of $42.7 million in the third quarter of 2014, exceeding the top end of its guidance, added 183 new customers, booked more large deals than the prior year, beat out IBM in an important deal for a civil federal agency, and that its customers included "8 of the

any facts suggesting that, at the time Mr. Schmid provided guidance, he actually knew or believed that such orders would be delayed or would cause a revenue miss.

In any event, the guidance was plainly forward-looking and accompanied by meaningful cautionary language. Def. Mem. at 10-11. Among other things, the Company noted that the market for its products "is intensely competitive," that its competitors include IBM, F5 Networks and other larger companies, that the presence of IBM and other competitors "increases the likelihood of competition based on integration or bundling," and that competitors may compete with Imperva by "pric[ing] their products more competitively than ours, or have an entirely different pricing or distribution model." Ex. D at 38-39, Ex. F at 37-39, Ex. H at 13-14. Thus, in addition to being hopelessly vague, plaintiff's allegations fail because the competitive threat posed by IBM was publicly disclosed and fell within the "safe harbor" for forward-looking statements. *See Cutera,* 610 F.3d at 1108 (no claim when guidance referenced meaningful cautionary language); *see also Oregon Pub. Emps. Ret. Fund v. Apollo Group, Inc.*, 774 F.3d 598, 607 (9th Cir. 2014) (no claim where matter was disclosed).

### 2. Plaintiff's Assertions Concerning Imperva's Competitive Success Against IBM Are Insufficient To State A Claim

Plaintiff asserts that, throughout the class period, the Company "regularly lost out" on deals to IBM because (a) IBM was allegedly "discounting/bundling" in a way that made its products "essentially free in the near term" and (b) the Company supposedly lacked a "mainframe offering" to compete with IBM. Opp. at 9. According to plaintiff, the Company ultimately "succumbed" to IBM due to this "fundamental and intractable challenge." *Id*. at 4. The only "fundamental and intractable challenge," however, is the absence of pleaded facts that supports plaintiff's rhetoric.

As to IBM's pricing, the opposition, like the Amended Complaint, offers no details

---

top 10 global communications companies, 5 of the top 10 commercial banks in the United States, three of the top five global consumer financial service firms, four of the top five computer hardware companies, more than 250 governmental agencies around the world, and more than 350 Global 2000 companies." Declaration of Douglas R. Britton, filed February 20, 2015, Ex. 1 at 3. They also indicate that the Company has world-class technology. *Id.*, Ex. 2 at 3-5, Ex. 3 at 5, 7.

whatsoever – telling us nothing of the prices IBM offered, the customers involved, which customers (if any) elected to use IBM instead of Imperva as a result, and nothing of how, when and who at the Company supposedly learned of IBM's pricing, and when and how it impacted Imperva. As to the supposed absence of "mainframe coverage," plaintiff never explains what it means, how it allegedly impacted the Company, with what customers, when, and whether such effect was material.[4] Put simply, plaintiff pleads only naked conclusions, not particularized facts. *See In re Rigel Pharms. Inc. Sec. Litig.*, 697 F.3d 869, 876-77 (9th Cir. 2012) (plaintiff must plead specific contemporaneous facts showing that challenged statements were false when made); *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1071-72 (9th Cir. 2008) (same).

The absence of such facts is not mere accident or oversight. It is because they cannot be pleaded given Imperva's success competing against IBM, as the Company's unchallenged financial results illustrate. As demonstrated above, in each quarter of the class period, revenues grew over the comparable period a year earlier, and the number of new customers increased, as did the number of deals in excess of $100,000 involving Imperva's SecureSphere solution. Although plaintiff was challenged to reconcile its conclusory allegations of inferior technology and competitive collapse with those results, plaintiff offers no response because it has none.

While plaintiff attempts to justify its vague averments by claiming that it need not plead "evidence" (Opp. at 8, 9 at n.2, 24), that argument is a red herring. The Amended Complaint fails not due to the absence of "evidence," but because of the steadfast requirement that plaintiff plead the factual basis for its claims with particularity, including the "reason or reasons why [each allegedly false] statement is misleading." 15 U.S.C. 78u-4(b)(1)(B); *see Ronconi v. Larkin*, 253

---

[4] The "mainframe" coverage allegation is premised on the fact that, in February 2014, the Company acquired Tomium Software for $8 million. As the Company explained in its February 6, 2014 earnings call referenced in the Amended Complaint, it had been utilizing Tomium Software as the original equipment manufacturer for its mainframe database auditing agent, and elected to purchase it because ownership would, among other things, eliminate any perceived risk of losing access to Tomium's technology down the line. Ex. N at 6. In other words, the Company never lacked "mainframe" coverage, but instead of relying on Tomium Software as an outside party for this component (and any risk associated with doing so), it now owned that technology. How this unremarkable fact constitutes securities fraud is never explained. Indeed, while plaintiff claims that Mr. Schmid "admitted" that Imperva was at a "competitive disadvantage" in the February 6, 2014 conference call (Opp. at 2-3, 7-8, 18, 20), the conference call transcript can be read in vain for any such supposed admission. *See* Ex. N.

