UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VISWANATH V. SHANKAR,<br>　　　　Plaintiff,<br>　　v.<br>IMPERVA, INC., et al.,<br>　　　　Defendants. | Case No. 14-cv-1680-PJH<br><br>**ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND** |

Defendants' motion to dismiss came on for hearing before this court on May 13, 2015. Plaintiff Viswanth Shankar ("plaintiff") appeared through his counsel, Douglas Britton and Ashley Price. Defendants Imperva, Inc., Shlomo Kramer, and Terrence Schmid ("defendants") appeared through their counsel, Jennifer Bretan. Having read the papers filed in conjunction with the motion and carefully considered the arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS defendants' motion, with leave to amend, as follows.

**BACKGROUND**

Plaintiff, on behalf of himself and those similarly situated, filed this action against defendants on April 11, 2014, alleging that defendants violated sections 10(b) and 20(a) of the Securities Exchange Act and Securities and Exchange Commission Rule 10b-5 by making false and misleading statements regarding the company's operations and business and its financial results.

The complaint starts by providing background about Imperva, which provides software to protect against cyber-attacks. Imperva has two primary products – one that

provides on-premise database security in data centers (SecureSphere), and one cloud-based security product (Incapsula).  Amended Complaint ("Complaint"), ¶ 29.  The complaint describes SecureSphere as Imperva's flagship product, accounting for a majority of Imperva's revenue.  Id.

Imperva was co-founded by defendant Kramer (the other co-founder is not a defendant in this case), who served as CEO during the class period.  Defendant Schmid serves as Imperva's Chief Financial Officer.

After Imperva went public in 2011, its stock price rose nearly 120%, leading defendants to boast about its "strong competitive position" throughout 2012.  Complaint, ¶¶ 34-35.  On May 2, 2013 (the start of the class period), Imperva reported strong financial results for the first quarter of 2013, and told investors that their investments in infrastructure "are beginning to pay off," and that their results "highlight the underlying strength of their technology."  Id., ¶ 37.  Defendants also stated that Imperva had a very strong win-loss ratio against its competitors.  Id.  Plaintiff claims that these statements were false and misleading, as defendants "failed to tell investors [] that Imperva was losing deals for its largest and most profitable SecureSphere product to IBM" because IBM was offering its product at a much lower cost (including by bundling its products together, essentially offering its competitive product for free).  Id., ¶ 39.

On August 7, 2013, defendants announced Imperva's second quarter 2013 results, reporting "strong demand" and a "very strong" win-loss ratio against competitors.  Complaint, ¶¶ 40, 42.  At a roadshow on August 14, 2013, Schmid stated that Imperva "had the best technology available" and that Imperva "had a bigger lead on [IBM] on the technical side."  Id., ¶ 43.  Plaintiff alleges that these statements were false and misleading because Imperva was actually losing deals to IBM based on cost, and because Imperva "did not have meaningful mainframe coverage" as compared to IBM.  Id., ¶¶ 44-45.

Also in August 2013, Kramer sold another cyber-security company of his (Trusteer) to IBM for close to $1 billion, of which Kramer received $240 million.

Complaint, ¶ 46. Plaintiff points to statements from Trusteer's CEO (who was also the co-founder of Imperva along with Kramer) that Trusteer and IBM shared a "joint vision" and that they "started getting to know the products and abilities on each side" going back to early 2012. Id., ¶ 50.

In November 2013, defendants continued to speak of "robust" demand for Imperva's products and "very strong" win-loss ratios against competitors. Complaint, ¶ 53. Schmid also stated at a November 2013 conference that Imperva's competitors "rely a bit more on their political connections and a little less on their innovations." Id., ¶ 55. Schmid then expanded on these comments at another conference in December, claiming that Imperva beat IBM "four out of five times" in competition, that it had "superior technology," and that IBM's successes were due to "taking the CEO to Augusta National to play a round of golf." Id., ¶ 57. Schmid also stated that "[t]echnically, we're better or we wouldn't win four out of five times" and "we have superior technology to IBM, no question." Id. Plaintiff claims that these statements were false and misleading because, again, IBM offered its products at a lower cost, and because Imperva was struggling against another competitor in addition to IBM, F5 Networks. Id., ¶ 58-59.

