1  ROBBINS GELLER RUDMAN
      & DOWD LLP
2  SHAWN A. WILLIAMS (213113)
   One Montgomery Street, Suite 1800
3  San Francisco, CA  94104
   Telephone:  415/288-4545
4  415/288-4534 (fax)
   shawnw@rgrdlaw.com
5        – and –
   DOUGLAS R. BRITTON (188769)
6  CODY R. LeJEUNE (249242)
   ASHLEY M. PRICE (281797)
7  655 West Broadway, Suite 1900
   San Diego, CA  92101-8498
8  Telephone:  619/231-1058
   619/231-7423 (fax)
9  dougb@rgrdlaw.com
   clejeune@rgrdlaw.com
10 aprice@rgrdlaw.com

11 Lead Counsel for Plaintiff

12                  UNITED STATES DISTRICT COURT

13                 NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 14  VISWANATH V. SHANKAR, Individually and on Behalf of All Others Similarly Situated, | Case No. 3:14-cv-01680-PJH |
| 15                                    Plaintiff, | <u>CLASS ACTION</u> |
| 16  vs. | THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| 17  IMPERVA, INC., et al., | |
| 18                                    Defendants. | |
| 19 | <u>DEMAND FOR JURY TRIAL</u> |

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

INTRODUCTION ...........................................................................................................1

PARTIES ......................................................................................................................9

RELEVANT NON-PARTIES ......................................................................................10

COMPREHENSIVE STATEMENT OF THE CASE ...................................................12

    Background ........................................................................................................12

    Imperva and Its Founder Shlomo Kramer's Connection to the Cyber-Security
        Industry in Israel ....................................................................................14

    Imperva Goes Public ........................................................................................15

    The Class Period Begins – Defendants Emphasize Strong Wins Against
        Competitor IBM ......................................................................................17

    Knowing that Imperva Was Struggling to Compete in Large Deals, Kramer
        Pockets $240 Million by Selling IBM an Instrumental Piece of IBM's
        Comprehensive Threat Protection Solution, Further Strengthening
        Imperva's Chief Competitor ...................................................................22

    Defendants Continue to Dismiss Imperva's Competition, Claiming IBM's
        "Political Connections" Were the Only Way It Could Win a Deal Against
        Imperva ...................................................................................................25

    Defendants Continue to Boast About Imperva's Competitive Success While
        Executing Their Shift to the Cloud; Kramer Begins to Use Imperva as His
        Personal Bank to Cash out on His Imperva Investment – and in on His
        Other Investments ..................................................................................28

    Defendants Disclose the Truth – Sales of SecureSphere Collapse Because of
        Extended Sales Cycles on Big Deals and Purported "Sales Execution
        Issues" ....................................................................................................32

    The Aftermath ...................................................................................................33

JURISDICTION AND VENUE ...................................................................................35

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ....36

DEFENDANTS DISCLOSE THE TRUTH .................................................................44

FRAUDULENT SCHEME AND COURSE OF BUSINESS ......................................45

ADDITIONAL SCIENTER ALLEGATIONS .............................................................45

LOSS CAUSATION/ECONOMIC LOSS ...................................................................52

NO SAFE HARBOR ....................................................................................................53

|  |  | Page |
|---|---|---|
| APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET | | 54 |
| CLASS ACTION ALLEGATIONS | | 55 |
| COUNT I | | 56 |
| For Violation of §10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder Against All Defendants | | 56 |
| COUNT II | | 57 |
| For Violation of §20(a) of the 1934 Act and Rule 10b-5 Against All Defendants | | 57 |
| PRAYER FOR RELIEF | | 59 |
| JURY DEMAND | | 59 |

Court-appointed Lead Plaintiff Delaware County Employees Retirement System ("plaintiff"), individually and on behalf of all others similarly situated, by its undersigned attorneys, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and under the supervision of plaintiff's counsel, which included, among other things: (1) review of press releases, news articles, conference call transcripts, and other public statements issued by or concerning Imperva, Inc. ("Imperva" or the "Company" ); (2) review of research reports issued by financial analysts concerning Imperva's business; (3) review of Imperva's United States Securities and Exchange Commission ("SEC") filings; (4) interviews with witnesses knowledgeable of relevant information, including former employees of the Company; and (5) review of other publicly available information and data concerning Imperva, its securities, and the markets therefor. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.  Plaintiff brings this securities class action on behalf of itself and all persons who purchased or otherwise acquired the publicly traded securities of Imperva between May 2, 2013 and April 9, 2014, inclusive (the "Class Period"), against defendants Imperva, Imperva's President and Chief Executive Officer ("CEO") Shlomo Kramer ("Kramer"), and Imperva's Chief Financial Officer ("CFO") Terrence J. Schmid ("Schmid") (collectively, "defendants") for violating the Securities Exchange Act of 1934 (the "1934 Act").

2.  In the Amended Complaint for Violation of the Federal Securities Laws (Dkt. No. 33) ("Amended Complaint" or "AC"), plaintiff alleged that defendants misrepresented Imperva's competitive position against IBM. Defendants' Class Period refrain was that Imperva was dominating IBM in head-to-head competition, "beat[ing] IBM 4 out of 5 times," and emphasizing that the only way IBM could compete with Imperva's technology was through its "political connections" or by taking a potential customer's "CEO to Augusta National for a round of golf." The Amended Complaint alleged that these statements were false and misleading because, as analysts confirmed, IBM secured deals over Imperva not through political connections or rounds of

golf, but instead through "more aggressive discounting/bundling practices" and "attractive[] pric[ing]" through Enterprise License Agreements ("ELAs"), which permitted customers to defer costs for IBM's security solutions until they renewed their agreements with IBM, at times years later. Contrary to the impression that defendants' statements created, the AC alleged that customers in fact made the common sense decision to choose IBM over Imperva, not because of who they knew or where they golfed, but because of the perception of saving money. Defendants Kramer and Schmid, as executives that were closely involved in the sales process and benefitted from Imperva's inflated stock price, acted with scienter, and caused plaintiff's loss when they disclosed the truth about Imperva's actual competitive position against IBM, causing Imperva's stock to collapse 44% in a single day of trading.

3. New facts have since come to light that confirm that the AC's allegations were accurate and that further support plaintiff's allegations that investors in Imperva stock were deceived by Kramer's scheme to enrich himself with his strategy of creating and selling cyber-security companies. As previously alleged, Imperva was one of many companies that Kramer had started in a never-ending cycle of creating companies and selling them at a profit without regard for their long-term sustainability. At its core, Imperva is comprised of two products that block hackers from destroying an organization's website or stealing its valuable data. The first is SecureSphere, Imperva's flagship product dedicated to protecting large enterprises with so-called on-premise security. *SecureSphere represented 63% of the Company's net revenues* when Imperva went public in November 2011 but *would fall to 38% by the end of the Class Period*. The second is Incapsula, Imperva's majority-owned subsidiary dedicated to protecting small to medium-sized organizations that stored their data remotely in the "cloud." Plaintiff's AC alleged, accurately, that Imperva was losing large deals for its SecureSphere product during the Class Period as its Incapsula sales grew in importance, increasing from just 2.3% of Imperva's net revenues when Imperva began trading publicly in November 2011 to over 14% at the end of the Class Period. Defendants were steadfast, however, as previously alleged, that Imperva's business was not shifting from perpetual license revenue (*i.e.*, SecureSphere) to cloud-based subscription revenue (*i.e.*, Incapsula). The

distinction was important – only SecureSphere sales were recognized entirely in the quarter in which the sale occurred and were outcome determinative for reaching Imperva's quarterly guidance.

4. As alleged in detail herein, new facts overwhelmingly corroborate plaintiff's allegations. Since plaintiff filed the AC, Imperva's new CEO Anthony Bettencourt ("Bettencourt") has been speaking publicly about the differences between the competitive environment that Imperva faces currently (*i.e.*, in 2015) and the environment that Imperva operated in "a year ago," which necessarily describes the environment during the Class Period.[1] Those public comments confirm that defendants' Class Period statements amounted to a tall tale. Imperva, in fact, was not dominating IBM throughout the Class Period and defendants' refrain about "beat[ing] IBM 4 out of 5 times" was false and misleading. Even if that ratio was technically accurate, defendants' proffered 80% win-ratio distorted the economic reality of the competitive dynamic between Imperva and IBM. As Bettencourt himself would confirm, IBM "***took [Imperva] to the woodshed***" in "***203 deals between 2010 and 1Q of 2015***" and they were "***all seven-figure" deals***. Hyping a win-ratio that included deals that could be as low as $50,000 concealed that Imperva lost the largest, most lucrative deals, and created a false and misleading impression about how Imperva was dominating IBM. Indeed, a ratio of "4 out 5" in these large "seven-figure" deals would have required Imperva to report as much as ***$800 million*** in SecureSphere revenue, which it has not even reported to date for the company as a whole. As Bettencourt's statement confirms, it was IBM that was dominating Imperva in the largest, most lucrative deals. Yet defendants hid this important information. Bettencourt even acknowledged that Imperva was being "outflanked by IBM" as late as May 2014 and was not even

---

[1] Plaintiff filed the AC on October 10, 2014. Bettencourt first spoke on behalf of the Company during the 3Q14 earnings call on October 30, 2014. Since then, Bettencourt has made numerous statements shedding light on Imperva's true competitive dynamic against IBM, which corroborate the AC's allegations. Those statements are alleged herein and include statements from the following conferences: September 10, 2014 Deutsche Bank Technology Conference; October 30, 2014 Imperva Inc. Earnings Conference Call; November 11, 2014 RBC Capital Markets Technology, Internet, Media & Telecom Conference; November 19, 2014 UBS Global Technology Conference; December 10, 2014 BMO Capital Markets Technology & Digital Media; February 5, 2015 Imperva Inc. Earnings Conference Call; March 2, 2015 JMP Securities Technology Conference; May 7, 2015 Imperva Inc. Earnings Conference Call; May 20, 2015 JPMorgan Global Technology, Media and Telecom Conference; June 2, 2015 Stephens Inc., New York Conference; June 10, 2015 William Blair Annual Growth Stock Conference; August 10, 2015 Pacific Crest Global Technology Leadership Forum; August 12, 2015 Oppenheimer Technology, Internet & Communications Conference.

superior to IBM in deals a year later, after going through significant product and personnel enhancements, and even while experiencing a "hot market" that "shifted rather recently"[2] in Imperva's direction:

> So rather than *as being a year ago talking about the fact we were being outflanked by IBM*, today we say *we are at the same level of IBM in these deals*, as an example, and we perform well.[3]

5. The market for Imperva's SecureSphere product during the Class Period corroborates plaintiff's allegations that Imperva misrepresented its competitive position against IBM. According to Bettencourt, database security was viewed at the time as a "checklist item"[4] where "it didn't matter" who provided that protection. As he described it, "*a year ago*, (*i.e.*, June 2014) having a great infrastructure company providing your security solutions was fine because *it didn't matter*. Checkbox; I need a Web application firewall to check that. If I need database activity monitoring, oh, *IBM is probably good enough*."[5] In fact, he even explained that "aside from having good loyal shareholders and good customers, *no one else cared*" that "Imperva really built out this franchise of web application firewall and database activity monitoring." These statements, which necessarily describe the state of the market during the Class Period, reveal that Imperva's win ratio declined significantly as the deal sizes increased in value. They also render misleading defendants' representations that Imperva dominated IBM 80% of the time in head-to-head competition.

6. Defendants' description of *how* IBM was able to win in a purported few deals was also a fabrication. Defendant Schmid has since publicly acknowledged on September 10, 2014 that plaintiff's allegations that IBM was beating Imperva in deals by "discounting/bundling" through Enterprise License Agreements were, in fact, accurate:

> Our product scales much, much better in large environments; it has better security functionality. It performs better. IBM is IBM and they have the brand and

---

[2] February 5, 2015 Imperva Inc. Earnings Conference Call at 10.

[3] May 7, 2015 Imperva Inc. Earnings Conference Call at 13.

[4] August 12, 2015 Oppenheimer Technology, Internet & Communications Conference at 3 ("[A] year ago . . . in many instances security for the web application firewall for database was a checklist item.").

[5] June 2, 2015 Stephens Inc. New York Conference at 5.

they use that brand, as you can imagine, ***they use ELAs*** and they use whatever they can to get around the fact that there is a significant gap in technology.

7.    Defendant Schmid's representations about IBM competing only through "political connections" or "round[s] of golf" are now admittedly false and misleading. And the description by Bettencourt of the competitive atmosphere between Imperva and IBM when he arrived at Imperva in August 2014 demonstrates how misleading defendants' statements really were. According to Bettencourt, it was not "political connections" or "round[s] of golf" that caused Imperva's losses to IBM at all. It was Imperva "never [getting] to the CIO" and not giving "the salesforce messaging that was important enough to be evocative of a CIO conversation." He even acknowledged that, contrary to defendants' Class Period representations boasting about Imperva's sales force, "[*t*]*he Q1 miss candidly could have happened two quarters earlier, three quarters earlier*, it just didn't. It just happened to happen in Q1, which is our seasonally-worst quarter." Given a market where "it didn't matter" if a great infrastructure company like IBM provided security, where "no one else cared" that "Imperva really built out this franchise of web application firewall and database activity monitoring," and where potential customers viewed database security as a "checklist item," it makes sense that customers selected IBM and its ELAs over Imperva in large deals because its products were "good enough" and, as analysts confirmed, were "discount[ed]/bundl[ed]" and "attractively priced." Defendants' statements clearly created an impression of a state of affairs that differed in a significantly material way from the one that existed internally.

8.    Defendants acted with scienter during the Class Period – they were directly involved in the sales process and benefitted from an inflated Imperva stock price. There is little question that both defendants knew that IBM was winning in large seven-figure deals by discounting/bundling through its ELAs. Only by being involved in the sales process were defendants able to speak publicly, and repeatedly, about the competitive dynamic between IBM and Imperva. How often Imperva supposedly won deals, how Imperva was winning because of its supposedly superior technology, and how IBM was supposedly only able to win using "political connections" and "round[s] of golf" are all descriptions that only come with being intimately involved in the process. Indeed, Bettencourt even acknowledged that defendant Schmid "would go out and have discussions

with the CIOs, [and] CSOs" on potential deals, which all but eliminates the possibility that he did not know how IBM was competing with Imperva. These types of visits, combined with Schmid's admission that Imperva tracked deals using the Salesforce.com CRM application – which boasts of the ability to allow users to "[v]iew critical details in a rich activity timeline," "[k]now who you're competing against," "what moves you need to make next to win" and "[s]end emails with templates just a click away" – renders absurd any claim that neither he nor Kramer knew that IBM was competing with Imperva on these "seven-figure deals" by discounting/bundling using its ELAs.

