SUSAN S. MUCK (CSB NO. 126930)
smuck@fenwick.com
DEAN S. KRISTY (CSB No. 157646)
dkristy@fenwick.com
JENNIFER BRETAN (CSB NO. 233475)
jbretan@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, California 94104
Telephone:    (415) 875-2300
Facsimile:    (415) 281-1350

DEBORAH KANG (CSB NO. 288143)
dkang@fenwick.com
Silicon Valley Center, 801 California Street
Mountain View, California 94041
Phone:    (650) 988-8500
Fax:    (650) 938-5200

Attorneys for Defendants Imperva, Inc.,
Shlomo Kramer and Terrence J. Schmid

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| VISWANATH V. SHANKAR, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> IMPERVA, INC., SHLOMO KRAMER and TERRENCE J. SCHMID, <br><br> Defendants. | Case No.  CV 14-01680 PJH <br><br> **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THIRD AMENDED COMPLAINT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Date:    March 30, 2016 <br> Time:    9:00 a.m. <br> Judge: Hon. Phyllis J. Hamilton <br> Date Action Filed:  April 11, 2014 |

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION TO DISMISS ................................................................. 1

ISSUES TO BE DECIDED ................................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................... 1

I.     PRELIMINARY STATEMENT ................................................................................ 1

II.    STATEMENT OF FACTS ..................................................................................... 4

       A.    The Defendants ....................................................................................... 4

       B.    The Company's Growth Throughout 2013 .............................................. 5

       C.    The Company Misses Its Guidance In Q1 2014, But Quickly Rebounds ... 6

       D.    Procedural History, Parties and Claims ................................................. 7

III.   PLAINTIFF HAS FAILED TO STATE A CLAIM UNDER SECTION 10(b) ............... 8

       A.    Imperva's Forward-Looking Guidance For Q1 2014 Is Not Actionable ... 9

       B.    Statements About Imperva's Competition With IBM Were Not Misleading ... 13

             1.    The Win-Loss Ratio Statements Are Not Actionable ..................... 13

             2.    The Political Connections and Golf Statements Are Not Actionable ... 15

       C.    Plaintiff Does Not Allege Facts Raising A Strong Inference Of Scienter ... 18

             1.    The Facts Fail To Show That Q1 2014 Guidance Was Knowingly
                   False ........................................................................................... 19

             2.    The Trading Allegations Negate Any Inference Of Scienter ........... 20

             3.    Mr. Kramer's Alleged "Insight" Into IBM Does Not Support
                   Scienter ....................................................................................... 21

             4.    The "Core Operations" Claims Fail To Raise An Inference Of
                   Scienter ....................................................................................... 22

             5.    Holistic Review Does Not Save Plaintiff's Deficient Scienter
                   Showing ....................................................................................... 23

       D.    Plaintiff Cannot Establish Loss Causation ............................................ 24

IV.    CONCLUSION ................................................................................................. 25

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alaska Elec. Pension Fund v. Adecco S.A.*,
434 F. Supp. 2d 815 (S.D. Cal. 2006), *aff'd*, 256 F. App'x 74 (9th Cir. 2007) ......................12

*Applestein v. Medivation, Inc.*,
861 F. Supp. 2d 1030 (N.D. Cal. Mar. 22, 2012), *aff'd*, 561 F. App'x 598 (9th Cir. 2014) ....................................................................................................................................20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...........................................................................................................8

*Berson v. Applied Signal Techs., Inc.*,
527 F.3d 982 (9th Cir. 2008) ............................................................................................23

*Cement Masons & Plasterers Joint Pension Trust v. Equinix, Inc.*,
2012 WL 685344 (N.D. Cal. Mar. 2, 2012) .....................................................................19

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
65 F. Supp. 3d 840 (N.D. Cal. 2014) ................................................................................22

*City of Roseville Emp. Ret. Sys. v. Sterling Fin. Corp.*,
963 F. Supp. 2d 1092 (E.D. Wash. 2013) .........................................................................24

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
880 F. Supp. 2d 1045 (N.D. Cal. 2012) ......................................................................20, 21

*DSAM Global Value Fund v. Altris Software, Inc.*,
288 F.3d 385 (9th Cir. 2002) ..............................................................................................9

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) .........................................................................................................24

*Glazer Capital Mgmt., LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008) .........................................................................................9, 23

*Gompper v. VISX, Inc.*,
298 F.3d 893 (9th Cir. 2002) ............................................................................................18

*In re Bare Escentuals Sec. Litig.*,
745 F. Supp. 2d 1052 (N.D. Cal. 2010) .................................................................13, 16, 19

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) ..........................................................................................25

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) ...............................................................................9, 10, 19

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*In re Daou Sys. Inc. Sec. Litig.*,
    411 F.3d 1006 (9th Cir. 2005)................................................................23

*In re Downey Sec. Litig.*,
    2009 WL 2767670 (C.D. Cal. Aug. 21, 2009)................................................20

*In re HP Sec. Litig.*,
    2013 WL 6185529 (N.D. Cal. Nov. 25, 2013)........................................14, 17

*In re Oracle Corp. Sec. Litig.*,
    627 F.3d 376 (9th Cir. 2010)................................................................24

*In re Rackable Sys., Inc. Sec. Litig.*,
    2010 WL 3447857 (N.D. Cal. Aug. 27, 2010)................................................25

*In re Rigel Pharms. Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012)................................................................9

*In re Silicon Graphics, Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999)..............................................................9, 20

*In re Silicon Storage, Inc. Sec. Litig*,
    2007 WL 760535 (N.D. Cal. Mar. 9, 2007)................................................16

*In re Skechers U.S.A., Sec. Litig.*,
    273 F. App'x 626 (9th Cir. 2008) ........................................................20

*In re Stac Elec. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996)................................................................22

*Janus Capital Group v. First Deriv. Traders*,
    131 S. Ct. 2296 (2011)................................................................19

*Kovtun v. VIVUS, Inc.*,
    2012 WL 4477647 (N.D. Cal. Sept. 27, 2012), *aff'd sub nom.*, 591 F. App'x
    592 (9th Cir. 2015)................................................................21

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002)................................................................22

*Lloyd v. CVB Fin. Corp.*,
    --- F.3d ----, 2016 WL 384773 (9th Cir. Feb. 1, 2016) ................................13, 24

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014)........................................................24, 25

*Mallen v. Alphatec Holdings, Inc.*,
    861 F. Supp. 2d 1111 (S.D. Cal. 2012), *aff'd sub nom.*, 607 F. App'x 694 (9th
    Cir. 2015) ................................................................22

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Mazzaferro v. Aruba Networks, Inc.*,
2015 WL 456534 (N.D. Cal. Feb. 2, 2015) ..........................................14, 15, 17, 18

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008)..........................................................9, 21, 23, 24

*Navarro v. Block*,
250 F.3d 729 (9th Cir. 2001) ...................................................................8

*Oregon Pub. Emps. Ret. Fund v. Apollo Group, Inc.*,
774 F.3d 598 (9th Cir. 2014)............................................................. *passim*

*Paracor Fin. Inc. v. General Elec. Capital Corp.*,
96 F.3d 1151 (9th Cir. 1996).....................................................................25

*Plevy v. Haggerty*,
38 F. Supp. 2d 816 (C.D. Cal. 1998).........................................................12

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001).............................................................8, 9, 19

*South Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008)....................................................................23

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
552 U.S. 148 (2008) .................................................................................8

*Teamsters Local. Nos. 175 & 505 Pension Fund v. The Clorox Co.*,
353 F.3d 1125 (9th Cir. 2004)...................................................................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)........................................................................9, 18, 23

*Tripp v. Indymac Fin. Inc.*,
2007 WL 4591930 (C.D. Cal. Nov. 29, 2007) ...........................................21

*Union Asset Mgmt. Holding AG v. Sandisk Corp.*,
2016 WL 406283 (N.D. Cal. Jan. 22, 2016) .........................................10, 11

*Verona Partners, LLC v. Tenet Capital Partners Convertible Opportunities Fund
LP*,
2006 WL 2669035 (N.D. Cal. Sept. 18, 2006) .........................................19

*Westley v. Oclaro, Inc.*,
897 F. Supp. 2d 902 (N.D. Cal. 2012), *modified in part on reconsideration*
(Jan. 10, 2013).......................................................................................22

*Wietschner v. Monterey Pasta Co.*,
294 F. Supp. 2d 1102 (N.D. Cal. 2003) ...................................................21

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' NOTICE OF MOT. AND MOT. TO DISMISS THIRD
AMENDED COMPL. AND MPA IN SUPPORT THEREOF

iv

CASE NO. CV 14-01680 PJH

*Wozniak v. Align Tech., Inc.*,
　850 F. Supp. 2d 1029 (N.D. Cal. 2012) ..........................................................25

