UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

VISWANATH V. SHANKAR,

    Plaintiff,

    v.

IMPERVA, INC., et al.,

    Defendants.

Case No. 14-cv-1680-PJH

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS THIRD AMENDED COMPLAINT**

Defendants' motion to dismiss the third amended complaint came on for hearing before this court on March 30, 2016. Plaintiff Viswanth Shankar ("plaintiff") appeared through his counsel, Douglas Britton and Ashley Price. Defendants Imperva, Inc., Shlomo Kramer, and Terrence Schmid ("defendants") appeared through their counsel, Jennifer Bretan and Deborah Kang. Having read the papers filed in conjunction with the motion and carefully considered the arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS in part and DENIES in part defendants' motion as follows.

## BACKGROUND

Plaintiff, on behalf of himself and those similarly situated, filed this action against defendants on April 11, 2014, alleging that defendants violated sections 10(b) and 20(a) of the Securities Exchange Act and Securities and Exchange Commission Rule 10b-5 by making false and misleading statements regarding the company's operations and business and its financial results.

The facts underlying this case were set forth in detail in the court's order granting defendants' previous motion to dismiss, with leave to amend. See Dkt. 53. To summarize in relevant part, plaintiff alleges that defendants made misrepresentations

1  regarding Imperva's competitive success with IBM, consistently referring to their "strong
2  competitive position" and "four out of five" win ratio in competitive deals, even though
3  Imperva was actually losing deals to IBM due to IBM's lower cost.  Defendants also
4  attributed IBM's success to "political connections" and "taking the CEO to Augusta
5  National to play a round of golf."

6  Plaintiff also alleges that Imperva's revenue forecast of $36 to $37 million for the
7  first quarter of 2014 was false or misleading because defendants knew that Imperva was
8  struggling to compete with its competitors and that it could not meet its revenue forecast.

9  In dismissing the previous complaint, the court found that the statements regarding
10  Imperva's "strong" or "very strong" competitive position were "the type of vague,
11  optimistic, subjective assessments that the Ninth Circuit has found not to be capable of
12  objective verification, and thus not actionable under the securities laws." Dkt. 53 at 10
13  (citing Oregon Public Employees Retirement Fund v. Apollo Group Inc., 774 F.3d 598,
14  606 (9th Cir. 2014)).  In contrast, the statements that Imperva "beat IBM four out of five
15  times" were capable of objective verification – however, the previous complaint had "not
16  pled any facts indicating that Imperva was not actually beating IBM four out of five times."
17  Dkt. 53 at 10.  And with respect to the "political connections" and "round of golf"
18  statements, the court found that those were adequately pled as misleading.

19  With respect to the revenue forecast, the court noted that the complaint did not set
20  forth a basis for alleging that the forecast was false or misleading.  While plaintiff's
21  opposition brief explained his theory that "in order to meet the revenue guidance, Imperva
22  would have had to achieve an unrealistic level of growth in its SecureSphere product,"
23  that theory "was not pled in the complaint," and thus could not provide a basis for denying
24  the motion to dismiss.  Dkt. 53 at 15.

25  Overall, the court found that plaintiff's complaint "suffer[ed] from a lack of
26  precision," lumping together statements that could give rise to a viable claim (such as the
27  "political connections" statements) with statements that were too vague to be actionable
28  (such as the "strong" or "very strong" statements).  The court thus granted defendants'

motion to dismiss with leave to amend (it also denied leave to amend as to a separate category of statements regarding Imperva's technology, and those statements are no longer alleged in the operative complaint).

On January 13, 2016, plaintiff filed the operative third amended complaint ("TAC"), setting forth more detailed facts regarding the two categories of allegedly false/misleading statements, and asserting the same two causes of action:  (1) violation of § 10(b) of the Securities Act and Rule 10b-5, asserted against all defendants; and (2) violation of § 20(a) and Rule 10b-5, asserted against all defendants.  Defendants move to dismiss the TAC.

