DEAN KRISTY (CSB No. 157646)
dkristy@fenwick.com
JENNIFER C. BRETAN (CSB No. 233475)
jbretan@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: (415) 875.2300
Facsimile: (415) 281.1350

Attorneys for Defendants Imperva, Inc.,
Shlomo Kramer and Terrence J. Schmid

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| VISWANATH V. SHANKAR, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>IMPERVA, INC., SHLOMO KRAMER and TERRENCE J. SCHMID,<br><br>Defendants. | Case No.: CV 14-01680 PJH<br><br>CLASS ACTION<br><br>**DECLARATION OF ALLAN W. KLEIDON, PH.D. IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Date: May 24, 2017<br>Time: 9:00 a.m.<br>Courtroom: 3, Third Floor<br>Judge: Hon. Phyllis J. Hamilton<br><br>Date Action Filed: April 11, 2014 |

## TABLE OF CONTENTS

Page

I.     QUALIFICATIONS ................................................................ 1

II.    ASSIGNMENT .................................................................... 1

III.   OVERVIEW OF ALLEGATIONS ..................................... 2

IV.   SUMMARY OF OPINIONS ............................................... 4

V.    BACKGROUND REGARDING IMPERVA'S BUSINESS AND COMPETITION.................................................................. 5

VI.   BACKGROUND REGARDING MARKET EFFICIENCY AND EVENT STUDY ANALYSIS.................................................... 6

VII.   ANALYSIS ......................................................................... 8

     A.    Alleged Win Rate Misrepresentations Did Not Have an Impact on Imperva's Price during the Putative Class Period........................ 8

         1.    No Front End Price Response to Alleged Win Rate Misrepresentations ................................................... 9

             a)    No Statistically Significant Price Increase Following the Alleged Win Rate Misrepresentations ........................... 10

             b)    No Statistically Significant Price Increase Following Earlier Statements Regarding Win Rate ....................... 10

             c)    Steinholt's Exclusion of the Alleged Win Rate Misrepresentations from Information Expected to Cause Observable Price Movements ........................ 11

         2.    No Back End Price Response to Alleged Win Rate Misrepresentations ................................................... 12

         3.    Conclusion Regarding Price Impact of Alleged Win Rate Misrepresentations ................................................... 15

     B.    Steinholt's Proposed Model Is Not Capable of Measuring on a Class-wide Basis Only Those Damages Attributable to Plaintiff's Liability Theory ................................................................. 16

         1.    Calculating Damages Attributable to Plaintiff's Liability Theory Requires Assessing Inflation and Losses Caused by the Alleged Misrepresentations ................................................... 16

         2.    Steinholt Asserts That an Event Study Can Measure Class-wide Damages Attributable to Plaintiff's Liability Theory ................ 18

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3.    Characteristics of the Current Matter Render an Event Study
Incapable of Measuring Damages Attributable to Plaintiff's
Liability Theory ............................................................................ 18

    a)    Steinholt's Proposed Model Does Not Isolate Any Price
Decline Due to Allegedly Corrective Information ........................ 19

    b)    Steinholt's Proposed Model Does Not Estimate Inflation
throughout the Putative Class Period ........................................... 23

    c)    Conclusion Regarding Steinholt's Proposed Class-wide
Damages Model ............................................................................ 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Fenwick & West LLP
Attorneys at Law
San Francisco

I, Allan W. Kleidon, hereby declare:

## I.  QUALIFICATIONS

1.      I am a Senior Vice President at Cornerstone Research, a financial and economic consulting firm, and an Honorary Professor in the School of Business at the University of Queensland in Australia.  Prior to joining Cornerstone Research, I was an Associate Professor of Finance at the Graduate School of Business, Stanford University, and I have taught in the Graduate School of Business and the School of Law at Stanford since joining Cornerstone Research.  I have also taught at the Haas School of Business at the University of California, Berkeley, and the University of Chicago, Graduate School of Business.  I received my doctorate in 1983 from the University of Chicago and my Master of Business Administration degree from that institution in 1981.  My academic work has been in the fields of econometrics (the application of statistical methods within an economic framework), security prices and markets, corporate finance, and management of financial institutions.  I have published numerous articles on economic and financial topics.  A copy of my curriculum vitae and a list of prior testimony over the past four years are attached hereto as Exhibit 1.

## II.  ASSIGNMENT

2.      I have been asked by counsel for Imperva Inc. ("Imperva" or "the Company") to evaluate whether the alleged misrepresentations[1] regarding Imperva's "four out of five" win ratio in competition with IBM had an impact on the Company's stock price during the period spanning May 21, 2013 to April 9, 2014 (the "Putative Class Period").  I have also been asked to investigate whether Plaintiff has specified a model capable of measuring class-wide damages attributable only to its liability theory.

3.      A list of the documents I have relied upon in forming my opinions is attached hereto as Exhibit 2.  Cornerstone Research is being compensated for my work in this matter at my hourly rate, which currently is $990.  My compensation is not affected by the outcome of this matter.

---

[1] Here, and throughout the remainder of this declaration, the term "misrepresentations" includes both misstatements and omissions.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## III. OVERVIEW OF ALLEGATIONS

4.      In the Order Granting in Part and Denying in Part Motion to Dismiss Third Amended Complaint dated May 16, 2016 ("MTD Order," pp. 1–2), the Court summarizes Plaintiff's claims:

> To summarize in relevant part, plaintiff alleges that defendants made misrepresentations regarding Imperva's competitive success with IBM, consistently referring to their "strong competitive position" and "four out of five" win ratio in competitive deals, even though Imperva was actually losing deals to IBM due to IBM's lower cost. Defendants also attributed IBM's success to "political connections" and "taking the CEO to Augusta National to play a round of golf."
>
> Plaintiff also alleges that Imperva's revenue forecast of $36 to $37 million for the first quarter of 2014 was false or misleading because defendants knew that Imperva was struggling to compete with its competitors and that it could not meet its revenue forecast.

5.      The MTD Order (pp. 14–16) dismissed claims in the Third Amended Complaint for Violation of the Federal Securities Laws dated January 13, 2016 ("Complaint") regarding Imperva's revenue guidance for 1Q2014. It also dismissed statements about "strong" or "very strong" performance in competition with IBM, finding them too vague to be actionable (MTD Order, pp. 13–14). However, the Court did not dismiss what it regarded as more concrete statements regarding Imperva's competitive success against IBM, namely (MTD Order, pp. 13, 15):

- Statements regarding Imperva's "four out of five" win ratio in competition with IBM ("Alleged Win Rate Misrepresentations")

- Statements that IBM's primary competitive strengths involved "political connections" and "round[s] of golf," which purportedly downplayed the role that IBM's pricing and ability to bundle played in the competitive dynamics ("Alleged Misrepresentations Regarding the Nature of Competition")

6.      Plaintiff alleges that Defendants made false and misleading statements on four occasions. According to Plaintiff, the first Alleged Win Rate Misrepresentation was made on May 21, 2013, while the first Alleged Misrepresentation Regarding the Nature of Competition was made on November 20, 2013. Specifically, Plaintiff points to the following statements (Lead Plaintiff Delaware County Employees Retirement System's Responses and Objections to Defendant Imperva Inc.'s First Set of Interrogatories dated August 26, 2016 ("Plaintiff's First

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Interrogatory Reponses"), p. 14) by defendant Terry Schmid ("Schmid"), who stated:

- "on May 21, 2013 at the B. Riley & Co. Investor Conference that '[w]e have better technology, we win four out of five times.'"

- "on November 20, 2013 at the UBS Global Technology Conference that 'the companies that we compete against I think rely a little bit more on their political connections and a little less on their innovations to compete against us' and '[i]t is generally not the approach that any of us take. We are not a commoditized business right now, so it's really not a price game.'"

- "on December 10, 2013 at the Raymond James Conference that '[s]o, we beat IBM four out of five times. We have a very, very good win rate against them. But they are – how do they win the other 20% of the time?,' 'they may be taking the CEO to Augusta National to play a round of golf,' and '[t]echnically, we're better or we wouldn't win four out of five times.'"

- "on March 5, 2014 at the Morgan Stanley Technology, Media & Telecom Conference that '[w]e [win] four out of five times… on the database side with IBM.'"

7.      Plaintiff asserts (Complaint, ¶2) that Imperva "disclosed the truth about [its] actual competitive position against IBM" in a press release on April 9, 2014 issued after market close ("April 9, 2014 Press Release" or "Press Release").[2]  Plaintiff also claims that Imperva's stock price decline of $21.73 (44%) on April 10, 2014 indicates that the Company's stock price was inflated by the alleged misrepresentations at the time of its stock purchases (Plaintiff's First Interrogatory Responses, p. 10).[3]

8.      In the Expert Report of Bjorn I. Steinholt, CFA, dated October 19, 2016 ("Steinholt Report," ¶7), Plaintiff's expert Bjorn I. Steinholt ("Steinholt") concludes that Imperva's stock traded in an efficient market throughout the Putative Class Period.[4]  Pointing to the 44% drop in Imperva's stock price following the April 9, 2014 Press Release, Steinholt further asserts that a "damages framework based on analyzing Imperva's market prices can be used to calculate class-wide damages consistent with Plaintiff's theory of liability" (Steinholt Report, ¶50).

---

[2] "Imperva Announces Preliminary First Quarter 2014 Financial Results," Imperva Inc. Press Release, April 9, 2014.

[3] According to Plaintiff's First Interrogatory Responses (pp. 5–6), Plaintiff purchased 5,850 shares during the Putative Class Period, beginning on August 8, 2013 and ending on November 6, 2013.

[4] I have not been asked to assess this claim and assume for purposes of the current declaration that Imperva's stock price traded in an efficient market as Steinholt concludes.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## IV.   SUMMARY OF OPINIONS

9.     Below is a brief summary of my preliminary findings in this matter.  The bases for each finding are detailed in the sections that follow.  My work in this matter is ongoing, and I reserve the right to supplement my current analysis if additional information becomes available.

- During the Putative Class Period, analysts understood that the data center security market in which Imperva participated was intensely competitive.  The Company's competitors included several large, well-established companies, and Imperva sought to differentiate itself by providing a technically superior product.  As the market evolved, analysts assessed many reported financial metrics to gauge the Company's future prospects and competitive strength (Section V).

- Plaintiff's expert concludes that Imperva's stock traded in an efficient market throughout the Putative Class Period.  In such a market, stock price responds quickly and fully to new publicly disclosed information, and one can use an event study to analyze stock price reaction immediately following a public disclosure to gauge whether it significantly altered the total mix of public information (Section VI).