DEFS.' REPLY ISO MOT. TO DISMISS AMENDED COMPLAINT     6     Case No.: CV 14-01680 PJH

F.3d 423, 437 (9th Cir. 2001) ("In few other areas are motions to dismiss … so powerful"). It has not come close to doing so. *See In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1076 (N.D. Cal. 2010) (claim dismissed where plaintiffs failed to provide details establishing that statements were false when made); *In re FoxHollow Techs. Inc. Sec. Litig.*, 2008 WL 2220600, at *14 (N.D. Cal. May 27, 2008) ("Vague claims about what statements were false or misleading and how they were false are subject to dismissal"), *aff'd*, 359 F. App'x 802 (9th Cir. 2009).[5]

Nor can plaintiff evade this requirement by suggesting that defendants "created an impression about Imperva's competitive success that differed from the one that existed internally." Opp. at 8, 9. Plaintiff does not identify a single "internal" fact that is inconsistent with the Company's statements. Nor does it identify a single witness, document, data source or other "internal" information showing that the Company's statements were inaccurate when made. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 2012 WL 6136746, at *6 (C.D. Cal. Dec. 7, 2012) ("It is telling that Plaintiffs do not rely on confidential witnesses or specific internal reports to demonstrate what, if anything, the Individual Defendants knew or when they may have acquired that knowledge"); *City of Roseville Emp. Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1132 (E.D. Wash. 2013) (dismissing case, noting "there are no documents or internal communications to show that Defendants were apprised of adverse financial information which they then failed to communicate to the public").[6]

---

[5] The cases cited by plaintiff are inapposite, as they involved detailed and specific allegations calling into question whether statements were true at the time they were made. *See, e.g., Reese v. Malone*, 747 F.3d 557, 569-70, 573, 577 (9th Cir. 2014) (plaintiffs identified specific facts that contradicted company statements about pipeline safety, including an internal report showing high corrosion rates); *In re HP Sec. Litig.*, 2013 WL 6185529, at *8 (N.D. Cal. Nov. 26, 2013) (alleging details about whistleblower complaint and internal company investigation).

[6] Unable to unearth anyone or anything with actual knowledge of the Company's "internal" information, plaintiff's opposition purports to rely on a report by a Wedbush analyst written immediately after the Company's April 9, 2014 announcement. *See* Opp. at 2, 4, 10, 12, 13, 24. Not only does this one-page report not suggest that the Company misrepresented any facts at any time, but it does not even purport to be based on "internal" Company information, instead citing the analyst's own opinion and unnamed "industry contacts." Because plaintiff failed to include this analyst report in its submission, defendants have attached it to the Reply Declaration of Jennifer Bretan ("Bretan Reply Decl.") as Ex. U.

DEFS.' REPLY ISO MOT. TO DISMISS AMENDED COMPLAINT     7     Case No.: CV 14-01680 PJH

### 3. Plaintiff's Assertions Concerning Imperva's Technological Capabilities Are Insufficient To State A Claim

Plaintiff does not seriously dispute that statements concerning the "strength" or "value" of the Company's products, that it had the "best technology available" which was "superior" to IBM, or that demand was "robust," reflect the type of corporate optimism that courts have repeatedly held are inactionable. *See Oregon Pub.*, 774 F.3d at 606 (expressions of opinion that are not subject to an objective standard, such as "good," "well-regarded" or similar statements are not actionable); *In re Cisco Sys. Inc. Sec. Litig.*, 2013 WL 1402788, at *13 (N.D. Cal. Mar. 29, 2013) (statements about having a "sizable lead over our competition," being "well positioned," possessing a "strong foundation," having "industry leading growth," "hitting on all cylinders," and "exceeding … expectations" not actionable); *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 868 (N.D. Cal. 2004) (statements that company has a "strong product set" and "these products will continue to position [company] solutions as best-of-breed" inactionable); *Stickrath v. Globalstar, Inc.*, 527 F. Supp. 2d 992, 998-99 (N.D. Cal. 2007) ("high quality [products]" and "high performance [products]" not actionable).