Imperva's stock increased over 60% during the last three months of 2013, and Kramer began to sell his Imperva stock for the first time since it had gone public. Between January 2 and January 8, 2014, Kramer sold 100,000 shares for $4.9 million. Complaint, ¶ 61.

On February 6, 2014, defendants again spoke of Imperva's "strong head-to-head win ratio" against its competitors and the "ongoing demand for our integrated solutions." Complaint, ¶ 63. Plaintiff alleges that these statements were false and misleading because Imperva was continuing to lose deals to IBM based on cost, and because it was also losing deals to F5 Networks, which had partnered with IBM. Id., ¶¶ 66-67.

On the same day, Imperva also announced a revenue forecast of $36 to $37 million for the first quarter of 2014. Complaint, ¶ 96. Plaintiff alleges that this forecast was false and misleading or made without a reasonable basis because Imperva was

3

losing deals to IBM, because Imperva's lack of mainframe coverage was hurting its ability to compete, and because IBM had partnered with F5 Networks to offer a more comprehensive security solution than Imperva could offer. Id., ¶ 98.

Also on the same day, Imperva announced the acquisition of two cloud-based companies – Skyfence and Incapsula (the latter of which was already majority-owned by Imperva). Complaint, ¶ 64. Both acquired companies were co-founded by Kramer, and while much of his compensation was in the form of Imperva stock, he also received $13.3 million in cash. Id. Defendants allegedly denied that these deals were made out of necessity, insisting that SecureSphere was not losing business to cloud-based products, but plaintiff claims that these denials were false and misleading because SecureSphere was in fact losing ground to Incapsula and other cloud-based solutions. Plaintiff also alleges that the statements about Imperva's strong win-loss ratio and technological superiority were false and misleading because they were losing to F5 Networks, which had partnered with IBM to offer an actual "combined solution." Id., ¶ 67.

Between April 1 and April 7, 2014, Kramer sold another 100,000 shares of Imperva for $5.25 million. Complaint, ¶ 68.

On April 9, 2014, defendants "shocked the market" with first quarter results that missed the revenue forecast by nearly $6 million. Complaint, ¶ 69. Imperva's stock price fell 44% in a single day of trading. Id. The complaint notes that "[a]nalysts directly attributed this news to increased competition from IBM for large on-premise deals." Id., ¶ 102.

The operative complaint was filed on October 10, 2014, and asserts two causes of action: (1) violation of § 10(b) of the Securities Act and Rule 10b-5, asserted against all defendants; and (2) violation of § 20(a) and Rule 10b-5, asserted against all defendants.

**DISCUSSION**

A.   Legal Standards

    1.   Motions to dismiss under Rule 12(b)(6)

        A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests for the

1   legal sufficiency of the claims alleged in the complaint. Ileto v. Glock, Inc., 349 F.3d
2   1191, 1199-1200 (9th Cir. 2003). Review is limited to the contents of the complaint.
3   Allarcom Pay Television, Ltd. v. Gen. Instrument Corp., 69 F.3d 381, 385 (9th Cir. 1995).
4   To survive a motion to dismiss for failure to state a claim, a complaint generally must
5   satisfy only the minimal notice pleading requirements of Federal Rule of Civil Procedure
6   8, which requires that a complaint include a "short and plain statement of the claim
7   showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

8         A complaint may be dismissed under Rule 12(b)(6) for failure to state a claim if the
9   plaintiff fails to state a cognizable legal theory, or has not alleged sufficient facts to
10  support a cognizable legal theory. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699
11  (9th Cir. 1990). The court is to "accept all factual allegations in the complaint as true and
12  construe the pleadings in the light most favorable to the nonmoving party." Outdoor
13  Media Group, Inc. v. City of Beaumont, 506 F.3d 895, 899-900 (9th Cir. 2007).