9. Kramer's perfectly timed stock sales (two blocks of $5 million each in 1Q14)[6] also strongly suggest that he knew what was coming. Those sales – the first time that Kramer had ever sold a share of Imperva's stock – occurred when Imperva's stock was trading at or near then-record highs. Worse, his sales concluded just **two days** before Imperva would announce that its SecureSphere sales had collapsed in competition with IBM and that Imperva would miss its revenue guidance by a large margin because of IBM. Still worse, this news (and Kramer's sales) came just a few months after Kramer pulled $240 million out of a $1 billion sale of a company named Trusteer to IBM in August 2013. Kramer co-founded Trusteer, a company focused on end-point security, and strengthened IBM's competitive position against Imperva. In fact, as Trusteer CTO told ZDnet for an article dated March 7, 2014, IBM's buyout of Trusteer gave IBM "a large footprint on the client side," since Trusteer's solutions were deployed in tens of millions of systems, all now IBM customers.

10. The Trusteer acquisition gave IBM a critical component in its security system that competed with Imperva because it provided endpoint security. Imperva's new CEO Bettencourt supports plaintiff's allegations. He explained publicly that, **at that time**, perimeter security was considered the "most important piece" of an organization's security solution – "[i]f you go back a year ago, **the perimeter was the most important piece. Endpoints were important.** AV was

---

[6] For purposes of brevity and convenience, fiscal quarters are referred to by their number and year. Thus, the first fiscal quarter of 2014 is abbreviated "1Q14." Fiscal years are abbreviated by FY and year. FY14, for example, represents fiscal year 2014. Imperva's fiscal year is contemporaneous with the calendar year.

important."[7]  Again, these descriptions necessarily encompass the market before that time and thus during the Class Period.  Kramer's sale of Trusteer meanwhile also gave Kramer unique insight into IBM's increasingly dominant competitive position as he sold his stock.  Trusteer's CEO even revealed publicly before the Class Period that both IBM and Trusteer "started getting to know the products and the abilities on each side" and "saw there was a connection and a joint vision."  As a Board member, Kramer shared this knowledge and vision.

11.     After Imperva's stock price increased over 60% during the last three months of 2013, and knowing that a strengthened IBM was dominating Imperva in head-to-head seven-figure database (*i.e.*, SecureSphere) deals, defendants issued quarterly guidance for 1Q14 of $36 to $37 million.  Imperva's stock jumped 18% in a single day in response and continued to rise as Kramer sold his second $5 million block of Imperva stock at near then-record highs, and as Imperva announced acquisitions of a company named Skyfence and the remaining shares of Imperva's Incapsula subsidiary, both of which Kramer had co-founded.  With IBM's increasing competitive dominance over SecureSphere, they were viewed as critical to Imperva's survival, but Imperva did not have sufficient cash reserves to acquire these companies using cash and had to fund the transactions with Imperva stock.  As Bettencourt explained it at a Pacific Crest Global Technology Leadership Forum in August 2015, Imperva's Board was considering transitioning entirely to a cloud-based business model when he joined Imperva just a few months after the end of the Class Period:

> [Q.]  How important is it to have a hybrid model?  Since you mentioned selling on-prem but you also sell in-cloud for most all of your products, except for DAM, which is just on-prem.
>
> [A.]  I would say when I joined it made me nervous, because a lot of the discussions we had **with the Board when I first joined was: why don't we go all cloud**?  Why don't we make **everything subscription**?

These are not the statements of a Board whose flagship on-premise product had historically dominated its fiercest competitor in "4 out of 5" deals.

---

[7]     June 10, 2015 William Blair Annual Growth Stock Conference at 4.

12.     As defendants knew, Imperva's 1Q14 guidance had no reasonable basis.  Given the historic revenue contributions of Imperva's flagship product (SecureSphere represented more than 50% of Imperva's revenues in every quarter in 2013, with the exception of 1Q13, when SecureSphere sales were 49.52% of total revenues), Imperva was required to generate $17.8 million in SecureSphere revenue or 25.9% year-over-year growth in 1Q14 to reach the low end of the guided range.  But Imperva had come nowhere close to this type of growth in the first fiscal quarter of any year in which it operated as a public company.  Indeed, defendants had stated publicly that "[b]udget cycles in our larger customers operate in such a way that we do more business with larger accounts in the second half of each fiscal year . . . lead[ing] to a seasonal drop-off in the first quarter for sales of perpetual license products" (*i.e.*, SecureSphere).[8]  Notably, when defendants gave its 1Q14 guidance, Imperva had only exceeded a 26% growth rate three times since going public, and each time was in the fourth quarter.  Yet as defendants confirmed, the fourth quarter is "always the quarter in which we do more product revenue than we do in other quarters."[9]  And to make matters worse, public statements reveal that, at that time, Imperva's sales force was admittedly "very fragile," and was experiencing "egregious" turnover.[10]  Defendants could not have had a reasonable belief that Imperva would generate the SecureSphere sales necessary to meet guidance under these circumstances.

13.     On April 9, 2014, just two days after Kramer's last stock sale after guaranteeing himself more than $25 million in cash and stock through the Skyfence and Incapsula transactions, and immediately before Imperva's SecureSphere sales would collapse and ***remain depressed at single digit growth rates for almost a year***, defendants shocked the market with preliminary first quarter 2014 financial results that missed the Company's revenue guidance by nearly $6 million – an almost 20% miss.  Defendants disclosed that Imperva's first quarter results were "primarily impacted by extended sales cycles on deals over $100,000" resulting from "a combination of intensifying

---

[8]     May 2, 2013 Imperva Inc. Earnings Conference Call at 6.

[9]     October 30, 2014 Imperva Inc. Earnings Conference Call at 16.

[10]     November 19, 2014 UBS Global Technology Conference at 5.

competition for large orders, which resulted in additional review and approval cycles, as well as sales execution challenges in the U.S." And by praising "strong performance . . . in sales of subscription products during the first quarter," defendants informed investors that Imperva's SecureSphere product was the problem. Imperva's stock collapsed in response, falling an extraordinary 44% in a single day of trading as analysts directly attributed the drop to the statements alleged herein to be misleading:

> "***IBM Squeezing Israel Cyber Guru*** as $584 Million Wiped Out . . . ."

> "They had a significant miss," Jonathan Ho, a Chicago-based analyst at William Blair & Co., said in an April 10 telephone interview. ***Investors were surprised as 'the company would always downplay their competitors and always viewed themselves as having a strong competitive position*.'**

14. Kramer's timing could not have been better. Three months later, he "step[ped] down and took a transitionary role about being Chief Strategy Officer." News reports, in fact, claimed that "Imperva replace[d] founder Shlomo Kramer as CEO with Anthony Bettencourt, who has led his last two companies through acquisitions." Kramer pulled over $25 million out of Imperva and sold another $10 million in stock at precisely the right time and positioned himself to realize a fortune when and if Imperva is sold. And he did all of this while moving on to his next investment, Exabeam – with some familiar faces from Imperva.

## PARTIES

15. Plaintiff Delaware County Employees Retirement System, acquired Imperva securities as set forth in the certification attached as Exhibit A to the Declaration of Tricia L. McCormick in Support of the Pennsylvania Retirement Fund Group's Motion for Appointment as Lead Plaintiff and Approval of Lead Plaintiff's Selection of Counsel (Dkt. No. 19-1) and has been damaged thereby.

16. Defendant Imperva provides data security solutions focused on providing visibility and control over business data across systems within the data center. Defendant Imperva is a Delaware corporation that maintains its headquarters at 3400 Bridge Parkway, Suite 200, Redwood Shores, California 94065.

17. Defendant Kramer was, at relevant times, Imperva's Chairman of the Board of Directors, President and CEO.

18. Defendant Schmid is, and at all relevant times was, the Company's CFO.

19. The defendants referenced above in ¶¶17-18 are referred to herein as the "Individual Defendants." The Individual Defendants made, or caused to be made, false statements that caused the prices of Imperva's common stock to be artificially inflated during the Class Period.

20. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Imperva's quarterly reports, shareholder letters, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

## RELEVANT NON-PARTIES

21. Anthony Bettencourt ("Bettencourt") currently serves as Imperva's President, CEO and member of the board of directors and has done so since he was hired by Imperva in August 2014 to replace Kramer.

22. Mickey Boodaei ("Boodaei") has a long history with defendant Kramer. He co-founded Imperva and Trusteer with Kramer, still serving as Trusteer's CEO, and, with Kramer, serves as a director on Trusteer's Board of Directors. Boodaei was also an investor in Skyfence with Kramer and serves on the Board of Directors of Lacoon Security Ltd. with Kramer, Amichai Shulman ("Shulman"), and Ralph Pisani ("Pisani"), among others.

23. Exabeam was founded in 2013 and is headquartered in San Mateo, California. Exabeam is a "big data security analytics company," which has technology and products that appear

to surpass Imperva's in that they "change the way cyberattacks are detected" and eliminate the need to "hire teams of data scientists" as Imperva had done with its products and technology. Exabeam shares many links with Imperva, most notably, personnel. Specifically, Nir Polak ("Polak") and Sylvain Gil ("Gil") co-founders of Exabeam, were both previously at Imperva. Then, in July 2014, Exabeam hired former Imperva Senior Vice President of Worldwide Sales Pisani as its Executive Vice President of Field Operations. In June 2014, Exabeam raised $10 million from three investors, one of which was Kramer. Currently, Polak, Gil, and Kramer serve together on the Exabeam Board of Directors.

24. F5 Networks, Inc. is based in Seattle, Washington and "develops, markets, and sells application delivery networking products that optimize the security, performance, and availability of network applications, servers, and storage systems." F5 Networks is Imperva's main competitor in the web application firewall ("WAF") market against Imperva's SecureSphere WAF product.

25. Sylvain Gil is the former Senior Director of Product Management at Imperva. Gil currently serves as Vice President of Products at Exabeam, and, along with Polak and Kramer, serves on the Board of Directors of Exabeam.

26. IBM, based in Armonk, New York, is Imperva's main competitor against its SecureSphere product in the database security market. IBM is a leading vendor in this market with products such as Guardium and its Comprehensive Threat Protection System, which features Trusteer technology, which Kramer sold to IBM in August 2013 for reportedly close to $1 billion. Kramer pocketed an estimated $240 million from that deal. Kramer also sold Worklight Ltd. ("Worklight") to IBM for a reported $50-$60 million in January 2012.

27. Incapsula is a subsidiary of Imperva and is Imperva's primary cloud-based product. Incapsula was founded by Kramer, along with Gur Shatz ("Shatz") and Marc Gaffan, in 2009. Shatz is a former employee of Imperva, serving previously as Imperva's product development director. In February 2014, Imperva purchased the remaining shares of Incapsula that it did not own for $5.8 million in Imperva stock.

28. Ralph Pisani was the former SVP Worldwide Sales at Imperva until June 30, 2014. On July 8, 2014, Exabeam announced that Pisani joined the Company as its Executive VP of Field

Operations, a position Pisani currently holds.  Pisani also sits on the Board of Directors of Lacoon Security with Kramer, Boodaei, and Shulman, among others.

29.    Nir Polak, along with Gil, co-founded Exabeam and currently serves as its CEO.  Polak is the former VP of Corporate Strategy at Imperva.  Polak, along with Kramer and Gil, among others, serve together on Exabeam's Board of Directors.

30.    Amichai Shulman is a co-founder and CTO of Imperva and a co-founder of, and major investor in, Skyfence.  Shulman also sits on the Board of Directors of Lacoon Security with Kramer, Boodaei, and Pisani.

31.    Skyfence is a cloud-based security company that was purchased by Imperva in February 2014 for $70 million.  Kramer profited more than $13 million in cash and 1% in Imperva stock.  Skyfence's major investors are Kramer, Boodaei and Shulman.

32.    Trusteer is an Israeli based, cyber-security company that was co-founded by Kramer and Boodaei.  Kramer, a current Board of Directors member, is known as the entrepreneur behind Trusteer, and Boodaei, who also serves on the Trusteer Board of Directors, is Trusteer's CEO.  In August, 2013, IBM acquired Trusteer for nearly $1 billion, wherein Kramer profited approximately $240 million.

## COMPREHENSIVE STATEMENT OF THE CASE

**Background**

33.    Imperva is an enterprise data security company that offers products designed to enable enterprises to comply with regulatory requirements while preventing cyber-attacks in databases that store valuable information, such as credit card numbers, social security numbers, and the like.  Founded in 2002, Imperva claims to pioneer "the third pillar of enterprise security," which is data center security.[11]  Imperva's products are "designed to provide the visibility and control needed to neutralize attacks, theft and fraud from inside and outside the organization, mitigate risk, and streamline compliance."  As defendants described it in plainer terms at the beginning of the

---

[11]    The first pillar addresses "endpoint security," which blocks threats targeting devices, while the second pillar addressed "network security," which blocks threats attempting access to the network.

Class Period, Imperva's products seek to prevent attackers from both inside and outside of an organization from damaging the organization's website or stealing its valuable information:

> [O]ur entire focus is on protecting the data and the applications that you would have in a data center environment. And why is this important? Because if you look at the fastest-growing type of attack that companies are facing right now, all of those attacks are focused on your data center . . . . Some designed to bring your website down, some designed to get through your website and into the data behind it to steal information.

34.     Imperva's technology is based, in part, on the efforts of many security engineers located in Tel Aviv, Israel. Imperva's dedicated security research team, which before the Class Period included 183 employees dedicated to research and development, "performs security analysis, tracks hackers and trends in the hacker community and undertakes vulnerability discovery, in addition to providing [Imperva] with regulatory compliance expertise." Based on these scientific efforts, Imperva offers two primary products – SecureSphere and Incapsula.[12] SecureSphere is Imperva's flagship product that provides database, file and web application security across various physical and virtual systems in data centers (*i.e.*, on-premise data center security). Incapsula is Imperva's primary cloud-based product, which is designed to protect against threats created as enterprises shift to deploying their applications and storing their data in the cloud (*i.e.*, remote data center security). While SecureSphere originally represented more than half of Imperva's revenues, Incapsula was an increasing component of Imperva's results leading up to the Class Period, increasing from 2.3% of net revenue when the Company went public to 7% of net revenue in 1Q13. By the end of the Class Period, it would reach as high as 14.5% of net revenue. Besides being subscription-based with revenue that can only be recognized ratably, the average size of an Incapsula transaction is significantly smaller than a SecureSphere transaction.

35.     The market in which Imperva competes is highly competitive and, importantly, fragmented – it is common for enterprises to utilize the product and services of multiple vendors to piece together a security solution. In fact, one report noted that a government organization had 85

---

[12]   While Imperva currently offers a cloud-based product called Skyfence, that product was in its infancy and acquired by Imperva during the Class Period. As Bettencourt explained publicly well over a year after Imperva acquired Skyfence from Kramer, "it's de minimis in revenue" as of August 10, 2015.

different security products across its environment. Along these lines, defendants described the data security market in terms of "pillar[s] of enterprise security." "[D]ata center security is the third pillar of enterprise security because it fills the gaps" between the traditional pillars of endpoint security (*i.e.*, antivirus) and network security (*i.e.*, network firewalls). And it is the nature of these pillars and the evolving nature of cyber-security that creates a fragmented market – different vendors focus on different pillars. For its part, Imperva competes in the third pillar with its on-premise SecureSphere product against large infrastructure database vendors, such as IBM, while its cloud-based Incapsula product primarily competes against security vendors, Akamai and CloudFlare.