*Zack v. Allied Waste Indus., Inc.*,
　2005 WL 3501414 (D. Ariz. Dec. 15, 2005), *aff'd*, 275 F. App'x 722 (9th Cir.
　2008) .............................................................................................................20

*Zucco Partners, LLC v. Digimarc Corp.*,
　552 F.3d 981 (9th Cir. 2009)......................................................................8, 23

**STATUTES AND RULES**

15 U.S.C.
　§ 78u- 4(b)(1)(B) ............................................................................................9
　§ 78u-4(b)(2)(A).........................................................................................9, 18
　§ 78u-5(c)(1) ...............................................................................................19
　§ 78u-5(c)(1)(A)(i) .........................................................................................9

Private Securities Litigation Reform Act ............................................ *passim*

Securities Exchange Act of 1934
　§ 10(b)...........................................................................................*passim*
　§ 20(a) ...........................................................................................1, 25

Federal Rules Of Civil Procedure
　Rule 9(b)............................................................................................1
　Rule 12(b)(6)...................................................................................1

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFS.' NOTICE OF MOT. AND MOT. TO DISMISS THIRD
AMENDED COMPL. AND MPA IN SUPPORT THEREOF

v

CASE NO. CV 14-01680 PJH

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## NOTICE OF MOTION AND MOTION TO DISMISS

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:  PLEASE TAKE NOTICE that on March 30, 2016, at 9:00 a.m., or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Phyllis J. Hamilton, U.S. District Court, Northern District of California, defendants Imperva, Inc. ("Imperva" or the "Company"), Shlomo Kramer and Terrence J. Schmid (together, "Defendants") will, and hereby do, move to dismiss with prejudice all claims asserted against them in plaintiff's Third Amended Complaint (the "TAC").  Defendants move pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA") on the grounds that plaintiff fails to state a claim for violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act").  This motion is based upon this Notice of Motion and Motion; the Memorandum of Points and Authorities that follows; Defendants' Request for Judicial Notice ("RJN"); the Declaration of Jennifer C. Bretan ("Bretan Decl.") and exhibits thereto ("Ex.")[1]; the [Proposed] Order; the pleadings and records on file herein; the argument of counsel; and such other matters as may be presented to the Court.

## ISSUES TO BE DECIDED

      1.     Should plaintiff's Section 10(b) claim be dismissed where plaintiff does not allege specific facts showing the existence of any actionable statement, raising a strong inference of scienter, or demonstrating that the allegedly fraudulent conduct caused plaintiff's losses?

      2.     Should plaintiff's Section 20(a) claim be dismissed where plaintiff fails to plead a primary violation of Section 10(b)?

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    PRELIMINARY STATEMENT

      Plaintiff's latest attempt to plead a securities fraud claim, like its predecessor, is devoid of the specifics required by the PSLRA and well-established legal principles, and remains predicated on an irrational theory of fraud that no court has accepted.  This Court should not be the first.

      The facts are straightforward.  Imperva achieved both sequential and year-over-year growth throughout 2013.  In the first quarter of 2014, however, the Company missed its forward-

---

[1] Unless otherwise noted, references to Exhibits ("Ex.") are to the Bretan Declaration.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

looking guidance, reporting revenues of $31.5 million, below its guidance of $36 million to $37 million.  As the Company explained on April 9, 2014, when it announced preliminary financial results, the lower than anticipated revenues were due to "extended sales cycles" on large deals (over $100,000), which caused delays in receiving expected orders from customers, as well as "sales execution challenges in the U.S."  The Company quickly recovered from the one quarter setback, posting strong results in every single period thereafter, and its stock price rebounded.  Nevertheless, working backward from that solitary miss, plaintiff alleges that the guidance for that quarter, and a series of  statements about the Company's competition with and win-loss ratio against IBM or others, reaching back almost a year earlier, were "knowingly false."

Plaintiff's effort to plead a materially misleading misstatement fails yet again.  As to Imperva's guidance – not only do those projections fall squarely within the PSLRA safe harbor – plaintiff's sole support for that claim is an exercise in speculative mathematics that is flawed in concept and does nothing to explain away *the fact* that Imperva's guidance for the first quarter of 2014 was completely in line with (and if anything conservative in light of) Imperva's actual, unchallenged revenue growth rates for the five quarters preceding the miss.  As to Imperva's win-loss ratio, plaintiff concedes such statements may be "technically accurate," but claims they were misleading, nonetheless, because they "distorted the economic reality" (purporting to rely on post-class period comments by Imperva's current CEO, who did not even work for Imperva in the class period, as support for that notion).  Putting aside that this is not a restatement case, and thus there can be no claim that Imperva's "economic reality" (by way of its financial statements) is anything but accurate, nothing the current CEO has said about Imperva's win rate against IBM (past or present) supports plaintiff's assertion.  Finally, despite efforts to portray a handful of statements by the Company's Chief Financial Officer (Terrence J. Schmid) as misleading, *i.e.,* claiming he suggested that the *only* reason IBM wins deals is by taking customers to golf at Augusta National, but failed to tell the market that IBM might also be competing by discounting and bundling its products, review of Mr. Schmid's *actual* statements in context reveals that he acknowledged that such bundling may be occurring and that pricing is a factor.

Were this just another ordinary fraud by hindsight case, it would be subject to dismissal

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   for all the foregoing reasons.  There are, however, two additional aspects of plaintiff's claim that

2   make it uniquely deficient.

3   *First*, in attempting to allege that the Company, its founder and former Chief Executive

4   Officer (Shlomo Kramer) and Mr. Schmid acted with scienter, plaintiff alleges that the reason

5   Defendants "hyped" Imperva's win-loss ratio against IBM, and offered false guidance, was to

6   inflate its stock to acquire two companies, Skyfence Networks, Ltd. ("Skyfence") and the rest of

7   Incapsula, Inc. ("Incapsula") (already 80% owned by the Company), in February and March

8   2014, respectively.  Among the many problems with that theory is that Mr. Kramer was also a

9   significant stockholder of Skyfence, and received 252,669 shares of Imperva stock in the

10  acquisition.  In other words, according to plaintiff, Mr. Kramer purposefully inflated the price of

11  Imperva's stock, only to acquire the allegedly inflated shares himself when Skyfence was sold,

12  and then stood by as they precipitously declined in value (as he *knew* they would, given plaintiff's

13  claim that he had knowledge of an impending miss).  As detailed below, that theory of scienter is

14  economically irrational and has no support in the case law or in common sense.

15  Nor does the fact that Mr. Kramer sold 100,000 shares of Imperva stock in early January

16  2014, and another 100,000 shares in early April 2014, overcome the irrational nature of plaintiff's

17  theory.  The sales were made pursuant to a pre-established Rule 10b5-1 trading plan, and

18  constituted just a tiny fraction of the more than 3.7 million shares of Imperva stock Mr. Kramer

19  owned at the time.  Indeed, Mr. Kramer was a *net purchaser* of Imperva stock during the class

20  period, *acquiring 52,669 more shares than he sold*.  And, rather than selling any significant

21  portion of his holdings, Mr. Kramer saw the value of his interest in Imperva decline by $79.8

22  million following the April 9, 2014 announcement.  Accordingly, for the TAC to survive, plaintiff

23  would need to show that Mr. Kramer was effectively "defrauding" himself.  As to Mr. Schmid,

24  plaintiff admits he did not trade and does not offer any other theory – much less pleaded facts –

25  demonstrating why he would engage in securities fraud.

26  *Second*, despite ample time for investigation, plaintiff still fails to identify a single

27  witness, document, internal communication or data source that corroborates any aspect of its

28  claim.  Not one.  Unable to unearth anyone or anything that supports the notion that Defendants

engaged in misconduct, the TAC continues to rely instead on lawyer say-so and invective. It

therefore contains none of the factual details necessary to plead securities fraud, and its vaguely

stated allegations (including those based on recent statements by Imperva's current CEO) remain

irreconcilable with the Company's actual results and forthright disclosures, as detailed below.

In an effort to overcome these deficiencies, plaintiff continues to cast aspersions on Mr.

Kramer's success in the cyber-security industry and his connections to the Israeli technology

community. Stripped of pejorative characterization, what these allegations actually show is that

Mr. Kramer is a visionary executive and innovator, who invested in or founded companies – like

Imperva – that make great products and have been quite successful, and that he has accumulated

considerable wealth as a result (which plaintiff estimates at $1 billion). Rather than creating an

incentive to commit fraud, these allegations eviscerate the notion. Mr. Kramer had no reason

(and certainly no financial one) to risk his stellar reputation as a technology "guru" by engaging

in securities fraud, much less an irrational one in which he actually acquired more shares than he

sold and saw the value of his holdings decline by $79.8 million. In any event, as shown below,

plaintiff only attributes statements to Mr. Kramer on four dates (May 2, 2013, August 7, 2013,

November 15, 2013 and February 6, 2014), in connection with Imperva's earnings releases, and

not one of them is actionable under well-established law.