**DISCUSSION**

A. Legal Standards

    1. Motions to dismiss under Rule 12(b)(6)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint. Ileto v. Glock, Inc., 349 F.3d 1191, 1199-1200 (9th Cir. 2003).  Review is limited to the contents of the complaint. Allarcom Pay Television, Ltd. v. Gen. Instrument Corp., 69 F.3d 381, 385 (9th Cir. 1995). To survive a motion to dismiss for failure to state a claim, a complaint generally must satisfy only the minimal notice pleading requirements of Federal Rule of Civil Procedure 8, which requires that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

A complaint may be dismissed under Rule 12(b)(6) for failure to state a claim if the plaintiff fails to state a cognizable legal theory, or has not alleged sufficient facts to support a cognizable legal theory. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990).  The court is to "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." Outdoor Media Group, Inc. v. City of Beaumont, 506 F.3d 895, 899-900 (9th Cir. 2007).

However, legally conclusory statements, not supported by actual factual allegations, need not be accepted. Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009).  The

allegations in the complaint "must be enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations and quotations omitted).  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citation omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" Id. at 679.  In the event dismissal is warranted, it is generally without prejudice, unless it is clear the complaint cannot be saved by any amendment.  See Sparling v. Daou, 411 F.3d 1006, 1013 (9th Cir. 2005).

In addition, while the court generally may not consider material outside the pleadings when resolving a motion to dismiss for failure to state a claim, the court may consider matters that are properly the subject of judicial notice. Lee v. City of Los Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001); Mack v. South Bay Beer Distributors, Inc., 798 F.2d 1279, 1282 (9th Cir. 1986).  Additionally, the court may consider exhibits attached to the complaint, see Hal Roach Studios, Inc. V. Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989), as well as documents referenced extensively in the complaint and documents that form the basis of a the plaintiff's claims.  See No. 84 Employer–Teamster Joint Counsel Pension Trust Fund v. America West Holding Corp., 320 F.3d 920, 925 n.2 (9th Cir. 2003).

2.    Federal Rule of Civil Procedure 9(b)

Generally, plaintiffs in federal court are required to give a short, plain statement of the claim sufficient to put the defendants on notice.  Fed. R. Civ. P. 8.  In actions alleging fraud, however, "the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  Under Rule 9(b), the complaint must allege specific facts regarding the fraudulent activity, such as the time, date, place, and content of the alleged fraudulent representation, how or why the representation was false or misleading, and in some cases, the identity of the person engaged in the fraud.  In re GlenFed Sec.

4

1  Litig., 42 F.3d 1541, 1547-49 (9th Cir. 1994).  Because the plaintiff must set forth what is
2  false or misleading about a particular statement, he must do more than simply allege the
3  neutral facts necessary to identify the transaction; he must also explain why the disputed
4  statement was untrue or misleading at the time it was made.  Yourish v. California
5  Amplifier, 191 F.3d 983, 992-93 (9th Cir. 1999).

        3.      Claims under the 1934 Securities Exchange Act

Section 10(b) of the Securities Exchange Act of 1934 provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b).

Rule 10b-5 makes it unlawful for any person to use interstate commerce:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

In order to state a claim under § 10(b) of the 1934 Act and Rule 10b-5, a plaintiff must allege:  (1) the use or employment of a manipulative or deceptive device or contrivance; (2) scienter, i.e., wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to as "transaction causation;" (5) economic loss; and (6) loss causation, i.e., a causal connection between the manipulative or deceptive device or contrivance and the loss.  Simpson v. AOL Time Warner, 452 F.3d 1040, 1047 (9th Cir. 2006); see also Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 341-42 (2005).  The misstatement or omission complained of must have been misleading; in the case of an omission, "[s]ilence, absent a duty to disclose, is not

misleading under Rule 10b-5." Basic, Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988).

4. The Private Securities Litigation Reform Act

It has long been established that claims brought under Rule 10b-5 and § 10(b) must meet the particularity requirements of Rule 9(b). See In re Daou Sys. Inc. Sec. Litig., 411 F.3d 1006, 1014 (9th Cir. 2005). In addition, the enactment of the Private Securities Litigation Reform Act ("PSLRA") in 1995 altered pleading requirements for actions brought under the 1934 Exchange Act. Id.