- The Supreme Court in *Halliburton II*[5] held that defendants in a securities class action can rebut the presumption of reliance by demonstrating a lack of price impact.  My analysis indicates that the Alleged Win Rate Misrepresentations did not have an impact on Imperva's stock price during the Putative Class Period:

  ◦ There is no indication of "front end" price impact (i.e., price response to the Alleged Win Rate Misrepresentations when they were made).  None of the Alleged Win Rate Misrepresentations was followed by a statistically significant price increase.  Analysis of Imperva's stock price response to earlier statements regarding win rate and assessment of Steinholt's event study analysis also indicate a lack of front end price impact.

  ◦ There is no "back end" price impact (i.e., price response when the market learned the alleged truth) because there was no disclosure correcting the Alleged Win Rate Misrepresentations.  Rather, Defendants affirmed their historical win rate at the end of the Putative Class Period and again shortly thereafter.

- I understand that to satisfy the class certification requirements under *Comcast*,[6] Plaintiff here must specify a model that measures stock price inflation and investor losses caused by the alleged misrepresentations as opposed to other factors.  Steinholt points to Imperva's stock price decline following the April 9, 2014 Press Release and asserts that a methodology "based on analyzing Imperva's market prices can be used to calculate class-wide damages consistent with Plaintiff's theory of liability" (Steinholt Report, ¶50).  However, Steinholt's proposed event study analysis of the April 10, 2014 price decline cannot measure only those damages (if any) caused by the alleged misrepresentations because it cannot deal with specific complications in this matter (Section VII.B).

  ◦ First, even assuming that the Press Release contained corrective information—and Steinholt has not shown that it did—an event study cannot

---

[5] *Halliburton Co. v. Erica P. John Fund Inc.*, 134 S. Ct. 2398 (2014) ("*Halliburton II*").
[6] *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) ("*Comcast*").

separate any price decline due to such information from that due to confounding information such as the 1Q2014 guidance miss and sales execution issues announced in the same Press Release.

○ Second, Steinholt's proposed event study analysis cannot measure inflation due to alleged misrepresentations throughout the Putative Class Period because what was actually disclosed in the Press Release regarding competition does not match the allegedly withheld truth throughout the Putative Class Period. For example, the April 10, 2014 price decline following Company statements that its win rate remained unchanged does not measure any inflation due to the Alleged Win Rate Misrepresentations.

## V.    BACKGROUND REGARDING IMPERVA'S BUSINESS AND COMPETITION

10.    Imperva competes in the enterprise security industry. According to the Company, it is "pioneering the third pillar of enterprise security, data center security, by directly protecting high value applications and data assets in physical and virtual data centers."[7] Imperva's solutions, which it believes "differentiate [it] as providing the broadest data center security offering in the marketplace," include database security, file security, and web application security (2013 10-K, p. 2).

11.    Regarding its competition, the Company states in its 2013 10-K (p. 10) that "[t]he market for data center security solutions is intensely competitive" and it "expect[s] competition to increase in the future." Securities analysts discussed the Company's competitive environment, noting the presence of large, well-established competitors and Imperva's strategy of differentiating itself by providing a technically superior product. For example:

Imperva competes directly with large, incumbent networking companies such as Citrix, F5, IBM, McAfee (Intel), Oracle, and Symantec, all of which have large installed bases and established distribution channels. Imperva will have to continue to innovate and provide best-of-breed technology to continue to convince accounts to choose its solution over one of the incumbents.

JMP Securities, 5/3/13 and 8/8/13

In the WAF [Web Application Firewall] space, Imperva's primary competitors are F5 and Citrix. In a recent analyst day, F5 outlined how it plans to become more focused on the security segment. IBM and Oracle are the primary competitors in the database protection segment, both having entered through acquisitions. All four of these very large companies have the ability to bundle their products as part of larger technology sales, putting pressure on the market segment. But the security industry has seen its customers look past these cost saving offers and

---

[7] Imperva Inc. Form 10-K for the fiscal year ended December 31, 2013, dated February 15, 2014 ("2013 10-K"), p. 1. The first pillar, endpoint security, blocks threats targeting devices, and the second pillar, network security, blocks threats trying to access the network (2013 10-K, p. 1).

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

focus more on the best solution. The money spent on products in this space pales in comparison to the economic loss felt from a successful attack.

J.P. Morgan, 5/3/13 and 2/7/14

12.     Analysts frequently discussed a number of financial metrics reported by the Company during its quarterly earnings calls—such as actual and projected revenue—to gauge the Company's future prospects and competitive strength. Other metrics frequently discussed by analysts include combined product and subscription revenue, pipeline, backlog, bookings, new customers, and information regarding large deals (>$100K) (see Exhibit 3 for examples of market commentary on these metrics). I understand that none of these metrics is disputed in this matter.

13.     Imperva disclosed that its revenue was generally backend loaded, creating the risk of revenue misses. For example, among other risks factors, the 2013 10-K states (pp. 12-13) that "[r]eliance on a concentration of shipments at the end of the quarter could cause our revenue to fall below expected levels, resulting in a decline in our stock price." Analysts also discussed these risks. For example:

Risks to Rating and Price Target

Business model follows a traditional lumpy and back-end-loaded software model Sales of Imperva products follow a very standard software sales model, where roughly 80% of the sale is recognized upfront and 20%, which represents maintenance and support, is recognized ratably, often over a 12-month timeframe. It is typical that 50% of revenue for a given quarter is captured in the third month of the quarter and is more heavily focused on the second half of that month. This is because of long-standing customer buying patterns in software focused on trying to derive the greatest discount possible out of software vendors. The back-end-loaded nature of the software model adds risk to the ability to deliver on quarterly financial expectations. An earnings miss in this industry is often met with large volatility in terms of stock price reaction.

J.P. Morgan, 2/7/14

## VI.     BACKGROUND REGARDING MARKET EFFICIENCY AND EVENT STUDY ANALYSIS

14.     Steinholt concludes that Imperva's stock traded in an efficient market throughout the Putative Class Period (Steinholt Report, ¶¶7, 48). In such a market, stock prices reflect all publicly available information and respond quickly and fully to new information once it is

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  publicly announced.[8]  For example, a study by Patell and Wolfson found that when a firm

2  publishes its latest earnings or announces a dividend change, the major part of the adjustment in

3  price occurs within five to ten minutes of the announcement.[9]  Thus, in an efficient market, one

4  can study the stock price reaction immediately following an announcement to gauge whether it

5  significantly altered the total mix of public information.

6      15.  An event study is a widely used and generally accepted analytical framework for

7  investigating the effects of information on stock prices in an efficient market.[10]  It provides an

8  objective measure of whether a disclosure is associated with a significant change in the total mix

9  of information, although when multiple pieces of information are announced within the study's

10  event window, the ensuing stock price reaction will measure their joint effect.

11      16.  An event study uses the statistical method of linear regression to estimate market

12  and industry effects.  Because stock prices reflect market, industry, and company-specific

13  information, it is necessary to estimate the market- and industry-related portions of stock price

14  movements to estimate that part that may be related to company-specific information.  Once

15  market and industry effects are controlled for, standard statistical tests can be conducted on the

16  remaining, or "residual," price movement to test for significant price changes that may indicate

17  the presence of new, value-relevant, company-specific information in the market.  Such statistical

18  tests must account for the normal random movements in stock price.

19      17.  To account for this random element, "normal" stock price volatility is estimated

20  over a control period.  A standard statistical measure of normal behavior during the control period

21  is defined as the range that contains a specified fraction of observations.  This range, or

22  "confidence interval," depends on the normal variation or volatility of the residual price changes

23  for the stock in question.

24  _____

[8] See, for example, Richard A. Brealey, Stewart C. Myers, and Franklin Allen, *Principles of*
25  *Corporate Finance*, 9th ed. (New York:  McGraw-Hill/Irwin, 2008) ("Brealey, Myers, and Allen
   (2008)"), p. 359, discussing the semi-strong form of market efficiency.
26  [9] Brealey, Myers, and Allen (2008), p. 360.
   [10] See, for example, Brealey, Myers, and Allen (2008), Chapter 14, pp. 359–360.  See also
27  Stephen J. Brown and Jerold B. Warner, "Using Daily Stock Returns: The Case of Event Studies,"
   *Journal of Financial Economics* 14 (1985), pp. 3–31; and John J. Binder, "On the Use of the
28  Multivariate Regression Model in Event Studies," *Journal of Accounting Research* 23, no. 1
   (Spring 1985), pp. 370–383.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18.     The Steinholt Report (¶32) discusses the event study analysis that Steinholt performed as part of his market efficiency analysis.  He uses the NYSE Composite Index and the S&P 500 Information Technology Index as "proxies" for market and industry effects, respectively, and estimates the relationship between Imperva's stock price movements and changes in these indices during a one-year period preceding the event analyzed.  Steinholt uses a 95% confidence interval to access statistical significance and notes that "[a] t-statistic with an absolute value greater that 1.96 is defined as being statistically significant at the 5% level, using a two-tailed test" (Steinholt Report, fn. 36).

19.     While I reserve the right to conduct additional regression analysis in the future, the results from Steinholt's regression analysis (when available[11]) are used for the analysis in this current declaration.[12]

## VII.    ANALYSIS

20.     This section discusses two main results of my analysis.  Section VII.A demonstrates that the Alleged Win Rate Misrepresentations did not have an impact on Imperva's stock price during the Putative Class Period.  Section VII.B demonstrates that the model proposed by Steinholt for calculating damages is not capable of measuring on a class-wide basis only those damages attributable to Plaintiff's liability theory.

### A.     Alleged Win Rate Misrepresentations Did Not Have an Impact on Imperva's Price during the Putative Class Period

21.     The Supreme Court in *Halliburton II* held that defendants in a securities class action can rebut the presumption of reliance by demonstrating a lack of price impact.  Specifically, the Court stated (p. 4) that "an indirect proxy" such as a showing that the security at issue traded in an efficient market during the putative class period "should not preclude consideration of a defendant's direct, more salient evidence showing that an alleged

---

[11] Steinholt reports his event study results beginning on February 1, 2013 (Steinholt Report, Exhibit E).

[12] A sensitivity analysis was also conducted in which Steinholt's regression methodology was modified to exclude days on which Imperva's stock price may have been affected by the alleged misrepresentations or alleged corrective disclosures.  That modification does not change any of the conclusions regarding statistical significance discussed in the remainder of this declaration.

misrepresentation did not actually affect the stock's price and, consequently, that the *Basic* presumption does not apply."

22.    Economic analysis demonstrates that the Alleged Win Rate Misrepresentations did not have an impact on Imperva's stock price during the Putative Class Period.  In particular, as discussed in Section A.1 below, there is no indication of "front end" price impact (i.e., price response to the alleged misrepresentations when they were made).  Further, as discussed in Section A.2 below, there is no "back end" price impact (i.e., price response when the market learned the alleged truth) because there was no disclosure correcting the Alleged Win Rate Misrepresentations.