Since the only three statements attributed to Mr. Kramer fall plainly within this category of inactionable optimism, the claims against him should be dismissed for this reason alone. *See* AC ¶ 81 (referring to the "strength of Imperva's technology, our comprehensive, fully-integrated solution"); AC ¶ 84 ("[w]hile we continue to see strong demand for our fully integrated solution…."); AC ¶¶ 88-89 ("demand for our integrated solution remained robust" and "our win-loss ratio in head-to head competitive deals remains very strong"). Nor, in any event, does plaintiff identify any contemporaneous facts that suggest that Mr. Kramer did not believe these statements were true.[7]

Instead of pointing to contemporaneous facts known to each defendant that show falsity, plaintiff asserts that the "undisclosed truth" was that Imperva could not compete with IBM "in the largest mainframe opportunities because of its technological dependency on an outside OEM

---

[7] Likewise, plaintiff has failed to plead any facts showing that Mr. Schmid's statements about competition with IBM, including that the Company was successful four out of five times in head-to-head competition, were false or not believed by Mr. Schmid.

provider," Tomium Software, which the Company acquired in February 2014. Opp. at 12. The opposition, however, never explains why or how the Company was unable to compete with IBM prior to that time, particularly since its business had grown. Moreover, as the Company disclosed when it announced the acquisition of Tomium Software (for $8 million), its mainframe auditing agent had been included in the Company's SecureSphere platform under an OEM licensing agreement all along. *See* Ex. N at 6. Accordingly, plaintiff has not and cannot show that reliance on an OEM manufacturer for one component of its SecureSphere solution prior to February 2014 rendered any Company statement false or misleading, much less that any defendant did not genuinely believe such statements.[8]

### B. Plaintiff's Scienter Arguments Fail

#### 1. Plaintiff Fails To Allege Facts Demonstrating That Guidance For The First Quarter of 2014 Was Knowingly False

As set forth above, plaintiff has failed to allege facts showing that Mr. Schmid actually knew that the revenue guidance he gave on February 6, 2014 for Q1 2014 was unreasonable at the time. *See* § II.A.1, *supra.* Indeed, as to Mr. Schmid, who is not alleged to have traded or profited in any way, plaintiff does not even purport to offer a credible rationale for inferring scienter on his part. *See Ronconi*, 253 F.3d at 432.

With respect to Mr. Kramer, plaintiff does not dispute that he did not provide any forward-looking guidance, and hence is not the "maker" of any such statement. *See Janus Capital Group v. First Deriv. Traders*, 131 S. Ct. 2296, 2302 (2011) (only the maker of a statement can be liable for it under Section 10(b)). The case cited by plaintiff, *Barrie v. Intervoice-Brite, Inc.*, 409 F.3d 653, 656 (5th Cir. 2005), not only pre-dates the Supreme Court's *Janus* decision, but is inapposite, as the statement there was known to be false by the

---

[8] Plaintiff's citation to cases in which there were concrete allegations that contradicted the company's statements are unavailing, as there are no such allegations here. *See In re Cooper Sec. Litig.*, 691 F. Supp. 2d 1105, 1118-19 (C.D. Cal. 2010) (statement that "we're doing very, very well against the silicon hydrogel products" was actionable because internal documents showed that defendant was in fact aware that it was doing poorly); *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1181 (S.D. Cal. 2009) (statements about "strong demand" actionable where largest customer had indicated it would discontinue all orders and where defendant admitted it "did not have the right products for the right customers").

defendant.  Here, plaintiff has not alleged facts showing Mr. Kramer had actual knowledge that the guidance Mr. Schmid provided was false.  To the contrary, it was entirely consistent with the Company's financial performance over the prior year.  *See* § II.A.1, *supra*.