14        However, legally conclusory statements, not supported by actual factual
15  allegations, need not be accepted. Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009). The
16  allegations in the complaint "must be enough to raise a right to relief above the
17  speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations
18  and quotations omitted). A claim has facial plausibility when the plaintiff pleads factual
19  content that allows the court to draw the reasonable inference that the defendant is liable
20  for the misconduct alleged." Iqbal, 556 U.S. at 678 (citation omitted). "[W]here the well-
21  pleaded facts do not permit the court to infer more than the mere possibility of
22  misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is
23  entitled to relief.'" Id. at 679. In the event dismissal is warranted, it is generally without
24  prejudice, unless it is clear the complaint cannot be saved by any amendment. See
25  Sparling v. Daou, 411 F.3d 1006, 1013 (9th Cir. 2005).

26        In addition, while the court generally may not consider material outside the
27  pleadings when resolving a motion to dismiss for failure to state a claim, the court may
28  consider matters that are properly the subject of judicial notice. Lee v. City of Los

Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001); Mack v. South Bay Beer Distributors, Inc., 798 F.2d 1279, 1282 (9th Cir. 1986).  Additionally, the court may consider exhibits attached to the complaint, see Hal Roach Studios, Inc. V. Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989), as well as documents referenced extensively in the complaint and documents that form the basis of a the plaintiff's claims.  See No. 84 Employer–Teamster Joint Counsel Pension Trust Fund v. America West Holding Corp., 320 F.3d 920, 925 n.2 (9th Cir. 2003).

2.	Federal Rule of Civil Procedure 9(b)

Generally, plaintiffs in federal court are required to give a short, plain statement of the claim sufficient to put the defendants on notice. Fed. R. Civ. P. 8.  In actions alleging fraud, however, "the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b).  Under Rule 9(b), the complaint must allege specific facts regarding the fraudulent activity, such as the time, date, place, and content of the alleged fraudulent representation, how or why the representation was false or misleading, and in some cases, the identity of the person engaged in the fraud.  In re GlenFed Sec. Litig., 42 F.3d 1541, 1547-49 (9th Cir. 1994).  Because the plaintiff must set forth what is false or misleading about a particular statement, he must do more than simply allege the neutral facts necessary to identify the transaction; he must also explain why the disputed statement was untrue or misleading at the time it was made.  Yourish v. California Amplifier, 191 F.3d 983, 992-93 (9th Cir. 1999).

3.	Claims under the 1934 Securities Exchange Act

Section 10(b) of the Securities Exchange Act of 1934 provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).

Rule 10b-5 makes it unlawful for any person to use interstate commerce:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

In order to state a claim under § 10(b) of the 1934 Act and Rule 10b-5, a plaintiff must allege: (1) the use or employment of a manipulative or deceptive device or contrivance; (2) scienter, i.e., wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to as "transaction causation;" (5) economic loss; and (6) loss causation, i.e., a causal connection between the manipulative or deceptive device or contrivance and the loss. Simpson v. AOL Time Warner, 452 F.3d 1040, 1047 (9th Cir. 2006); see also Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 341-42 (2005). The misstatement or omission complained of must have been misleading; in the case of an omission, "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." Basic, Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988).

4. The Private Securities Litigation Reform Act

It has long been established that claims brought under Rule 10b-5 and § 10(b) must meet the particularity requirements of Rule 9(b). See In re Daou Sys. Inc. Sec. Litig., 411 F.3d 1006, 1014 (9th Cir. 2005). In addition, the enactment of the Private Securities Litigation Reform Act ("PSLRA") in 1995 altered pleading requirements for actions brought under the 1934 Exchange Act. Id.

The PSLRA was enacted to establish uniform and stringent pleading requirements for securities fraud actions, and "to put an end to the practice of pleading 'fraud by hindsight.'" In re Silicon Graphics, 183 F.3d at 958. The PSLRA heightened the pleading requirements in private securities fraud litigation by requiring that the complaint plead

7

both falsity and scienter with particularity.  In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1084 (9th Cir. 2002).  If the complaint does not satisfy these pleading requirements, the court, upon motion of the defendant, must dismiss the complaint.  15 U.S.C. § 78u-4(b)(3)(A).