**Imperva and Its Founder Shlomo Kramer's Connection to the Cyber-Security Industry in Israel**

36. Imperva was co-founded by defendant Kramer, who is considered to be a cyber-security "guru." As a *Globes* article described him in August 2013, Kramer was "consolidating his status as a data security guru who ha[d] learned how to produce companies one after another and pretty quickly generate substantial value for anyone who believe[d] in his vision."[13] Public estimates in 2013 put Kramer's net worth, which he amassed using a create-and-sell strategy, in the $1 billion area. Ironically, one of Kramer's primary benefactors and a source of this significant wealth is IBM – which also happens to be one of Imperva's main competitors. Kramer sold one of his first startups, a company called Worklight, to IBM for $50-$60 million. And, as will be described herein, Kramer continued selling key security components to IBM during the Class Period, notwithstanding the detrimental impact this would have for Imperva and its shareholders.

37. Kramer is also an icon in the Israeli cyber-security industry – he started in Israel's elite military-intelligence department and has been instrumental in Israel's effort to dominate the cyber-security industry. A *Bloomberg* article even noted that "Israel's campaign to become a cybersecurity powerhouse, an effort trumpeted by Prime Minister Benjamin Netanyahu, owes a debt

---

[13] The list of companies Kramer founded, co-founded, and/or was an early investor in, and that he subsequently cashed out of for millions of dollars include: Check Point Software Technologies, Trusteer, Incapsula, Skyfence, and Worklight. Indeed, Kramer has proven to have a wandering eye when it comes to cyber-security companies. As he explained it himself in a September 12, 2013 forbes.com article, "'I like to invest at the intersection of the most cutting edge trends – changes in the IT infrastructure such as the growing popularity of mobile devices[.]'"

to entrepreneur and investor Shlomo Kramer."  The nature of that Israeli cyber-security industry, according to a February 10, 2014 *TechWorld* article, is "incestuous" because "people know one another, invest in each other's enterprises and eventually buy each other out."

38.     The cyber-security industry in the U.S. also has strong ties to Israel.  Imperva's chief competitor, IBM, in fact, has a rich history in that country.  It opened its first Scientific Center in 1972 on the University of Haifa campus.  Now known as the IBM Haifa Research Laboratory, the lab grew from just three researchers to over 500 employees, and is the biggest IBM research center outside the U.S.  The focus of the lab's work is to find solutions for IBM customers with projects concerning such issues as cloud, storage, Big Data, social analytics and security.  As IBM's Israeli arm grew, it acquired ten Israeli companies or companies with Israeli operations by January 2012, which became an integral part of IBM's R&D operations.  And, not surprisingly, Kramer was front and center on several of these acquisitions.

**Imperva Goes Public**

39.     Imperva went public in November 2011, selling 5.5 million shares at $18.00 per share for proceeds of approximately $90 million.  Imperva's offering was met with much fanfare.  Analysts were excited about Imperva's opportunity in a growing market, describing Imperva as a leader in data center security that would take advantage of the opportunity to bridge a disconnect between where enterprises spend their security dollars and where the attacks occur.  And as early as February 2012, defendants told analysts that "[f]rom a competitive perspective our win/loss ratio in head-to-head competitive deals remains at a very strong ratio *which is generally 4 to 1*."  As would be expected from this type of enthusiasm, Imperva's stock price jumped nearly 120% in response, closing at a high of $39.55 per share on March 23, 2012 – just four months after Imperva's IPO.  As an analyst from J.P. Morgan concluded after meeting with management in March 2012, "[w]e . . . came away feeling more positive about Imperva's competitive position, the opportunity ahead of them, and actions they are taking on their path to profitability."

40.     Imperva disappointed, however, with its 1Q12 results, reported in May 2012.  While defendants boasted about Imperva's "strong competitive position," its product and license revenue (*i.e.*, SecureSphere sales) had decelerated and were below analyst expectations.  Its stock price again

reacted in response, this time collapsing by more than 35% with the same vigor that it had jumped just weeks earlier.

41. Defendants were determined to reignite Imperva's stock price. They reported strong performance, record pipelines, and an improving "win/loss ratio" throughout 2012, claiming on September 6, 2012 that "[o]ur win rates against IBM are the same as they are against F5" where "[w]hen we compete head-to-head with F5, we win four out of five times." They caused Imperva to report "strong growth," while emphasizing that Imperva was "going to win every time" against its competitors because of its superior technology. Defendants issued press releases, participated in conference calls, and went on multiple roadshows, all for the purpose of promoting Imperva and its purportedly dominant position in the market. With this drumbeat of positive claims, Imperva's stock price was not far off of its post-IPO high by the end of the year, trading in the low $30 per share range throughout December 2012.

42. As 2013 began, defendants continued with their message of dominance, emphasizing their ability to compete against Imperva's largest competitors and repeating the 80% win-loss ratio that they represented throughout 2012, and would continue to emphasize throughout the Class Period. In particular, on March 7, 2013, at a Wedbush Technology, Media Telecommunication Management Access Conference, Schmid provided specifics on Imperva's win rate, asserting:

> [W]e have been competing for the longest period of time against large companies like F5 on the Web application side, IBM on the database side. Those are the two biggest competitors we face and the ones that we face most frequently. We have win rates against both of them that are around 4 out of 5, and this has been trending up slightly over time. But we are very successful against them.

43. Kramer went on at the March 7, 2013 Wedbush conference to explain that "our maturity as a company, our reputation within the space and [other companies'] need for security solutions that are large and immediate is driving up the number of large deals that we see and is driving up the average deal size of the Company." Thus, asserted Kramer, "[w]e are being invited into more deals that are larger." Praising the fast growth in the Company's pipeline, and the resulting "need [for] more salespeople," Kramer assured the market that "[w]e are growing that salesforce quickly, because we need to take advantage of the pipeline growth that's out there." At

defendants' urging, the market was now primed to see a company taking full advantage of its seemingly-dominant competitive edge in the data security market.

**The Class Period Begins – Defendants Emphasize Strong Wins Against Competitor IBM**

44. On May 2, 2013, the start of the Class Period, Imperva reported strong financial results for the first quarter of 2013 and emphasized that "[t]he investments being made to our global sales and support infrastructure are beginning to pay off." On the conference call the same day, defendants effectively reiterated the win ratio against IBM that they had reported less than two months earlier, which they had defined in 2012 to mean at least 75% and growing. *See* ¶39. Defendants proclaimed a win-loss ratio that "***remains at*** a very strong ratio" in head-to-head comparative deals while describing "wins during Q1 [that] include replacement of IBM":

> [PRESS RELEASE:] "The investments being made to our global sales and support infrastructure are beginning to pay off, evidenced by the 66% year-over-year increase in new customers during the first quarter," stated Shlomo Kramer, President and Chief Executive Officer of Imperva.
>
>         *      *      *
>
> [CONFERENCE CALL, KRAMER:] From a comparative perspective, our win-loss ratio in head-to-head comparative deals ***remains at a very strong ratio***. Similar to recent quarters, we had a number of deals in which we won against larger comparators, highlighting the value of our integrated solution and the superior level of support we provide on a global scale.
>
> Some of these wins during Q1 include replacement of IBM in two different database deals, one with a leading technology company, the other with a major prepaid debit card provider. In both cases the replacement decision was made due to Imperva's superior audit reporting and product support.

45. The market responded to defendants' message. While Imperva's stock price had not returned to its post-IPO high of $39.55, it had increased appreciably since the beginning of the year. Indeed, Imperva's stock closed above $39 per share on the date of Imperva's 1Q13 earnings announcement.

46. On May 21, 2013, while speaking at the B. Riley & Co. Investor Conference, Schmid again reiterated Imperva's dominance over IBM, claiming "we win four out of five times":

> We compete against f5 and win four out of five times. We win those four out of five times, frankly, because of the technological advantage we have. And when people are focused on technology, they pick our solution because it's best of breed. We do lose 20% of the time. Why? Primarily political – f5 is a very large company

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:14-cv-01680-PJH

with a lot of account control, and they exert a lot of influence within that account. So 20% of the time they win that way.

On the data security side and focused on the database security side right now, our largest competitor is IBM, by far. Oracle obviously plays in the security space for database security. McAfee does, and a couple of other smaller players, but, by far, it's us and IBM that have the lead here. And the competitive dynamics are very similar. We have better technology, *we win four out of five times*, but nobody exerts account control like IBM. They are masters of it, and they are very, very formidable competitors because of it. But when it comes down to technology, we're going to win there.

47.     Defendants' May 2, 2013 assertion that Imperva's win-loss ratio "remain[ed] at a very strong ratio" when describing deals where Imperva replaced IBM effectively reiterated the representations describing a win rate "around 4 out of 5 times" that defendants had made throughout 2012 and early 2013. [14] Defendants' May 21, 2013 statement that "we win four out of five times" against IBM likewise reiterated defendants' prior representations. Each of defendants' May 2 and May 21, 2013 statements, however, were false and misleading because they distorted the economic reality of Imperva's true competitive position against IBM. Even if Imperva was winning 4 out of 5 times, IBM was taking Imperva, in Bettencourt's words, to the "woodshed" on the largest and most lucrative seven-figure deals. As he revealed, Imperva had lost 203 seven-figure deals between 2010 and 1Q15. And by their sheer size, these seven-figure deals were most likely to involve IBM's ELAs, which deferred costs to customers for, at times, years later. *See* ¶6. The reality was thus quite different than what defendants were describing publicly. Bettencourt even later confirmed shortly after the Class Period that Imperva was experiencing a market where "no one else cared" that "Imperva really built out this franchise of web application firewall and database activity monitoring," and where customers concluded that "IBM is probably good enough" since the products were considered merely a "checklist item." These statements undermine and render defendants' professed 80% win-loss ratio against IBM false and misleading.

---

[14]     On February 9, 2012, defendants told investors that "[f]rom a competitive perspective our win/loss ratio in head-to-head competitive deals remains at a very strong ratio which is generally 4 to 1." On September 6, 2012, defendants told investors that "[o]ur win rates against IBM are the same as they are against F5," which is "four out of five times." On March 7, 2013, defendants told investors that "We have win rates against both [F5 and IBM] that are around 4 out of 5, and this has been trending up slightly over time."

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:14-cv-01680-PJH                                                                                              - 18 -

48.     Defendants also failed to disclose the reason for Imperva's losses to IBM. While Imperva may have been winning some larger deals, Imperva was losing the largest deals for its most profitable SecureSphere product to IBM because IBM was offering its security solution (which a Gartner report in October 2013 confirmed "includes all nine critical DAP capabilities" that Gartner recommends) at low cost, and in a way that permitted customers to defer costs for IBM solutions until the renewal of their enterprise license agreements with IBM. Schmid would even admit after the Class Period that IBM competed with Imperva using these enterprise license agreements, or "ELAs." As a result, on a regular basis, senior-level managers at potential customers decided to use IBM, instead of Imperva, because of existing enterprise license agreements and the perception of saving money, while still receiving robust cyber-security protection.

49.     The impression that defendants' statements created was definitely different than reality. Far from dominating IBM, Imperva's sales representatives, who were supposedly driving Imperva's results, actually were regularly unable to advance their sales cycle for SecureSphere deals beyond the request for information stage because of IBM's established agreements. Defendant Schmid and Bettencourt would explain that Imperva's sales force was "very fragile" and experiencing "egregious" turnover, and was unable to reach senior levels of management because they did not "have a message that was evocative of a CIO conversation." To put it plainly, Imperva's regional sales managers and Strategic Account Directors were incapable of fulfilling the lofty picture of competitive dominance defendants were painting publicly, struggling to meet and missing sales quotas, even as defendants were claiming that they had resolved sales execution challenges in North America. With Imperva's SecureSphere sales goals not being achieved, Imperva's business was shifting to its Incapsula product, which was smaller and less profitable than its SecureSphere counterpart and, unlike SecureSphere, was treated as deferred revenue and recognized ratably over the life of the underlying contract. The average size of a SecureSphere transaction was around $70,000, whereas the average size of an Incapsula transaction was considerably less. And while facing these competitive challenges in 2013, Kramer was also in the process of enabling IBM to increase its already strong security offering and capture even more of the cyber-security market.

50.     On August 7, 2013, knowing that Imperva's business was becoming increasingly dependent on its smaller and less profitable Incapsula products as it struggled in on-premise deals with SecureSphere, defendants were still able to report strong, albeit unsustainable, results across Imperva's business.  That day, Imperva announced its financial results for the second quarter of 2013.  Defendants reported $31.3 million in total revenue, up 28% year-over-year, and diluted EPS of $(0.24) and emphasized that "[t]he second quarter was highlighted by the 46% year-over-year growth in new customers and 36% increase in deals valued over $100,000."  Defendants did not disclose that in this same period, many sales representatives in North America were struggling and unable to achieve their sales goals due to the reasons specified above.

51.     Defendants also reported that Imperva's South American and European businesses had reported a slow-down in product revenue growth, not because of competitive issues with its products or prices but instead because of "sales execution challenges."  Imperva had used and would use this ambiguous catchall phrase to explain away past and future sales shortfalls without owning up to the actual competitive reality facing the Company.  Defendants used those "sales execution challenges," however, as an opportunity to highlight the significant investments that they had made to address and supposedly correct a similar problem in North America.  Defendants told investors that they "brought in new sales leadership in North America last year, and restructured the sales organization" and that "[t]hose investment[s] have paid off."  Imperva, according to defendants, saw "increased growth in North America, [as] evidenced by the 38% year over year growth in revenue."  Defendants directly attributed North America's success in 2Q13 to their sales organization changes and emphasized that similar changes, already instituted, would correct Imperva's sales execution challenges in South America and Europe:

> The changes that we made in [North America] have paid off.
>
> During the second quarter, we began instituting similar changes in Europe and South America.  We have brought new sales leadership on board in both territories, and we believe this transition is one of the factors that led to the under-performance, as the new leadership began the process of evaluating and upgrading their organizations.  Going forward, we will continue to invest in the sales infrastructure to support accelerating growth in these regions, just as we did in North America. . . .  [W]e are confident that we can successfully address the sales execution issues, as we did in North America.

52.     Despite Imperva's "sales execution challenges" during the quarter, defendants claimed that Imperva "***continu[ed] to displace [its] competitors in the market quite successfully***, and we continued to do that in last – in Q2, as well," adding that "we continue to be . . . in a very good competitive position, and ***our win-loss ratio continues to be very strong***." This statement effectively reiterated the 80% win-loss ratio that defendants reported on March 7, 2013, May 21, 2013, and throughout 2012. *See* ¶¶39, 41-42. Defendants' message was clear – Imperva dominated competitors and would continue to do so.