Because the TAC remains devoid of specifics, fails to allege a single actionable statement,

relies on an irrational theory of fraud, and fails to demonstrate that alleged losses were tied in any

way to revelation of a fraud, the TAC should be dismissed, this time with prejudice.

## II.     STATEMENT OF FACTS

### A.     The Defendants

Imperva is a publicly traded Delaware corporation headquartered in Redwood Shores,

California. TAC ¶ 16. It offers security products and services designed to enable companies to

protect against cyber-attacks in databases that store valuable information and applications. *Id.* ¶¶

33-34. Among its product offerings are SecureSphere, Incapsula and Skyfence. *Id.* ¶¶ 27, 31, 34.

SecureSphere provides database, file, and web application security across systems with on-

premise and virtual data centers. *Id.* ¶ 34. Incapsula is a cloud-based product designed to block

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

attacks against web applications to help ensure website safety and availability. *Id.* Skyfence helps ensure security and compliance of cloud applications and data, allowing greater visibility and control over corporate use of Software-as-a-Service applications. Ex. G (Ex. 99.1).

Defendant Shlomo Kramer co-founded Imperva in 2002. TAC ¶¶ 22, 33. He served as the Company's Chief Executive Officer and Chairman of the Board of Directors during the period relevant to the TAC. *Id.* ¶ 17. Upon the hiring of a new CEO in August, 2014, Mr. Kramer took on an ultimately transitional role as the Company's Chief Strategy Officer, but remained the Chairman until October 2015. *See id.* ¶¶ 17, 83. Defendant Terrence J. Schmid is Imperva's Chief Financial Officer. *Id.* ¶ 18.

## B. The Company's Growth Throughout 2013

Plaintiff's alleged class period begins May 2, 2013, when the Company announced its results for the first quarter of 2013 (ending March 31, 2013) (for convenience, quarters will be referenced in the form "Q1 2013" hereafter). For that period, Imperva reported net revenues of $28.6 million, a 33% increase over the same period the prior year, when net revenues totaled $21.5 million. Year over year, there was also a 66% increase in new customers utilizing Imperva's products and services. *See* TAC ¶ 44; Ex. A (Ex. 99.01); Ex. B at 3.

The next quarter, Q2 2013, was an equal success. Imperva reported net revenues of $31.3 million, a 28% increase over the same period the prior year, a 46% increase in new customers, and a 36% increase in deals valued over $100,000. *See* TAC ¶ 50; Ex. C (Ex. 99.01); Ex. D at 3.

The growth continued in Q3 2013, both sequentially and year-over-year. Net revenues were $35.1 million, a 33% increase over the comparable period the prior year, with deals over $100,000 also up over 39% over the same period. *See* TAC ¶ 62; Ex. E (Ex. 99.01); Ex. F at 3.

Imperva's results for Q4 2013 and year-end were equally impressive. Net revenues for the quarter were $42.7 million and totaled $137.8 million for the full year. *See* TAC ¶ 100, Ex. G (Ex. 99.2). This represented greater than 34% growth over fourth quarter net revenues in 2012 of $31.8 million, and net revenue growth of more than 32% for the full year (compared to $104.2 million in 2012). *See id.*; Ex. H at 39, 54. The Company also reported "solid growth across all geographic regions" for the year. TAC ¶ 70. Imperva's stock price reacted accordingly, rising

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

from $32.54 per share at the beginning of the year to $48.13 at year's end.  Ex. I.

### C.    The Company Misses Its Guidance In Q1 2014, But Quickly Rebounds

Imperva thus entered 2014 with terrific momentum.  On February 6, 2014, Imperva held its earnings conference call to discuss 2013 results, during which Mr. Schmid provided forward-looking guidance for Q1 2014.  He stated that Imperva expected "total revenue to be in the range of $36 million to $37 million" (a growth estimate of 26-29% versus the 33% growth in the same quarter the prior year or the 32% growth rate achieved for all of 2013).  TAC ¶¶ 70, 100.

Ultimately, however, the Company faced unanticipated difficulties in Q1 2014, and on April 9, 2014 (the end of the class period), announced preliminary results with expected revenues of $31 million to $31.5 million (the latter being the revenue number it would ultimately report). TAC ¶ 106.  While the revenues were still significantly above results in the comparable period the prior year ($28.6 million in Q1 2013), they were below the Company's earlier guidance.[2]  In the April 9 press release, Mr. Kramer explained that the lower than anticipated results were principally due to "extended sales cycles on deals over $100,000, which led to delays in receiving anticipated orders from customers," caused by "a combination of intensifying competition for large orders" as well as "sales execution challenges in the U.S."  Ex. K (Ex. 99.1); TAC ¶ 106.

The problems proved to be short-lived.  By Q2 2014 – the very next quarter – the Company reported revenues of $38.4 million (compared to $31.3 million the prior year).  Ex. L (Ex. 99.01).  Likewise, in Q3 2014 and Q4 2014, Company revenues were $42.7 million and $51.4 million respectively, well above the comparable periods the prior year ($35.1 million and 42.7 million).  Ex. M (Ex. 99.01), Ex. U (Ex. 99.01).  The Company's stock price reacted accordingly, closing as high as $52.19 on December 26, 2014 (above the $49.73 per share price immediately before the April 9, 2014 announcement).  Ex. I.

---

[2] By contrast, Imperva's forward-looking guidance was remarkably accurate throughout 2013. For Q1 2013, the Company predicted revenues of $27 million to $27.5 million, and reported revenues above that estimate at $28.6 million.  Ex. A (Ex. 99.01); Ex. J (Ex. 99.01); TAC ¶¶ 44, 88.  For Q2 2013, the Company provided guidance of $31 million to $31.5 million in revenues, and ultimately reported $31.3 million.  Ex. A (Ex. 99.01); Ex. C (Ex. 99.01); TAC ¶¶ 50, 92.  For Q3 2013, the Company reported $35.1 million in revenues, which slightly exceeded its guidance of $34 million to $35 million.  Ex. C (Ex. 99.01); Ex. E (Ex. 99.01); TAC ¶¶ 62, 94.  And, for Q4 2013, the Company again exceeded its guidance, reporting revenues of $42.7 million, slightly above its range of $41 to $42 million.  Ex. E (Ex. 99.01); Ex. G (Ex. 99.2); TAC ¶¶ 70, 71, 100.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

### D. Procedural History, Parties and Claims

This action was filed on April 11, 2014, just two days after the April 9 announcement. Following appointment of a lead plaintiff and counsel, plaintiff Delaware County Employees Retirement System ("plaintiff") filed its Amended Complaint ("AC") on October 10, 2014. On January 6, 2015, Defendants moved to dismiss the AC on the grounds that plaintiff failed to plead a cognizable claim for securities fraud, having failed to allege particularized facts establishing an actionable misstatement, scienter or that allegedly fraudulent conduct caused plaintiff's losses.

On September 17, 2015, the Court granted Defendants' motion. Dkt. 53 (the "Order"). Focused solely on whether plaintiff sufficiently alleged any false or misleading statements, the Court's detailed opinion rejected that claim as to a host of alleged misstatements and otherwise found that the AC "suffers from a lack of precision." Order at 15. In particular, the Court held that plaintiff failed to plead facts showing that statements concerning Imperva's competitive success (specifically, its win-loss ratio) or technological superiority were false or misleading. *Id*. at 9-12. The Court also rejected as factually deficient claims focused on Imperva's financial guidance for Q1 2014. *Id*. at 12-14. Only as to one narrow category of statements, appearing to attribute IBM's wins to political connections or golfing perks alone, did the Court find plaintiff's pleading adequate. *Id*. at 10.[3] Given the AC's overall insufficiencies, the Court did not reach scienter or loss causation, but instead, allowed leave to amend solely to add new facts supporting the claim that plaintiff's *already identified* statements (1) about Imperva's competitive success and (2) the Q1 2014 revenue guidance were false or misleading. *Id*. at 16.[4]

---

[3] The Court reached its conclusion because, as pleaded, the AC suggested that Mr. Schmid had "omitted and/or gloss[ed] over the other alleged reasons for IBM's successes (*i.e.*, lower prices, including through the bundling of products) . . . [creating] a false impression that Imperva's competitive losses were due **solely** to IBM taking CEOs out to golf, rather than IBM's competitive pricing and bundling." *Id*. at 10 (emphasis added). For the reasons discussed *infra*, Section III.B.2, the full context of the statements at issue show that Mr. Schmid *directly acknowledged* pricing is a factor and that IBM's bundling practices could be responsible for wins.