The PSLRA was enacted to establish uniform and stringent pleading requirements for securities fraud actions, and "to put an end to the practice of pleading 'fraud by hindsight.'" In re Silicon Graphics, 183 F.3d at 958. The PSLRA heightened the pleading requirements in private securities fraud litigation by requiring that the complaint plead both falsity and scienter with particularity. In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1084 (9th Cir. 2002). If the complaint does not satisfy these pleading requirements, the court, upon motion of the defendant, must dismiss the complaint. 15 U.S.C. § 78u-4(b)(3)(A).

Under the PSLRA – whether alleging that a defendant "made an untrue statement of a material fact" or alleging that a defendant "omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading" – the complaint must specify each statement alleged to have been false or misleading, specify the reason or reasons why each such statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, state with particularity all facts on which that belief is formed. 15 U.S.C. § 78u-4(b)(1). If the challenged statement is not false or misleading, it does not become actionable merely because it is incomplete. In re Vantive, 283 F.3d at 1085; Brody v. Transitional Hosp. Corp., 280 F.3d 997, 1006 (9th Cir. 2002).

In addition – whether alleging that a defendant "made an untrue statement of material fact" or alleging that a defendant "omitted to state a material fact" – the complaint must, with respect to each alleged act or omission, "state with particularity facts giving

rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In the Ninth Circuit, the required state of mind is "deliberate or conscious recklessness." In re Silicon Graphics, 183 F.3d at 979.

Because falsity and scienter in securities fraud cases are generally strongly inferred from the same set of facts, the Ninth Circuit has incorporated the falsity and scienter requirements into a single inquiry. No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Co., 320 F.3d 920, 932 (9th Cir. 2003). In addition, when considering whether plaintiffs have shown a strong inference of scienter, "the district court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." Gompper v. VISX, Inc., 298 F.3d 893, 897 (9th Cir. 2002) (noting the "inevitable tension . . . between the customary latitude granted the plaintiff on a [12(b)(6)] motion to dismiss . . . and the heightened pleading standard set forth under the PSLRA). In other words, the court must consider all the allegations in their entirety in concluding whether, on balance, the complaint gives rise to the requisite inference of scienter. Id.

B. Legal Analysis

As mentioned above, the alleged false/misleading statements fall into two categories: (1) statements about Imperva's competitive success (especially in relation to IBM), and (2) revenue guidance for the first quarter of 2014 ("1Q14").

1. Statements about Imperva's competitive success

This category generally consists of statements that Imperva "beat IBM four out of five times" in competitive deals, that Imperva had a "strong" or "very strong" win-loss ratio against IBM, and that IBM's success came as the result of "political connections" and "taking the CEO to Augusta National to play a round of golf." In the TAC, plaintiff includes a number of comments from before the start of the class period – partially to provide context, and partially to hold defendants to a specific definition of the word "strong."

Specifically, the TAC alleges that, starting in February 2012, defendants (the TAC

7

1  is not specific as to the identity of the speaker) told analysts that Imperva's "win-loss ratio
2  in head-to-head competitive deals remains at a very strong ratio, which is generally 4 to
3  1." TAC, ¶ 39.  Similar "four out of five" comments were made in September 2012 and
4  March 2013.  TAC, ¶¶ 41, 42.

5  Then, on May 2, 2013 (the start of the class period), defendant Kramer stated on a
6  conference call that Imperva's "win-loss ratio in head-to-head comparative deals remains
7  at a very strong ratio."  TAC, ¶ 44.  Plaintiff claims that the term "strong" had been
8  "defined in 2012 to mean at least 75% and growing."  Id.  However, no specific claim of a
9  "four out of five" win ratio was made during this May 2, 2013 call, and the court rejects
10 plaintiff's attempt to graft the earlier definition of "strong" onto all subsequent uses of that
11 word.  "Strong" just means "strong," which is too vague to be actionable.  Put another
12 way, if, while on the May 2, 2013 conference call, Kramer had again defined "strong" to
13 mean "four out of five" – it would be the "four out of five" statement that would be
14 actionable, not the word "strong."  The fact that, in this instance, Kramer used the word
15 "strong" in isolation prevents it from being actionable.