### 1.    No Front End Price Response to Alleged Win Rate Misrepresentations

23.    According to Plaintiff, the Alleged Win Rate Misrepresentations were made on three occasions—after market close on May 21, 2013,[13] shortly before market close on December 10, 2013,[14] and after market close on March 5, 2014.[15]  The economic evidence indicates that these statements did not have an impact on Imperva's stock price when they were made.  As explained in more detail below, none of the Alleged Win Rate Misrepresentations was followed by a statistically significant price increase, indicating no significant positive change in the total mix of public information.  Moreover, the facts that (1) none of the earlier statements regarding win rates to which the Complaint points was followed by a statistically significant price increase, and (2) Steinholt does not cite the Alleged Win Rate Misrepresentations among statements expected to cause observable price movements, are also consistent with the conclusion that there was no front end price impact.

---

[13] "Imperva to Present at Upcoming Conferences," Imperva Inc. Press Release, May 6, 2013 ("14th Annual B. Riley & Co. Investor Conference in Santa Monica, CA – Terry Schmid, CFO to present on Tuesday, May 21, 2013 at 1:30 p.m. Pacific Time (4:30 p.m. Eastern time)"); Steinholt Report, Exhibit C, pp. 44, 47.

[14] "Imperva to Present at the Raymond James Systems, Semiconductors, Software & Supply Chain Conference," Imperva Inc. Press Release, December 2, 2013 ("Imperva…today announced scheduled participation at the Raymond James Systems, Semiconductors, Software & Supply Chain Conference in New York, NY.  Terry Schmid, CFO, is to present on Tuesday, December 10, 2013 at 3:05 p.m. Eastern Time…"); Steinholt Report, Exhibit C, pp. 150, 154.

[15] "Technology, Media & Telecom Conference Agenda," Morgan Stanley, p. 3 ("March 5th, 2014, 4:25 – Imperva Terry Schmid, CFO"); Steinholt Report, Exhibit C, pp. 226, 233.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

a) **No Statistically Significant Price Increase Following the Alleged Win Rate Misrepresentations**

24.     As discussed in Section VI above, stock prices respond quickly and fully in an efficient market to new, value-relevant information, and an event study provides an objective measure of whether publicly disclosed information is associated with a significant change in the stock price.  There was not a statistically significant change in Imperva's stock price following any of the three Alleged Win Rate Misrepresentations.  Specifically, Imperva's residual stock price changes—as calculated by Steinholt—were -2.3% (t-statistic = -0.82) on May 22, 2013 (the day following Schmid's evening presentation at the B. Riley & Co. investor conference); 0.4% (t-statistic = 0.15) and 0.1% (t-statistic = 0.04) on December 10, 2013 and December 11, 2013 (the day of and the day after Schmid's afternoon presentation at the Raymond James investor conference, respectively); and 0.5% (t-statistic = 0.19) on March 6, 2014 (the day following Schmid's evening presentation at the Morgan Stanley investor conference).[16]  The lack of any statistically significant price increase indicates no significant positive change in the public mix of information on these days, supporting the conclusion that the Alleged Win Rate Misrepresentations did not have an impact on Imperva's stock price when they were made.

b) **No Statistically Significant Price Increase Following Earlier Statements Regarding Win Rate**

25.     The Complaint identifies three disclosures made prior to the Putative Class Period discussing Imperva's four-out-of-five win rate:

- In its earnings call after market close on February 9, 2012,[17] the Company "told analysts that '[f]rom a competitive perspective our win/loss ratio in head-to-head competitive deals remains at a very strong ratio which is generally 4 to 1'" (Complaint, ¶39, emphasis removed).

---

[16] Steinholt Report, Exhibit E, pp. 2, 5–6.

[17] "Q4 2011 Imperva Inc. Earnings Conference Call," Imperva Inc. Press Release, February 9, 2012; "Imperva Announces Fourth Quarter and Full Year 2011 Financial Results," Imperva Inc. Press Release, February 9, 2012 ("Imperva will host a conference call today at 2:00 p.m. Pacific Time (5:00 p.m. Eastern Time) to review the company's financial results for the fourth quarter and full year ended December 31, 2011.").

- At an analyst conference during the trading day on September 6, 2012,[18] Imperva stated: "Our win rates against IBM are the same as they are against F5," which it states is "four out of five times" (Complaint, ¶41).

- At an analyst conference at an unspecified time in the morning of March 7, 2013,[19] Imperva stated: "We have win rates against both of them [F5 and IBM] that are around 4 out of 5, and this has been trending up slightly over time" (Complaint, ¶42).

26. As with the Alleged Win Rate Misrepresentations, there was no statistically significant price increase following these earlier statements regarding win rate. Imperva's residual price changes were 1.5% (t-statistic = 0.51) on February 10, 2012; 2.9% (t-statistic = 0.95) on September 6, 2012;[20] and -0.7% (t-statistic = -0.24) on March 7, 2013.[21] The lack of any statistically significant price increase indicates no significant positive change in the public mix of information on these days.

### c) Steinholt's Exclusion of the Alleged Win Rate Misrepresentations from Information Expected to Cause Observable Price Movements

27. As part of his analysis of market efficiency, Steinholt tests Imperva's stock price response to events that he believes "clearly…would be expected to cause observable price movements" (Steinholt Report, ¶36). Steinholt identifies only three such events—Imperva's August 7, 2013 announcement of its 2Q2013 results, its November 5, 2013 announcement of 3Q2013 results, and its April 9, 2014 preannouncement of 1Q2014 results (Steinholt Report, ¶37). None of these disclosures corresponds to the Alleged Win Rate Misrepresentations. Steinholt's decision not to use the Alleged Win Rate Misrepresentations in his market efficiency analysis—presumably because he did not expect them to cause a statistically significant price movement—is again consistent with a lack of front end price impact.

---

[18] "Imperva Inc. at Citi Technology Conference," Imperva Inc. Press Release, September 6, 2012; "Imperva to Present at Upcoming Conferences," Imperva Inc. Press Release, August 21, 2012 ("2012 Citi Technology Conference in New York, NY - Terry Schmid, CFO to present on Thursday, September 6, 2012 at 11:45 a.m. Eastern Time (8:45 a.m. Pacific Time.").

[19] "Imperva Inc. Presentation Wedbush Transformational Technology," *Bloomberg*, March 7, 2013.

[20] See Exhibit 4 for event study analysis of February 10, 2012 and September 6, 2012, which precede the first date for which Steinholt reports his regression results (February 1, 2013).

[21] Steinholt Report, Exhibit E. A sensitivity analysis was also conducted in which Steinholt's regression methodology was modified to exclude February 10, 2012 and September 6, 2012 (the other pre-Putative Class Period dates on which the Complaint identifies statements regarding Imperva's win rate). This modification yields a residual return and t-statistic on March 7, 2013 virtually identical to those reported by Steinholt.

### 2. No Back End Price Response to Alleged Win Rate Misrepresentations

28.     Not only is there no indication of front end price impact of the Alleged Win Rate Misrepresentations, there is also no back end price impact, that is, there is no price decline caused by the market's learning the relevant alleged truth.  Indeed, no alleged truth about the Alleged Win Rate Misrepresentations was disclosed during the Putative Class Period.  To the contrary, the Company affirmed its stated historical win rate.

29.     Plaintiff points to a single alleged corrective disclosure, the April 9, 2014 Press Release (Complaint, ¶106).  The Press Release disclosed that overall win rates remained consistent during the quarter but noted that sales cycles had extended for several reasons, including sales force execution issues and intensifying competition for large orders, and that its preliminary estimates for 1Q2014 revenue fell below prior guidance.  Specifically, the Press Release stated (emphasis added):

> Based on preliminary financial information, Imperva currently expects to report total revenue for the first quarter of 2014 in the range of $31.0 million to $31.5 million compared to the company's prior guidance of total revenue in the range of $36.0 million to $37.0 million.
> …
> First quarter 2014 preliminary results are subject to change based on the completion of the company's normal quarter-end review process.

> "Based on our preliminary analysis, our first quarter results were primarily impacted by extended sales cycles on deals over $100,000, which led to delays in receiving anticipated orders from customers, particularly in the U.S, which resulted in lower than expected revenue for products," said Imperva President and CEO, Shlomo Kramer.  "*While our overall win rates remained consistent during the quarter, the extended sales cycles resulted from a combination of intensifying competition for large orders, which resulted in additional review and approval cycles, as well as sales execution challenges in the U.S.*  We are taking steps to address these issues.  We are also continuing to analyze the factors that impacted our first quarter results, and consider additional steps we may take to address them and how they may impact our outlook for the full year.  We expect to provide updated guidance during our regular earnings call."

30.     While there was a statistically significant price decline on April 10, 2014, that decline was not due to disclosure of the purported truth about the Alleged Win Rate Misrepresentations.  Indeed, the Company specifically stated in the April 9, 2014 Press Release that its win rate "remained consistent."  Moreover, Imperva reiterated these remarks when it

released its final 1Q2014 financial results on May 1, 2014, stating that "our overall high win rates remain consistent and we are still competing for the largest deals that slipped out of the quarter."[22]

31.     Market commentary is consistent with the absence of information correcting the Alleged Win Rate Misrepresentations in the April 9, 2014 Press Release.  Analysts commented on the Company's announcement and on the consistency of Imperva's win rate.  For example:

> The majority of Imperva's revenue comes from classic perpetual licenses where most of the revenue is recognized up front and a maintenance contract is recognized ratably over its contract length. That causes the business to be extremely backend loaded in terms of linearity of deals, and exposes the company to potential misses, like the one they just preannounced, that can cause big hits to the stock.
>
> The area that felt the biggest impact was in the larger deals—over $100,000 in revenue—where it appears competition has grown and while *the company believes its win rates remain intact*, sales cycles are extending because of competition….
>
> …Imperva has shown an *impressive win rate against its main competitors*, F5 and Citrix (covered by J.P. Morgan analyst John DiFucci), in WAF as well as IBM and Oracle (covered by Tien-Tsin Huang and John DiFucci, respectively) in database. With more than a year now in the public markets, we believe *win rates could further improve* with declining customer uncertainty that stemmed from buying from a small private company.
>
> J.P. Morgan, 4/9/14, emphasis added
>
> [M]anagement indicated that overall deal *win rates remained consistent* in the March quarter, but that the increased competitive market led to additional review and approval cycles by customers.
>
> …Longer term, we believe the competitive environment should still be favorable to Imperva and that demand for its products should remain strong.  While we are frustrated by the lack of consistent execution, we do not believe the competitive landscape or data center security opportunity has diminished or suddenly shifted within a single quarter.
>
> William Blair, 4/9/14, emphasis added
>
> The good news is the company saw strong growth in [Europe, Middle East, and Africa] and noted that *win rates remained consistent* meaning that deals appear to be pushed out vs. lost and that the pipeline continues to build.
>
> RBC Capital Markets, 4/10/14, emphasis added

---

[22] "IMPV - Q1 2014 Imperva Inc. Earnings Conference Call," Thomson Reuters, May 1, 2014 ("May 1, 2014 Conference Call"), p. 3.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

While the company insists it has *not experienced any degradation in its win rates*, shift in pipeline, or new competitors, management reported it is experiencing more difficulty in deal closure than in the past.