### 2. Plaintiff's Stock Trading Argument Fails

Despite being challenged to do so, plaintiff cites no authority holding that defendants engaged in securities fraud when they were net purchasers, not net sellers, of shares during the class period.  To do so, one would need to accept the illogical proposition that a defendant was intentionally inflating the price of company shares only to purchase them, effectively defrauding himself.  Courts have rejected that theory.  *See, e.g., In re NVIDIA Corp. Sec. Litig.*, 2011 WL 4831192, at *10 (N.D. Cal. Oct. 12, 2011) (no inference of scienter where CEO was a net purchaser in the class period and his sales were made pursuant to 10b5-1 trading plan), *aff'd*, 768 F.3d 1046 (9th Cir. 2014); *Zack v. Allied Waste Indus., Inc.*, 2005 WL 3501414, at *14 (D. Ariz. Dec. 15, 2005) (defendants' purchases were "not actions demonstrating an intent to commit fraud, and instead give rise to an inference of good faith"), *aff'd*, 275 F. App'x 722 (9th Cir. 2008).  Given that Mr. Kramer was a net purchaser of 52,669 shares of Company stock during the class period, his "stock trading" cannot possibly give rise to a strong inference of scienter.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007) (inference of fraud must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent").[9]

Plaintiff attempts to side-step this devastating fact, and the case law, by arguing that Mr. Kramer acquired 252,669 shares of Imperva stock by virtue of the Skyfence transaction in February 2014, and that this somehow does not count because Mr. Kramer was supposedly in the business of "selling companies, not shares."  Opp. at 22.  This is a *non-sequitur*.  Putting aside that this theory is unpleaded, it would still be economically irrational for Mr. Kramer to knowingly inflate Imperva's stock price only to acquire those shares in a transaction for a company in which he was a substantial investor.  Plaintiff cites no case suggesting the contrary, because there is none.

---

[9] Plaintiff does not allege that Mr. Schmid traded Company stock, and hence the claim fails as to him as well.

DEFS.' REPLY ISO MOT. TO DISMISS AMENDED COMPLAINT    10    Case No.: CV 14-01680 PJH

Nor does plaintiff cite anything suspicious about the sales Mr. Kramer made in early January, 2014 and early April, 2014. Those sales, of 100,000 shares each, represented a tiny fraction of Mr. Kramer's holdings of over 3.7 million shares. Sales of such a small percentage of a defendant's holdings – here about 5% – do not give rise to a strong inference of scienter. *See, e.g., Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1043 (N.D. Cal. 2012), *aff'd*, 561 F. App'x 598 (9th Cir. 2014). Indeed, by retaining the vast bulk of his holdings, Mr. Kramer saw the value of his Company shares decrease by $78.9 million, which eviscerates the notion that he "cashed-in" on any supposed fraud.

In any event, it is plaintiff's burden to allege facts showing that Mr. Kramer's trades were suspiciously timed and executed to "maximize the personal benefit from undisclosed inside information." *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999). Here, however, plaintiff admits that Mr. Kramer's trades were made pursuant to an existing Rule 10b5-1 trading plan – entered into in advance and where the sales were automatic according to the plan. Such pre-determined stock sales negate scienter as they provide an "innocent, alternative explanation" for trades. *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1069 (N.D. Cal. 2012), citing *Metzler*, 540 F.3d at 1067 n.11. While plaintiff speculates that Mr. Kramer might have entered into that trading plan while in possession of material inside information, thereby negating its effect, it fails to identify any facts that could support that theory, which is not pleaded in the Amended Complaint.[10]

In sum, plaintiff's trading allegations only serve to negate any inference of scienter.

### 3. Plaintiff's Assertions Regarding Mr. Kramer's Supposed "Insight" Into IBM Are Insufficient

Plaintiff's allegations concerning IBM's August 2013 acquisition of Trusteer, in which Mr. Kramer was a stockholder and board member, do not rescue its implausible scienter theory.

---

[10] Plaintiff also makes the claim that Mr. Kramer's trades were "at, or near, record highs." Opp. at 21. That too has no basis. Mr. Kramer's trades in January 2014 were at prices of $47.39 to $50.90 per share (AC ¶ 114), while the Company's stock price in the ensuing week had risen to $56.69 and thereafter reached a high of $65.53 on March 6, 2014. Likewise, his early April trades were at prices of $48.83 to $56.99 (AC ¶ 114), which were significantly lower than the price of the Company's shares in March, when the stock traded at prices up to $65.53. *See* Ex. I.

| DEFS.' REPLY ISO MOT. TO DISMISS AMENDED COMPLAINT | 11 | Case No.: CV 14-01680 PJH |

Although plaintiff insists that Mr. Kramer's association with Trusteer gave him "access" to IBM's "development plans," it alleges no facts showing that such "access" actually existed, and never explains what kind of "access" Mr. Kramer had, or provides any reason why IBM would disclose its strategy to the CEO of a competitor. Instead, Plaintiff's arguments on this topic consist entirely of uninformative generalities – that Mr. Kramer allegedly had "deep insight into IBM's strategy" and that Trusteer and IBM shared a "joint vision." Opp. at 18. In the absence of specific facts establishing what IBM disclosed to Mr. Kramer and when, and that Mr. Kramer actually believed that Imperva could not successfully compete against IBM as a result, those allegations are insufficient to create a strong inference of scienter. *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) (no inference of scienter when "plaintiffs do not allege with particularity any specific information" conveyed to defendant that undermines his statements).