Under the PSLRA – whether alleging that a defendant "made an untrue statement of a material fact" or alleging that a defendant "omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading" – the complaint must specify each statement alleged to have been false or misleading, specify the reason or reasons why each such statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, state with particularity all facts on which that belief is formed.  15 U.S.C. § 78u-4(b)(1).   If the challenged statement is not false or misleading, it does not become actionable merely because it is incomplete.  In re Vantive, 283 F.3d at 1085; Brody v. Transitional Hosp. Corp., 280 F.3d 997, 1006 (9th Cir. 2002).

In addition – whether alleging that a defendant "made an untrue statement of material fact" or alleging that a defendant "omitted to state a material fact" – the complaint must, with respect to each alleged act or omission, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  In the Ninth Circuit, the required state of mind is "deliberate or conscious recklessness."  In re Silicon Graphics, 183 F.3d at 979.

Because falsity and scienter in securities fraud cases are generally strongly inferred from the same set of facts, the Ninth Circuit has incorporated the falsity and scienter requirements into a single inquiry.  No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Co., 320 F.3d 920, 932 (9th Cir. 2003).  In addition, when considering whether plaintiffs have shown a strong inference of scienter, "the district court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs."  Gompper v. VISX, Inc., 298 F.3d 893, 897 (9th Cir. 2002) (noting the "inevitable tension . . . between the

8

customary latitude granted the plaintiff on a [12(b)(6)] motion to dismiss . . . and the heightened pleading standard set forth under the PSLRA).  In other words, the court must consider all the allegations in their entirety in concluding whether, on balance, the complaint gives rise to the requisite inference of scienter.  <u>Id.</u>

B.   Legal Analysis

Although the complaint groups together all of defendants' alleged false/misleading statements into a single section, the parties' briefs separate them into three categories: (1) statements about Imperva's competitive success (especially in relation to IBM); (2) statements about Imperva's superior technology; and (3) revenue guidance for the first quarter of 2014 ("1Q14").  The court will address each category in turn.

1.   Statements about Imperva's competitive success

In general, this category consists of statements that Imperva had a "very strong" win-loss ratio against its competitors (Complaint, ¶ 82), that it "beat IBM four out of five times" (¶ 92), and that it was experiencing "strong demand" for its product (¶ 84).  Plaintiff alleges that these statements "created an impression about Imperva's competitive success that differed from the one that existed internally."  Plaintiff further alleges that, with respect to competition with IBM, defendants were misleading in attributing IBM's success to "taking the CEO to Augusta National to play a round of golf," and by stating that "the companies that we compete against I think rely a little bit more on their political connections and a little less on their innovations to compete against us."  Complaint, ¶¶ 91-92.  Plaintiff claims that these statements were misleading in "omitting any reference to the success IBM was having by 'discounting/bundling' through its enterprise agreements."

In attempting to explain why the above statements were false and misleading, plaintiff alleges that "defendants failed to tell investors [] that Imperva was losing deals for its largest and most profitable SecureSphere product to IBM because IBM was offering its security solutions (which offered equivalent protection) at low cost, and in a way that permitted customers to defer costs."  Complaint, ¶¶  39, 83, 86, 93.  Plaintiff's allegations,