53.     Only a week after reporting these disappointing results for 2Q13, defendant Schmid took to the road, boasting at technology conferences about Imperva's success. He claimed at an August 14, 2013 Oppenheimer conference that Imperva "***compete[d] very well against***" IBM effectively repeating the win-loss ratio message defendants had been delivering since February 2012. These statements conformed with defendants' previous representations on September 6, 2012, March 7, 2013, May 2, 2013, May 21, 2013, and August 7, 2013, that Imperva saw win-rates against IBM "around 4 out of 5" times and that Imperva experienced a "very strong" win-loss ratio, which, as early as February 2012, had been defined as "4 to 1" and increasing. *See* ¶¶39, 41-42, 44, 52 and n.14. Defendant Schmid even told investors that he expected Imperva's "average deal sizes to continue to trend upward," in part, because "customers are more comfortable with Imperva." Defendants' statements had their intended effect – Imperva's stock price had not only returned to its post-IPO high level, it raced past it to trade higher than $45 per share in July and August 2013.

54.     But defendants' statements about "continu[ing] to displace [Imperva's] competitors in the market quite successfully," a win-loss ratio that "continues to be very strong," and "compet[ing] well against" IBM, which effectively reiterated earlier statements about an 80% win-loss ratio against IBM, were false and misleading. As alleged at ¶¶4, 47-49, Imperva was not displacing its competitors "quite successfully" and it was not competing well against IBM. To the contrary, Imperva was losing to IBM in the largest and most lucrative seven-figure database deals, having been "tak[en] to the woodshed" in those deals. As Bettencourt would confirm, Imperva lost in 203 of those deals between 2010 and 1Q15, which at seven-figures amounted to, at a minimum, $203 million in lost SecureSphere revenue. These losses occurred when IBM was offering its security

solution, which provided equivalent protection, at low cost, and in a way that permitted customers to defer costs for IBM solutions until the renewal of their enterprise license agreement they had with IBM, which was a significant advantage for products considered at the time to be "checklist item[s]." What defendants knew and concealed from investors is that Imperva's "very fragile" sales force, which was experiencing "egregious" turnover, was admittedly unable to execute against IBM on the most lucrative database deals because it did not have a message that was "evocative of a CIO conversation." As Bettencourt described it, "we had a sales force that didn't feel comfortable trying to get to the top . . . [w]e lost because we just weren't properly deployed." Bettencourt also revealed that the 1Q14 miss that ends the Class Period "could have happened two quarters earlier, three quarters earlier," *i.e.*, 2Q13, because of these issues. Boasting that sales and marketing investments have paid off in "North America" when the reality was so different shows defendants' scienter.[15]

**Knowing that Imperva Was Struggling to Compete in Large Deals, Kramer Pockets $240 Million by Selling IBM an Instrumental Piece of IBM's Comprehensive Threat Protection Solution, Further Strengthening Imperva's Chief Competitor**

55.    IBM took its first step in database security when it purchased Guardium in 2009 for a reported $225 million.  Guardium provided (and continues to provide) "real-time monitoring of database activity" and was Imperva's direct competitor for its SecureSphere opportunities.  Since at least its IPO, Imperva recognized IBM as a competitor.

56.    Yet, in August 2013, during the middle of the Class Period and when Imperva was struggling to compete with IBM for large on-premise opportunities, defendant Kramer sold to IBM an Israeli based cyber-security specialist, Trusteer, that would become an important component in IBM's security solution.  Kramer, who was reportedly "the entrepreneur behind Trusteer" and served as a director on Trusteer's Board of Directors, sold Trusteer to IBM for close to a reported $1 billion, personally pocketing $240 million from the sale.  While the timing of the sale suited Kramer, it was not so convenient for Imperva, as Trusteer was an important piece of IBM's security strategy and gave it a full set of online defense technologies.  IBM explained when it announced the acquisition

---

[15]   Given the Court's order prohibiting new false statements, plaintiff does not allege that defendants' sales and marketing investment statements are false.  The stark contrast between defendants' statements about those investments and reality, however, contributes to a showing of scienter.  *See* ¶126.

publicly that Trusteer would "complement IBM's advanced portfolio of counter-fraud software and services." And analysts recognized the transaction's importance to IBM's strategy, viewing it as a sign of "IBM's ambition to make [cyber-security] a bigger part of its own business" and an "indication of how moving into more, next generation services like cybersecurity is part of IBM's bigger strategy to evolve." To Imperva's even greater detriment, ZDNet.com reported on March 7, 2014, that IBM's acquisition of Trusteer was a boon to IBM in amassing new customers: with Trusteer solutions already deployed in tens of millions of systems, IBM gained all of those users as customers. As Trusteer CTO Amit Klein is quoted saying, "We have both client-side and server-side defence systems, so it's easy to see why IBM would be interested in what we do. I think IBM is getting a significant footprint in the client side and consumer side, and this is important to them right now." Besides giving IBM a "large footprint on the client side," the Trusteer acquisition also helped "bump up" IBM's security portfolio. According to Brendan Mannigan, the general manager of IBM's security systems division, "Trusteer's expertise and superior technology in enterprise endpoint defence and advanced malware prevention will help our clients across all industries address the constantly evolving threats they are facing." Incredibly, Kramer sat on Trusteer's Board of Directors during the transaction and throughout the Class Period.

57. Without question, the Trusteer acquisition made IBM (compliments of Kramer) an even stronger competitor to Imperva. Trusteer bolstered IBM's endpoint security offering and, as Bettencourt would explain after the Class Period, "Endpoints were important" in an organization's security solution.[16] Bettencourt was speaking about conditions "back a year ago" (*i.e.*, June 2014), which necessarily described the state of the market before then – during the Class Period and during the time when Kramer sold Trusteer to IBM.

58. But, as defendants knew, IBM was not content with just competing with Imperva for database monitoring projects. It was focused on offering a much larger and comprehensive solution to its customers (or, in layman terms, one-stop shopping) to avoid "security sprawl," the phrase used to describe the practice of deploying separate new tools to address each new risk. And defendants

---

[16] June 10, 2015 William Blair Annual Growth Stock Conference at 4.

knew this. IBM announced four separate acquisitions of security companies since 2007 and each were integral to IBM's larger security strategy. Defendant Schmid himself publicly acknowledged that he was paying attention to IBM's security strategy – during a roadshow conference on August 14, 2013, he acknowledged that at least one IBM acquisition, that of Q1 Labs in October 2011, advanced IBM's security strategy, but reiterated that "[w]e have had the same success rate we've always had with [IBM]":

> On the database side, really not much competitive landscape change in all, other then I will tell you that I think that IBM has got – they bought Q1 Labs, which I think was a great acquisition for them. It makes very good sense strategically. I think they got some good talent with that, some good leadership, and I think their security strategy is coming together a little bit more.
>
> **We have had the same success rate we've always had with them.** But, it will be interesting to see how IBM plays out here. . . . [I]t will be interesting to see if they can start to pull together a security strategy overall that makes more sense than it has in the past.

59. The Trusteer acquisition gave defendant Kramer deep insight into IBM's product development plans and the new-found strength of its security strategy. In fact, Trusteer CEO Boodaei, who was Kramer's fellow Imperva founder, explained publicly that even by approximately February 2012, Trusteer and IBM "started getting to know the products and the abilities on each side, and [they] saw there was a connection and a joint vision." And to add to Kramer's opportunities for insight into IBM's strategy, IBM also agreed to "form[] a cybersecurity software lab in Israel that [would] bring together more than 200 Trusteer and IBM researchers and developers." IBM's Trusteer acquisition was viewed for IBM as being a "deeper move into Israel," where the cyber-security industry is viewed as "incestuous" because "people know one another, invest in each other's enterprises, and eventually buy each other out."

60. Kramer had actual knowledge of IBM's product development plans through his direct dealings with IBM, where as a Trusteer Board of Directors member, at a minimum, he would have seen "a connection and a joint vision" with IBM, and through his involvement in the Israeli cyber-security industry, knew that the IBM acquisition strengthened an already formidable competitor for Imperva in the on-premise deals for which defendants were claiming such a high win-loss ratio.

**Defendants Continue to Dismiss Imperva's Competition, Claiming IBM's "Political Connections" Were the Only Way It Could Win a Deal Against Imperva**

61.     Armed with the knowledge that, through the Trusteer sale, Kramer had significantly enhanced IBM's already strong competitive position against Imperva and that IBM was already beating Imperva in large on-premise opportunities with its ELAs, defendants knew that Imperva would need to adjust its own product offerings to remain viable.  Thus, defendants had to shift Imperva's business to the cloud.  Consistent with this allegation, Bettencourt confirmed that when he joined Imperva in August 2014, "a lot of the discussions we had with the Board when I first joined was: why don't we go all cloud?  Why don't we make everything subscription?"  And to minimize the cost of doing so, defendants increased the intensity of their statements to further inflate Imperva's stock price, which had lost its momentum and had fallen back below its post-IPO highs.  The higher they were able to drive Imperva's stock price, the more Imperva could afford to buy using Imperva's common stock as currency for the targeted acquisitions.  Defendants thus proceeded to flood the market with positive claims about Imperva's strong financial performance and competitive dominance.

62.     Accordingly, on November 5, 2013, Imperva reported impressive financial results for 3Q13.  Despite suffering from "execution challenges" just a quarter earlier, defendants highlighted "strong execution" this quarter and "solid growth across all geographies."  Specifically, defendants reported that they "benefited from improved sales execution overall, as well as from the changes we began to implement last quarter regarding our European and South American sales infrastructure."  Defendants again emphasized the number of deals that Imperva had closed over $100,000, emphasizing a 39% year-over-year increase as evidence that Imperva's security solutions remained dominant.  Defendants added that its product revenue (*i.e.*, SecureSphere revenue) reportedly grew 24% year-over-year and that its "win-loss ratio in head-to-head competitive deals" "***remain[ed]*** very strong," with wins against large competitors.  These statements effectively reiterated the 80% win-loss ratio that defendants described on March 7, 2013, May 21, 2013, and throughout 2012.  *See* ¶¶39, 41-42, 46 and n.14, *supra*.

63.     Defendants' statements had their intended effect.  Imperva's stock price jumped 20% in response in a single day of trading, increasing $8.01 per share from a close of $36.65 on November 5, 2013 to $44.66 the next day on volume of 2.8 million shares.

64.     Two weeks later, defendants were back on the road promoting Imperva and its products.  Knowing that IBM's strategy, in fact, was advancing rapidly, Schmid specifically addressed Imperva's competitive position against IBM at a November 20, 2013 UBS Technology Conference.  During that conference, Schmid told investors that Imperva's products were so technologically superior to IBM that IBM had to rely on its "political connections" to compete:

> So I think that from the competitive perspective on the technology side, IBM is the most competitive technically.  I would say the pace of innovation since they bought the company, Guardium, three years ago has certainly slowed relative to when we competed against Guardium as a standalone business.  They were more innovative and more formidable from a technology perspective there.

> That's not to disparage IBM, but it's more difficult to innovate and hold the team together that created those innovations when you're part of a larger organization.  One of the mainstays of the security business is standalone security companies.  They are the ones who innovate and come out with the newest products.

> You really don't see innovative security products coming out of networking vendors.  I can't think of any, to be honest with you.  So, it's very, very difficult to be innovative in that case.

*      *      *

> ***So, you know, technically I think that is – the companies that we compete against I think rely a little bit more on their political connections and a little less on their innovations to compete against us***.

65.     Schmid also dispelled the idea that Imperva was competing on price.  Sure, price was an issue for very large deals.  But Schmid clarified that "***it's really not a price game***" and "***it is not a race to the bottom***."  As he explained: "It is generally not the approach that any of us take" because "[w]e are not a commoditized business right now."  Schmid did not disclose IBM's success using its ELAs against Imperva in the largest, most lucrative, database deals, which made IBM's product "attractively priced."

66.     Schmid went a step further on December 10, 2013, at a Raymond James Conference.  That day, Schmid reiterated the 80% win-loss ratio that defendants had previously reported throughout 2012 and on March 7 and May 21, 2013, stating that Imperva purportedly "beat IBM

four out of five times." But this time, minimizing the effect of IBM's pricing options, he claimed that Imperva lost deals to IBM not because of the quality of IBM's products but instead because IBM could take potential customers to "Augusta National to play a round of golf":

> [SCHMID:] *So, we beat IBM four out of the five times*. We have a very, very good win rate against them. But they are – how do they win the other 20% of the five? They're IBM. And they have an enormous amount of –

> [Q.:] They [IBM] wouldn't be bundling services or anything like that?

*    *    *

> [SCHMID:] They may be doing that, *and they may be taking the CEO to Augusta National to play a round of golf*. There are things that – I can't get them there. I can take them to my local muni.

> So they have a lot of tentacles into organizations that give them a lot of political power, and a lot of account control. And it's very, very difficult for a Company of our size to overcome. Technically, we're better or *we wouldn't win four out of five times*.

> They don't scale the way we do. They don't have the same level of functionality that we have. I don't think there's anything controversial about me saying we have superior technology to IBM, no question.

67. Defendants' statements that Imperva's "win-loss ratio in head-to-head competitive deals" "remains very strong," and that Imperva "beat IBM four out of five times" were false and misleading. In fact, defendants' claims that IBM could only compete with Imperva with its "political connections" or by taking customers to "Augusta National to play . . . golf" were a farce. While Imperva may have been winning some larger deals, Imperva was losing the largest and most lucrative deals to IBM at a rate far higher than what defendants represented, and was doing so because IBM was offering its competitive security solutions at low cost, and in a way that permitted customers to defer costs for IBM solutions until the renewal of their ELAs with IBM.

68. With Imperva's SecureSphere sales goals not being achieved, Imperva's business continued to shift to its cloud-based products. By this time, Incapsula's cloud-based product had grown from 2.3% of Imperva's revenue when it went public in 2011 to 8.7% of Imperva's net revenue in 3Q13. Defendants did not disclose Imperva's competitive position against IBM, that it was being "tak[en] to the woodshed" in the largest and most lucrative seven-figure deals, or the

reasons why Imperva was losing to IBM when boasting about Imperva's competitive dominance. Instead, Kramer would soon capitalize on Imperva's shift to the cloud.

**Defendants Continue to Boast About Imperva's Competitive Success While Executing Their Shift to the Cloud; Kramer Begins to Use Imperva as His Personal Bank to Cash out on His Imperva Investment – and in on His Other Investments**

69.     Just three weeks after Schmid promoted Imperva and its products during the December 2013 technology conferences, Kramer began to unload significant amounts of his Imperva holdings – the first time that he had ever done so during Imperva's time as a publicly traded company – and he did so when Imperva's stock was trading very near its then all-time trading high. Between January 2, 2014 and January 8, 2014, Kramer sold 100,000 shares of Imperva stock for proceeds of $4.9 million.  These sales were suspicious in timing and amount.  Not only was Kramer's selling spree the first time Kramer had ever sold Imperva stock and at near then-record highs, but it also came on the heels of Kramer's sale of Trusteer to IBM where he not only strengthened Imperva's primary competitor but also reaped $240 million in the process.