[4] Despite the narrow grounds for amendment set forth in the Order, plaintiff filed a Second Amended Complaint that included additional false and misleading statements and expanded the class period (simultaneously seeking leave to do so). Dkts. 55-56. The Court denied the motion on procedural grounds, but without prejudice. Dkt. 57. Thereafter, plaintiff moved for leave to file a Third Amended Complaint, again including the additional statements and an expanded class period, which motion Defendants opposed. Dkts. 59, 61. On December 23, 2015, the Court issued an order allowing plaintiff to add two statements concerning Imperva's win-loss ratio during the class period (virtually identical to those previously alleged), but denied leave to add an

The TAC was filed on January 13, 2016, again naming Imperva's founder and former CEO (Mr. Kramer), its CFO (Mr. Schmid), and the Company. As before, plaintiff generally alleges that Defendants made a series of materially false and misleading statements during a class period running from May 2, 2013 through April 9, 2014. The statements were made in press releases announcing earnings issued on May 2, August 7 and November 5, 2013, and February 6, 2014, and in analyst and investor conference calls on those days. TAC ¶¶ 88, 92, 94, 100. The TAC also references four technology conferences at which Mr. Schmid spoke, on May 21, November 20 and December 10, 2013 and on March 5, 2014. *Id.* ¶¶ 89, 96-98, 102. The claimed misstatements concern: (1) Imperva's competition with IBM and others, which statements plaintiff alleges were false and misleading throughout the class period, even as the Company was reporting increasing revenues; and (2) the Company's Q1 2014 guidance provided by Mr. Schmid, which plaintiff contends was knowingly false when given. As before, and for the reasons detailed below, plaintiff's allegations remain deficient as a matter of law.

## III. PLAINTIFF HAS FAILED TO STATE A CLAIM UNDER SECTION 10(b)

A motion to dismiss "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). The Court examines the well-pleaded factual allegations, and any materials referenced in the pleading or subject to judicial notice, and "determine[s] whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

In asserting claims for securities fraud under Section 10(b), a plaintiff "must meet the higher, exacting pleading standards" of Rule 9(b) and the PSLRA. *Oregon Pub. Emps. Ret. Fund v. Apollo Group, Inc.*, 774 F.3d 598, 603 (9th Cir. 2014); *see Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).[5] The PSLRA imposes stringent pleading requirements that are designed to "filter out the unfounded [suits] early enough to avoid huge litigation expenses." *Ronconi v. Larkin*, 253 F.3d 423, 428 (9th Cir. 2001).

Among other things, the PSLRA requires plaintiffs to identify "each statement alleged to

---

earlier statement along similar lines or to expand the class period. Dkt. 63.
[5] A Section 10(b) claim requires: (1) a material misrepresentation or omission; (2) scienter; (3) purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

have been misleading, [and] the reason or reasons why [it] is misleading" (15 U.S.C. § 78u-4(b)(1)(B)), including specific contemporaneous facts showing that the challenged statements were false when made. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1071-72 (9th Cir. 2008). *See In re Rigel Pharms. Inc. Sec. Litig.*, 697 F.3d 869, 876-77 (9th Cir. 2012).

Plaintiffs must also establish a "strong inference" that each alleged misstatement was made with scienter (15 U.S.C. § 78u-4(b)(2)(A)), "the nefarious mental state necessary to constitute securities fraud." *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 391 (9th Cir. 2002); *see Rigel*, 697 F.3d at 877; *Oregon Pub.*, 774 F.3d at 604, 607-08. Plaintiff must plead facts showing that defendants intentionally made false statements or acted with deliberate recklessness tantamount to actual intent. *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 976-77 (9th Cir. 1999); *Oregon Pub.*, 774 F.3d at 608. Scienter must be established as to *each* defendant (*Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 743, 745 (9th Cir. 2008)) and the necessary strong inference "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

The PSLRA also creates a two-pronged "safe harbor" protecting forward-looking statements. Statements – such as earnings guidance – are not actionable if identified as forward-looking and "accompanied by meaningful cautionary" language. Even absent such language, to encourage companies to provide guidance and other prospective information, the PSLRA requires plaintiffs to plead specific facts showing a speaker had *actual knowledge* that a forward-looking statement was false when made. *See* 15 U.S.C. § 78u-5(c)(1)(A)(i); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010). If the first safe harbor prong applies, however, a statement is not actionable irrespective of the speaker's state of mind (*i.e.*, scienter is "irrelevant.") *Id*. at 1112.

The PSLRA thus changes the way in which pleadings are analyzed and represents a "deviation from the usually lenient requirements of federal rules pleading." *Ronconi*, 253 F.3d at 437. "In few other areas are motions to dismiss … so powerful." *Id.*

**A.      Imperva's Forward-Looking Guidance For Q1 2014 Is Not Actionable**

At the outset of the February 6, 2014 earnings call, the Company expressly indicated that

it would be making "forward-looking statements regarding future events and future financial performance of the Company" and that such projections were "subject to material risks and uncertainties that could cause actual results to differ materially from those in the forward-looking statements." Ex. N at 2.  Stockholders were also directed to "risk factors" described in the Company's accompanying press release and its most recent Form 10-Q filed with the SEC, which emphasized that the market for Imperva's products "is intensely competitive" by virtue of competition with IBM and others and that competition was expected "to intensify in the future." *Id.*; *see* Ex. G (Ex. 99.2); Ex. F at 35-52.

Those were not the only risks described by the Company.  Imperva's specific disclosures regarding its projections of future financial results were similarly robust, and noted that:

> ***Our revenues and operating results could vary significantly from period to period*** as a result of a variety of factors, many of which are outside of our control. As a result, ***comparing our revenues and operating results on a period-to-period basis may not be meaningful, and you should not rely on our past results as an indication of our future performance***. ***We may not be able to accurately predict our future revenues*** or results of operations . . ..

Ex. F at 36 (emphasis added).  Such warnings brought the Company's Q1 2014 projection of $36 million to $37 million, provided by Mr. Schmid on the February 6, 2014 conference call, well within the safety of the "first prong" of the PSLRA safe harbor.  *Cutera*, 610 F.3d at 1108, 1112-13 (no claim when guidance references meaningful cautionary language); *see Teamsters Local. Nos. 175 & 505 Pension Fund v. The Clorox Co.*, 353 F.3d 1125, 1132-33 (9th Cir. 2004) (holding that such warning was sufficient to invoke the safe harbor).  *See also* Order at 13-14. Once the safe harbor applies, that ends the inquiry. *Cutera*, 610 F.3d at 1112-13 (scienter need not be evaluated where statement falls within the safe harbor's first prong); *Union Asset Mgmt. Holding AG v. Sandisk Corp.*, 2016 WL 406283, at *3 (N.D. Cal. Jan. 22, 2016) (dismissing claims based on guidance where accompanied by meaningful cautionary language).

Here, plaintiff persists in arguing that the Q1 2014 projections are actionable nonetheless because there was "no real basis for the outsized guidance." TAC ¶ 104 n.20.  Not only does that claim disregard the application of the safe harbor, but as set forth above, Imperva achieved sequential and year-over-year revenue growth in all quarters of the class period in 2013, with

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

results that met or exceeded guidance in each period.  Even plaintiff concedes that the reported financial results were "strong" and "impressive" in each quarter of 2013.  *Id.* ¶¶ 44, 50, 62, 70.  Notwithstanding those proven results, plaintiff relies on a faulty mathematical premise to allege that the Company's SecureSphere revenues would have needed to grow by at least 25.9% to meet guidance and that such growth "was simply unattainable."  *Id.* ¶ 104.

Plaintiff's exercise in speculation fails. As with the Company's guidance in prior periods, the Q1 2014 guidance was Company-wide and did not purport to differentiate among one product line or another. *See* TAC ¶ 100.  If anything, those projections were perfectly in line (if not conservative) when compared to the total revenue growth the Company experienced in 2013, including transactions in excess of $100,000 involving SecureSphere.[6]  In 2013, total revenues grew by over 32% and large deals increased by 34% notwithstanding plaintiff's blanket claim that the same competitive environment plagued Imperva throughout the class period.  *See* Ex. G (Ex. 99.2).  The forecast for the first quarter of 2014 was entirely consistent with that momentum.  In fact, "products and license" revenues grew over 29% in Q4 2013 (*i.e.*, well over 25.9%), the period ending just prior to the Q1 2014 guidance, lending further support to the notion that the guidance was reasonable. *See* Ex. H at 54.  Imperva's business also grew in Q1 2014 (albeit at a rate lower than anticipated).  Revenues were $31.5 million (up from $28.6 million in the comparable period), the Company added 171 new customers (up from 148), and it booked 67 deals in excess of $100,000 (up from 64).  *See* Ex. Z (Ex. 99.01).