16 On May 21, 2013, defendant Schmid spoke at an investor conference, and
17 claimed that "we win four out of five times" against IBM."  TAC, ¶ 46.  This is potentially
18 actionable, for the same reasons set forth in the court's previous order.

19 In later instances during the class period, plaintiff makes more attempts to graft the
20 "four out of five" language onto vague-sounding statements.  For instance, in August
21 2013, defendant Schmid stated that Imperva "competed very well against" IBM.  TAC, ¶
22 53.  Plaintiff claims that this statement "effectively repeat[ed]" the win-loss ratio, but the
23 court disagrees for the same reasons discussed above.  Then on November 5, 2013,
24 "defendants" (plaintiff does not specify who) stated that their win-loss ratio "remained very
25 strong."  TAC, ¶ 62.  For the same reasons, this statement is not actionable.

26 Before going any further, the court will evaluate plaintiff's basis for characterizing
27 the "four out of five" statements as false or misleading.  Both parties point to statements
28 made by current CEO Anthony Bettencourt – but they point to different statements.

1 The TAC alleges that Bettencourt acknowledged that IBM had won "203 deals between 2010 and Q1 2015" and that they were "all seven-figure deals." TAC, ¶ 4. Plaintiff argues that, if Imperva were really winning four out of five deals against IBM, then they would have needed to win 800 seven-figure deals during the same timeframe, which is contradicted by Imperva's revenue figures.

Defendants' motion appears to provide a fuller version of Bettencourt's statement, in which Bettencourt says "we lost 203 deals to IBM between 2010 and Q1 of 2015. Now, obviously, the losses are dialing down as we go forward. We have won 39 of them back. They are all seven-figure deals if we do this right." Dkt. 67 at 15. Based on that quote, defendants argue that only 39 of the deals were seven-figure deals.

However, along with the opposition, plaintiff attached a transcript from a different conference than the one cited by defendants, and that transcript shows that Bettencourt said "Since 2010 to 2015, I lost – we lost 203 deals to IBM. I want them all back. They are all seven-figure deals; they can't compete with me." Dkt. 70-1, Ex. 3 at 4. In their reply, defendants appear to argue that their cited statement carries more weight than the one cited by plaintiff, but the court finds no basis for crediting one statement over the other.

It may be true that Bettencourt misspoke in the instance cited by plaintiff, and defendants may certainly present evidence showing that the majority of the 203 lost deals were not actually seven-figure deals, but the court may consider that evidence only on a motion for summary judgment, not a motion to dismiss. At this stage of the case, the Bettencourt statements cited by plaintiff do adequately meet the PSLRA's requirement to "specify the reason or reasons why each such statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, state with particularity all facts on which that belief is formed." And while defendants are correct that Bettencourt was speaking of a broader time frame than the one covered by the class period, it strains credulity to believe that Imperva was winning four out of five deals against IBM when the statements were made, yet still performed so much worse