…

We believe Imperva saw a concerted effort by competitors to target the largest deals in the company's pipeline, which significantly affected both bookings and revenue for the March quarter. Imperva insisted that the competition was not focused on pricing and that the deals had been pushed out rather than being lost altogether. Since the close of the quarter, the company has closed a few deals with other deals expected to be closed in later quarters this year.

William Blair, 5/1/14, emphasis added

The company is still competing for large deals that slipped out of the quarter, and *expectations are to win those deals in time consistent with historical close rates*.

BMO Capital Markets, 5/2/14, emphasis added

It appears that IBM is using traditional large company sales tactics in trying to motivate senior executives to choose IBM. This is causing a lengthening of sales cycles but *win rates have not changed, indicating that the technological differential still favors Imperva*.

…

Positives

…

Overall *win rates remain consistent*. Management emphasized that the company's win rates were largely unchanged and they are still competing for slipped deals….

…Imperva has shown *an impressive win rate* against its main competitors F5 and Citrix in WAF, as well as IBM and Oracle in database. With more than a year now in the public markets, we *believe win rates could further* improve with declining customer uncertainty that stemmed from buying from a small private company.

J.P. Morgan, 5/2/14, emphasis added

While we anticipate restrained near-term performance, we believe that the company's solutions remain technically competitive, *as evidenced by the company's continued win rates for deals closed during the quarter*.

Imperial Capital, 5/2/14, emphasis added

[T]he company believes there have been *no changes in win rates* and that the delayed large deals remain up for grabs.

Pacific Crest Securities, 5/2/14, emphasis added

32. Analyst comments indicating that win rates had not changed are consistent with statements by Derek Fisher ("Fisher"), the research analyst in charge of following Imperva on behalf of Plaintiff's investment advisor, Emerald Asset Management.[23] Fisher testified that he

---

[23] Lead Plaintiff Delaware County Employees Retirement System granted Emerald Asset Management sole discretion to choose which stocks to buy or sell on its behalf, and Emerald

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

had not "heard anything in his research that would suggest that [Imperva's] win ratios had changed" (Deposition of Derek Fisher dated March 21, 2017 ("Fisher Deposition"), p. 286).

33.     While the Complaint (¶78) highlights many analyst quotes following the April 9, 2014 Press Release, only one—an April 9, 2014 BMO Capital Markets report—explicitly discusses Imperva's win rate. That report states that the Company's explanation "is a little hard to square with comments noting unchanged win rates," and goes on to say that "we don't have reason to believe as of yet that anything major has changed regarding the company's secular or competitive positioning." The same analyst on May 2, 2014 indicated that "[t]he company is still competing for large deals that slipped out of the quarter, and expectations are to win those deals in time consistent with historical close rates" (BMO Capital Markets, May 2, 2014). In sum, a review of the evidence, including comments from BMO Capital Markets, does not indicate a belief that Imperva's win rate had changed, and supports the conclusion that there is no back end price impact of the Alleged Win Rate Misrepresentations because there was no corresponding corrective disclosure during the Putative Class Period.

### 3.     Conclusion Regarding Price Impact of Alleged Win Rate Misrepresentations

34.     There is no evidence of front end or back end price impact of the Alleged Win Rate Misrepresentations in this matter. Thus, given Plaintiff's allegations, there could be no price impact until, at the earliest, November 20, 2013 when the first Alleged Misrepresentation Regarding the Nature of Competition was made. Consequently, putative class members purchasing prior to November 20, 2013—such as the named Plaintiff, who purchased shares between August 8, 2013 and November 6, 2013 (see fn. 3 above)—cannot establish that they relied upon any alleged misrepresentation simply by showing that they purchased shares traded in an efficient market.[24]

---

Asset Management made the decision to buy and sell Imperva stock at issue in this case (Deposition of Edward Eugene O'Lone, March 23, 2017, p. 127).

[24] My conclusion that the Alleged Win Rate Misrepresentations did not have an impact on Imperva's stock price during the Putative Class Period, thus severing the link between any alleged misrepresentation and Imperva's stock price prior to the first Alleged Misrepresentation Regarding the Nature of Competition on November 20, 2013, does not indicate that the Alleged

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**B.** **Steinholt's Proposed Model Is Not Capable of Measuring on a Class-wide Basis Only Those Damages Attributable to Plaintiff's Liability Theory**

35.     This section demonstrates that the damages model proposed by Steinholt is not capable of measuring on a class-wide basis the damages (if any) attributable to the alleged misrepresentations in this matter.  It first describes what is required to calculate damages attributable to Plaintiff's liability theory (Section B.1) and describes Steinholt's proposed methodology for doing so (Section B.2).  It then discusses why the characteristics of this matter render Steinholt's proposed methodology incapable of measuring only those damages attributable to Plaintiff's liability theory (Section B.3).

**1.     Calculating Damages Attributable to Plaintiff's Liability Theory Requires Assessing Inflation and Losses Caused by the Alleged Misrepresentations**

36.     I understand that *Comcast* requires plaintiffs "to show that their damages stemmed from the defendant's actions that created the legal liability."[25]  *Comcast* states (p. 7), for example, that "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to [the plaintiff's liability] theory."  It further states (p. 2) that "[a] model that does not attempt to measure only those damages attributable to [the plaintiff's liability] theory cannot establish that damages are susceptible of measurement across the entire class for Rule 23(b)(3) purposes."

37.     Per-share recoverable damages in a securities case such as the current matter cannot exceed the lesser of:

- Out-of-pocket damages, that is, share price inflation on the date of purchase less share price inflation on the date of sale (where share price inflation is defined as the difference between the actual share price and the "true value" that would have prevailed absent the alleged misrepresentations);[26] and

---

Misrepresentations Regarding the Nature of Competition had an impact on Imperva's stock price. To establish that the Alleged Misrepresentations Regarding the Nature of Competition had a price impact, one would need to demonstrate, at a minimum, that they caused Imperva's stock price to increase when they were made or caused Imperva's stock price to decline when they were corrected.  Plaintiff has not done so in this matter.

[25] Order Certifying Plaintiff Class, *In re Intuitive Surgical Securities Litigation*, Case No. 5:13-cv-01920-EJD, 2016 WL 7425926, at *17 (N.D. Cal. Dec. 22, 2016).

[26] Damages in securities class actions such as this one are typically "governed by the 'out-of-pocket' rule—i.e., a Section 10(b) claimant may recover 'the difference between the price paid

- Actual losses caused to the shareholder by the alleged misrepresentations as opposed to the share price declines resulting from non-fraud-related factors.[27, 28]

38.     Thus, at a minimum, specifying a model capable of determining damages consistent with Plaintiff's liability theory requires articulating a methodology that assesses both inflation and loss causation.  Specifically, it requires specifying a model capable of determining (1) for each day during the Putative Class Period the level of price inflation (i.e., the difference between Imperva's actual stock price and the "true value" that would have prevailed in the but-for world had Defendants revealed that which allegedly could and should have been disclosed to the market but was not), and (2) how much the stock price declined due to revelation of the allegedly withheld truth.  With respect to the latter, the Supreme Court's ruling in *Dura* makes clear that a model capable of determining damages consistent with Plaintiff's liability theory would need to isolate those price declines due to corrective information, separating out the effect of other

---

and the "value" of the stock when bought'" (Memorandum and Order, *In Re: BP p.l.c. Securities Litigation* (S.D. Tex. May 20, 2014), p. 16).

[27] "The proper measure of damages utilizes the out-of-pocket rule:  the plaintiff can recover 'the difference between the price paid and the "real" value of the security, *i.e.*, the fair market value absent the misrepresentations, at the time of the initial purchase by the defrauded buyer.' *Huddleston*, 640 F.2d at 556.  Consequently, as long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement.  But in determining recoverable damages, these contributing forces must be isolated and removed…" (*Robbins v. Koger Properties Inc.,* 116 F. 3d 1441 (11th Cir. 1997), fn. 5).  Also, "[f]or one thing, as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value.  Moreover, the logical link between the inflated share purchase price and any later economic loss is not invariably strong.  Shares are normally purchased with an eye toward a later sale.  But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss….  When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." (*Dura Pharmaceuticals v. Broudo,* 544 U.S. 336, 125 S. Ct. 1627 (2005) ("*Dura*"), pp. 342–343, emphasis in original).

[28] Other limitations include a rule specified in the Private Securities Litigation Reform Act for the calculation of damages in securities litigation.  Section 21D paragraph (e) stipulates that damages shall not exceed the difference between the purchase price and the "mean [average] trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission" enters the market.  In addition, in cases where the plaintiff sells prior to the end of the 90-day period, damages cannot exceed the difference between the purchase price and the average closing price between the corrective disclosure and the date(s) on which the sale(s) took place.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

factors—that is, "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." (*Dura*, pp. 342–343).

### 2. Steinholt Asserts That an Event Study Can Measure Class-wide Damages Attributable to Plaintiff's Liability Theory

39.     Steinholt describes methodologies for quantifying damages and provides a conclusion regarding the appropriate methodology in the current matter (Steinholt Report, ¶50, internal footnote omitted):

> According to Plaintiff's allegations, the alleged truth in this case was revealed on April 9, 2014.… In an efficient market, the impact of the disclosure of the alleged truth can ordinarily be quantified by analyzing the market prices, and class-wide damages calculated…. The damage analysis can also be further refined using fundamental valuation tools analyzing the impact of the disclosure on the Company's future cash flows. In my opinion, the above event study damages framework based on analyzing Imperva's market prices can be used to calculate class-wide damages consistent with Plaintiff's theory of liability.