Moreover, even after IBM's acquisition of Trusteer, the Company continued to grow its business and compete successfully against IBM. Plaintiff also never explains how anything Mr. Kramer allegedly "learned" actually contradicted any of the Company's statements about Imperva's technology or its success against IBM during the class period.[11] To the contrary, the Amended Complaint actually pleads that IBM did not even announce the introduction of its new "comprehensive solution" incorporating Trusteer technology until May 5, 2014, *well after* the class period. *See* AC ¶ 71. Plaintiff has pleaded no facts tying this post-class period development to statements made as early as May 2, 2013, a full year earlier (and pre-dating IBM's acquisition).

### 4. Plaintiff's Miscellaneous Remaining Arguments Do Not Give Rise To A Strong Inference of Scienter

Plaintiff's remaining arguments are a hodgepodge of speculative theories that do not come close to creating a strong inference of scienter. The fact that Mr. Kramer elected to step down as

---

[11] Although plaintiff attempts to distinguish defendants' cases on this point, it offers no authorities to support its theory that Mr. Kramer's position as a former director of Trusteer gave him special knowledge of IBM's plans. *In re Lattice Semiconductor Corp. Sec. Litig.*, 2006 WL 538756 (D. Or. Jan. 3, 2006), held only that scienter may be inferred when a plaintiff alleges *specific details* about the contents of a report that contradicts the defendant's alleged misstatements. *Id.* at *14. *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 345 (S.D.N.Y. 2004), meanwhile, addresses grounds for inferring scienter in actions against auditors.

1  CEO of the Company in August 2014 (well after the class period ended) and transition to a Chief
2  Strategy officer role, while still remaining a Section 16 officer and the Chairman of the Board of
3  Directors, is hardly suggestive of wrongdoing. *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d
4  1046, 1062-63 (9th Cir. 2014) (no inference of scienter where facts did not tie alleged
5  management transitions to the issues in the lawsuit and, in particular, where individuals remained
6  in senior roles at the company); *Oklahoma Firefighters Pension & Ret. Sys. v. IXIA*, 2014 WL
7  4978568, at *28 (C.D. Cal. Oct. 6, 2014) ("Absent additional allegations that suggest the reasons
8  given for [the CEO's] resignation were suspicious, the court cannot conclude that plaintiffs have
9  raised a strong inference of scienter based on [the CEO's] resignation").

10  Plaintiff's assertion that defendants were "motivated" to artificially inflate the Company's
11  stock price in order to consummate acquisitions of Tomium Software (with $3.4 million in stock),
12  the remaining 20% of Incapsula (with $5.8 million in stock), and Skyfence (with $42.1 million in
13  stock), is also the sort of generic motive that courts have routinely rejected as insufficient to plead
14  a strong inference of scienter. *See Glazer Cap. Mgmt., L.P. v. Magistri*, 549 F.3d 736, 748 (9th
15  Cir. 2008) (rejecting notion that merger gives rise to an inference of scienter); *Rigel*, 697 F.3d at
16  884. That is especially the case here, where the acquisitions were either small (Tomium and
17  Incapsula) or where Mr. Kramer was actually ***receiving*** the allegedly inflated shares (Skyfence).

18  Nor can plaintiff rely on the "core operations" theory to establish scienter. There was no
19  catastrophic setback in the Company's business. Rather, the crux of this case involves one
20  quarter in which the Company's revenues grew but nevertheless fell short of guidance due to
21  delayed orders and sales execution challenges, from which the Company quickly recovered. That
22  hardly constitutes the sort of adverse result that is so "prominent … that it would be absurd to
23  suggest that top management was unaware" that their statements were false. *See Zucco Partners,*
24  *LLC v. Digimarc Corp.*, 552 F.3d 981, 1001 (9th Cir. 2009).