9

1    if true, undermine defendants' stated reasons for losing deals to IBM, but do not
2    undermine the assertion that it had a "very strong" win-loss ratio, that it was experiencing
3    "strong demand," or even that it "beat IBM four out of five times."  In fact, the "very strong"
4    and "strong demand" statements are the type of vague, optimistic, subjective
5    assessments that the Ninth Circuit has found not to be capable of objective verification,
6    and thus not actionable under the securities laws.  See, e.g., Oregon Public Employees
7    Retirement Fund v. Apollo Group Inc., 774 F.3d 598, 606 (9th Cir. 2014).
8        While the statement about "beat[ing] IBM four out of five times" is certainly capable
9    of objective verification, plaintiff has not pled any facts indicating that Imperva was not
10   actually beating IBM four out of five times.  As mentioned above, the complaint's
11   allegations undermine only defendants' stated reasons for why Imperva lost any deals to
12   IBM.
13       Plaintiff's opposition brief similarly fails to allege any facts that would undermine
14   the statement that Imperva beat IBM four out of five times.  Plaintiff insists that the
15   complaint's allegations are sufficient because they "contrast[] defendants' statements
16   about Imperva's competitive success with the truth that Imperva:  (1) regularly lost out on
17   SecureSphere deals to IBM, whose practice of 'discounting/bundling' through its
18   enterprise agreements made the product essentially free in the near term; and (2) lacked
19   a mainframe offering to compete with IBM in the largest on-premise deals."  Dkt. 43 at 9.
20   Again, plaintiff succeeds at undermining only defendants' stated reasons for losing deals
21   to IBM.
22       Regarding the statement attributing IBM's success to "taking the CEO to Augusta
23   National to play a round of golf," and the statement regarding competitors' use of "political
24   connections," the court does find that plaintiff has adequately pled that those statements
25   were misleading.  By omitting and/or glossing over the other alleged reasons for IBM's
26   successes (i.e., lower prices, including through the bundling of products), defendant
27   Schmid created a false impression that Imperva's competitive losses were due solely to
28   IBM taking CEOs out to golf, rather than due to IBM's competitive pricing and bundling.

These statements are analogous to the ones in In re HP Securities Litigation, in which HP's CEO was discussing the weak performance of one of its acquisitions, but omitted the fact that she was considering accounting fraud as the reason for the weak performance, and instead claimed that the weak performance was a function of transitioning from a startup to a larger corporation.  2013 WL 6185529 (N.D. Cal. Nov. 26, 2013).  The HP court found that the CEO "was not required to speak of" the company's weakness, but that "the decision to put forward entrepreneurial challenges as an explanation while choosing not even to mention the alternative possibility of accounting fraud, which she knew to be plausible, constitutes a material omission." Id. at *9.  The court went on to say that "context matters," and that "the context of [the CEO's] statements would have called for her to either decline to answer the question or to at least mention the possibility that something other than entrepreneurial scaling challenges explained" the weak performance.  Id.

2.	Statements about Imperva's technology

This category consists of statements that "Imperva is the only provider to offer a comprehensive integrated data center security solution" (Complaint, ¶ 82), that "technically, we're better or we wouldn't win four out of five times (¶ 92), and that "we have superior technology to IBM, no question" (¶ 92).

Plaintiff puts forth a number of reasons why these statements regarding technological superiority were false and misleading.  In the complaint, plaintiff alleges as follows:

> Imperva was facing intense competition in its flagship web application firewall from vendor F5 Networks, which was either extending sales cycles for Imperva or costing it market share.  As an analyst would explain after the class period, "[o]ur most recent channel checks suggest F5 Networks . . . has significantly enhanced its WAF solution when compared to Imperva's and we believe F5 is at least extending sales cycles for Imperva, if not taking share."  To make the competitive landscape worse for Imperva, IBM and F5 Networks had formed a partnership to offer a solution that strengthened their already formidable offerings.

Complaint, ¶ 94.

The court fails to see how any of the above allegations regarding competition from F5 Networks serves to render defendants' statements regarding technological superiority false or misleading. Plaintiff offers no explanation as to the significance of F5's "enhanced . . . WAF solution" or how the existence of F5's product is inconsistent with defendants' statements regarding technological superiority.

In his opposition, plaintiff no longer relies on allegations regarding F5's enhanced WAF solution, and instead argues that "what made these statements [regarding technological superiority] false and misleading is the undisclosed truth that Imperva could not compete with IBM in the largest mainframe opportunities because of its technological dependency on an outside OEM provider." Dkt. 43 at 12. However, plaintiff has alleged no facts supporting his allegation that Imperva's reliance on an OEM provider rendered its product inherently inferior from a technological standpoint.