70.     On February 6, 2014, shortly after Kramer finished selling his first block of sales, defendants again increased the intensity of their statements.  That day, Imperva reported its fourth quarter and fiscal year 2013 results, with a "strong finish" that was "highlighted by revenue growth that was above [Imperva's] guidance."  The "sales execution challenges" that plagued Imperva in 2Q13 were also represented to be clearly behind defendants.  Imperva reportedly "had solid growth across all geographic regions and continued to make progress on leveraging the investments made in our global sales and research and development infrastructure," while achieving an impressive 29% growth rate in product and license revenue (*i.e.*, SecureSphere sales).  Defendants also gave guidance for 1Q14, expecting "***total revenue to be in the range of $36 million to $37 million, or growth of approximately 28% at the midpoint, compared to the same period in 2013***."

71.     Defendants also emphasized Imperva's strong win-loss ratios on the conference call the same day, claiming that Imperva "continued to see traction with some of our largest existing accounts, as well as ***strong head-to-head win ratio[s] in competitive deals***."  They also attributed Imperva's "strong fourth quarter results" to "continuing improved overall sales execution

performance" and emphasized that a 40% growth rate in North America was directly attributable to the sales organization changes that they had made a year earlier.

72.     The same day, and consistent with defendants' knowledge that Imperva's on-premise solution was struggling in competition with IBM, defendants announced that Imperva was making two cloud-based acquisitions – one of cloud-based startup Skyfence, and the remaining shares of Imperva's cloud-based Incapsula subsidiary.  Both acquisitions confirmed Imperva's focus away from its large and most profitable on-premise SecureSphere solution to the much smaller and less profitable solutions for the cloud.  At defendants' direction, Imperva agreed to acquire cloud security gateway startup Skyfence, co-founded by Kramer, for $60 million and the remaining shares of its cloud security Incapsula subsidiary, also co-founded by Kramer, for $5.8 million.  Taking advantage of Imperva's inflated stock price, defendants originally agreed to acquire the companies almost exclusively with Imperva stock as consideration – $57.2 million of the $60 million Skyfence purchase and the entire Incapsula purchase would be paid for using Imperva stock.  And while defendant Schmid commented at the time that "Shlomo . . . will be receiving only common stock as part of the transaction," defendants would later restructure the deal to replace a portion of Kramer's stock from the transaction with $13.3 million in cash to avoid a shareholder vote that would have been required under New York Stock Exchange ("NYSE") rules dealing with related party transactions.  In the end, Kramer personally received a total of $25.4 million in cash and stock from the Skyfence transaction alone.  And Imperva paid this amount to Kramer even though Skyfence was not generating revenue at the time of the acquisition and would still only produce "de minimis" revenue nearly two years later.

73.     While these acquisitions were clearly a shift in Imperva's strategy – away from large deals involving on-premise solutions and large enterprises to smaller cloud-based solutions and smaller enterprises – defendants expressly denied that they were borne out of necessity because of troubles with SecureSphere sales.  In fact, Schmid specifically stated that "***we're not experiencing . . . a move from perpetual license to subscription***," emphasizing that "***[w]e're seeing growth in both***."  But defendants' denials were false and/or misleading.  Imperva's customers were, in fact, electing its cloud-based product over its on-premise SecureSphere product.  As an analyst

from Stephens Inc. confirmed just weeks later, "a few partners did mention they had deals for the on-premise WAF [in 1Q14] which ended up turning into cloud-based WAF deals." And the distinction was crucial for Imperva to meet its quarterly guidance because "the on-premise version is a license sale whereas the cloud-based version is a subscription, and this would have led to the deals being recognized as deferred revenue on the balance sheet rather than immediate product revenue." Another analyst, this one from Deutsche Bank, even confirmed that demand for on-premise database firewalls was lagging that of cloud-based application firewalls – "our checks have indicated that demand momentum for the Database firewall lags that of Web Application Firewall, as customer awareness is low, and customer perception of the vulnerability of their database servers appears to be lower than that of their Application Servers." Defendants' claims that "we're not experiencing . . . a move from perpetual license to subscription" and "[w]e're seeing growth in both" were clearly untrue and misleading. In fact, defendants would later admit that while SecureSphere sales were falling, Imperva saw a "big uptick very nice growth" with regard to its cloud-based Incapsula products. Imperva's Board was even speaking of "go[ing] all cloud" just a few months later when Bettencourt joined Imperva in August 2014.

74. Defendants reiterated their 80% win-ratio message just a month later. On March 5, 2014, at the Morgan Stanley Technology, Media & Telecom Conference, Schmid stated: "We went *four out of five times* against [F5]. Sounds like a Trident commercial, I know. ***And the same is true on the database side with IBM***."

75. Defendants' February 6, 2014 statements about its "strong head-to-head win ratio in competitive deals," which effectively reiterated the 80% win-loss ratio that defendants boasted about throughout 2012 and on March 7, 2013, May 21, 2013, December 10, 2013, and their statement on March 5, 2014 reiterating that "we win four out of five times" against IBM, were also false. Imperva continued to lose the largest on-premise deals to IBM, as IBM was offering its security solutions with equivalent protection at a low cost, and in a way that permitted customers to defer costs for IBM solutions until the renewal of their enterprise agreement with IBM. Indeed, one analyst opined after defendants disclosed the truth to the market on April 9, 2014, that Imperva was facing intensifying competitive issues in its database security business that "we think is driven by more

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:14-cv-01680-PJH

aggressive discounting/bundling practices by IBM," with "the IBM Guardium product . . . attractively priced." And as alleged herein, defendant Schmid would later admit that IBM competed with Imperva using "ELAs," and as Bettencourt explained, was facing an industry where "IBM was good enough" as customers viewed Imperva's SecureSphere product as a "checklist item." Again, defendants did not disclose any of this material information to investors when boasting about Imperva's purported competitive success. Meanwhile, Imperva's statements regarding its revenue guidance for 1Q14 were without a reasonable basis, considering Imperva's historical performance in the first quarter, which was typically its lightest in making deals. Defendants' guidance was clearly unattainable – it required SecureSphere growth of 26% at a minimum, nine percentage points above SecureSphere sales in 1Q13. *See also* ¶¶12, 105.

76. Only a few weeks after announcing strong financial results for 4Q13 and FY13 and Imperva's dramatic turnaround from the "sales execution challenges" that Imperva faced in 2Q13, and reiterating their 80% win-ratio against IBM, defendant Kramer unloaded more Imperva stock, again when Imperva stock was trading near then all-time highs. Between April 1, 2014 and April 7, 2014, Kramer sold another 100,000 shares of his Imperva stock for proceeds of $5.25 million. Like his January sales, these sales were also suspicious in timing and amount. It was only the second time that Kramer had sold any of his Imperva stock, he sold them at then near record highs, they came on the heels of his first sale, and they followed only months after Kramer secured $240 million from his sale of Trusteer to IBM and only days after Imperva's acquisitions of Incapsula and Skyfence, which brought Kramer another $13.3 million in cash and 252,669 shares of Imperva stock – or just under 1% of Imperva's total shares issued and outstanding – for a total of $25.4 million. And to make Kramer's sales even more suspicious, no other insider had sold Imperva shares since January 2, 2014 or would sell again until May 19, 2014. Yet Kramer stopped selling stock just *two days* before Imperva's stock price plummeted upon the market learning of Imperva's huge first quarter 2014 earnings miss, which was attributed to sales of SecureSphere collapsing due to "intensifying competition for large orders" and continued execution issues. SecureSphere sales – after seeing -15% year-over-year growth in 1Q14 – would remain depressed throughout 2014, with

growth in single digits compared to the 12% to 29% year-over-year growth that Imperva reported during the Class Period.

**Defendants Disclose the Truth – Sales of SecureSphere Collapse Because of Extended Sales Cycles on Big Deals and Purported "Sales Execution Issues"**

77. On April 9, 2014, defendants shocked the market with preliminary first quarter 2014 financial results that missed the Company's revenue guidance by nearly $6 million – an almost 20% miss. Contrary to their repeated mantra that Imperva's products dominated the competition with Imperva beating IBM "4 out of 5 times," defendants disclosed that Imperva's first quarter results were "primarily impacted by extended sales cycles on deals over $100,000." And despite defendants' repeated claims that their sales organization changes in North America had "paid off" and had been responsible for growth that exceeded guidance the previous quarter, and also a basis for Imperva's strong guidance going forward, defendants attributed the extended sales cycles to a "combination of intensifying competition for large orders, which resulted in additional review and approval cycles, as well as sales execution challenges in the U.S." And by praising "strong performance . . . in sales of subscription products during the first quarter," defendants informed investors that Imperva's SecureSphere product was the problem. The market clearly did not find defendants' excuse credible – it punished Imperva's stock in response by collapsing an extraordinary 44% in a single day of trading on volume of 11,359,700 shares. Imperva's stock dropped $21.73 per share from a close of $49.73 on April 9, 2014 to just $28.00 the following day.

78. This news obviously caught the market by surprise. According to a *Bloomberg* article with the headline "IBM Squeezing Israel Cyber Guru as $584 Million Wiped Out," one analyst expressed surprise because of the very misrepresentations that are at issue in this case – "'[t]hey had a significant miss,'" Jonathan Ho, a Chicago-based analyst at William Blair & Co., said in an April 10 telephone interview. Investors were surprised as "'the company would always downplay their competitors and always viewed themselves as having a strong competitive position.'" And this analyst was not alone in his assessment – analyst reports following defendants' disclosure expressed similar surprise and even questioned the Company's explanation:

- BMO Capital Markets – The magnitude of the shortfall following a strong 4Q and upwardly revised F2014 targets is puzzling. . . . [Company's] explanation is a little

hard to square with comments noting unchanged win rates, but we don't have reason to believe as of yet that anything major has changed regarding the company's secular or competitive positioning.

- William Blair & Co. – We were surprised by the magnitude of the miss given the decision to increase investments and the solid pipeline of opportunities. Our discussions with private companies suggest a strong spending environment where deal cycles are shortening given heightened breach activity rather than one where spending is undergoing delays.

- JMP Securities – [W]e feel Imperva's preannouncement reflects competitive issues rather than a slow-down in the broader cyber-security market.

- Wedbush – We believe intensifying competition is concentrated in Imperva's database security business (accounts for slightly less than 50% of overall sales), which we think is driven by more aggressive discounting/bundling practices by IBM. Our industry contacts tell us that the IBM Guardium product is attractively priced and can cover a variety of use cases, including both relational and mainframe databases. We think lack of mainframe coverage forced Imperva to acquire Tomium in February of 2014, and we think the company is actively restructuring its sales force to more effectively compete with IBM. . . .

- RBC Capital Markets – We find the news disappointing, particularly following a strong Q4/13 that saw the Company go on the offensive by making several strategic acquisitions, release SecureSphere WAF for AWS, increase investments to expand product offerings and boost the SM infrastructure, and increase guidance for FY/14.

- sterne agee – This preannouncement constitutes a significant miss of expectations, as the midpoint of revenues of $31.25 million is 15% below our $37 million prior estimate and consensus of 36.7 million and the midpoint of the new EPS guidance drops to 37% below the ($0.32) prior consensus number. . . . We believe that investors, in [a downside] scenario, would apply a lower multiple to the equity, based on damaged management credibility . . . .

**The Aftermath**

79.     The events transpiring after defendants stunned the market are revealing about the truth behind defendants' false and misleading claims about Imperva's purported competitive success. Less than four weeks after Imperva's disclosure, IBM announced on May 5, 2014, what defendants – and specifically Kramer – knew was coming: the introduction of its new "Comprehensive Threat Protection System and Critical Data Protection Program," which was a culmination of two years of intensive work by IBM to integrate its acquisitions, including Trusteer, the very company defendant Kramer co-founded and then sold to IBM during the Class Period. And, unlike Imperva, IBM

reported that its security business had experienced its sixth consecutive quarter of double-digit growth, with IBM rising to become one of the largest players in enterprise security since it formed a dedicated cyber security business in late 2011:

> Today's introduction of the IBM Threat Protection System and Critical Data Protection Program represent two years of significant investment in organic development and the acquisition of companies, including Q1 Labs, Trusteer, Guardium, Ounce Labs, Watchfire and Fiberlink/MaaS360. Since forming a dedicated cyber security business in late 2011, IBM has risen to become one of the largest players in enterprise security and has achieved six straight quarters of double-digit growth. According to IDC's Software Tracker, IBM significantly outpaced the overall security software market, and has moved from the 4th largest security vendor to the 3rd for 2013.

80. The timing of this announcement cannot be mere coincidence. Companies routinely notify their customers when significant product enhancements are nearing introduction. In fact, IBM announced a partnership with AT&T on February 25, 2014 – contemporaneous with defendants' claims of Imperva's superiority – that offered similar features to the Threat Protection System and Critical Data Protection Program that IBM officially announced on May 5, 2014. Stated simply, defendants knew this was coming.

81. And the revealing news was not limited to IBM's new product. Indeed, shortly before IBM's disclosure, and contemporaneous with Imperva's announcement that it had significantly missed its guidance, Imperva announced that its SVP of Worldwide Sales, Ralph Pisani, resigned. While it was natural to believe that Pisani's resignation was related to Imperva's sales execution issues in North America, subsequent events reveal that was not the case. Specifically, on July 8, 2014, a startup company called Exabeam, in which defendant Kramer is a co-founder and investor, announced a "sales push with the hiring of former Imperva SVP of Worldwide Sales Ralph Pisani" as its Executive Vice President of Field Operations. And Exabeam's technology appears to surpass that of Imperva – it "uses machine-learning technologies . . . to simplify security operations by focusing on attacker behavior rather than ever changing malware." Kramer joined two funds in June 2014 in investing a combined $10 million – coincidentally the same amount of Kramer's insider sales from Imperva – in the new company.

82. Exabeam's cutting edge software was "engineered by the [same] team behind the security company Imperva." Both Polak and Gil, co-founders of Exabeam, were previously at

Imperva, and Gil left Imperva in July 2013 to start Exabeam. It thus appears that in addition to cashing out on his Imperva holdings, and in on other investments – namely Incapsula and Skyfence – at the expense of Imperva, defendant Kramer also strip-mined Imperva's top talents – Pisani, Polak, and Gil – to bolster his new investment in Exabeam, once again to the detriment of Imperva. And, importantly, Exabeam's press release announcing the $10 million investment quoted Pisani as stating that the market had been "waiting for a solution like Exabeam," which eliminated the need to hire teams of data scientists – the very approach Imperva's technology depended upon:

> "Having seen the challenges enterprises face in protecting against modern-day cyberattacks and harmful data breaches, the market has been waiting for a solution like Exabeam," said Ralph Pisani, executive vice president of field operations at Exabeam. "The company has an impressive founding team that's applying big data security analytics to arm IT with the tools it needs, without having to rebuild monitoring infrastructure or hire teams of data scientists."

83. On July 31, 2014, Imperva reported its 2Q14 financial results, with subscription revenue growing substantially more than product and license revenue (*i.e.*, SecureSphere sales). One week later, on August 18, 2014, the *San Jose Mercury News* announced breaking news that "Imperva replaces founder Shlomo Kramer as CEO with Anthony Bettencourt, who has led his last two companies through acquisitions." Defendant Kramer took a position as Chief Strategy Officer, which Bettencourt would later describe as "transitionary."