By contrast to these unassailable facts, the 25.9% growth rate that plaintiff arrives at to suggest there was "no reasonable basis" for the guidance is pure fiction.  That figure relies on the false assumption that Imperva's "products and license" revenues (*i.e.*, SecureSphere sales) will

---

[6] At the outset of the class period, Imperva announced revenues of $28.6 million for Q1 2013 (up 33% from $21.5 million in the comparable period a year earlier), it added 148 new customers (up 66%), and it booked 64 deals over $100,000 (up from 57). Ex. A. In Q2 2013, revenues increased to $31.3 million (up 28% from $24.6 million), it added 185 new customers (up 46%), and entered into 76 deals in excess of $100,000 (up 36%). Ex. C. In Q3 2013, revenues increased to $35.1 million (up 33% from $26.3 million), it added 148 new customers (up from 138 the prior year), and entered into 97 deals over $100,000 (up 39%). Ex. E. In Q4 2013, revenues were $42.7 million (up 34%), the Company added 237 new customers (compared to 199), and booked 136 deals over $100,000 (up 43%). Ex. G.  For the full year, revenues increased to $137.8 million (up 32% from $104.2 million), 718 new customers were added (up 30%), and the Company entered into 373 deals over $100,000 (up 34%). *Id.*

always account for the same percentage of its business.  *See* TAC ¶ 104 n.20.  Even plaintiff concedes, however, that the Company's business was constantly changing, not static.  *See, e.g.*, *id.* ¶¶ 34-35 (noting the relative contributions to revenue of Imperva's SecureSphere and cloud solutions had shifted over time and acknowledging the "evolving nature of cyber-security").  For that reason alone, plaintiff's math, which rejects the possibility of change in an admittedly evolving market, should be rejected.  *See Plevy v. Haggerty*, 38 F. Supp. 2d 816, 829 (C.D. Cal. 1998) ("As the Ninth Circuit has recognized, markets and consumer demand move swiftly in the high-technology area."); *Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815, 832 (S.D. Cal. 2006) (recognizing market conditions change and affect companies), *aff'd*, 256 F. App'x 74 (9th Cir. 2007).

Because it has no facts, plaintiff appears to pin all hopes for this argument on this Court's prior Order, which noted that some speculation may be permissible under the PSLRA, so long as the facts underlying such claims are stated with specificity.  Order at 15.  Were plaintiff relying on a factually coherent theory, that might apply.  But here, plaintiff does not purport to rely on the *actual* information used by Mr. Schmid to provide guidance.  Rather, the sole support for its claim that Q1 2014 guidance was false (the 25.9% predicted growth rate) is the product of a mathematical exercise that does not withstand scrutiny.  For plaintiff's math to be relied upon as meaningful for Q1 2014, for example, it should yield the same results when applied to guidance in other periods.  When applied to 2013, however, plaintiff's formula predicts growth rates for SecureSphere that are completely inconsistent with (and in most cases well above) the actual results achieved, even though ***it is undisputed*** that the Company met or exceeded guidance in every quarter of 2013.  Specifically, plaintiff's same model[7] would have required SecureSphere revenue growth of 24.8% (Q1 2013); 23% (Q2 2013); and 29% (Q3 2013) for guidance to have been accurate in the first three quarters of 2013.  But actual SecureSphere revenues were significantly below those growth levels, sometimes by double digits: 17.4% (Q1 2013); 11.6% (Q2 2013); and 23.8% (Q3 2013).  The fact that the Company ***still exceeded guidance*** in each of

---

[7] Here, applying the lowest quarterly percentage contribution of products and license revenue in 2012 (*i.e.* 55.71%) against guidance in each of Q1, Q2, and Q3 2013 to calculate the required growth rate for SecureSphere in those quarters.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   those periods is undeniable proof that, when it comes to pleading that the Company-wide

2   guidance provided by Mr. Schmid was "unattainable" at the time it was provided, plaintiff's math

3   just does not add up.

4       In short, the guidance was accompanied by meaningful cautionary language that placed it

5   squarely within the safe harbor, and for this reason alone fails. In addition, because not a single

6   fact is offered that reasonably calls that guidance into question, plaintiff yet again fails to state a

7   claim based on the Q1 2014 projections. *See In re Bare Escentuals Sec. Litig.*, 745 F. Supp. 2d

8   1052, 1076 (N.D. Cal. 2010) (dismissing claims in the absence of "particularized allegations that

9   would demonstrate 'how' or 'why' defendants' alleged statements… were false when made.").

10      **B.    Statements About Imperva's Competition With IBM Were Not Misleading**

11      The bulk of plaintiff's remaining allegations concern putative misstatements about

12  Imperva's competition with IBM and others. Plaintiff alleges misrepresentations in connection

13  with Imperva's win-loss ratio against IBM throughout the class period (TAC ¶¶ 2, 4, 5, 11, 44,

14  46-49, 54, 67, 90, 93, 99, 103), including various statements (by Mr. Kramer) that the Company's

15  win-loss ratio remains "strong" or "very strong" (*id.* ¶¶ 88, 92, 94, 100) and statements (by Mr.

16  Schmid) that the Company "beat IBM four out of five times" in head to head competition (*id.* ¶¶

17  46, 66, 74, 89, 98, 102). Plaintiff also assails certain statements by Mr. Schmid at analyst

18  conferences, claiming he misleadingly attributed IBM's success to "taking the CEO to Augusta

19  National to play a round of golf" or "political connections," but failed to acknowledge that IBM

20  might be winning due to a successful discounting/bundling strategy. *See, e.g., id.* ¶¶ 98-99.

21      **1.    The Win-Loss Ratio Statements Are Not Actionable**

22      As a preliminary matter, as this Court has found, the only statements attributed to Mr.

23  Kramer, "are the type of vague, optimistic, subjective assessments" that have been found

24  incapable of objective verification, and thus "not actionable under the securities laws." Order at

25  10 (citing *Oregon Pub.*, 774 F.3d at 606); *see also Lloyd v. CVB Fin. Corp.*, --- F.3d ----, 2016

26  WL 384773, at *5 (9th Cir. Feb. 1, 2016) (same). On this basis alone, all claims against Mr.

27  Kramer should be dismissed. But further, plaintiff offers no facts, witnesses, documents, data or

28  any other information showing that the Company *did not* have a "very strong" or "four out of

five" win-loss ratio against IBM. *See Mazzaferro v. Aruba Networks, Inc.*, 2015 WL 456534, at

*2 (N.D. Cal. Feb. 2, 2015) (rejecting almost identical misrepresentation claim that Aruba was

"losing market share or that Aruba's 'win rate' against Cisco [its larger competitor] was

decreasing" in the absence of specific factual allegations supporting such claims).

Although plaintiff has yet to point to a single purported "fact" establishing that the

Company's win-loss ratio statements (at any time) were false, plaintiff contends the statements

are misleading nonetheless because they "distorted the economic reality of Imperva's competitive

position against IBM." *See, e.g.*, TAC ¶¶ 47, 90 & n.17, 93, 99, 103. In place of facts, this

"distortion" claim relies on a mischaracterization of recent comments by Imperva's current CEO

(Anthony Bettencourt) regarding competition with IBM reaching back years before the period at

issue here. Plaintiff alleges that Mr. Bettencourt revealed that "[Imperva] *lost 203 deals to IBM*

between 2010 and Q1 of 2015," and that they were "*all seven-figure deals*." *Id.* ¶ 4; *see also id.* ¶¶

47, 54, 68, 90 & n.17, 99, 103. From there, plaintiff calculates that Imperva has lost "at a

minimum" $203 million in SecureSphere revenue to IBM. *Id.* ¶ 90 n.17. And, doubling down on

that faulty premise, plaintiff speculates that Imperva would have needed to record over $800

million in SecureSphere revenues for the win-loss ratio to have been accurately stated. *Id.*

Plaintiff's math (once again) is untethered to reality, and therefore does nothing to call the

accuracy of the win-loss statements at issue into question.

As this Court noted in the Order, when determining whether a statement has been

misleading, "context matters." Order at 11 (citing *In re HP Sec. Litig.*, 2013 WL 6185529 (N.D.

Cal. Nov. 25, 2013)). Plaintiff fails to include the *complete* context of a statement whenever

doing so tends to undermine its putative theory of this case.[8] Thus, while it is true that Imperva's

current CEO commented on the *number* of deals Imperva lost to IBM *over the last five years*,

that fact does nothing to undermine statements about Imperva's win-loss ratio in the much

narrower period of *2013 and 2014*. Moreover, because plaintiff points to no statement about the

---

[8] For example, as discussed *infra*, Section III.B.2, only by selectively omitting contemporaneous acknowledgments by Imperva's CFO that *pricing or bundling* may factor into wins by IBM (the very thing plaintiff alleges was concealed), was plaintiff able to create a misimpression that Mr. Schmid failed to accurately describe the competitive dynamic with IBM.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

number of deals Imperva **won** during the 2010-2015 timeframe, it also fails to call into question the win-loss ratio on that account as well. No facts are offered to show that Imperva **did not** win four times as many competitive deals against IBM in the same period. *See also Aruba Networks*, 2015 WL 456534, at *2 (rejecting similar 'win-rate' claim where "[complaint] does not plead facts that would allow the reader to conclude what the plaintiffs assume"). Indeed, even plaintiff concedes the ratio may be "technically accurate." TAC ¶ 4.