9

1  immediately before and afterwards that they lost 203 seven-figure deals to IBM during
2  that time.
3        Finally, to the extent that defendants argue that Imperva still could have won four
4  out of five small deals while still losing 203 seven-figure deals, even if that were true, it
5  would show that the "four out of five" may not have been technically false, but it would still
6  be potentially misleading. Thus, with respect to the "four out of five" statements, the court
7  finds that the false/misleading statements are adequately pled.
8        That brings us to November 20, 2013, when Schmid stated that "the companies
9  that we compete against rely a little bit more on their political connections and a little less
10 on their innovations." TAC, ¶¶ 64, 96. The complaint does not provide much context with
11 which to evaluate this statement – it does not specify whether the statement was in
12 response to a question, and if so, what the question was.
13       Defendants' motion does seek to provide some additional context, and actually
14 attaches the transcript of the conference. Dkt. 69, Ex. W at 7-8. Schmid was asked a
15 question about both competition, generally, and about technology, specifically. The
16 questioner mentioned the companies competing against Imperva (including IBM), and
17 first asked "how competitive are these solutions now?" and then immediately added
18 "you're going to these bake-offs. Is it – from a technology perspective, what do you
19 think?" Id. at 7. Schmid's answer mostly related to competition from a technological
20 perspective, and after discussing some of the other companies, he said "the companies
21 that we compete against I think rely a little bit more on their political connections and a
22 little less on their innovations to compete with us." Id. at 7-8. The TAC then cites a
23 portion from Schmid's next answer, when he was specifically asked about pricing, and
24 responded that "it's not really a price game," and "it's not a race to the bottom." Id. at 8.
25       The transcript shows that there were two separate exchanges between Schmid
26 and the questioner, and because the context was different for each question, so too is the
27 analysis. In the first exchange, Schmid was asked two questions at once – one about
28 competition generally, and one about technology specifically. To the extent that Schmid

was answering about technology, the court has no basis to find that statement adequately pled as false or misleading.  To the extent that Schmid was answering about competition generally, the court finds the statement somewhat misleading, in that it left out the primary reason for IBM's success – price.

In the second exchange, the misleading nature of Schmid's statement is more clear.  Schmid specifically said that "it's not really a price game," when later events showed that IBM was able to win deals based on price.  Because of that, the court finds Schmid's statements regarding political connections and pricing to be adequately pled as false or misleading.

Then, in December 2013, while speaking at a conference, defendant Schmid made more statements about the "four out of five" win ratio (for which the analysis is the same as above), but also responded to a question about whether IBM was "bundling services or anything like that?" by answering "[t]hey may be doing that, and they may be taking the CEO to Augusta National to play a round of golf."  TAC, ¶ 66.  Defendants argue that, because Schmid acknowledged the bundling, the answer is not false or misleading.  But because statements must be considered in context, the court finds that Schmid's deflection and immediate pivot to another topic does make the answer potentially misleading (though not false):

> They may be doing that, and they may be taking the CEO to Augusta National to play a round of golf.  There are things that – I can't get them there.  I can take them to my local muni.
>
> So they have a lot of tentacles into organizations that give them a lot of political power, and a lot of account control.  And it's very, very difficult for a company of our size to overcome.  Technically, we're better, or we wouldn't win four out of five times.
>
> They don't scale the way we do.  They don't have the same level of functionality that we have.  I don't think there's anything controversial about me saying we have superior technology to IBM, no question.

TAC, ¶ 66.

Again, Schmid was asked whether IBM was "bundling services or anything like

that?" and his response was to (1) immediately pivot away from the bundling, (2) present the bundling as "they may be doing that" as opposed to "they are doing that," and (3) discuss a list of other reasons why IBM may be succeeding – none of which included price. This issue is similar to one addressed in the previous dismissal order:

> These statements are analogous to the ones in In re HP Securities Litigation, in which HP's CEO was discussing the weak performance of one of its acquisitions, but omitted the fact that she was considering accounting fraud as the reason for the weak performance, and instead claimed that the weak performance was a function of transitioning from a startup to a larger corporation. 2013 WL 6185529 (N.D. Cal. Nov. 26, 2013). The HP court found that the CEO "was not required to speak of" the company's weakness, but that "the decision to put forward entrepreneurial challenges as an explanation while choosing not even to mention the alternative possibility of accounting fraud, which she knew to be plausible, constitutes a material omission." Id. at *9. The court went on to say that "context matters," and that "the context of [the CEO's] statements would have called for her to either decline to answer the question or to at least mention the possibility that something other than entrepreneurial scaling challenges explained" the weak performance. Id.

Dkt. 53 at 11.