40.     Steinholt asserts that "impact of the disclosure of the alleged truth," which allegedly occurred on April 9, 2014 in this matter, "can ordinarily be quantified by analyzing the market prices." He makes passing reference to a different methodology that is not based on analyzing Imperva's stock price reaction to disclosure of the alleged truth—specifically, "using fundamental valuation tools analyzing the impact of the disclosure [of the alleged truth] on the Company's future cash flows." However, Steinholt ultimately concludes that, in this matter, a methodology "based on analyzing Imperva's market prices"— an event study—"can be used to calculate class-wide damages consistent with Plaintiff's theory of liability" (Steinholt Report, ¶50).[29]

### 3. Characteristics of the Current Matter Render an Event Study Incapable of Measuring Damages Attributable to Plaintiff's Liability Theory

41.     Specific complications in the current matter render an approach based on analyzing Imperva's market prices using an event study insufficient to measure only those

[29] Not only does Steinholt ultimately conclude that an event study is appropriate, but he also does not even attempt to demonstrate how (if at all) any alternative methodology could be employed to measure class-wide damages attributable to Plaintiff's theory of liability.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

damages attributable to Plaintiff's liability theory. First, as discussed in Section 3.a below, Steinholt's proposed methodology does not isolate price declines due to corrective information. Even assuming that the April 9, 2014 Press Release contained corrective information—and Steinholt has not shown that it did—it also contained confounding information such as the 1Q2014 guidance miss and sales execution issues. An event study cannot separate any price decline due to corrective information from that due to confounding information, as is necessary to measure only damages attributable to Plaintiff's liability theory, because by construction an event study estimates the price decline caused by the totality of company-specific information disclosed. Second, as discussed in Section 3.b below, event study analysis of Imperva's April 10, 2014 price decline cannot measure inflation due to the alleged misrepresentations throughout the Putative Class Period because what was actually disclosed in the Press Release does not match the allegedly withheld truth throughout the Putative Class Period. For example, it is clearly inappropriate to use the April 10, 2014 price decline following a Company statement that its win rate remained *unchanged* as a measure of inflation ostensibly caused by the Alleged Win Rate Misrepresentations.

**a)**      **Steinholt's Proposed Model Does Not Isolate Any Price Decline Due to Allegedly Corrective Information**

42.      While Plaintiff asserts that the April 9, 2014 Press Release "disclosed the truth about [Imperva's] actual competitive position against IBM" (Complaint, ¶2), Steinholt fails to demonstrate how the Press Release corrected either the Alleged Win Rate Misrepresentations or the Alleged Misrepresentations Regarding the Nature of Competition. As discussed in the preceding section, the Press Release did not correct the Alleged Win Rate Misrepresentations but rather stated affirmatively that "win rates remained consistent during the quarter." Moreover, Steinholt does not point to any statements demonstrating that the previously disclosed nature of competition with IBM was untrue.

43.      The only part of the April 9, 2014 Press Release describing competition states:

> While our overall win rates remained consistent during the quarter, the extended sales cycles resulted from a combination of intensifying competition for large orders, which resulted in additional review and approval cycles, as well as sales

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

execution challenges in the U.S. We are taking steps to address these issues. We are also continuing to analyze the factors that impacted our first quarter results.…

44.    As discussed in Section VII.A above, the Alleged Win Rate Misrepresentations were not corrected by this statement. This statement also does not directly reveal any falsity of the Alleged Misrepresentations Regarding the Nature of Competition, namely that IBM's primary competitive strengths involved things such as "political connections," purportedly misleadingly downplaying the role of IBM's pricing and ability to bundle in the competitive dynamics (see Section III above). In fact, the April 9, 2014 Press Release said nothing about losing deals to IBM or pricing. Moreover, comments in the May 1, 2014 Conference Call, when Imperva's final 1Q2014 results were released and more detail regarding the nature of competition during that quarter were provided, are consistent with the previously disclosed nature of competition with IBM; for example (May 1, 2014 Conference Call, p. 9, emphasis added):

> But on the data side of the business, it's not really a matter of necessarily them trying to bundle and give it away. It's really been a situation where they continue to push on the account, fly executives in, *use whatever connections and political influence* that they have to drag the sales cycle out hoping to win by attrition basically. But we continue to battle for these.

> But if you look at our discounts, for example, they've held steady, *it has not necessarily become a pricing game.* On the very large deals, certainly the discount [is] larger than on the less large deals. But it's not about bundling necessarily. *It's about bringing to bear whatever political resources they can to extend that sales cycle as long as possible.*

45.    Fisher's testimony is also consistent with the absence of a corrective disclosure regarding the nature of competition with IBM. For example, when asked about his analysis of the Press Release, he testified (Fisher Deposition, pp. 286–287):

> Q. Does that mean that nothing in your research suggested that pricing by IBM or other competitors was leading to lost deals?

> A. That means when I looked -- when I listened to people at [the RSA investor conference] and I listened to what the sell side was telling me and my own due diligence, it was telling me that I didn't hear anything that said IBM was being more aggressive either in terms of win rates or price.

> Q. Did you hear anything in your research about Imperva losing deals to IBM?
> …
> A. No.

46.     Even setting aside Plaintiff's failure to identify information directly correcting any of the alleged misrepresentations, and assuming that the statement in the April 9, 2014 Press Release regarding "intensifying competition for large orders" somehow indirectly corrected the Alleged Misrepresentations Regarding the Nature of Competition,  the Press Release clearly also includes negative confounding news.  For example, the Court in this matter previously dismissed allegations regarding 1Q2014 financial guidance, and the Press Release discusses a 1Q2014 revenue miss.[30]  Additionally, the Press Release points to "sales execution challenges in the U.S.," which are not at issue in this case, as a contributor to the lengthening sales cycles.[31]

47.     Thus, Steinholt's proposed event study cannot measure only those damages due to Plaintiff's liability theory because it does not isolate and remove price declines due to such confounding information.  His study estimates only the net effect of *all* company-specific information disclosed during the one-day trading window spanning market close on April 9, 2014 to market close on April 10, 2014, which clearly includes confounding information.

48.     Analyst commentary also indicates that confounding information contributed to (if not wholly caused) Imperva's subsequent stock price decline.  For example, Plaintiff's investment advisor believed that "the company's issues were driven by salesforce execution and poor use of the company's indirect channel" (EMERALD_0000832–33; see also Fisher Deposition, p. 308).  Fisher also testified that "part of the market's reaction, the stock drop and sell off [on April 10, 2014] was because management did not hold a conference call" (Fisher Deposition, p. 288).

49.     Other analysts also focused on confounding issues, including discussions of how realization of the previously disclosed risk associated with back-end-loaded quarters and lumpy sales can lead to significant quarterly misses and stock price volatility, and expressing concern regarding sales execution issues.  For example:

---

[30] "Based on preliminary financial information, Imperva currently expects to report total revenue for the first quarter of 2014 in the range of $31.0 million to $31.5 million compared to the company's prior guidance of total revenue in the range of $36.0 million to $37.0 million" (April 9, 2014 Press Release).

[31] Potentially confounding information is not limited to Imperva's 1Q2014 guidance miss and the contribution of sales execution issues to lengthening sales cycles, but the presence of these issues is sufficient to illustrate Steinholt's failure to specify a model that measures only those damages due to Plaintiff's liability theory.

The majority of Imperva's revenue comes from classic perpetual licenses where most of the revenue is recognized up front and a maintenance contract is recognized ratably over its contract length. That causes the business to be extremely backend loaded in terms of linearity of deals, and exposes the company to potential misses, like the one they just preannounced, that can cause big hits to the stock.
…
Sales execution issues again… The head of worldwide sales announced he is departing at the end of the June quarter back on April 1, which will make investors wonder if that was part of the execution issues.

…[Sales execution] is not a new item for Imperva. Since coming public we have seen management make changes both proactively and reactively in all the major theaters (North America, Europe, etc.) at least one time. What is difficult to discern is exactly what the execution issues are or if some of the problem is…market issues.

J.P. Morgan, 4/9/14

The results were particularly disappointing following the company's decision the past several quarters to step up spending to accelerate top-line growth and make several acquisitions to open up new market opportunities. In our view, given the magnitude of the miss, multiple factors likely contributed to the poor results, which the company indicated it will be taking steps to correct. As an example, the head of worldwide sales recently resigned, and we believe improved sales execution and consistency continues [*sic*] to be a significant challenge. As a result of the first-quarter miss, we believe investors will expect a material cut to full-year growth rates, reflecting a more difficult environment and uncertainty regarding the pipeline.

William Blair, 4/9/14

Sales execution issues and change in leadership could result in disruption for the next couple of quarters, and our outlook turns more cautious.

Deutsche Bank Securities, 4/10/14

Despite Execution Challenges and Preannouncement, We are Buyers

Lack of Sales Execution Leads to Negative Preannoucement [*sic*]

Pacific Crest Securities, 4/10/14

Without knowing too many of the details, we believe end market demand is still growing, but recognize that the near-term sales process can be lumpy. Given preliminary results that came in materially below expectations, we are lowering our price target from $57 to $45, but due to our belief that results were timing related and Imperva can reaccelerate growth, we are reiterating our Overweight/Vol. rating.

Stephens, 4/10/14

The Blame is Placed on "Extended Sales Cycles" but also, more disconcertingly, on "U.S. Sales Execution." The company explained the poor results by delays on orders, in particular on deals over $100,000, due to higher competition resulting in

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

longer approval cycles by customers. More disconcertingly, the company also mentioned "sales execution challenges in the U.S.," that it is in the process of addressing, likely in conjunction with the replacement of the VP of Worldwide Sales, Ralph Pisani, by Jason Forget, for the expanded role of VP of Worldwide Field Operations last week.

Sterne Agee, 4/10/14

Guides Down, but Focus on Sales Execution Should Drive Reacceleration

…the company believes there have been no changes in win rates and that the delayed large deals remain up for grabs. We believe there could be significant upside to estimates as the company focuses on improving its sales execution.

Pacific Crest Securities, 5/2/14

1Q14 Review-Nothing New Vis-a-Vis The Pre-release… While citing more aggressive competitors (IBM-$193.53:NR, ORCL-$40.97:NR, FFIV-$106.70:NR) as a challenge that translated into an elongation of selling cycles, the bigger culprit was poor sales execution.

Topeka Capital Markets, 5/2/14

50. In sum, the content of the April 9, 2014 Press Release and subsequent analyst reaction indicate that confounding news (e.g., the revenue guidance miss and sales execution problems) contributed to, if not wholly caused, the April 10, 2014 price decline. Clearly, the 40.5% residual price decline as measured by Steinholt's event study is not limited to the price decline (if any) caused by the alleged fraud. Steinholt's event study cannot isolate the portion of the April 10, 2014 price decline due to corrective information, because by construction an event study estimates the price decline caused by the totality of company-specific information. Consequently, he has not articulated a damages model that measures only those damages attributable to Plaintiff's liability theory.