25  Finally, plaintiff suggests that defendants lack any "innocent" explanation for the one
26  quarter revenue miss, under the holistic analysis of all surrounding circumstances mandated by
27  *Tellabs*, even though defendants devoted an entire section of the moving brief to that very
28  point. *See* Def. Mem. at 22-23. The complete picture shows that Imperva was thriving during the

DEFS.' REPLY ISO MOT. TO DISMISS AMENDED COMPLAINT   13   Case No.: CV 14-01680 PJH

class period, it was adding customers and doing more deals in excess of $100,000 than ever before, and it then had one quarter in which its revenues grew but were (for the first time) below its guidance due to unanticipated delays in orders and sales execution challenges, from which it quickly recovered.  Mr. Kramer was also a net purchaser of shares during the class period, and Mr. Schmid is not alleged to have made any sales at all.  In view of these unassailable facts, plaintiff's theory of fraud – in which Mr. Kramer acquires "inflated" stock and the Company's actual results are disregarded – does not come close to being "at least as cogent and compelling" as the non-culpable opposing explanation.  *Tellabs*, 551 U.S. at 314.

### C. Plaintiff's Opposition Confirms That Loss Causation Is Absent

Unable to identify facts demonstrating that the April 9 announcement was a corrective disclosure (*i.e.*, that it revealed a fraud to the market), the opposition effectively confirms that plaintiff cannot establish loss causation.  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010) ("Loss causation requires more than an earnings miss); *Loos v. Immersion Corp.*, 762 F.3d 880, 887-88 (9th Cir. 2014) (disappointing financial results insufficient to establish loss causation).

Though plaintiff pays lip-service to the pleading standard (*see* Opp. at 24), vague allegations that "defendants disclosed the truth" and the "stock dropped 44%" do not suffice. What plaintiff does not (and cannot) show is that any "concealed facts" were revealed.  *In re Herbalife, Ltd. Sec. Litig.*, 2015 WL 1245191, at *7 (C.D. Cal. Mar. 16, 2015) (dismissing on loss causation grounds in the absence of "facts sufficient to support the conclusion that the [] earnings report revealed new information concerning [the Company's] allegedly fraudulent operations"). Plaintiff leaps from Imperva's disclosures, regarding *recent* (and ultimately, short-lived) impacts to its revenue, to a long-running scheme to hide "problems with SecureSphere and thus IBM." Opp. at 24.  However, the "gap between the alleged misrepresentations and a . . . claimed loss . . . cannot [] be bridged by conjecture."  *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1122 (9th Cir. 2013).[12]

---

[12] The handful of selectively-quoted analyst opinions plaintiff references do not provide cover for its inability to meet its pleading burden.  *See* Opp. at 24.  None of the cited reports suggests *a fraud* related to IBM or SecureSphere, and indeed, analysts largely attributed the results to

DEFS.' REPLY ISO MOT. TO DISMISS AMENDED COMPLAINT      14      Case No.: CV 14-01680 PJH

In an effort to excuse these pleading deficiencies, the opposition claims corrective disclosures need not identify fraud with great precision. *See* Opp. at 25. But the nebulous pleading here does not suffice. That is true because to "'touch upon' a loss is not to cause a loss, and it is the latter that the law requires." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005). *See also Metzler*, 540 F.3d at 1064 (loss causation cannot be pleaded through "euphemism" – *i.e.*, that the "market 'understood' a defendant's statement . . . as a coded message revealing the fraud").

## III. CONCLUSION

The PSLRA is designed to "filter out the unfounded [case] early enough to avoid huge litigation expenses." *Ronconi*, 253 F.3d at 428. Plaintiff's suit is devoid of specifics and offers an irrational and unprecedented theory of fraud that cannot be cured by another round of repleading.[13] It should be dismissed with prejudice.

Dated: March 27, 2015　　　　　　　　FENWICK & WEST LLP

By: */s/ Dean S. Kristy*
　　　Dean S. Kristy

Attorneys for Defendants
Imperva, Inc., Shlomo Kramer and
Terrence J. Schmid

---

"multiple factors," including sales execution, consistency, and a business model that was "still highly reliant on end-of-the-month large deal closures." *See* Bretan Reply Decl., Ex. V. And though plaintiff claims a Bloomberg News article "removes any doubt" that hidden SecureSphere losses to IBM were "revealed" on April 9, *not a single fact* in that article is cited to support that claim.

[13] Plaintiff's perfunctory request for another opportunity to amend (Opp. at 25), with no offer of additional facts they would allege, strongly indicates that "plaintiffs have no additional facts to plead." *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1163 (C.D. Cal. 2007).