Plaintiff's opposition cites an analyst's opinion stating that Imperva's "lack of mainframe coverage forced Imperva to acquire Tomium in February of 2014. Dkt. 43 at 12 (citing Complaint at ¶ 70). However, as defendants argue in their reply, even before Imperva's purchase of Tomium, it was "utilizing Tomium Software as the original equipment manufacturer for its mainframe database auditing agent," ultimately "elect[ing] to purchase it" in February 2014. Dkt. 48 at 6. Plaintiff does not provide any basis for drawing a distinction between Imperva's use of a third-party mainframe solution (which occurred until Imperva's acquisition of Tomium) as opposed to an in-house mainframe solution. Plaintiff does not dispute that Imperva, while lacking its own mainframe solution, was still able to offer a mainframe solution to its customers. As a result, the court finds no basis for plaintiff's allegations that defendants' statements regarding Imperva's technological superiority were false and/or misleading.

3. Revenue guidance for 1Q14

Plaintiff challenges defendants' revenue guidance for the first quarter of 2014, which was made on a conference call on February 6, 2014. Defendant Kramer announced a forecast of $36 million to $37 million in first-quarter revenue. In the

12

complaint, plaintiff alleges that the guidance was false and misleading or made without a reasonable basis for the following reasons:

> [A]t the same time that defendants were boasting about Imperva's dominance in the industry, it faced a number of troubling facts that severely hindered Imperva's ability to sell its flagship SecureSphere products, including:  (a) Imperva was losing deals to IBM because it was offering its security solutions (which offered equivalent protection) at a low cost, and in a way that permitted customers to defer costs for IBM solutions until the renewal of their enterprise agreement with IBM; (b) Imperva was unable to compete for the largest enterprise deals because Imperva's products did not have meaningful or reliable mainframe coverage and faced the "perceived risk of losing access to the mainframe technology agent" that they belatedly sought to redress with the Tomium asset acquisition; and (c) IBM had advanced its already competitive offering by developing a comprehensive security solution and had partnered with F5 Networks, which had significantly closed any feature advantage that Imperva had with its web application firewall.

Complaint, ¶ 98.

In their motion, defendants argue that plaintiff has provided no facts indicating that the revenue guidance was false when made, and further argue that the guidance is protected by the PSLRA's safe harbor for forward-looking statements.

The safe harbor protects "forward-looking statements" as long as those statements are "identified as a forward-looking statement," and are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward looking statement." In re Cutera, 610 F.3d 1103, 1111 (9th Cir. 2010).  Even in the absence of such cautionary language, the safe harbor may still apply if the speaker did not have actual knowledge of the statement's falsity.  However, if the cautionary language is present, the speaker's state of mind is irrelevant, and the safe harbor applies regardless of any knowledge of falsity. Id. at 1112.

Defendants note that, on the call, the company expressly stated that it would be making "forward-looking statements regarding future events and future financial performance of the company," and that such statements were "subject to material risks and uncertainties that could cause actual results to differ materially from those in the

13

forward-looking statements." Dkt. 36 at 10.  Defendants specifically pointed investors to the "risk factors" described in their press release, such as the "intensely competitive" presence of IBM and the expectation that "competition would intensify."

Plaintiff responds by arguing that the case law requires cautionary statements to be "precise" and to "directly address" the future projections.  See Provenz v. Miller, 102 F.3d 1478, 1493 (9th Cir. 1996).  "Blanket warnings that securities involve a high degree of risk are insufficient."  Id.

Plaintiff is correct that the cautionary language on the call was very general, making vague references to "competition" without providing any insight as to the reasons for IBM's success or the shortcomings of Imperva.  The cautionary language would not put an investor "sufficiently on notice of the danger of the investment to make an intelligent decision about it," as required to qualify for the safe harbor's first prong.  In re Immune Response, 375 F.Supp.2d 983, 1033 (S.D. Cal. 2005) (citing Harris v. Ivax, 182 F.3d 799 (11th Cir. 1999)).

However, in addition to the vague cautionary language provided on the conference call, defendants also directed listeners to the list of "risk factors" in its most recent Form 10-Q.  In the 10-Q, defendants are much more specific regarding the competition posed by IBM and others.  They specifically warn that Imperva's competitors "could reduce the price of their competing products," and that "customers may elect to accept a bundled product offering from our competitors."  Dkt. 38, Ex. F at 37.  The "risk factors" also mention the "consolidation in our industry" which "increases the likelihood of competition based on integration or bundling."  Id.