## JURISDICTION AND VENUE

84. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5)).

85. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

86. Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

87. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to,

the mails, interstate telephone communications and the facilities of the NYSE, the world's largest

stock exchange by market capitalization.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS**

88.     On May 2, 2013, Imperva reported strong financial results for the first quarter of

2013. On the conference call the same day, defendants reiterated Imperva's strong financial results

and emphasized win-loss ratios in head-to-head comparative deals that "remain[] at a very strong

ratio," while discussing wins against "large comparators" and "wins during Q1 [that] include

replacement of IBM in two different database deals":

> [KRAMER:]  As I mentioned earlier, we believe that our existing customer base is less than 10% penetrated and represents a significant long-term growth opportunity for the Company.  From a comparative perspective, our win-loss ratio in head-to-head comparative deals *remains at a very strong ratio*.  Similar to recent quarters, we had a ***number of deals in which we won against larger comparators***, highlighting the value of our integrated solution and the superior level of support we provide on a global scale.
>
> Some of these ***wins during Q1 include replacement of IBM in two different database deals***, one with a leading technology company, the other with a major prepaid debit card provider.  In both cases the replacement decision was made due to Imperva's superior audit reporting and product support.

89.     On May 21, 2013, while speaking at the B. Riley & Co. Investor Conference, Schmid

reiterated the message that Imperva was beating IBM in "four out of five" deals:

> We compete against f5 and win four out of five times. We win those four out of five times, frankly, because of the technological advantage we have.  And when people are focused on technology, they pick our solution because it's best of breed. We do lose 20% of the time.  Why?  Primarily political – f5 is a very large company with a lot of account control, and they exert a lot of influence within that account.  So 20% of the time they win that way.
>
> On the data security side and focused on the database security side right now, our largest competitor is IBM, by far.  Oracle obviously plays in the security space for database security.  McAfee does, and a couple of other smaller players, but, by far, ***it's us and IBM that have the lead here.  And the competitive dynamics are very similar***.  We have better technology, ***we win four out of five times***, but nobody exerts account control like IBM.  They are masters of it, and they are very, very formidable competitors because of it.  But when it comes down to technology, we're going to win there.

90.     Defendants' statements about win rates against IBM of "around 4 out of 5," as alleged

at ¶¶88-89, and their claims that Imperva's win-ratio ***remained*** at a ***very strong ratio*** while

referencing "large comparators" in general, and IBM in particular, as alleged in ¶88, which

effectively reiterated the "4 out of 5" win-ratio that defendants revealed in 2012 and on March 7, 2013, were false and misleading. Contrary to their positive assertions, as alleged in detail in ¶¶4, 47-49, 54, 75, Imperva's purported 80% ratio distorted the economic reality of Imperva's competitive position against IBM. Imperva was, in fact, losing deals for its flagship SecureSphere product to IBM on the largest, most lucrative, seven-figure deals. As Bettencourt revealed after the Class Period, Imperva was taken to the "woodshed" on 203 seven-figure contracts between 2010 and 1Q15. Imperva would need to report $800 million in SecureSphere revenue for its "4 out of 5" ratio to be accurate in these largest deals.[17] But Imperva came nowhere close, reporting $305 million in SecureSphere revenue for the entire 51-month period referenced. What defendants failed to tell investors was that Imperva was losing deals for its largest and most profitable SecureSphere product to IBM because IBM was offering its security solutions (which offered equivalent protection) at low cost, and in a way that permitted customers to defer costs for IBM solutions until the renewal of their enterprise agreement with IBM. Schmid even acknowledged after the Class Period that IBM offered customers ELAs that eased costs, making IBM's product, as analysts described it, "attractively priced." Public perception of Imperva's dominance was thus much different than reality – on a regular basis, senior-level managers at potential customers often decided to use IBM, instead of Imperva, especially on these very large seven-figure deals, because of existing enterprise license agreements and the perception of saving money. And sales execution problems only exacerbated Imperva's failures to get these deals throughout the Class Period. As Bettencourt would confirm later, "[w]e never got to the CIO . . . and we never gave the salesforce messaging that was important enough to be evocative of a CIO conversation." Obviously, the larger the deal, the higher Imperva

---

[17]  Plaintiff calculated the $800,000,000 figure by taking defendants' professed 80% win-loss ratio (*i.e.*, "4 out of 5") to calculate a total pool of "seven-figure deals." Plaintiff submits this hypothetical number as a way to put into context how defendants' professed "4 out of 5" win-loss ratio distorted the economic reality of the competition between Imperva and IBM. Bettencourt's confirmation that Imperva lost 203 seven-figure deals between 2010 and 1Q15 reveals a minimum total loss of $203 million. At a loss ratio of "1 out of 5" (1/5 or 20%), the total pool would amount to approximately $1 billion ($203 million x 5 = $1 billion). An 80% win-ratio of a $1 billion pool would amount to $800 million in sales ($1 billion x 4/5 or 80% = $800,000,000). Applying Imperva's total SecureSphere revenue for the referenced 51-month period to this admittedly hypothetical figure would leave a win ratio of approximately 30% ($305 million ÷ $1 billion = 30%).

was required to climb in an organization to secure approval, which it was unable to do in the most coveted deals.

91.     Defendants' statements thus created an impression far different than the one that existed internally. Far from dominating IBM, sales representatives were regularly unable to advance their sales cycle beyond the request for information stage for on-premise deals because of IBM's ELAs, which contributed to Imperva's regional sales managers and Strategic Account Directors struggling to meet and missing their SecureSphere quotas. Defendants have now admitted that Imperva's sales force was "very fragile," they "weren't properly deployed," and they were experiencing "egregious" turnover. These facts were occurring even as defendants were claiming that they had resolved sales execution challenges in North America, adding to the misleading message of dominance over IBM. Consequently, with SecureSphere sales goals slipping, Imperva's business was shifting to its Incapsula products, which were far smaller and less profitable than their SecureSphere counterparts.

92.     On August 7, 2013, Imperva issued a press release announcing its second quarter 2013 financial results. During the conference call the same day for analysts, media representatives and investors, defendant Kramer took the opportunity to reiterate Imperva's competitive dominance, emphasizing that Imperva ***continued to*** displace its competitors "quite successfully" with a "win-loss ratio [that] ***continues to be*** very strong":

> [KRAMER:]  Yes, so no, ***we continue to displace our competitors in the market quite successfully, and we continued to do that in last – in Q2, as well***. In general, we continue to be – as I said earlier – in a very good competitive position, ***and our win-loss ratio continues to be very strong***.

93.     Defendants' statements, as alleged in ¶92, that they "continue[d] to displace [Imperva's] competitors . . . quite successfully" and enjoyed a "win-loss ratio [that] continues to be very strong," which defendants previously described as winning "4 out of 5 times," were false and misleading. Contrary to these positive assertions, as alleged in detail in ¶¶4, 47-49, 54, 75, 90-91, Imperva was losing deals for its flagship SecureSphere product on the largest, most lucrative deals at a rate far higher than the 20% defendants' statements suggested. Defendants' professed win-ratio distorted the economic reality of the competition between Imperva and IBM. Even if Imperva was

winning the numerical competition, including deals that could be as low as $50,000 and reach into the millions, Bettencourt's acknowledgement that Imperva was "tak[en] to the woodshed" on $203 million in deals, at a minimum, demonstrates the disconnect between defendants' public message and economic reality (*see* n.17). In truth, IBM was beating Imperva on the largest, most lucrative deals because IBM was offering its competitive security solutions at low cost, and in a way that permitted customers to defer costs for IBM solutions until the renewal of their enterprise license agreements with IBM. And what defendants failed to mention was that Imperva had a "sales force that didn't feel comfortable trying to get to the top" and which was operating without "messaging that was important enough to be evocative of a CIO conversation," and was unable to compete for these large deals. Indeed, Bettencourt even acknowledged that "a year ago" (*i.e.*, June 2014), which thus includes the state of the market before that time and during the Class Period, "having a great infrastructure company [like IBM] providing your security solutions was fine because it didn't matter . . . [i]f I need database activity monitoring, oh, IBM is probably good enough."[18] That perception explains why most of Imperva's regional sales managers and Strategic Account Directors were struggling to meet or even missing their SecureSphere quotas on a regular basis throughout the Class Period and why Imperva's business was becoming increasingly reliant on Imperva's Incapsula product, which was far smaller and less profitable than its SecureSphere counterpart. While defendants were boasting about Imperva's performance, they knew that the facts they concealed were far different than the impression defendants' statements were creating for investors.

94. On November 5, 2013, Imperva issued a press release announcing its third quarter 2013 financial results. During the Company's earnings conference call the same day, defendant Kramer emphasized that Imperva's win-loss ratio "*remains* very strong," effectively reiterating the "4 out of 5" win-loss ratio that defendants had repeated many times throughout 2012 and 2013:

> ***From a competitive perspective our win-loss ratio in head-to-head competitive deals remains very strong***, similar to past quarters we had a number of deals that we won against large competitors, highlighting the value of our integrated solutions . . . .

---

[18] June 2, 2015 Stephens Inc., New York Conference.

THIRD AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 3:14-cv-01680-PJH

95. The market responded to the news, increasing almost 22% in a single day of trading. Imperva's stock jumped $8.01, from a close of $36.65 per share on November 5, 2013 to $44.66 per share on November 6, 2013, on extremely heavy volume of more than 2.8 million shares.

96. With the momentum from Imperva's 3Q13 results, defendants went back out on the road to reiterate their message that Imperva was dominating its primary SecureSphere competitor. On November 20, 2013, defendant Schmid addressed investors and analysts at the UBS Global Technology Conference and downplayed IBM's competitive advantage, claiming that it could succeed against Imperva only by using its "political connections":

> So it's IBM that we see the most. We do see McAfee every now and then. I think Oracle relies on their native audit capabilities more than anything else, which is a fundamental limitation in a security policy anyway because your database administrator is now not protected. That guy can do anything he wants, he or she.

> *       *       *

> So, you know, technically I think that it is – ***the companies that we compete against I think rely a little bit more on their political connections and a little less on their innovations to compete against us*** . . . .

97. Schmid also denied that Imperva was competing for these deals on prices or that its competition was bundling, claiming that "throwing this in" "it's not going to cut it":

> [Q.:] Pricing out, this is an industry that is basically more technology-based than pricing based. So the fact that you and up against the F5s . . . and the IBM's and the Oracles, that you can't come down to – I'll throw this in because it's not going to cut it.

> [SCHMID:] ***It is generally not the approach that any of us take***. We are not a commoditized business right now, ***so it's really not a price game***. When we get engaged in very, very large deals, sure, pricing becomes a very significant factor when you're talking about that kind of money. But we're not – it is not a race to the bottom.

98. A couple of weeks later, on December 10, 2013, Imperva participated in the Raymond James Systems, Semiconductors, Software & Supply Chain Conference. During the conference, defendant Schmid acknowledged that IBM was Imperva's "biggest competitor" but yet reiterated that "we beat IBM four out of five times." It was only because IBM "may be taking the [potential customers'] CEO to Augusta National to play a round of golf" that, according to Schmid, Imperva lost to IBM when competing for SecureSphere deals:

[Q.] [SCHMID]  So on the database side, the biggest competitor for us is IBM. About three years ago, they bought a company called Guardi[um], and that's still the name of the product that they sell.  We see IBM and competitor situations far more than we see anybody else by far.

It's just not even – in terms of market share, IBM and Imperva are number one and two and three is really far behind in terms of specific products.  Actually, the number one market share goes to people.  People pouring over audit logs and doing code reviews and things like that.  That's the number one competitor in the space, which is why it is a green field opportunity.

*So, we beat IBM four out of five times.  We have a very, very good win rate against them.  But they are – how do they win the other 20% of the time?*

\*       \*       \*

They may be doing that, and *they may be taking the CEO to Augusta National to play a round of golf*.  There are things that – I can't get them there.  I can take them to my local muni.

So they have a lot of tentacles into organizations that give them a lot of political power, and a lot of account control.  And it's very, very difficult for a Company of our size to overcome.  *Technically, we're better or we wouldn't win four out of five times*.

They don't scale the way we do.  They don't have the same level of functionality that we have. . . .  [W]e have superior technology to IBM, no question.

99.     Defendants' statements, as alleged in ¶¶94, 96, 98, that Imperva "beat IBM four out of five times" with a "very good win rate against them," including defendants' assertions that "the companies we compete against I think rely a little more on their political connections and a little less on their innovation to compete against us" with IBM needing to "tak[e] the CEO to Augusta National to play . . . golf" to win against Imperva were false and misleading.  As alleged in ¶¶4, 47-49, 54, 75, 90-91, 93, Imperva's claims of dominance and defendants' professed 80% win-loss ratio against IBM distorted the economic reality of the competitive dynamic between Imperva and IBM.  Even if Imperva was winning based on numbers of deals, it was being "tak[en] to the woodshed" in the largest, most lucrative, seven-figure deals.  And, as previously alleged, Imperva was losing deals to IBM because IBM offered its security solution at low cost and in a way that permitted customers to defer costs for IBM solutions until the renewal of their enterprise license agreements with IBM, as Schmid confirmed after the Class Period.  In fact, defendants knew when promoting Imperva's dominance over IBM that most of its regional sales managers and its Strategic Account Directors were struggling to meet and were missing their quotas because of these types of established

relationships and resulting discounts.  As Bettencourt and Schmid would later disclose, Imperva's sales force was "fragile," improperly deployed, experiencing "egregious" turnover, and was not "arm[ed] with the right data."  Because of these issues, Bettencourt confirmed that "the Q1 [2014] miss candidly could have happened two quarters earlier, three quarters earlier, it just didn't."  Imperva's sales struggles in the largest database deals thus existed precisely when Schmid was proclaiming to the market Imperva's 80% win-rate against IBM.

100.     On February 6, 2014, Imperva issued a press release announcing its fourth quarter and full year 2013 financial results.  During the conference call the same day, defendant Kramer boasted of Imperva's continued "strong head-to-head win ratio[s] in competitive deals," again reiterating the 80% win-loss ratio repeated consistently and regularly since 2012.  Defendants also forecasted $36 million to $37 million in revenue for 1Q14 and growth of approximately 28% at the midpoint:

> [KRAMER:]  Now, turning to a deal highlight in Q4, we **continued** to see traction with some of our largest existing accounts, **as well as strong head-to-head win ratio in competitive deals**.  Some highlights include a Fortune 250 energy company that selected Imperva to replace and consolidate their existing Lumigent BeyondTrust and IBM Guardi[um] deployments.  The primary use case is privileged user monitoring for regulatory compliance.  The key selection driver was ease of use and ability to successfully roll out at the scale needed for the deployment.

*          *          *

> [SCHMID:]  **Now, turning to our outlook for the first quarter of 2014.  We expect total revenue to be in the range of $36 million to $37 million, or growth of approximately 28% at the midpoint, compared to the same period in 2013**. . . .