Plaintiff's "hypothetical" also does not hold up in light of what Mr. Bettencourt *actually* said about the lost deals:

> [W]e lost 203 deals to IBM between 2010 and Q1 of 2015. Now, obviously, the losses are dialing down as we go forward. **We have won 39 of them back. They are all seven-figure deals if we do this right**.

*See* Ex. V at 9-10 (emphasis added). In other words, Imperva had already recovered about 20% of the missed opportunities, and **those deals** had the potential **in the future** to be **seven-figure deals** if Imperva executed well. Such sentiments are plainly forward-looking and simply do not support the claim that **every deal** lost to IBM over a five year-period was a seven-figure loss.

Finally, if what plaintiff hopes to suggest is that Imperva's win-loss ratio was misleading because the ratio did not include the relative size of each deal, plaintiff offers no facts supporting that claim either. This is not a restatement case. There is no claim that Imperva's reported financial results and publicly disclosed revenues throughout the alleged class period (*i.e.*, the true measure of its "economic reality") were anything but accurate.[9] For this further reason, there can be no claim that Imperva misled investors about its results **at any time**.

### 2. The Political Connections and Golf Statements Are Not Actionable

Plaintiff also fails to state a claim on the basis that Mr. Schmid failed to disclose that IBM

---

[9] In this respect, the claim that Imperva was secretly "shifting" its business from large, on-premise deals (SecureSphere) to smaller, cloud-based solutions (Incapsula) remains a red herring. *See* TAC ¶¶ 68, 105. Growth in the cloud-based subscription business (from 2.3% of net revenues in Q4 2011 to 8.8% by Q4 2013 and 14.5% by Q1 2014) was a function of evolving customer demand and those results were regularly disclosed. *See* Ex. O at 54; Ex. H at 54; TAC ¶¶ 3, 34, 68, 105. Product and license revenues (including SecureSphere) were also regularly disclosed. *See, e.g.,* Ex. H at 54; TAC ¶ 3. Plaintiff appears to suggest that a drop in the relative contribution of SecureSphere to total net revenues (from 63% at the time of the IPO) (TAC ¶ 3) is somehow attributable to competition with IBM or others, but there is no factual basis for that allegation identified in the TAC, and it ignores that IBM and others compete with the Company for cloud-based storage as well. Accordingly, such allegations remain a roadmap to nowhere.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

also may be competing with Imperva based on discounting or bundling. Throughout the TAC, plaintiff attempts to create the appearance of specificity, repeatedly incanting the allegation that IBM allegedly secured deals through "aggressive discounting/bundling practices" that allowed customers to "defer costs" and faulting Defendants for not disclosing these competitive pressures. *See* TAC ¶¶ 2, 6-8, 46, 64-67, 75, 89, 96-99. But this allegation is again entirely vague and conclusory. No details whatsoever are offered about IBM's prices, the customers involved, which customers (if any) elected to use IBM instead of Imperva as a result, or who at Imperva knew about IBM's pricing proposals to customers (much less how or when they knew of them). Nor is the allegation bolstered by the suggestion that unidentified "sales representatives" were "missing their sales quotas" in unspecified ways at unspecified times – especially absent any facts tying such quotas to Imperva's guidance. *See id.* ¶¶ 49, 91, 93, 111. Indeed, the Company's business grew and sales were robust throughout the class period. Such "vague allegations of deception" have been repeatedly rejected as insufficient. *See Bare Escentuals*, 745 F. Supp. 2d at 1076; *In re Silicon Storage, Inc. Sec. Litig*, 2007 WL 760535, at *8 (N.D. Cal. Mar. 9, 2007).

Moreover, the fact that Imperva faced intense competition from IBM and others (*see* TAC ¶¶ 42, 46, 89, 97), and that those competitors may price their products more aggressively or under a different model, was publicly disclosed throughout the class period. For example, Imperva's Form 10-Q for Q1 2013, filed May 9, 2013, disclosed:

> [t]he market . . . **is *intensely competitive and we expect competition to intensify in the future.*** Our competitors include companies such as . . . F5 Networks, Inc., International Business Machines Corporation ("IBM"), McAfee, Inc. . . . and other point solution security vendors.

Ex. B at 34 (emphasis added). The Company specifically warned that "some of our larger competitors have substantially broader product offerings and leverage their relationships based on other products . . . in a manner that discourages customers from purchasing our products" (*i.e.*, **bundling**) and might compete with Imperva by "pric[ing] their products more competitively than ours, or have an entirely different pricing or distribution model" (*i.e.*, **discounting**). *Id.* These disclosures were repeated in all of the Company's quarterly and annual reports filed with the SEC during the class period. *See* Ex. D at 38-39; Ex. F at 37-38; Ex. H at 13-14. The Company also

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

told investors that "IBM is the most competitive technically," was its "biggest competitor," and "publicly acknowledged" that it was "paying attention to IBM's security strategy." *See* TAC ¶¶ 58, 64. Thus, in addition to being hopelessly vague, plaintiff's allegations fail because *the very information at issue was publicly disclosed*. *See Oregon Pub.*, 774 F.3d at 607 (no claim stated where information publicly disclosed); *Aruba Networks*, 2015 WL 456534, at *1-2 (rejecting claim that defendants "deflected and dissembled" about how Aruba was faring against Cisco where discounting and bundling risks were disclosed in SEC filings and where it was "no secret" that "Cisco used its advantage as a larger and more established company to avoid a pure head-to-head competition . . . by bundling" other products with the competing product).

Notwithstanding that plaintiff offers no specific facts to support such claims in the TAC, plaintiff takes aim at Mr. Schmid, alleging that statements he made to analysts about IBM's "political connections" and ability to take clients "out to golf" were misleading because he omitted to flag that IBM might be competing by discounting or bundling. *See, e.g.*, TAC ¶ 96 (suggesting Mr. Schmid claimed IBM "could succeed against Imperva *only* by using its 'political connections'"); *Id.* ¶ 98 (suggesting Mr. Schmid claimed that "[i]t was *only* because IBM 'may be taking the [potential customers'] CEO to Augusta National to play a round of golf' that Imperva lost SecureSphere deals to IBM). This Court addressed those statements in the Order and found them potentially misleading but emphasized that "context matters." Order at 3, 9-11 (citing *In re HP Sec. Litig.*, 2013 WL 6185529, at *9). Review of the *complete* text of Mr. Schmid's statements (in context and not just the select excerpts plaintiff features in the TAC) reveals that he did not attribute IBM wins to "political connections" or "golf" alone.

For example, Mr. Schmid's "political connections" comment (TAC ¶ 96) was in direct response to a question about whether competitors were winning against Imperva's *technology* in head to head competition, to which Mr. Schmid responded that competitors "rely a little bit more on their political connections and a little less on their innovations to compete." *See* Ex. W at 7-8. But the discussion did not stop there. After the moderator commented that the industry values technology over price, Mr. Schmid agreed, but noted that *"in very, very large deals"* (*i.e.*, the very types of deals plaintiff complains about here) *"pricing becomes a very significant factor."*

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Id*. at 8. Read in context, it is clear that Mr. Schmid did not suggest that political connections *alone* were responsible for competitor wins or that pricing was not a factor in November 2013.

So too, plaintiff's recitation of the alleged "golf" comment in December 2013 omits a critical portion of the discussion (not to mention Imperva's extensive disclosures throughout the class period). Mr. Schmid was directly responding to a question about whether IBM may be "bundling services." *See* TAC ¶ 98 (omitting moderator's question about bundling, to which Mr. Schmid was responding) *compare* Ex. X at 6-7. Thus, when Mr. Schmid responds: "***They may be doing that*** and they may be taking the CEO to Augusta National to play a round of golf,*" **he is directly acknowledging** the very fact plaintiff claims he omits – that IBM may be bundling to compete. Read in context, Mr. Schmid's comments cannot reasonably be understood to suggest that the only way IBM competes is by taking "the CEO to Augusta National." *See* TAC ¶¶ 98-99. In sum, the *complete* context undermines any omissions claim.

### C.     Plaintiff Does Not Allege Facts Raising A Strong Inference Of Scienter

To plead fraud under the PSLRA, plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" as to "each act or omission." *Oregon Pub.*, 774 F.3d at 604, quoting 15 U.S.C. 78u-4(b)(2)(A). The facts must show that misstatements were intentional or made "with deliberate recklessness." *Id.* at *6. Consistent with *Tellabs,* the "strong inference" standard requires careful examination of all relevant facts – including materials referenced in the complaint or subject to judicial notice – to determine whether they rationally support a theory of fraud. The relevant facts are to be weighed "holistically," including inferences unfavorable to plaintiff, to determine whether the inference of fraud is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314; *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002).