Defendants separately argue that the bundling/price aspect of competition with IBM was already publicly disclosed, but there are two problems with that argument. First, most of the risk disclosures cited by defendants are overly vague, containing statements like "we may not be able to accurately predict our future revenues" and "you should not rely on our past results as an indication of our future performance." Defendants point to some more specific disclosures, but they appear to be buried within 18 pages of fine-print risk disclosures in Imperva's Form 10-Q. See Dkt. 69, Ex. B at 34 ("these companies could reduce, [sic] the price of their competing products, resulting in intensified pricing pressures within our market" and "companies competing with us may price their products more competitively than ours"). Plaintiff cites a Ninth Circuit case holding that "any material information which insiders fail to disclose must be transmitted to the public with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression created by the insiders' one-sided representations," and in this case, the risk

12

disclosures were transmitted with a much lower "degree of intensity." In re Apple, 886 F.2d 1109, 1116 (9th Cir. 1989).

Plaintiff then cites a different Ninth Circuit case where a challenged statement "speaks entirely of as-yet-unrealized risks and contingencies," while "[n]othing alerts the reader that some of these risks may already have come to fruition." Berson v. Applied Signal Technology, 527 F.3d 982, 986 (9th Cir. 2008). Plaintiff also cites a case holding that the type of "truth on the market" defense asserted by defendants is an affirmative defense too fact-specific for resolution on a motion to dismiss. In re Amgen, 544 F.Supp.2d 1009 (C.D. Cal. 2008) (citing In re Convergent, 948 F.2d 507, 513 (9th Cir.1991)). Any of these reasons, standing alone, is enough to find that the "golf" statement is adequately pled as misleading, let alone taking them all together.

Thus, for the reasons set forth above, the statements regarding "strong" or "very strong" competition are not adequately pled as false or misleading, and the motion to dismiss is GRANTED as to those statements; and the statements regarding the "four out of five" win ratio, the "political connections," and the "round of golf" are adequately pled as false or misleading, and the court will separately analyze the other elements challenged by defendants: (1) scienter and (2) loss causation. The court also notes that only Schmid is alleged to have made those statements, Kramer is alleged to have made only the "strong" statements.

As to scienter, the court finds that the "core operations" theory applies to the remaining alleged false/misleading statements regarding Imperva's competitive success. See, e.g., Reese v. Malone, 747 F.3d 557, 575 (9th Cir. 2014) ("we can impute scienter based on the inference that key officers have knowledge of the 'core operations' of the company."). Statements about Imperva's "four out of five" wins against IBM, its primary competitor, goes to the heart of Imperva's business. And the "golf" and "political connections" statements are related to the same issue – Imperva's performance against IBM. The court thus finds that plaintiff has adequately pled scienter as to the statements regarding Imperva's competitive success against IBM.

13

Finally, as to loss causation, the analysis is fairly straightforward – when Imperva announced its missed earnings projection, it also acknowledged the role of pricing in losing deals to IBM, and the stock suffered a corresponding 44% drop.

Accordingly, as to the statements about Imperva's competitive success, the court GRANTS the motion to dismiss as to defendant Kramer, but DENIES the motion to dismiss as to defendants Schmid and Imperva.

2.  Revenue guidance for 1Q14

As discussed above, on February 6, 2014, defendants forecasted earnings of $36 to $37 million for the first quarter of 2014, which it ultimately missed by $5-6 million. FAC, ¶ 100. And as also mentioned above, the primary deficiency identified in the court's dismissal order was the complaint's failure to plead plaintiff's theory that "in order to meet the revenue guidance, Imperva would have had to achieve an unrealistic level of growth in its SecureSphere product."

In the TAC, plaintiff does allege that defendants could not have had a reasonable basis for the guidance, because that level of earnings would have required unrealistic growth from SecureSphere sales. Plaintiff points out that, during the previous year, SecureSphere sales represented at least 50% of sales in every quarter – except for one, when it was 49.52%. So, if that ratio holds, that means that around 50% of the $36 to $37 million in projected earnings would have had to come from SecureSphere sales. To give defendants the benefit of the doubt, plaintiff used the 49.52% figure, which was the lowest from the previous year. So, essentially, plaintiff argues that, in order for the earnings projection to be reasonable, SecureSphere sales would have needed to be at least 49.52% of the projected $36-37 million in earnings. See, e.g., TAC ¶ 104.