**b)** **Steinholt's Proposed Model Does Not Estimate Inflation throughout the Putative Class Period**

51. Even assuming that Steinholt had isolated the portion of the April 10, 2014 price decline attributable to purportedly corrective information (and he has not specified a model to do so), his methodology is inadequate to limit damages appropriately to those attributable to Plaintiff's liability theory. Estimating out-of-pocket damages requires determining for each day during the Putative Class Period the "true value" of Imperva's stock—that is, its value had the Company disclosed everything that Plaintiff alleges it could and should have disclosed (the

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

allegedly withheld truth) on that day. Establishing that inflation throughout the Putative Class Period is appropriately measured by any fraud-related price decline on April 10, 2014 requires, at a minimum, an equivalency between the allegedly withheld truth throughout the Putative Class Period and what was disclosed in the April 9, 2014 Press Release, yet a cursory examination of the facts in this case reveals no such equivalency.

52.     In particular, the purportedly fraud-related portion of the April 9, 2014 Press Release clearly does not match the allegedly withheld truth regarding the Alleged Win Rate Misrepresentations. It comprises discussion of a *consistent* win rate but lengthening sales cycles due in part to increasing competitive pressure in large deals. There is no economic justification for an assertion that any price response to this announcement, which affirmatively states that win rate is unchanged, could be used to measure purported inflation due to the Alleged Win Rate Misrepresentations, for example, Schmid's May 21, 2013 statement "that '[w]e have better technology, we win four out of five times'" (Plaintiff's First Interrogatory Reponses, p. 14). Given the lack of equivalency between the allegedly corrective information actually disclosed on April 9, 2014 and the allegedly withheld truth regarding the only alleged misrepresentation prior to November 20, 2013 (the first Alleged Misrepresentation Regarding the Nature of Competition), a suggestion that any fraud-related portion of the April 10, 2014 price decline appropriately measures inflation throughout the Putative Class Period is flawed.[32]

### c)     Conclusion Regarding Steinholt's Proposed Class-wide Damages Model

53.     Steinholt does not specify a model capable of measuring class-wide damages attributable only to Plaintiff's liability theory. It does not, as it must, isolate declines attributable

---

[32] The issue of lack of equivalency between the allegedly corrective disclosure and the allegedly withheld truth is not necessarily limited to the May 21, 2013 to November 20, 2013 period. However, the presence of the problem during this period is sufficient to illustrate Steinholt's failure to specify a model that measures only those damages due to Plaintiff's liability theory. In order to support an assertion that inflation throughout the Putative Class Period is appropriately measured by any fraud-related portion of the April 10, 2014 price decline, Steinholt would need to establish that the value of what the Company allegedly could and should have disclosed to the market remained constant throughout the Putative Class Period, notwithstanding changing financial metrics and competitive dynamics. The Steinholt Report provides no support for such an assumption.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

to alleged corrective disclosures. Moreover, even if it had done so, such a decline does not measure alleged inflation throughout the Putative Class Period given the lack of equivalency between what was actually disclosed about competition in the April 9, 2014 Press Release and the allegedly withheld truth throughout the Putative Class Period.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 3rd day of April, 2017, at Menlo Park, California.

_____
Allan W. Kleidon, Ph.D.

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# Exhibit 1

Exhibit 1

# ALLAN WILLIAM KLEIDON

**Cornerstone Research**
1000 El Camino Real, Suite 250 • Menlo Park, CA 94025
650.470.7112 • akleidon@cornerstone.com

## CURRENT POSITIONS

**Cornerstone Research**
Senior Vice President

**University of Queensland, School of Business, Australia**
Honorary Professor

## EDUCATION

**University of Queensland, Australia**
Bachelor of Commerce, 1973
Bachelor of Commerce (First Class Honours), 1976
Bachelor of Laws (Honours), 1978

**Graduate School of Business, University of Chicago**
Master of Business Administration, 1981
PhD, 1983
    Finance examination, 1979
    Economics examination, 1980

## ACADEMIC EXPERIENCE

**School of Law, Stanford University**
Consulting Professor of Law (in Finance), 1994 – 2000
Lecturer in Law (in Finance), 2001 – 2003

**Graduate School of Business, Stanford University**
Lecturer in Finance, 1993 – 1994; 1997 – 1999; 2005 – 2006
Associate Professor of Finance, 1986 – 1992
Assistant Professor of Finance, 1982 – 1986

| Doctoral | Econometrics |
| | Empirical Research in Finance |
| | Doctoral Seminar in Finance |
| Masters | Corporate Finance |
| | Management of Financial Institutions |
| | Derivatives |
| Executive | International Investment Management Program |
| | Financial Management Program |

**University of California, Berkeley**
Visiting Associate Professor of Finance, 1992
Lecturer (Finance), 2003

Exhibit 1

**University of Chicago**
Part-time teaching and tutoring, 1978 – 1982:
    Corporate Finance, Investments
Personal tutoring in finance, statistics, accounting, economics, and mathematics.

**University of Queensland, Australia**
Honorary Professor, School of Business, 2008 – present
Full-time faculty, 1974 – 1978:
    Finance (undergraduate, postgraduate), Business Economics (Honours), Scientific
    Method (Honours), Research Methods (M.B.A. level), Financial Accounting,
    Managerial Accounting

## HONORS

### Professional
Business School Trust Faculty Fellow, 1990 – 1991
Batterymarch Fellowship, 1989 – 1990

### Graduate
Dean's List all eligible quarters
1979 Finance Prize
1980 Center for Research in Security Prices Research Grant
1980 Beta Gamma Sigma

### Undergraduate
1974 Institute of Chartered Accountants in Australia Prize in Finance
1976 Thomas Brown and Sons, Ltd. Prize in Commerce Honours

## RESEARCH

### Publications

"Just How Much Damage Did Those Misrepresentations Actually Cause And To Whom?:
Damages Measurement in 'Fraud on the Market' Securities Class Actions," joint with
D. Lefler, *Securities Litigation & Enforcement Institute 2005,* 2005, pp. 285–325.

"The Stock Market Crashes of 1987 and 1989," joint with R. Mehra, *Business Cycles,
Panics and Depressions,* D. Glassner, ed., Garland Press, New York, 1997.

"U.K. and U.S. Trading of British Cross-Listed Stocks:  An Intraday Analysis of Market
Integration," joint with I. Werner, *The Review of Financial Studies*, Vol. 9 (2), 1996,
pp. 619–664.

"Bid-Ask Spreads in Foreign Exchange Markets:  Implications for Models of Asymmetric
Information," joint with D. A. Hsieh, in *Microstructure of Foreign Exchange Markets,*
J. Frankel, G. Galli and A. Giovannini, eds., National Bureau of Economic Research,
University of Chicago Press, 1996, pp. 41–65.

"Stock Market Crashes," in *Finance Handbook,* K. Jarrow, V. Maksimovic and W.T.
Ziemba, eds., Elsevier Science B.V., North Holland, *Handbooks in OR & MS*, Vol. 9,
1995, pp. 465–495.

# Exhibit 1

"Price Volatility and Volume Spillovers between the Tokyo and New York Stock Markets: Comment," *The Internationalization of Equity Markets,* J. Frankel, ed., National Bureau of Economic Research, University of Chicago Press, 1994, pp. 333–338.

"Market Maker Activity on Nasdaq: Implications for Trading Volume," joint with J. Gould, *Stanford Journal of Law, Business and Finance,* Vol. 1 (1), 1994, pp. 11–27.

"'Windfall' Gains in Mutual-to-Stock Conversion of Thrift Institutions?," joint with J. Barth and R. D. Brumbaugh, *Challenge: The Magazine of Economic Affairs,* Vol. 37 (4), 1994, pp. 43–49.

"CEO Performance, Board Types and Board Performance: A First Cut," joint with K.E. Scott, in *Institutional Investors and Corporate Governance,* T. Baums, R.M. Buxbaum, and K.J. Hobt, eds., de Gruyter, 1993, pp. 181–199.

"Market 2000," in *Modernizing U.S. Securities Regulation: Economic and Legal Perspectives,* K. Lehn and R.W. Kamphuis, Jr., eds., Business One Irwin, 1992, pp. 363–373.

"Arbitrage, Nontrading, and Stale Prices: October 1987," *Journal of Business,* Vol. 65 (4), 1992, pp. 483–507.

"One Market? Stocks, Futures and Options During October 1987," joint with R. Whaley, *Journal of Finance,* Vol. 47, 1992, pp. 851–877.

"Market and Environmental Uncertainty," *The New Palgrave Dictionary of Money and Finance,* The Macmillan Press, Vol. 2, 1992, pp. 651–653.

"Periodic Market Closure and Trading Volume: A Model of Intraday Bids and Asks," joint with W. A. Brock, *Journal of Economic Dynamics and Control*, Vol. 16, 1992, pp. 451–489.

"Underestimation of Portfolio Insurance and the Crash of October 1987," joint with C.J. Jacklin and P. Pfleiderer, *The Review of Financial Studies,* Vol. 5 (1), 1992, pp. 35–63.

"Are Stock Prices Excessively Sensitive to Current Information? Comment," joint with J. Lynch Koski, *Journal of Economic Behavior and Organization,* Vol. 18, 1992, pp. 127–131.

"Market Volatility: Review," *Journal of Economic Literature*, Vol. 29, December 1991, pp. 1760–1761.

"Tests de acotacion de la varianza Y modelos de valoracion del precio de las acciones," *Cuadernos Economicos De Ice,* Numero 38 (1), 1988, pp. 49–93. (Translation of "Variance Bounds Tests and Stock Price Valuation Models," *Journal of Political Economy,* Vol. 94 (5), 1986, pp. 953–1001.

"The Probability of Gross Violations of a Present Value Variance Inequality: Reply," *Journal of Political Economy,* Vol. 96 (5), 1988, pp. 1093–1096.

"Bubbles, Fads and Stock Price Volatility Tests, A Partial Evaluation: Discussion," *Journal of Finance,* Vol. 43 (3), 1988, pp. 656–660.

# Exhibit 1

"Anomalies in Financial Economics: Blueprint for Change?," *Journal of Business,* Vol. 59, 1986, S469–S499. Reprinted in *Rational Choice: The Contrast Between Economics and Psychology,* R. G. Hogarth and M. W. Reder, eds., University of Chicago Press, 1987.

"Empirical Assessment of Present Value Relations: Comment," *Econometric Reviews,* Vol. 5 (2), 1986, pp. 261–265.

"Variance Bounds Tests and Stock Price Valuation Models," *Journal of Political Economy,* Vol. 94, 1986, pp. 953–1001. (Reprinted in *The International Library of Financial Econometrics*, Andrew W. Lo, ed., Cheltenham: Edward Elgar, 2007, pp. 953–1001.)

"Bias in Small Sample Tests of Stock Price Rationality," *Journal of Business,* Vol. 59, 1986, pp. 237–261.

"New Evidence on the Nature of Size Related Anomalies in Stock Prices," joint with P. Brown and T. A. Marsh, *Journal of Financial Economics,* Vol. 12, 1983, pp. 33–56.