The cautionary language provided in the Form 10-Q does directly address two of the alleged omissions identified by plaintiff:  that IBM was able to offer products at a lower cost, and that it had partnered with other companies in order to offer comprehensive and integrated solutions.  With regard to Imperva's lack of a mainframe solution, as mentioned above, the court finds that plaintiff has not pled sufficient facts to show that Imperva's use of Tomium's third-party mainframe solution was disadvantageous in any

14

1 way. Thus, the court finds that defendants' cautionary language does address the
2 relevant concerns identified by plaintiff in his complaint.

3 However, in his opposition, plaintiff identified a new basis on which to claim that
4 the revenue guidance was false and/or misleading. Plaintiff claims that, in order to meet
5 the revenue guidance, Imperva would have had to achieve an unrealistic level of growth
6 in its SecureSphere product. Specifically, "SecureSphere sales thus had to reach
7 between $17.8 million (25.9% year-over-year growth) and $18.3 million (29.45% year-
8 over-year growth) to meet guidance," even though "SecureSphere, in fact, had not grown
9 at the low end of 26% in any quarter over the previous year, except for the fourth quarter
10 (Imperva's seasonably strongest) when it grew at 29%." See Dkt. 43 at 14. Plaintiff
11 provides further detail on his calculations in his opposition brief, concluding that
12 "defendants had no real basis for the outsized guidance they gave for 1Q14." Id. at 14,
13 n.6.

14 In their reply, defendants characterize this "unpleaded mathematical exercise" as
15 "speculative." Indeed it is, but some level of speculation is permitted under the PSLRA,
16 which allows plaintiffs to make allegations based on information and belief, so long as
17 they state with particularity all facts on which that belief was formed. Plaintiff may allege
18 that defendants had no reasonable basis on which to issue their revenue guidance, and
19 may support those allegations with facts regarding past revenue growth – and past
20 growth of the SecureSphere product in particular. However, as defendants point out, this
21 theory is not pled in the complaint, and thus cannot provide a basis for denying
22 defendants' motion.

23 Overall, with regard to all three categories of false/misleading statements, the
24 court finds that plaintiff's complaint suffers from a lack of precision. While plaintiff has
25 identified some statements that could give rise to a viable claim (in particular, the
26 "political connections" statements), the complaint lumps those statements in with
27 statements that are far too vague to be actionable (such as Imperva experiencing "strong
28 demand" or having a "very strong" win-loss ratio against its competitors) along with

15

statements for which plaintiff has simply not provided enough facts to show that they are false or misleading (i.e., the revenue guidance).  As a result, defendants' motion to dismiss is GRANTED. Plaintiff will be given an opportunity to amend his complaint as to only the following allegations:  (1) defendants' statements about Imperva's competitive success, and (2) the revenue guidance for the first quarter of 2014.  As to the other category of allegedly false/misleading statements – namely, the statements about Imperva's superior technology – plaintiff has not provided any facts suggesting that the pleading deficiencies could be cured through amendment.

Accordingly, plaintiff shall have until **October 15, 2015** to file an amended complaint in accordance with this order.  Defendants shall have 21 days thereafter to answer or otherwise respond to the amended complaint.  Plaintiff will not be permitted to add any new alleged false/misleading statements to any amended complaint without leave of court or the consent of all parties.  In other words, plaintiff may add new facts supporting his allegation that the already-identified statements were false or misleading, but may not identify new statements that he alleges are false or misleading.

4. Scienter

Given the court's finding that the bulk of the statements identified in the complaint are insufficiently alleged to be false or misleading, it will not yet address the argument of whether defendants knew the statements to be false or misleading.

5. Loss causation

As with scienter, the court finds it premature to address loss causation until and unless plaintiff has provided more detailed allegations regarding the alleged false/misleading statements.

**IT IS SO ORDERED.**

Dated:  September 17, 2015

_____
PHYLLIS J. HAMILTON
United States District Judge