101.     The market again reacted in response, jumping 6.8% in a single day of trading.  Imperva's stock price increased $3.78 per share, from a closing price of $55.30 on February 6, 2014 to a closing price of $59.08 on February 7, 2014.

102.     Defendants reiterated their 80% win-ratio message just a month later.  On March 5, 2014, at the Morgan Stanley Technology, Media & Telecom Conference, Schmid stated: "We went **four out of five times** against [F5].  Sounds like a Trident commercial, I know.  **And the same is true on the database side with IBM**."

103.     Defendants' statements, as alleged in ¶¶100, 102, that Imperva was winning "four out of five times" against IBM with continued "strong head-to-head win ratios in competitive deals" were false and misleading.  As alleged in detail in ¶¶4, 47-49, 54, 75, 90-91, 93, 99, the professed

"four out of five" win-loss ratio against IBM distorted the economic reality of the competitive position between IBM and Imperva, as IBM "took [Imperva] to the woodshed" on the largest, most lucrative, "seven-figure deals." And, at the same time that defendants were boasting about Imperva's dominance, it faced a number of troubling facts that severely hindered Imperva's ability to sell its flagship SecureSphere products. In fact, Imperva was losing deals to IBM because IBM was offering its security solutions (which offered equivalent protection) at low cost, and in a way that permitted customers to defer costs for IBM solutions until the renewal of their enterprise agreement with IBM. *See* ¶6. At the same time, Imperva's "salesforce . . . didn't feel comfortable trying to get to the top" and failed to have "messaging that was important enough to be evocative of a CIO conversation," while operating in a market that viewed IBM's solution as "good enough" for a "checklist item."

104. Defendants' statement, as alleged in ¶100, forecasting 28% growth with revenue guidance of "$36 million to $37 million" for the first quarter 2014 was false and without basis, as defendants knew. As defendants acknowledged, the Company's "first quarter is always the lightest," with "the low point for product and subscription revenue as a percentage of the overall total [is] Q1."[19] Since Imperva's guidance depended largely on the bigger SecureSphere deals, which represented 50% of Imperva's revenues in every quarter in 2013 (except 1Q13, when SecureSphere sales were 49.52% of total revenues), and was recognized immediately in the quarter it was sold – as opposed to the Incapsula sales, which as subscription were recognized as deferred revenue – SecureSphere would have had to grow at a rate between 25.9% and 29.45% in Imperva's seasonally weakest quarter to reach the guidance range.[20] Given the environment facing SecureSphere and its sales force, that type of growth was simply unattainable. Tellingly, Imperva had only reached that

[19] May 16, 2013 JPMorgan Global Technology Conference at 2; May 2, 2014 Imperva Inc. Earnings Conference Call at 12.

[20] Plaintiff calculated the SecureSphere sales thresholds by using SecureSphere's lowest percentage/contribution of any quarter in the previous year and multiplying that by the range of defendants' stated guidance (*i.e.*, $36 million x 49.52% = $17.8 million; $37 million x 49.52% = $18.3 million). Notably, the low end of $17.8 million, which gives defendants all the advantages in calculation, is only $6.3 million less than Imperva's 4Q13 sales, and the fourth quarter is seasonally Imperva's strongest quarter. This further demonstrates that defendants had no reasonable basis for the outsized guidance they gave for 1Q14.

1  level of growth for SecureSphere three times before, and each time was in Imperva's seasonally

2  strongest fourth quarter.

3      105.    With Imperva's SecureSphere goals not being met, Imperva was shifting to its smaller

4  and less profitable Incapsula product.  Indeed, by the end of the year, Incapsula sales had jumped

5  from just 2.3% of net revenue when Imperva went public to 8.8% of revenue at the end of 2013.

6  Yet, defendant Schmid denied it expressly, stating that "we're not experiencing . . . a move from

7  perpetual license [*i.e.*, SecureSphere sales] to subscription [*i.e.*, Incapsula sales]" and claimed that

8  "[w]e're seeing growth in both."  These claims were not only untrue and misleading, the true facts

9  gave defendants actual knowledge that their 1Q14 guidance was made without a reasonable basis.

10                    **DEFENDANTS DISCLOSE THE TRUTH**

11      106.    On April 9, 2014, the Company announced preliminary first quarter 2014 financial

12  results and disclosed the truth about its SecureSphere sales.  The Company reported preliminary total

13  revenue in the range of $31.0 million to $31.5 million ($5 million to $6 million below the

14  Company's prior guidance of total revenue in the range of $36.0 million to $37.0 million) and

15  expected EPS in the range of $(0.40) to $(0.44), (as much as $0.11 below prior guidance of $(0.33)

16  to $(0.37)).  The release directly attributed this significant miss to "intensifying competition for large

17  orders, which resulted in additional review and approval cycles, as well as sales execution challenges

18  in the U.S."  And by praising "strong performance . . . in sales of subscription products during the

19  first quarter," defendants informed investors that Imperva's SecureSphere product was the problem:

20          "Based on our preliminary analysis, our first quarter results were primarily
        impacted by extended sales cycles on deals over $100,000, which led to delays in
21      receiving anticipated orders from customers, particularly in the U.S., which resulted
        in lower than expected revenue for products," said Imperva President and CEO,
22      Shlomo Kramer.  "While our overall win rates remained consistent during the
        quarter, the extended sales cycles resulted from a combination of intensifying
23      competition for large orders, which resulted in additional review and approval cycles,
        as well as sales execution challenges in the U.S.  We are taking steps to address these
24      issues.  We are also continuing to analyze the factors that impacted our first quarter
        results, and consider[ing] additional steps we may take to address them and how they
25      may impact our outlook for the full year.  We expect to provide updated guidance
        during our regular earnings call."
26
            Kramer added, "[w]hile we are disappointed with the overall results, we were
27      pleased with the strong performance in EMEA as well as in sales of subscription
        products during the first quarter.  We remain confident in the longer term due to
28      ongoing growth in global demand for data center security solutions and our growing

global pipeline of opportunities, as well as our commitment to innovation and ability to execute our comprehensive plan for addressing the security challenges for the cloud."

107. As a result of this news, Imperva's stock price plummeted $21.73 per share to close at $28 per share on April 10, 2014, a one-day decline of nearly 44% on volume of 11,359,700 shares. Analysts noted this "[m]assive [g]uidance [r]eduction" and referred to "damaged management credibility."

108. Analysts directly attributed this news to increased competition from IBM for large on-premise deals. According to a *Bloomberg* article with the headline "IBM Squeezing Israel Cyber Guru as $584 Million Wiped Out," one analyst expressed surprise because of the very misrepresentations that are at issue in this case – "'[t]hey had a significant miss,'" Jonathan Ho, a Chicago-based analyst at William Blair & Co., said in an April 10 telephone interview. Investors were surprised as "'the company would always downplay their competitors and always viewed themselves as having a strong competitive position.'" And as alleged at ¶78 , this analyst was not alone in his assessment.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

109. During the Class Period, defendants had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time. In so doing, defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of Imperva securities during the Class Period. The fraudulent scheme: (a) deceived the investing public regarding Imperva's financial outlook, technology of their products and the value of the Company's securities; (b) enabled defendant Kramer to sell $10.2 million worth of his Imperva stock at artificially inflated prices; (c) enabled Imperva to purchase Skyfence and the remaining shares in Incapsula using Imperva's inflated stock as currency; and (d) caused plaintiff and other Class members to purchase Imperva stock at artificially inflated prices, causing them damage.

## ADDITIONAL SCIENTER ALLEGATIONS

110. As alleged herein, defendants acted with scienter in that defendants either knew or recklessly disregarded that the public documents and statements issued or disseminated in the name

of the Company were materially false and misleading, that such statements or documents would be issued or disseminated to the investing public, and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Imperva, their control over, and/or receipt and/or modification of Imperva's allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning Imperva, participated in the fraudulent scheme alleged herein.

111. Defendants had actual knowledge that Imperva was losing deals to enterprise vendor IBM for large on-premise opportunities for Imperva's flagship SecureSphere product. As Imperva's most expensive and profitable product, defendants knew about and followed closely the circumstances surrounding its sales. Importantly, SecureSphere sales were recognized immediately as license revenue upon sale (compared to ratably for Incapsula sales) and therefore had the ability to influence in the short term Imperva's success or failure each quarter. As a result, defendants Kramer and Schmid were highly focused on the success and/or failure of the product to sell and the reasons therefore. Thus, they knew that most of Imperva's regional sales representatives and Strategic Account Directors with responsibility for selling Imperva's SecureSphere product were struggling to meet and were missing their sales quotas and, in particular, because of the enterprise license agreements and the deferred payments that IBM was offering using those agreements, potential customers were selecting IBM's security solutions, which were viewed as sufficiently protecting enterprises security needs, and rejecting Imperva's solutions often at the request for information stage of the sales process.

112. Defendants also had complete insight into the sales process for Imperva's SecureSphere product and therefore knew about the struggles that Imperva's sales representatives were facing in their attempts to sell Imperva's SecureSphere product. As defendant Schmid would admit after the Class Period, Imperva utilized a Salesforce.com Customer Relationship Management ("CRM") application to track Imperva's sales opportunities. Salesforce.com's own description of its product details the insight defendants gained on the progress of their deals through the program:

> View critical details in a rich activity timeline of your customer's activity.
> Know who you're competing against, what stage your deal is in, and what moves you
> need to make next to win. Track all associated activities as they happen and receive
> updates when action is needed. Send emails simply with templates just a click away.

113. In fact, Salesforce.com documented every sales opportunity on which Imperva's sales representatives were working. The sales representatives were required to rate each prospective sales opportunity from 10% to 100%, which represented the sales person's confidence in the opportunity becoming a sale by a certain point in time. At Imperva, there existed a common standard across all opportunities with regard to the percentages assigned in Salesforce.com, and each sales representative was expected to abide by that methodology.

114. Sales representatives were required to update the status of each sales opportunity continuously, and every three months sales representatives presented sales forecasts utilizing the data from Salesforce.com to each sales representative's immediate supervisor. The three-month forecast had to be as accurate as possible, detailing every sales opportunity and what part of the sales process the customer had completed and needed to complete.

115. Higher-level executives such as SVP of Sales Pisani, defendant Kramer and defendant Schmid, had access to Salesforce.com and used it throughout any given month to routinely question the status of particular sales opportunities and to authorize discounts. This access and involvement gave defendants Kramer and Schmid actual knowledge that Imperva's SecureSphere sales were suffering and were facing a competitive landscape that represented a fundamental and intractable challenge to Imperva's business as IBM offered an equivalent security product at low cost, and in a way that permitted customers to defer costs for IBM solutions until the renewal of their enterprise license agreement.

116. Defendant Kramer also had unusual insight into IBM's product offerings and thus knew that it was developing a comprehensive solution that would increase IBM's already formidable position in the market. As an initial matter, defendant Kramer has significant influence in the Israeli cyber-security industry where IBM does substantial business. In fact, Kramer's influence is such that he is credited for the strong position of the Israeli cybersecurity industry. As a *Bloomberg* article explained it, "Israel's campaign to become a cybersecurity powerhouse, an effort trumpeted

by Prime Minister Benjamin Netanyahu, owes a debt to entrepreneur and investor Shlomo Kramer." And as alleged, the nature of that Israeli cyber-security industry is "incestuous" because "people know one another, invest in each other's enterprises and eventually buy each other out." Kramer was thus in a perfect position to know about IBM's intentions and the nature of its offerings.

117. Beyond this influence, defendant Kramer also had direct insight into IBM's plans and offerings because he sold IBM Trusteer, a specialist in cyber-security. Kramer was credited as "the entrepreneur behind" Trusteer and reaped $240 million of the nearly $1 billion purchase price for the Company. When IBM announced the transaction, Trusteer's CEO, Boodaei – who founded Imperva with Kramer – stated publicly that both IBM and Trusteer "started getting to know the products and the abilities on each side" beginning in February 2012 and "saw there was a connection and a joint vision." And to further connect IBM to Kramer, IBM announced with the Trusteer acquisition that it was forming "a cybersecurity software lab in Israel," which brought together more than "200 Trusteer and IBM researchers and developers." Defendant Kramer therefore had unique insight into the developments of Imperva's primary competitor. Indeed, Kramer sat on the Trusteer Board of Directors with Boodaei during the Class Period.

118. The Trusteer deal, which Kramer knew would bolster IBM's competitive position relative to Imperva on the Company's largest deals, exemplifies Kramer's motivation throughout the Class Period – to cash out of his investments at the expense of, and regardless of the fallout to, Imperva and its shareholders.

119. Defendants were motivated to inflate Imperva's stock price because they used Imperva's stock to make two acquisitions during the Class Period. As defendants knew, the higher they were able to drive Imperva's stock price, the cheaper those acquisitions would ultimately be for Imperva and the more it would be able to pay. On February 6, 2014, defendants announced that Imperva agreed to acquire Skyfence for $60 million and the remaining shares of its Incapsula subsidiary for another $5.8 million using large amounts of Imperva's stock – all $5.8 million of the Incapsula acquisition and $57.2 million of the Skyfence acquisition would be paid for using Imperva common stock.

120.     Only days after announcing the Skyfence acquisition, defendants renegotiated it. Defendants originally agreed to fund the transaction almost entirely with Imperva stock – 1.2 million shares would fund $57.2 million of the $60 million purchase price.  An acquisition of a related party comprised of cash and greater than 1% stock, however, requires shareholder approval pursuant to NYSE rules.  Knowing that shareholders would not approve Kramer reaping a 2.1% stake (nearly $29 million) in Imperva, defendants instead re-structured the deal, paying Kramer $13.3 million in cash (nearly 25% of Imperva's available cash) and $12.1 million in shares.  The amended Skyfence acquisition served to insulate Kramer from the 44% drop in Imperva stock when defendants disclosed the truth about Imperva's SecureSphere sales to the market.