Here, plaintiff's theory of scienter is wholly undermined by these governing standards. According to the TAC, Defendants supposedly hyped Imperva's win-loss ratio against IBM in order to inflate its stock value to acquire Skyfence and the remaining shares of Incapsula (already 80% owned by the Company). *See* Ex. P at 1; TAC ¶¶ 109, 119. However, because none of Mr. Kramer's alleged win-loss statements are actionable, any motive plaintiff seeks to impute to him

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

on this basis is immaterial as a matter of law. *See supra* at 14; *Janus Capital Group v. First Deriv. Traders*, 131 S. Ct. 2296, 2302 (2011). The Skyfence deal also resulted in Mr. Kramer *substantially increasing* his Imperva holdings. TAC ¶¶ 31, 72. As an early investor and significant stockholder of Skyfence, he received 252,669 Imperva shares (worth $12.1 million, per the TAC) when the acquisition closed in February 2014. *Id.* ¶ 120. In other words, plaintiff contends Mr. Kramer purposely inflated Imperva's stock price only to *acquire* the allegedly inflated shares when Skyfence was sold. Such an irrational theory of scienter has no support in the case law.[10]

### 1. The Facts Fail To Show That Q1 2014 Guidance Was Knowingly False

Guidance numbers or forecasts of revenue are by definition forward-looking statements. 15 U.S.C. § 78u-5(c)(1); *Cement Masons & Plasterers Joint Pension Trust v. Equinix, Inc.*, 2012 WL 685344, at *4 (N.D. Cal. Mar. 2, 2012). Because the Q1 2014 guidance provided by Mr. Schmid was forward-looking and accompanied by meaningful cautionary language, Ninth Circuit precedent holds that the state of mind of the speaker need not be considered, as the statement is not actionable as a matter of law under the safe harbor. *Cutera*, 610 F.3d at 1112-13.

Even absent cautionary language, projections cannot be the basis for liability unless shown to be knowingly false. *Bare Escentuals*, 745 F. Supp. 2d at 1080. For all the reasons set forth in Section III. A, *supra*, plaintiff fails to allege facts giving rise to a strong inference that Mr. Schmid knew the guidance provided on February 6, 2014 was unreasonable at the time (and, since Mr. Schmid is not alleged to have traded or profited in any way, plaintiff offers no credible motive for acting with scienter). *See Ronconi*, 253 F.3d at 432; *Verona Partners, LLC v. Tenet Capital Partners Convertible Opportunities Fund LP*, 2006 WL 2669035, at *13 (N.D. Cal. Sept. 18, 2006) (facts must show "that defendants had knowledge of…the falsity of public statements at the time they were made"). As to Mr. Kramer, plaintiff does not allege that he made any forecast, much less did so with scienter. *See Janus*, 131 S. Ct. at 2302 (defendant who does not "make" challenged statement is not subject to § 10(b)). The "guidance" allegations therefore fail.

---

[10] Mr. Kramer owned 43% of Skyfence and was set to receive only Imperva stock in the deal (532,263 shares). TAC ¶ 72. Later, the deal was amended to conform with NYSE listing rules, but even then, he still received 252,669 Imperva shares. *See* Ex. Q at 1-2; TAC ¶¶ 72, 76, 120.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## 2. The Trading Allegations Negate Any Inference Of Scienter

Efforts to suggest that Mr. Kramer's stockholdings and trading support a strong inference of fraud also backfire. Mr. Kramer **actually acquired more shares than he sold during the class period**, posing a conundrum that neither case law nor logic allows plaintiff to finesse. Such facts are inconsistent with a belief that Imperva's stock price was artificially inflated, and "instead gives rise to an inference of good faith." *Zack v. Allied Waste Indus., Inc.*, 2005 WL 3501414, at *14 (D. Ariz. Dec. 15, 2005), *aff'd*, 275 F. App'x 722 (9th Cir. 2008).[11]

Even ignoring that devastating fact – as plaintiff does – the notion that Mr. Kramer had a financial motive to inflate the Company's stock fails as a matter of law. Only "unusual" or "suspicious" insider trading can support an inference of scienter. *See Silicon Graphics*, 183 F.3d at 986 (trading is "suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information"); *In re Downey Sec. Litig.*, 2009 WL 2767670, at *13 (C.D. Cal. Aug. 21, 2009) ("a strong inference of scienter is negated when there is an absence of stock sales or where such sales are minimal").[12]

Here, Mr. Kramer held over 3.7 million Imperva shares as of March 31, 2014. Ex. R at 41. Plaintiff – who estimates Mr. Kramer's net worth at $1 billion (TAC ¶ 36) – asserts he sold a total of 200,000 shares during the class period for proceeds of about $10 million (half in January 2014 and half in early April 2014) – **about 5%** of his overall Imperva holdings. TAC ¶ 121. Courts repeatedly find sales of much larger magnitudes not indicative of scienter. *See, e.g.*, *Silicon Graphics*, 183 F.3d at 987 (sale of 43.6% not suspicious); *In re Skechers U.S.A., Sec. Litig.*, 273 F. App'x 626, 628 (9th Cir. 2008) (sale of 42% did not support scienter). Put another way, Mr. Kramer **retained 95%** of his Imperva shares (including those received in the Skyfence deal), and saw them decline in value by $79.8 million. This too is inconsistent with scienter. *See, e.g., Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1043 (N.D. Cal. Mar. 22, 2012) ($22

---

[11] Plaintiff *admits* that Mr. Schmid did not sell any stock in Q1 2014, so no scienter can be found as to him on that basis. TAC ¶ 122. What plaintiff fails to note is that Mr. Schmid **received** 30,000 options in Q1 2014 (at $54.66), a fact inconsistent with fraud. *Zack*, 2005 WL 3501414, at *14 (acquisitions at allegedly inflated prices negate scienter). *See* Ex. Y.

[12] In determining whether sales are suspicious, courts consider: (1) the amount and percentage of shares sold; (2) the timing of sales; and (3) consistency with prior trading history. *See City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1069 (N.D. Cal. 2012).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

million sale did not support scienter where vast bulk of holdings retained), *aff'd*, 561 F. App'x 598 (9th Cir. 2014); *Tripp v. Indymac Fin. Inc.*, 2007 WL 4591930, at *4 (C.D. Cal. Nov. 29, 2007) ("scienter is functionally negated" by retention of large stock holdings).

Plaintiff's attempt to rely on the timing of Mr. Kramer's April 2014 sales, just prior to the April 9 release, is also misplaced as those sales were pursuant to a Rule 10b5-1 trading plan. *See* TAC ¶ 122; Ex. S at 2 n.1; Ex. T at 2 n.1. Such sales are pre-determined and non-discretionary (*i.e.*, entered in advance and made automatically according to the plan), and thus negate scienter because they provide an "innocent, alternative explanation" for the trades. *Kovtun v. VIVUS, Inc.*, 2012 WL 4477647, at *21 (N.D. Cal. Sept. 27, 2012), *aff'd sub nom.*, 591 F. App'x 592 (9th Cir. 2015); *City of Royal Oak*, 880 F. Supp. 2d at 1069, citing *Metzler*, 540 F.3d at 1067 n.11; *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1117 (N.D. Cal. 2003). The throwaway claim that Mr. Kramer's trading plan can be disregarded because "he cannot establish that he was not aware of the facts . . . before entering into such plan" flips the pleading burden on its head. *See* TAC ¶ 122. *Plaintiff* must establish the trades were suspicious under all the circumstances, and it simply has not and cannot do so.

### 3. Mr. Kramer's Alleged "Insight" Into IBM Does Not Support Scienter

Plaintiff's attempt to plead scienter by attacking Mr. Kramer's success in the cyber-security industry and connections to the Israeli technology community also fail. *See* TAC ¶¶ 37-38, 56-60, 116-18. Those allegations show only that Mr. Kramer is an innovator, who founded or funded companies (like Imperva) that have been quite successful, and as a result, he has accumulated considerable wealth. *See id.* ¶¶ 9, 26, 36. If anything, these allegations eviscerate the notion that Mr. Kramer had an incentive to engage in fraud: there is no reason, financial or otherwise, for him to risk a sterling reputation as a technology "guru" (*id.* ¶ 36) to commit fraud, much less by *acquiring* more shares than he sold and watching his holdings decline *$79.8 million*.