The next step is that, in order for SecureSphere sales to meet that number (which would be around $18 million – i.e., 49.52% of $36 million), sales would have needed to increase 25.9% from the previous year. Plaintiff claims that defendants could not reasonably believe that such an increase would occur – the main reason being that the first quarter had historically been SecureSphere's seasonally weakest quarter. TAC, ¶

14

1   104. Defendants' own statements appear to acknowledge that the "first quarter is always
2   the lightest." Id. That, in a nutshell, is plaintiff's argument – SecureSphere historically
3   represented at least 50% of total earnings, so even estimating conservatively (49.52%),
4   Imperva would have needed around $18 million in SecureSphere sales in order to meet
5   the $36 million guidance – and that $18 million number would have required an
6   unrealistic level of growth (25.9% over the previous quarter), considering that the first
7   quarter is SecureSphere's weakest.

Now, on to defendants' challenges to those calculations. They apply plaintiff's rationale to the year before (i.e., Q1 2013 and the previous year), and argue that the math does not hold up. Specifically, defendants start with Q1 2013, for which the earnings guidance was $27 million. Over the course of the previous year (2012), SecureSphere always represented more than half of total earnings, and in fact, the low-water mark was 55.71% (in choosing this number, defendants are trying to do the same thing that plaintiff did with 2013 – pick the lowest percentage in order to reach a conservative estimate of the share of earnings attributable to SecureSphere). So, if Imperva were to meet its Q1 2013 earnings guidance of $27 million, then 55.71% of those earnings (around $15 million) would need to be attributable to SecureSphere. And as compared to the year before, SecureSphere revenue of $15 million would represent a 25% increase. In reality, in Q1 2013 SecureSphere experienced only a 17% increase, but Imperva still exceeded the earnings guidance by more than $1 million. In defendants' view, this shows the failure of plaintiff's methodology. Defendants also argue that plaintiff relies on the false assumption that SecureSphere revenue would always account for the same percentage of total revenue, when in reality, Imperva's business was "constantly changing, not static."

Overall, both parties have shown that the figures at issue in this case can be cherry-picked to reach opposite conclusions. Plaintiff has narrowly focused on one set of numbers in order to support their conclusion that the guidance was unreasonable, whereas defendants focus on a different set of numbers to show that there was a

reasonable basis for believing the guidance to be accurate.  Overall, the court is concerned that, if it were to accept plaintiff's theory without stronger allegations showing why the revenue guidance was false when made, every missed earnings report would result in a securities lawsuit based on cherry-picked figures.  Indeed, the court notes that plaintiff has not cited any case law – even non-binding case law from other circuits or other district courts – accepting a similar theory.  And as mentioned above, defendants are correct that, if plaintiff's methodology is applied to the first quarter of the previous year, it predicts a necessary growth rate for SecureSphere that was not met, even though Imperva actually exceeded its guidance in that quarter.  Overall, the court finds that plaintiff's allegations regarding the 1Q14 revenue guidance fall into the category of "fraud by hindsight" precluded by the PSLRA.  Accordingly, defendants' motion to dismiss is GRANTED as to the allegations regarding Imperva's revenue guidance.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is GRANTED in part and DENIED in part.  As to the allegations regarding Imperva's financial guidance, the motion is GRANTED as to all defendants.  As to the allegations regarding Imperva's competitive success, the motion is GRANTED as to defendant Kramer, but DENIED as to defendants Schmid and Imperva.

The court will conduct a case management conference on **June 30, 2016** at **2:00 p.m.**

**IT IS SO ORDERED.**

Dated:  May 16, 2016

_____
PHYLLIS J. HAMILTON
United States District Judge