"Stock Return Seasonalities and the 'Tax-loss Selling' Hypothesis: Analysis of the Arguments and Australian Evidence," joint with P. Brown, D. B. Keim, and T. A. Marsh, *Journal of Financial Economics,* Vol. 12, 1983, pp. 105–127. (Reprinted in *Share Markets and Portfolio Theory: Readings and Australian Evidence,* 2nd ed., R. Ball, P. Brown, F. Finn, and R. Officer, eds., University of Queensland Press, 1987.)

"International Arbitrage Pricing Theory: Discussion," joint with P. Pfleiderer, *Journal of Finance,* Vol. 38 (2), 1983, pp. 470–472.

"Stock Prices as Rational Forecasters of Future Cash Flows," Proceedings, *Seminar on the Analysis of Security Prices,* Vol. 27 (1), 1982, pp. 157–189.

"Mergers and the Trade Practices Act, 1974," joint with L. E. Bracker, Proceedings, *Tenth Students Congress of the Institute of Chartered Accountants in Australia* (Queensland Branch), April 1977.

"Some Problems Associated with the Prices Justification Tribunal," *The Chartered Secretary,* April–June 1975, pp. 67–74.


**Work in Progress**

"Why Nasdaq Market Makers Use Even-Eighths Quotes: A Model of Quote Clustering in Dealer Markets," joint with P. Pfleiderer.


**Conferences**

*Practising Law Institute, Securities Litigation & Enforcement Institute 2005,* San Francisco, September 2005: Panelist, "Just How Much Did Those Misrepresentations Actually Cause and to Whom: Damages Measurement in 'Fraud on the Market' Securities Class Actions."

*Practising Law Institute, Securities Litigation 2001,* San Francisco, November 2001: Panelist, "Damages: Illusion or Reality?"

# Exhibit 1

*Accounting Association of Australia and New Zealand,* Annual Conference, August 1977: "The Paradigm of Accounting?"

*Institute of Chartered Accountants in Australia,* Student Congress (Queensland Branch), April 1977: "Mergers and the Trade Practices Act, 1974.

Paper prepared for the Japan Advisory Committee of the New York Stock Exchange

"Liberalization in the Japanese Financial Markets," with Kenneth J. Singleton, *Research Paper Series, Stanford University,* September 1989, Research Paper No. 1069, pp. 1–22.

Papers requested by and sent to Trade Practices Commission, Australian Government, Canberra

"The Structure of the Queensland Liquor Industry:  Brewer-Hotel Ties of Trade, and the Trade Practices Act 1974."

"Theories of Government Regulation and the Queensland Liquor Industry."

"The Trade Practices Act 1974 and Queensland Brewer-Hotel Ties of Trade."


## SOCIETY MEMBERSHIP

American Finance Association

Western Finance Association

Australian Society of Accountants (Senior Associate)

The Econometric Society

Securities Institute of Australia


## OTHER PROFESSIONAL ACTIVITIES

Associate Editor, *Journal of Finance*

Associate Editor, *Journal of Financial Economics*

Referee for:  *National Science Foundation, Econometrica, Journal of Political Economy, American Economic Review, Journal of Monetary Economics, Journal of Money, Credit and Banking, Quarterly Journal of Economics, Journal of Financial Economics, Journal of Business, Journal of Finance, Journal of Financial and Quantitative Analysis, Journal of Accounting Research, Science, Australian Journal of Management, and Journal of Economic Behavior and Organization.*

Research consultant


## PERSONAL

Raised in Toowoomba, Queensland, Australia.  Graduated from Harristown State High School, 1969.  Active in school sports (Sporting House Captain); Army Cadets (Cadet Commanding Officer, Head Cadet Under Officer); drama (President of Drama Club); debating (team captain); school prefect, and Vice School Captain.  Recent interests include sports, music, drama, food and wine, and family.  Birth date: 1/23/53.

# Exhibit 1

## ALLAN WILLIAM KLEIDON
### *Previous Expert Testimony*
### *Past Four Years*

**TRIAL AND ARBITRATION TESTIMONY**

*Halifax Hospital Medical Center v. Citigroup Global Markets Inc. and UBS Securities LLC*
March 9, 2016

*Confidential Arbitration Testimony*
October 7 and 8, 2014

**DEPOSITIONS**

*In re Silver Wheaton Corp. Securities Litigation*
March 8, 2017

*Robert Englehart, et al. v. Charles M. Brown, et al.*
April 18, 2016

*Barclays Bank PLC Securities Litigation*
March 30, 2016

*Tutor Perini Corp. v. Banc of America Securities LLC*
April 29, 2015

*In re St. Jude Medical Inc. Securities Litigation*
July 15, 2014

*Confidential Arbitration*
July 10, 2014

*In re Gatekeeper Pharmaceuticals Inc. Litigation*
June 6, 2013

*In re New Jersey Carpenters Health Fund v. DLJ Mortgage Capital Inc. et al.*
February 16, 2011 and January 14, 2015

**DECLARATIONS AND REPORTS**

*In re Textura Securities Litigation*
March 17, 2017

*In re Silver Wheaton Corp. Securities Litigation*
February 10, 2017

*Abu Dhabi Investment Authority v. Citigroup Inc.*
January 29, 2016, and June 30, 2016

*Robert Englehart, et al. v. Charles M. Brown, et al.*
February 16, 2016 and March 14, 2016

*Barclays Bank PLC Securities Litigation*
December 15, 2015, February 2, 2016, March 18, 2016, and December 14, 2016

*In the Matter of Dendreon Corporation Shareholder Litigations Derivative*
August 26, 2015 and September 25, 2015

*In the Matter of Tutor Perini Corp. v. Banc of America Securities LLC*
March 19, 2015 and April 16, 2015

# Exhibit 1

## ALLAN WILLIAM KLEIDON
### *Previous Expert Testimony*
### *Past Four Years*

*In the Matter of AirTouch Communications, Inc., Hideyuki Kanakubo and Jerome Kaiser, CPA*
December 16, 2014

*In re Green Mountain Coffee Roasters, Inc., HO-11484*
October 3, 2014

*Confidential Arbitration*
May 19, 2014 (revised on July 9, 2014)

*Confidential Regulatory Matter*
January 16, 2014

*In re St. Jude Medical Inc. Securities Litigation*
October 14, 2013, February 3, 2014, and June 2, 2014

*BNP Paribas v. The Bank of New York Trust Company, N.A.*
June 3, 2013

*Marie Gaudin v. Saxon Mortgage Services, Inc.*
May 30, 2013

*In re Gatekeeper Pharmaceuticals Inc. Litigation*
May 3, 2013

*In re Diamond Foods Inc. Securities Litigation*
April 11, 2013

*Cunha v. Hansen Natural Corporation et al.*
February 19, 2013 and May 30, 2013

*In re New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc., et al.*
January 17, 2011, June 13, 2014, September 30, 2014, December 19, 2014, February 26, 2015, April 28, 2015, June 29, 2015, and July 28, 2015

# Exhibit 2

# Exhibit 2
# Documents Relied Upon by Allan W. Kleidon

| Document Title | Document Date |
| --- | --- |
| **Legal Documents** | |
| Third Amended Complaint for Violation of the Federal Securities Laws | January 13, 2016 |
| Order Granting in Part and Denying in Part Motion to Dismiss Third Amended Complaint | May 16, 2016 |
| Lead Plaintiff Delaware County Employees Retirement System's Responses and Objections to Defendant Imperva Inc.'s First Set of Interrogatories | August 26, 2016 |
| **Expert Reports** | |
| Expert Report of Bjorn I. Steinholt, CFA, with Exhibits A–E | October 19, 2016 |
| **Depositions** | |
| Deposition of Derek Fisher | March 21, 2017 |
| Deposition of Edward Eugene O'Lone | March 23, 2017 |
| **Analyst Reports** | |
| "Imperva Inc. – Sales Momentum Continues, Mixed Guide as Growth-Driven Investments Accelerate; Maintain Neutral, PT to $37," Wedbush | May 2, 2013 |
| "Imperva Inc. – Management Steps Up Investments in Light of Growing Opportunities," JMP Securities | May 3, 2013 |
| "Imperva Inc. – 1Q13: Focus Remains on Growth," J.P. Morgan | May 3, 2013 |
| "Imperva Inc. – Product Sales Growth Slows to 12% as IMPV Struggles to Execute," JMP Securities | August 8, 2013 |
| "Imperva Inc. – Nothing but Growing Pains; Increasing Price Target to $48," Pacific Crest Securities | August 8, 2013 |
| "Imperva Inc. – 3Q13: Impressive Reacceleration," J.P. Morgan | November 5, 2013 |
| "Imperva Inc. – Back on Track as Reacceleration Evident in Large-Deal Momentum," Pacific Crest Securities | November 6, 2013 |
| "Imperva Inc. – Improved Sales Execution Drives Beat and Accelerated Bookings Growth," Stephens Inc. | November 6, 2013 |
| "Imperva Inc. – Investing into Accelerating Growth," BMO Capital Markets | February 7, 2014 |
| "Imperva Inc. – Bold Investment Plan for FY14," Deutsche Bank Securities Inc. | February 7, 2014 |
| "Imperva Inc. – ~30% Growth with a Cloud Strategy," J.P. Morgan | February 7, 2014 |
| "Imperva Inc. – Solid 4Q13; Continue to Increase OPEX Spending to Capture Growth Opportunity," Stephens Inc. | February 7, 2014 |
| "Imperva Inc. – Substantial Top-Line Shortfall," BMO Capital Markets | April 9, 2014 |
| "Imperva Inc. – Preannounces 1Q14: Cutting Price Target but Remaining Overweight," J.P. Morgan | April 9, 2014 |