121.     Defendant Kramer was also motivated to inflate Imperva's stock price to dispose of significant amounts of his stock.  Indeed, Kramer took full advantage of Imperva's artificially inflated stock price by selling 200,000 shares, for total proceeds of $10.192 million.  He sold his Imperva shares in two blocks – 100,000 shares for $4.9 million in January 2014 and another 100,000 shares in April 2014 for $5.19 million as follows:

| Date | Shares | Price | Proceeds | Holdings End of CP | % Sold |
|---|---|---|---|---|---|
| 01/02/14 | 20,000 | $47.39 | $947,800 | | |
| 01/03/14 | 20,000 | $49.23 | $984,600 | | |
| 01/06/14 | 10,081 | $49.09 | $494,876 | | |
| 01/06/14 | 9,919 | $49.62 | $492,181 | | |
| 01/07/14 | 9,508 | $50.90 | $483,957 | | |
| 01/07/14 | 10,492 | $50.38 | $528,587 | | |
| 01/08/14 | 20,000 | $50.10 | $1,002,000 | | |
| 04/01/14 | 9,190 | $56.99 | $523,738 | | |
| 04/01/14 | 10,810 | $56.35 | $609,144 | | |
| 04/02/14 | 9,343 | $53.95 | $504,055 | | |
| 04/02/14 | 1,100 | $56.52 | $62,172 | | |
| 04/02/14 | 7,886 | $55.11 | $434,597 | | |
| 04/02/14 | 1,671 | $55.66 | $93,008 | | |
| 04/03/14 | 12,056 | $51.95 | $626,309 | | |
| 04/03/14 | 7,944 | $52.40 | $416,266 | | |
| 04/04/14 | 4,384 | $49.99 | $219,156 | | |
| 04/04/14 | 3,783 | $51.46 | $194,673 | | |
| 04/04/14 | 3,003 | $51.85 | $155,706 | | |

| Date | Shares | Price | Proceeds | Holdings End of CP | % Sold |
|------|--------|-------|----------|--------------------|--------|
| 04/04/14 | 8,830 | $49.18 | $434,259 | | |
| 04/07/14 | 9,293 | $48.83 | $453,777 | | |
| 04/07/14 | 6,127 | $49.39 | $302,613 | | |
| 04/07/14 | 4,580 | $50.06 | $229,275 | | |
| TOTAL | 200,000 | | $10,192,749 | 3,672,457 | 5.16% |

122.    Kramer's sales were suspicious in timing and amount for the following reasons:  (a) this was the first time that Kramer had sold as much as a single Imperva share in Imperva's history as a publicly traded company; (b) Kramer's sales occurred at or very near Imperva's then all-time trading highs; (c) Kramer's sales occurred just four months after Kramer reaped $240 million from his sale of Trusteer to IBM; (d) Kramer's last trade occurred just two days before defendants disclosed the truth about Imperva's SecureSphere sales to the market; and (e) besides Chief Technology Officer Amichai Shulman's sales of $1.1 million dollars of Imperva shares on January 2, 2014, no other Imperva insider sold Imperva shares during 1Q14.  Kramer's trades are not insulated by his Rule 10b5-1 trading plan because he cannot establish that he was not aware of the facts herein before entering into any such plan or that the plan otherwise complies with Rule 10b5-1(c).

123.    Kramer's self-dealing also demonstrates that he had the motive to artificially inflate Imperva's stock.  Beyond his $10 million in suspicious stock sales and the windfall that he received from selling Skyfence and the remaining interest in Incapsula to Imperva, Kramer appears to have moved on to his next venture – investing in Exabeam, a "big data security analytics company," which has technology and products that appear to surpass Imperva's in that they "change the way cyberattacks are detected" and eliminate the need to "hire teams of data scientists" as Imperva had done with its products and technology.  On June 10, 2014, shortly after Kramer finished selling his Imperva stock, Exabeam announced that it had raised $10 million from private investors, which included Kramer.  While the Exabeam announcement did not itemize how much of the $10 million came from Kramer, the total amount is suspiciously similar to the amount that Kramer received from his Imperva sales.  As if the timing of the investment was not suspicious enough, Exabeam's cutting edge software appears to surpass Imperva's – this fact should be unsurprising since it was

"engineered by the [same] team behind the security company Imperva." Indeed, both Polak and Gil, co-founders of Exabeam, were previously at Imperva. Then, in June 2014, following his resignation, Pisani, a top Imperva salesman, surfaced at Exabeam as its Executive Vice President of Field Operations. Thus, it would appear that Kramer mined Imperva's top talents – Pisani, Polak, and Gil – to use them to bolster his own investment in Exabeam, to the detriment of Imperva. In August 2014, Imperva announced that Kramer was stepping down as CEO, being replaced with Anthony Bettencourt, who has a "history of acquisitions." Indeed, Kramer appears to be looking to cash out again as he moves on to his next venture.

124.    Schmid had direct knowledge about Imperva's failure to beat IBM in the large seven-figure deals because he was directly involved in those deals. As Bettencourt related, Schmid had discussions at the CIO level of potential customers to attempt to close out the larger deals:

> I think the reason we had the event last year is because a combination of things. We had a message that was a bit opaque. So we talked about data center string. Nobody knew what we did. We didn't have the bandwidth in the Company to go out – Terry was the one who would go out and have discussions with CIOs, CSOs, and help you deal with us. But Terry has a day job; he is our CFO.

125.    As the person able to make contact with customers' CIOs, Schmid was well aware of the deals (and their size) that Imperva lost even as he was misleadingly emphasizing to the market that Imperva beat IBM in head-to-head competition "four out of five times."

126.    Both Kramer and Schmid were also aware of Imperva's failure to compete against IBM in the larger deals as evidenced by the concerted effort put behind the sales and marketing investments during the Class Period. In fact, Kramer and Schmid admittedly had been focused on "sales execution issues" in North America, as they stated in the August 7, 2013 earnings call, and were "instituting similar changes in Europe and South America," including by bringing in new leadership and investing in sales infrastructure. The supposed changes enacted to remedy "sales execution issues" indicates defendants' awareness that Imperva was losing to IBM in the largest deals. Moreover, defendants' Class Period statements that the "changes we made in [North America] had paid off," that "we are confident that we can successfully address the sales execution issues, as we did in North America," and that the Company had "benefited from improved sales execution overall," were at direct odds with the state of the Company as Bettencourt found it upon

his arrival. The sales force was "very fragile," improperly deployed, suffered "egregious" turnover, and did not "have a message that was evocative of a CIO conversation." In fact, the serious sales execution issues led Bettencourt to conclude that "the Q1 [2014] miss candidly could have happened two quarters earlier, three quarters earlier, it just didn't." Such a discrepancy in the description of the sales force and their execution provides an inference of scienter: defendants knew the sales force could not compete with IBM on the largest deals.

127. Finally, both Kramer and Schmid knowingly downplayed the Class Period shift to Incapsula in light of SecureSphere's failure to compete against IBM in the larger, seven-figure deals. In the 2014 Imperva Compensation Plan for the Imperva Sales Organization, attached as an exhibit to Imperva's Form 10-K for FY 2013 filed on February 28, 2014, the Company modified the 2013 Compensation Plan to add the "Incapsula Incentive Program," which provided, "Double payment and double quota relief on all first year stand-alone Incapsula sales. . . . Incapsula DDOS bundled with Secure Sphere offering does not qualify for this program." Having approved this new compensation provision for Imperva's sales force incentivizing Incapsula deals, the inference is compelling that Kramer and Schmid, who certified the Form 10-K and would have approved the new compensation plan, knew Imperva was being taken to the "woodshed" on the larger deals against IBM, requiring a shift in the focus of its sales force from SecureSphere to Incapsula.

**LOSS CAUSATION/ECONOMIC LOSS**

128. The markets for Imperva common stock were open, well-developed and efficient at all relevant times. During the Class Period, as detailed herein, defendants made false and misleading statements regarding the Company's financial performance and demand for the Company's products, and engaged in a scheme to deceive the market. This artificially inflated Imperva's stock price and operated as a fraud or deceit on the Class. Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, Imperva's stock price fell immediately and significantly, as the prior artificial inflation came out of the stock price. Plaintiff and other members of the Class purchased or otherwise acquired Imperva's common stock relying upon the integrity of the market price of Imperva's common stock and market information relating to Imperva. As a

result of their purchases of Imperva securities during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

129. At all relevant times, the material misrepresentations and omissions particularized in this Amended Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Imperva's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Imperva and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein, upon defendants' revelations of the truth and resulting collapse of Imperva's stock price.

130. In sum, the significant decline in Imperva's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Imperva's stock price decline negates any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff and other Class members was a direct result of defendants' fraudulent scheme to artificially inflate Imperva's stock price and the subsequent significant decline in the value of Imperva's stock when defendants' prior misrepresentations and other fraudulent conduct was revealed.

**NO SAFE HARBOR**

131. Imperva's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

132. Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

authorized and/or approved by an executive officer of Imperva who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made. On the contrary, such statements concealed critical information about Imperva's financial performance.

## APPLICABILITY OF PRESUMPTION OF
## RELIANCE: FRAUD ON THE MARKET

133. Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact which there was a duty to disclose.

134. Plaintiff is entitled to a presumption of reliance because, as more fully alleged above, defendants failed to disclose its true competitive position against IBM.

135. Alternatively, plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) Defendants' misrepresentations and omissions artificially inflated and maintained the inflation in Imperva's stock;

(c) The omissions and misrepresentations were material;

(d) The Company's stock traded in an efficient market;

(e) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(f) Plaintiff and other members of the Class purchased Imperva stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

136.     At all relevant times, the market for Imperva stock was efficient for the following reasons, among others:

(a)     Since November 2011, Imperva's stock has been listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Imperva filed periodic public reports with the SEC; and

(c)     Imperva regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## CLASS ACTION ALLEGATIONS

137.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Imperva publicly traded securities during the Class Period (the "Class"). Excluded from the Class are defendants, directors and officers of Imperva and their families and affiliates.

138.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Imperva had more than 26 million shares of stock outstanding, owned by thousands of persons.

139.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the 1934 Act was violated by defendants;

(b)     Whether defendants omitted and/or misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether defendants knew or recklessly disregarded that their statements were false and misleading;

1    (e)    Whether the price of Imperva stock was artificially inflated; and

2    (f)    The extent of damage sustained by Class members and the appropriate

3  measure of damages.

4    140.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class

5  sustained damages from defendants' wrongful conduct.

6    141.    Plaintiff will adequately protect the interests of the Class and has retained counsel

7  who are experienced in class action securities litigation.  Plaintiff has no interests which conflict

8  with those of the Class.

9    142.    A class action is superior to other available methods for the fair and efficient

10  adjudication of this controversy.

11  ## COUNT I

12  **For Violation of §10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder**
    **Against All Defendants**

13  143.    Plaintiff repeats and realleges each and every allegation set forth in the paragraphs

14  above as if fully set forth herein.  This Count is asserted pursuant to §10(b) of the 1934 Act and Rule

15  10b-5 promulgated thereunder by the SEC against all defendants.

16  144.    As alleged herein, throughout the Class Period, defendants, individually and in

17  concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce,

18  the mails and/or the facilities of national securities exchanges, made untrue statements of material

19  fact and/or omitted to state material facts necessary to make their statements not misleading and

20  carried out a plan, scheme and course of conduct, in violation of §10(b) of the 1934 Act and Rule

21  10b-5 promulgated thereunder.  Defendants intended to and did, as alleged herein: (i) deceive the

22  investing public, including plaintiff and members of the Class; (ii) artificially inflate and maintain

23  the prices of Imperva common stock; and (iii) cause plaintiff and members of the Class to purchase

24  Imperva common stock at artificially inflated prices.

25  145.    The Individual Defendants were individually and collectively responsible for making

26  the false and misleading statements and omissions alleged herein and having engaged in a plan,

27  scheme and course of conduct designed to deceive plaintiff and members of the Class, by virtue of

28

having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

146.     As set forth above, defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon plaintiff and the other members of the Class who purchased Imperva common stock during the Class Period.

147.     In ignorance of the false and misleading nature of defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Imperva common stock, plaintiff and other members of the Class purchased Imperva common stock at artificially inflated prices during the Class Period.  But for the fraud, plaintiff and members of the Class would not have purchased Imperva common stock at such artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the price of Imperva common stock declined precipitously and plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Imperva common stock at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

148.     By virtue of the foregoing, defendants are liable to plaintiff and members of the Class for violations of §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of §20(a) of the 1934 Act and Rule 10b-5
### Against All Defendants

149.     Plaintiff repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.  This Count is asserted pursuant to §20(a) of the 1934 Act against each of the Individual Defendants.

150.     As alleged above, Imperva violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase and sale of Imperva common stock and by participating in a fraudulent scheme and course of

business or conduct throughout the Class Period. This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate and/or reckless disregard of the falsity of the Company's statements and the fraudulent nature of its scheme during the Class Period.

151. As set forth above, the Individual Defendants were controlling persons of Imperva during the Class Period, due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations. By virtue of the foregoing, the Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision making of Imperva, including the content of its public statements.

152. Imperva had the power to control and influence the Individual Defendants and other Company executives through its Board of Directors and its power to hire, fire, supervise and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation and other employment considerations. By virtue of the foregoing, Imperva had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Individual Defendants, including the content of their public statements.

153. Defendants acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon plaintiff and the other members of the Class who purchased Imperva common stock during the Class Period.

154. In ignorance of the false and misleading nature of the Company's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for Imperva common stock, plaintiff and other members of the Class purchased Imperva securities at an artificially inflated price during the Class Period. But for the fraud, plaintiff and members of the Class would not have purchased Imperva common stock at artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Imperva common stock declined precipitously and plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Imperva common stock at artificially inflated prices and the subsequent decline in the price of those securities when the truth began to be disclosed.

1  155.  By reason of the foregoing, defendants are liable to plaintiff and the members of the

2  Class as controlling persons in violation of §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

4  WHEREFORE, plaintiff prays for judgment as follows:

5  A.  Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

6  B.  Awarding plaintiff and the members of the Class damages and interest;

7  C.  Awarding plaintiff's reasonable costs, including attorneys' fees; and

8  D.  Awarding such equitable/injunctive or other relief as the Court may deem just and

9  proper.

### JURY DEMAND

11  Plaintiff demands a trial by jury.

12  DATED: January 13, 2016

ROBBINS GELLER RUDMAN
& DOWD LLP
DOUGLAS R. BRITTON
CODY R. LeJEUNE
ASHLEY M. PRICE


s/ DOUGLAS R. BRITTON
DOUGLAS R. BRITTON

655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
& DOWD LLP
SHAWN A. WILLIAMS
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2016, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 13, 2016.

s/ DOUGLAS R. BRITTON
DOUGLAS R. BRITTON

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  dougb@rgrdlaw.com

## Mailing Information for a Case 4:14-cv-01680-PJH Shankar v. Imperva, Inc. et al

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jennifer Corinne Bretan**
  jbretan@fenwick.com,vsheehan@fenwick.com,mbafus@fenwick.com,kayoung@fenwick.com,pnichols@fenwick.com,kkeller@fenwick.com

- **Doug Britton**
  dougb@rgrdlaw.com,kathyj@rgrdlaw.com,e_file_sd@rgrdlaw.com,tjohnson@rgrdlaw.com,ldeem@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Frank James Johnson**
  frankj@johnsonandweaver.com,paralegal@johnsonandweaver.com,shawnf@johnsonandweaver.com,michaelf@johnsonandweaver.com,ceciliar@johnsonandweaver.co

- **Deborah Kang**
  dkang@fenwick.com,tchow@fenwick.com

- **Dean S. Kristy**
  dkristy@fenwick.com,vsheehan@fenwick.com,kayoung@fenwick.com

- **Cody Ross LeJeune**
  clejeune@rgrdlaw.com

- **Tricia Lynn McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com,tjohnson@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Susan Samuels Muck**
  smuck@fenwick.com,kayoung@fenwick.com,pnichols@fenwick.com,acaloza@fenwick.com

- **Ashley Price**
  aprice@rgrdlaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com

- **Darren Jay Robbins**
  e_file_sd@rgrdlaw.com

- **David Conrad Walton**
  davew@rgrdlaw.com,ldeem@rgrdlaw.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)