Likewise ineffective are claims based on IBM's August 2013 purchase of Trusteer, a company in which Mr. Kramer invested and was a director. *See* TAC ¶¶ 9-10, 32, 56-57, 59-61, 69, 76, 79-80, 117-18. Plaintiff speculates that this transaction (which was publicly disclosed) somehow gave Mr. Kramer "unique insight into the developments of Imperva's primary

competitor" and, from that unsupported premise, leaps to the equally untenable conclusion that Mr. Kramer therefore "knew" the Company statements regarding Imperva's business or competitive edge were false. *See* TAC ¶¶ 79, 116-18. Not only is IBM not known to be in the business of "sharing insights" with competitors, plaintiff's theory is utterly devoid of specifics. No facts show Mr. Kramer knew how IBM intended to market or price its products after acquiring Trusteer, what customers it planned to target, or any other information of significance. Ignoring the need for such necessary details, plaintiff also fails to reconcile its theory with the fact that Imperva continued to perform well *even after* IBM purchased Trusteer. Indeed, nothing announced on April 9 is alleged to have had anything to do with IBM's purchase of Trusteer or supposed "insights" Mr. Kramer derived therefrom. In sum, the Trusteer allegations are an essay in speculation, not a pleading of particularized facts. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) (rejecting claims which did not "plead, in any detail, the contents of any such report or the purported data" to which defendants had access); *Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 923-25 (N.D. Cal. 2012), *modified in part on reconsideration* (Jan. 10, 2013) (mere access to information is not enough to create a strong inference of scienter).

In any event, it is well-established that Defendants were not obligated to predict what IBM would or would not do, even assuming they had any "insight" into IBM's strategy. *See In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1406-07 (9th Cir. 1996) ("a company is not required to forecast future events or to caution that future prospects [may not be] as bright as past performance . . . [A]nother company's plans cannot be known to a certainty"); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 65 F. Supp. 3d 840, 859 (N.D. Cal. 2014) (knowledge of increasing competition insufficient to support a strong inference of scienter).[13]

### 4. The "Core Operations" Claims Fail To Raise An Inference Of Scienter

Plaintiff's attempt to invoke the "core operations" doctrine – by asserting Defendants knew of supposed misstatements because, as "[h]igher-level executives," they occasionally met with

---

[13] As noted, *supra*, Section III.B.2, Imperva warned investors throughout the class period that IBM was its chief competitor, disclosures entirely inconsistent with plaintiff's theory. *See* TAC ¶¶ 58, 64; *and see Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1136 (S.D. Cal. 2012) (matters publicly disclosed in SEC filings fail to raise a strong inference of scienter), *aff'd sub nom.*, 607 F. App'x 694 (9th Cir. 2015).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

"CIOs" or had access to Salesforce.com – fails. TAC ¶¶ 8, 112-15. 124-27. The doctrine applies only in "rare circumstances" where facts show the existence of adverse information so "prominent … that it would be 'absurd to suggest' that top management was unaware" that their statements were false. *Zucco*, 552 F.3d at 1001 (citing *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989 (9th Cir. 2008)). By contrast, where the "complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard." *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).

This case is about one earnings miss attributed to extended customer purchasing decisions and sales execution challenges in the U.S. in a single quarter. *See* TAC ¶¶ 77, 106. Imperva performed well both before and after that period, suffered no catastrophic setbacks, and its stock price soon rebounded. The "core operations" theory is inapplicable on these facts, and thus is no substitute for plaintiff's obligation to plead specific facts raising a strong inference of scienter. *See Glazer*, 549 F.3d at 746 ("[g]eneral allegations of defendants' 'hands-on' management style … are insufficient to create strong inference of scienter") (quoting *In re Daou Sys. Inc. Sec. Litig.*, 411 F.3d 1006, 1022 (9th Cir. 2005)); *Metzler*, 540 F.3d at 1068 ("management's general awareness of the day-to-day workings of the company's business does not establish scienter.").[14]

### 5. Holistic Review Does Not Save Plaintiff's Deficient Scienter Showing

The PSLRA requires a "holistic" review of all facts, including nonculpable explanations, to determine whether, viewed as a whole, they support a strong inference of fraud. *Tellabs*, 551 U.S. at 314; *Oregon Pub.*, 774 F.3d at 607-08. Such scrutiny disposes of plaintiff's claim.

At its core, plaintiff's theory is that Defendants lied about Imperva's ability to compete with IBM and others throughout the class period, even though it had record quarterly revenues throughout 2013. Then, plaintiff alleges, Mr. Schmid gave "inflated" guidance for Q1 2014 to help acquire Skyfence for stock and Mr. Kramer received 252,669 of those "artificially inflated" shares *knowing* his total Imperva holdings faced an imminent drop (ultimately, $79.8 million).

Only concrete facts showing purported misstatements were made knowingly or with

---

[14] Given that this is the sole scienter theory aimed at Mr. Schmid, the claims as to him fail.

deliberate recklessness could support such an implausible fraud claim.  But the TAC is devoid of such details.  Not a single confidential witness, document, data source or internal communication is identified to corroborate a single allegation.  *See City of Roseville Emp. Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1132 (E.D. Wash. 2013) (rejecting scienter showing where no witnesses or documents showed the defendants "were apprised of adverse financial information which they then failed to communicate to the public").  Therefore, whether viewed individually or holistically, the TAC fails as a matter of law.

### D.    Plaintiff Cannot Establish Loss Causation

Plaintiff's inability to plead loss causation – that a "revelation of fraudulent activity" proximately caused Imperva's stock price decline – is an independent basis for dismissal.  *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014).  Like all other elements of a Section 10(b) claim, loss causation must be pleaded with specificity.  *Oregon Pub.*, 774 F.3d at 604-05.  Stock drops can be caused by myriad factors entirely unrelated to fraud.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005).  Thus, to recover under Section 10(b), the facts must show a "causal connection between the material misrepresentation and the loss."  *Id.* at 342.  *See also Metzler*, 540 F.3d at 1062-63.  The question is whether "the market learned of and reacted to th[e] fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally."  *Id.* at 1063.  *See also In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010) ("Loss causation requires more than an earnings miss"); *Loos*, 762 F.3d at 887-88 (requiring a revelation of "fraudulent *practices* as opposed to the financial impact of those practices"); *CVB Fin. Corp.*, 2016 WL 384773, at *8 ("the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss.").

Plaintiff's loss causation argument proceeds on the precise theory discredited by the Supreme Court in *Dura* and echoed by the Ninth Circuit in *Oregon Pub.*, *Metzler, Oracle* and *Loos*.  Though plaintiff contends the April 9 announcement revealed "fraudulent conduct" to the market, Imperva merely noted it would miss its Q1 2014 estimate due to "extended sales cycles," intensifying competition, and domestic "sales execution challenges" but said ***nothing whatsoever*** to suggest ***improprieties*** in connection with those results. *See* TAC ¶¶ 128-30.  *In re Rackable*

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Sys., Inc. Sec. Litig.*, 2010 WL 3447857, at *12 (N.D. Cal. Aug. 27, 2010) (news of missed earnings due to increased competition may show "correlation between [an] announcement of financial results and a decrease in stock price" but "do[es] not reveal the necessary causal link between the alleged fraud and the drop in . . . stock price" for purposes of loss causation).

Indeed, not one of the purportedly hidden or misrepresented facts plaintiff broadly asserts as the basis for its claim was even addressed on April 9. *See* TAC ¶ 106; Ex. K (Ex. 99.1). There is *no* mention of deals lost to IBM or any other competitor. The *only* thing Imperva revealed is that it would miss the Q1 2014 guidance provided on February 6, 2014. That "revelation" not only fails to suggest fraud or misconduct, it cannot support loss causation as to earlier alleged misstatements such as the results throughout 2013 (which plaintiff admits were "strong" and "impressive" – TAC ¶¶ 44, 50, 62, 70). *Loos*, 762 F.3d at 887-88 (no loss causation based on theory that "disappointing financial results signaled that the company lacked the 'growth drivers and profitability' that it had previously claimed").[15]

## IV. CONCLUSION

Like its predecessor, plaintiff's TAC is devoid of specifics and relies on an unsupported and irrational theory of fraud.[16] It should be dismissed without further leave to amend.

Dated: February 10, 2016   FENWICK & WEST LLP

         By: /s/ *Jennifer C. Bretan*
           Jennifer C. Bretan, Esq.

         Attorneys for Defendants Imperva, Inc.,
         Shlomo Kramer and Terrence J. Schmid

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

---

[15] Also ineffective is plaintiff's attempt to transform Mr. Kramer's comment on the "'strong performance . . . in sales of subscription products" into a dire revelation about SecureSphere. *See* TAC ¶¶ 13, 77, 106. The mere fact that subscription-based products gained traction in Q1 2014 – and thus grew as a percentage of Imperva's overall business – does not support an inference that other products performed poorly that quarter. *See In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (rejecting claims "'merely consistent' with [plaintiffs'] favored explanation but . . . also consistent with the alternative explanation."). Accordingly, plaintiff does not (and cannot) plead the necessary element of loss causation. *See Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1046 (N.D. Cal. 2012) (loss causation absent where allegations fail to show "the market became aware of the alleged fraud" and where "'far more plausible' reason for 'drop in [] stock price [was that] company failed to hit prior earnings estimates.
[16] Plaintiff fails to plead a violation of Section 10(b), thus the Section 20(a) control person claim also fails. *Paracor Fin. Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996).