| Document Title | Document Date |
|---|---|
| "Imperva's Large Q1 Miss Not an Indication of Overall Security Spending, in Our View," Wedbush | April 9, 2014 |
| "Imperva Inc. – Negative Preannouncement Attributed to Large Deal Delays, Increased Competition, and Sales Execution Missteps," William Blair | April 9, 2014 |
| "Imperva Inc. – Lowering PT Given Execution Risks," Barclays | April 10, 2014 |
| "Imperva Inc. – Negative Pre; Downgrading to Hold," Deutsche Bank | April 10, 2014 |
| "Imperva Inc. (IMPV) – F1Q14 Shortfall Reflects Competitive and Execution Issues – Buy Other Security Vendors on the Dip," JMP Securities | April 10, 2014 |
| "Imperva Inc. – Too Many Growing Uncertainties: Downgrade to Perform," Oppenheimer | April 10, 2014 |
| "Imperva Inc. – Despite Execution Challenges and Preannouncement, We Are Buyers," Pacific Crest | April 10, 2014 |
| "Imperva Inc. – Big Deal Blues," RBC Capital Markets | April 10, 2014 |
| "Imperva Inc. – 1Q14 Preliminary Results Below Expectations; A Buying Opportunity," Stephens Inc. | April 10, 2014 |
| "Imperva Inc. – Sales Execution Issues Lead to Expectations Reset – Cutting Estimates and Target Price," Sterne Agee | April 10, 2014 |
| "Imperva Inc. (IMPV - $49.73) – Imperva Whiffs 1Q14; Estimates Under Review," Topeka Capital Markets | April 10, 2014 |
| "Imperva Inc. – Upgrading to Buy Rating – Fundamentals Remain Solid, Sell-Off Overdone," Sterne Agee | April 11, 2014 |
| "Imperva Inc. – Guidance Reset Creates Achievable Bar as Company Works Through Competition and Execution Challenges," William Blair | May 1, 2014 |
| "Imperva Inc. – Lowering PT; Still See the Value," Barclays | May 2, 2014 |
| "Imperva Inc. – Executing Against an Increasingly Aggressive Competition Will Take Time to Play Out," BMO Capital Markets | May 2, 2014 |
| "Imperva Inc. – Execution and Competition Drive Weakness," Deutsche Bank | May 2, 2014 |
| "Imperva Inc. – Research Brief—1Q14 Consistent with Lower Preannouncement; FY14 Guidance Meets Estimates; Organizational Changes Underway—We Have an Outperform Rating and $40 PT," Imperial Capital | May 2, 2014 |
| "Imperva Inc. (IMPV) – Results in Line with Preannounced Range; Struggling with Sales Execution and Increased Competition," JMP Securities | May 2, 2014 |
| "Imperva Inc. – 1Q14: Doubling Down on Growth," J.P. Morgan | May 2, 2014 |
| "Imperva Inc. – Putting the House in Order; Waiting for the Execution to Return," Oppenheimer | May 2, 2014 |
| "Imperva Inc. – Q1 Deals Pushed Out, but Opportunity Remains," Pacific Crest Securities | May 2, 2014 |
| "Imperva Inc. – Weak Large Deal Execution Weighs on 1Q14; Looking for Reacceleration in 2H14," Stephens Inc. | May 2, 2014 |
| "Imperva Inc. – Not as Bad as Some Had Feared, Raising Estimates," Sterne Agee | May 2, 2014 |
| "Imperva Inc. – 1Q14 Review; There Is Work To Do," Topeka Capital Markets | May 2, 2014 |
| "Imperva (IMPV) – Turnaround a Multi-Quarter Process That Will Likely Require More Investment; NEUTRAL, PT Lowered to $26," Wedbush | May 2, 2014 |

## Conference Call Transcripts and Public Press

| | |
| --- | --- |
| "Imperva Announces Fourth Quarter and Full Year 2011 Financial Results," Imperva Inc. Press Release | February 9, 2012 |
| "Q4 2011 Imperva Inc. Earnings Conference Call," Imperva Inc. Press Release | February 9, 2012 |
| "Imperva to Present at Upcoming Conferences," Imperva Inc. Press Release | August 21, 2012 |
| "Imperva Inc. at Citi Technology Conference," FD Disclosure | September 6, 2012 |
| "Imperva Inc. Presentation Wedbush Transformational Technology," Bloomberg | March 7, 2013 |
| "Imperva to Present at Upcoming Conferences," Imperva Inc. Press Release | May 6, 2013 |
| "Imperva to Present at the Raymond James Systems, Semiconductors, Software & Supply Chain Conference," Imperva Inc. Press Release | December 2, 2013 |
| "Imperva Announces Preliminary First Quarter 2014 Financial Results," Imperva Inc. Press Release | April 9, 2014 |
| "IMPV - Q1 2014 Imperva Inc. Earnings Conference Call," Thomson Reuters | May 1, 2014 |
| "Technology, Media & Telecom Conference Agenda," Morgan Stanley | Undated |

## SEC Filings

| | |
| --- | --- |
| Imperva Inc. Form 10-K for the Fiscal Year Ended December 31, 2013 | February 15, 2014 |

## Academic Literature

Binder, John J., "On the Use of Multivariate Regression Model in Event Studies," *Journal of Accounting Research* 23, no. 1 (1985), pp. 370–383

Brealey, Richard A., Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 9th ed. (New York: McGraw-Hill/Irwin, 2008)

Brown, Stephen J., and Jerold B. Warner, "Using Daily Stock Returns: The Case of Event Studies," *Journal of Financial Economics* 14 (1985), pp. 3–31

## Data Sources

Capital IQ

Center for Research in Security Prices (CRSP)

## Case Rulings

*Robbins v. Koger Properties Inc.*, 116 F. 3d 1441 (11th Cir. 1997)

*Dura Pharmaceuticals v. Broudo,* 544 U.S. 336, 125 S. Ct. 1627 (2005)

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013)

*Halliburton Co. v. Erica P. John Fund Inc.,* 134 S. Ct. 2398 (2014)

Memorandum and Order, *In Re: BP p.l.c. Securities Litigation* (S.D. Tex. May 20, 2014)

Order Certifying Plaintiff Class, *In re Intuitive Surgical Securities Litigation*, Case No. 5:13-cv-01920-EJD, 2016 WL 7425926 (N.D. Cal. Dec. 22, 2016)

| **Document Title** | **Document Date** |
| --- | --- |

**Miscellaneous**

E-mail from Derek Fisher (EMERALD_0000832–33)                              April 10, 2014

**All other materials cited in this declaration and in the exhibits to this declaration.**

# Exhibit 3

# Exhibit 3
## Imperva, Inc.
## Examples of Analyst Report Quotes Related to Undisputed Metrics

| Report Date | Analyst | Title | Relevant Quotes |
|---|---|---|---|
| 5/2/13 | Wedbush | "Sales Momentum Continues, Mixed Guide as Growth-Driven Investments Accelerate; Maintain NEUTRAL, PT to $37" | "Leading indicators of growth improving…Management indicated that growth in the company's pipeline exceeded overall bookings growth, with bookings growth exceeding both billings growth as well as revenue growth, suggesting that backlog and visibility continue to improve. Given the challenging environment that has caused many security firms to revise growth projections downward, we view continued momentum in Imperva's forward leading metrics as especially impressive…." |
| 8/8/13 | Pacific Crest Securities | "Nothing but Growing Pains; Increasing Price Target to $48" | "We believe the strong North American bookings show the true growth potential of the company." |
| 11/5/13 | J.P. Morgan | "3Q13: Impressive Reacceleration" | "Product & license + subscription reaccelerates to 33% growth. This is a key indicator in the business…" |
| 11/5/13 | J.P. Morgan | "3Q13: Impressive Reacceleration" | "Bookings grew faster than revenue, and pipeline grew faster than bookings, giving management confidence to guide to 25% growth in FY14." |
| 11/6/13 | Pacific Crest Securities | "Back on Track as Reacceleration Evident in Large-Deal Momentum" | "Record quarter for large deals. While new customers dipped sequentially, Imperva recorded a record number of deals over $100,000 at 97. This greatly exceeded the 70 deals over $100,000 recorded in the third quarter last year and showcases the improving strategic nature of Imperva's solutions to existing customers and new enterprises." |
| 11/6/13 | Stephens Inc. | "Improved Sales Execution Drives Beat and Accelerated Bookings Growth" | "3Q13 results, including the 36% YTD increase in new customer adds and the 39% Y/Y increase in large deals [greater than $100,000], give evidence to solid core fundamentals and strong competitive positioning and underscores our belief that broader market recognition and adoption of WAF, DAM [Database Activity Monitoring] and FAM [File Activity Monitoring] is occurring in the enterprise." |
| 2/7/14 | BMO Capital Markets | "Investing Into Accelerating Growth" | "Imperva continues to experience impressive growth, and strong results continue to suggest that the company is the category leader in data center security. Revenue, bookings, pipeline, and new customer metrics continue to underpin our positive outlook on the company…" |
| 2/7/14 | Deutsche Bank Securities Inc. | "Bold investment plan for FY14" | "Deal metrics continue their upward march…The number of deals greater than $100k in 4Q13 was 136, up 43% y/y and up 34% for FY13 vs. FY12. Imperva added 237 new customers in 4Q, up 19% and 30% for the full year, to finish the year at over 3,000 customers." |
| 2/7/14 | J.P. Morgan | "~30% Growth with a Cloud Strategy" | "The highlight of the quarter though was product + subscription revenue, a metric we view as a leading indicator of the business, accelerated to 37% y/y growth driven by 123% growth in subscription and an acceleration to 29% growth in license on stronger WAF sales and better sales execution."<br><br>"… Product + subscription revenue accelerates to 37% y/y, driven by 123% growth in subscription. Recall, this is a key metric that we view as a leading indicator of the business because many customers buy subscriptions in lieu of licenses." |
| 2/7/14 | J.P. Morgan | "~30% Growth with a Cloud Strategy" | "Positives<br>Large deal volume grows 43% y/y. The number of deals over $100k grew in number by 43% y/y during 4Q, and management noted average deal size was also higher as company's sales changes through FY13 are resulting in better execution." |
| 2/7/14 | Stephens Inc. | "Solid 4Q13; Continue to Increase OPEX Spending to Capture Growth Opportunity" | "Product revenue grew 29% Y/Y to $24.2 mil., but combined with subscription services (which we think is the right way to look at it) growth was actually +37% Y/Y for the core solution." |
| 2/7/14 | Stephens Inc. | "Solid 4Q13; Continue to Increase OPEX Spending to Capture Growth Opportunity" | " 4Q13 results, including the 19% Y/Y increase in new customer adds and the 43% Y/Y increase in large deals [greater than $100,000], give evidence to solid core fundamentals and strong competitive positioning and underscores our belief that broader market recognition and adoption of WAF, DAM [Database Activity Monitoring] and FAM [File Activity Monitoring] is occurring in the enterprise." |

**Exhibit 4**

# Exhibit 4
# Imperva, Inc.
# Regression Results
## Dependent Variable: Imperva, Inc. Returns
## Regression Period: 2/1/12 – 2/1/13

| | Imperva, Inc. Returns | |
| --- | --- | --- |
| | Coefficient | T-statistic |
| NYSE Composite Index | -0.0100 | -0.0258 |
| S&P 500 Value-Weighted Information Technology Sector Index | 0.6270 | 1.9760 * |
| Indicator for Return on 2/10/12 | 0.0152 | 0.5080 |
| Indicator for Return on 9/6/12 | 0.0287 | 0.9490 |
| | | |
| Constant | 0.0003 | 0.1340 |
| | | |
| Observations | 252 | |
| RMSE | 0.0298 | |
| Adjusted R-Squared | 0.0375 | |

Source:  *CRSP; Bloomberg*

Note:
[1] T-statistics marked with a single asterisk are statistically significant using a 95% confidence interval.